# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW SNITZER and PAUL LIVANT, individually and as representatives of a class of similarly situated persons, on behalf of the American Federation of Musicians and Employers' Pension Plan,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND, THE INVESTMENT COMMITTEE OF THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND, RAYMOND M. HAIR, JR., AUGUSTINO GAGLIARDI, GARY MATTS, WILLIAM MORIARITY, BRIAN F. ROOD, LAURA ROSS, VINCE TROMBETTA, PHILLIP E. YAO, CHRISTOPHER J.G BROCKMEYER, MICHAEL DEMARTINI, ANDREA FINKELSTEIN, ELLIOT H. GREENE, ROBERT W. JOHNSON, ALAN H. RAPHAEL, JEFFREY RUTHIZER, BILL THOMAS, MAUREEN B. KILKELLY, and DOES NO. 1-6, WHOSE NAMES ARE CURRENTLY UNKNOWN,<br><br>　　　　　Defendants. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

## I.    NATURE OF ACTION

1.    Plaintiffs, Andrew Snitzer ("Snitzer") and Paul Livant ("Livant") (collectively, "Plaintiffs"), individually and as representatives of a class of participants and beneficiaries (collectively, "participants" or the "Class") of the American Federation of Musicians and Employers' Pension Plan (the "AFME Plan" or the "Plan"), bring this action under 29 U.S.C. §1132 on behalf of the Plan, against Defendants, the Board of Trustees of the American Federation of Musicians and Employers' Pension Fund ("Board of Trustees"), the Investment Committee of the Board of Trustees, Raymond M. Hair; Jr.; Augustino Gagliardi; Gary Matts; William Moriarity; Brian F. Rood; Laura Ross; Vince Trombetta; Phillip E. Yao; Christopher J. G. Brockmeyer; Michael DeMartini; Andrea Finkelstein; Elliot H. Greene; Robert W. Johnson; Alan H. Raphael; Jeffrey Ruthizer; Bill Thomas; Maureen B. Kilkelly; and Does 1-6 (collectively, "Defendants") for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

2.    The Plan sponsor is the Board of Trustees, and the Plan and Fund are administered and operated by the Board of Trustees from its headquarters, which is located at 14 Penn Plaza, 12th Floor, New York, NY 10122.

3.    The Plan is funded by the American Federation of Musicians and Employers' Pension Fund ("Fund") under the Agreement and Declaration of Trust establishing the Fund ("Trust Agreement"). Under Section 7.2 of the Trust Agreement, the Board of Trustees has the authority and responsibility for the overall design and operation of the Plan and Fund and the investment of the assets attributable thereto (except to the extent that such responsibility has been delegated by

the Board of Trustees to the Executive Director, a Custodian or an Investment Manager). Such responsibilities shall include, without limitation, the following:

(1)     design of the Fund, including the right to amend, modify or terminate the Trust Agreement at any time;

(2)     design of the Plan, including the right to amend, modify or terminate the Plan (in whole or in part) at any time;

(3)     maintenance of the qualification of the Plan, and tax-exempt status of the Fund, under the IRS Code;

(4)     designation of fiduciaries of the Fund and Plan (including, without limitation, the Executive Director, Investment Managers, Custodians, and members of the Administrative Committee, Investment Committee, Audit Committee and other Committees);

(5)     retention of all accounting, actuarial, administrative, clerical, legal and other professionals to provide service to the Fund;

(6)     exercise of those fiduciary functions provided for in the Plan, or the Trust Agreement, or those necessary for the prudent operation or administration of the Plan (except such functions as are delegated to a Committee, the Executive Director, an Investment Manager or Custodian, or to other fiduciaries of the Fund or the Plan); and

(7)     generally, exercise of those functions and responsibilities which the Board of Trustees deems necessary and appropriate for the prudent operation and administration of the Plan or Fund, and the protection of Fund assets, which

functions have not been duly delegated to the Executive Director, a Committee or another fiduciary of the Plan or the Trust Fund.

The Board of Trustees may, by the adoption of a written resolution, delegate to any Committee or a specific Trustee or group of Trustees the authority and discretion to act on behalf of the Board of Trustees to the extent and within the time limitations set forth in the resolution.

4.     The fiscal year of the Plan and the Fund is April 1 through March 31. Following an approximately $810 million loss during the 2008 and 2009 Plan fiscal years, the Fund has been in "critical" status and operating under a rehabilitation plan ("Rehabilitation Plan") adopted by the Board of Trustees in April 2010 pursuant to the Pension Protection Act of 2006, as amended in 2008 ("PPA"). Under the Rehabilitation Plan, the Fund was projected to emerge from "critical" status by no later than March 2047. Under the circumstances facing the Fund, as alleged herein, the Fund's investment returns were vital to the Fund's recovery, particularly in the early years of the recovery process.

5.     The Multiemployer Pension Relief Act ("MPRA") was enacted by Congress in December 2014. The MPRA permits a plan in "critical and declining" status to seek authorization from the U.S. Department of Treasury to suspend earned benefits. For the Fund, "critical and declining" status means projected insolvency within 20 years. The Fund is considered insolvent if it is unable to pay benefits (at least equal to the federally guaranteed limit) when due.

6.     In December 2016, after assuring the participants in early 2015 that the Fund "is not severely underfunded," benefits were not in jeopardy under the MPRA and the Fund was projected to be solvent through at least 2047, Defendants (more fully defined below) stunned the Plan participants with a letter revealing that the Fund was in emergency circumstances. Defendants stated that the Fund could soon be in "critical and declining" status under the MPRA. Defendants

attributed the failure of the Rehabilitation Plan and the emergency circumstances to insufficient investment returns caused by recent market conditions. Defendants stated "the five plan years that followed the recession…showed some recovery…[with] average [gross] annual return of 12.5%...[but] [t]he past two plan years have not been as kind…."

7.      On May 19, 2017, Defendants notified the Plan participants that the Fund would not be in "critical and declining" status for the June 2017 actuarial certification, but indicated that the Fund remains in emergency circumstances and will likely enter "critical and declining" status soon. Based on the Fund's net investment return of 11.5% for fiscal year 2017, the Fund apparently is on the brink of "critical and declining" status and Plan participants are facing possible benefits reductions.

8.      With the Fund in "critical" status resulting from bad investment decisions, Defendants chased recovery of lost investment returns by repeatedly gambling on the hope of high investment returns from the highest risk asset classes, in breach of their fiduciary duties under ERISA. Defendants failed to prudently invest hundreds of millions of dollars of Fund assets and monitor and manage risk tolerance and exposure in the stressed financial circumstances facing the Fund. Defendants invested approximately $243.5 million of the Fund's assets over the period since 2010 in high-risk, high-cost international emerging markets equities, gambling on outsized growth in international emerging markets economies and coincident investment returns consistent with returns in the previous decade. Defendants further gambled on the investment managers they hired to outguess the market and produce better returns for their excessively high costs and fees. As the investment lost market value, Defendants chased recovery of the lost returns with further Fund assets. Defendants knew, or should have known, this continuing and increasingly risky gamble exposed the Fund to imprudent and excessive risk when the Fund's returns were vital to recovery.

The whopping 10.5% annualized return assumption chased by Defendants for the emerging markets equities asset class, itself, confirms the extreme risk.

9.     Defendants knew the average pension plan had 4.5% of total assets invested in emerging markets equities. Defendants approved a policy to invest up to 5% of total Fund assets in emerging markets equities, and then, following negative returns, more than doubled the high risk investment to 11%, only to again double-down and increase the Fund's investment to an extraordinary 15% of Fund assets. Defendants' process of chasing recovery of lost returns with increasingly risky asset allocations, in an attempt to meet or beat the actuarial return assumption, was imprudent and resulted in substantial injury to the Fund. Like a gambler "chasing" his losses,[1] Defendants did so despite the high-risk nature of the asset class, substantial and continuing declines in the market value of the investment, increased uncertainty concerning volatility and growth prospects in emerging markets, substantial underperformance by the managers, substantial underperformance of the Fund versus its peers, and the mounting substantially negative impact of the investment on the Fund's returns.

10.     Defendants either failed to educate and inform themselves to understand the extreme risk, or disregarded the risk, in sustaining and increasing the bet of Fund assets on emerging markets equities since August 2010, as the Fund remained in financially vulnerable circumstances, struggling to recover. As of March 31, 2017, the approximately $243.5 million of Fund assets that Defendants caused the Fund to invest in emerging markets equities in the period beginning in August 2010 had a market value of just approximately $250.8 million. Regardless of any future

---

[1]     Chasing losses refers to a specific form of pathological behavior of many gamblers to recklessly try to win back money they have already lost by, not only increasing the amount that they gamble, but also increasing the riskiness of their gambling bets, which leads to a vicious cycle of more losses, and more chasing.

performance in emerging markets equities, Defendants' imprudence resulted in substantial lost returns, which were vital to the Fund and its recovery. As alleged herein, an investment of $243.5 million in the Vanguard Balanced Index Fund Admiral Shares would have produced a return of over $96 million by March 31, 2017. The lost returns were further compounded over the period by the costs of liquidating Fund assets to pay liabilities.

11.     Moreover, the high cost of Defendants' extensive reliance on active asset managers without adequate processes or methods to monitor the return – net of costs and fees versus alternatives – was imprudent. The approximately $83 million paid to investment managers cost the Fund and the participants substantial lost returns. An overwhelming body of evidence, repeatedly confirmed by numerous studies, reflects that, over time, actively-managed funds with high fees do not deliver returns, net of fees and costs, greater than passively-managed, low-cost funds like index funds, in part because virtually no active investment manager can beat market returns over time, and in part because such actively-managed funds have to somehow generate returns far greater than the average market return in order to offset the high fees. Thus, a fiduciary who uses Fund assets to hire active managers, particularly where, as here, the fiduciary allocates the substantial majority of the Fund's assets to active managers, must have appropriate methods and processes in place to continually monitor and measure whether the overall net returns of the active managers, in fact, produce a financial benefit for the Fund versus passively managed available alternatives.

12.     As Plan fiduciaries, Defendants were required to have an adequately informed process continually to monitor and consider the Fund's investments and available alternatives. Defendants failed to give sufficiently informed consideration to alternative passive index investments and whether the net returns produced by the active managers provided a financial benefit to the Fund versus alternatives. Defendants imprudently spent over $83 million of Fund assets for fiscal years

2010-2017 on investment management fees. The fundamental purpose of measuring the Fund's performance against a benchmark is to determine whether managers add value over passive investment strategies. Defendants continued the expensive active management strategy even as the Fund failed to produce returns, net of costs, meeting the custom benchmark for the Fund's aggregate assets five of seven fiscal years.

13. As alleged herein, the return on the net Fund assets since 2010 in a hypothetical strategy of three Vanguard index funds, including a 5% allocation to emerging markets equities with annual cost savings, would have been hundreds of millions of dollars greater than the Fund's actual net assets as of March 31, 2017. The annual investment fees for the index strategy are less than $1 million, versus the approximately $10 million per year paid by the Fund in the same period.

14. Further, the habitual lack of transparency by the Plan fiduciaries is a red flag signaling a governance culture inconsistent with the fiduciary duties under ERISA. Defendants disloyally withheld important information from Plan participants regarding the Fund's emergency condition and the imminent jeopardy to participants' benefits. Defendants' lack of transparency in Plan governance is inconsistent with the required loyalty to the Plan participants and the provision of benefits. On information and belief, Defendants' lack of transparency has been intentional, to avoid scrutiny by participants. Moreover, among other things, the Executive Director of the Plan and the Fund, Defendant Maureen B. Kilkelly ("Kilkelly"), disloyally denied Snitzer's request for the identities of the Trustees who populate the Fund's committees. On information and belief, Kilkelly did so in consideration of her personal interest in continuing her lucrative position as an employee of the Board of Trustees, which conflicts with and breaches her fiduciary duties under ERISA. Other Defendants also disloyally refused to provide accurate or responsive answers to

reasonable requests for information made by other Plan participants. On information and belief, Defendants did so to avoid scrutiny by participants.

15.     Plaintiffs claim that, as alleged herein, Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plan for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Defendants breached their fiduciary duties to the Plan and its participants and are liable to restore all losses to the Plan resulting from their breaches, as alleged more particularly herein.

16.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs, individually and as representatives of a class of Plan participants and beneficiaries, bring this action on behalf of the Plan under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

17.     Plaintiffs specifically bring this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- A permanent injunction removing Defendants Raymond M. Hair, Jr., Augustino Gagliardi, Phillip E. Yao and Christopher J.G. Brockmeyer from the Board of Trustees;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.  JURISDICTION AND VENUE

18.     This Court has exclusive jurisdiction over this action under 28 U.S.C. §1331 and ERISA, §502(e)(1), 29 U.S.C. §1132 (e)(1).

19.     Venue is proper in this District pursuant to ERISA 502(e)(2), 29 U.S.C. §1132 (e)(2), because the Plan is administered in this District and, on information and belief, one or more Defendants can be found in this District.

## III.  PARTIES

### A.  Plaintiffs

20.     Plaintiff, Snitzer, is a citizen of the State of New York and a current participant in the Plan under 29 U.S.C §1002(7) in the Plan. Snitzer has been a participant in the Plan since prior to August 9, 2010. As of the date hereof, Snitzer has been employed over the years by numerous employers, which all have contributed on his behalf to the Plan. Snitzer is vested in the Plan and is a member of AFM Local 802.

21.     Plaintiff, Livant, is a citizen of the State of New York and has been a Plan participant under 29 U.S.C. §1002(7) for over 30 years. Livant is a vested participant in the Plan. As of the date hereof, Livant has been employed by numerous employers, all of which have contributed on his behalf to the Plan. Livant is a member of AFM Local 802.

### B.     Defendants

22.     Defendant, the Board of Trustees, is the Plan Sponsor and is the named fiduciary under Article 1.6 of the Trust Agreement and under ERISA pursuant to 29 U.S.C. §§ 1002.   At all times pertinent herein, the members of the Board of Trustees are the following Defendants: Raymond M. Hair, Jr. ("Hair"); Augustino Gagliardi ("Gagliardi"); Gary Matts ("Matts"); William Moriarty ("Moriarty"); Brian F. Rood ("Rood"); Laura Ross ("Ross"); Vince Trombetta ("Trombetta"); Phillip E. Yao ("Yao"); Christopher J. G. Brockmeyer ("Brockmeyer"); Michael DeMartini ("DeMartin"); Andrea Finkelstein ("Finkelstein"); Elliot H. Greene ("Greene"); Robert W. Johnson ("Johnson"); Alan H. Raphael ("Raphael"); Jeffrey Ruthizer ("Ruthizer"); and Bill Thomas ("Thomas") (collectively, "Board of Trustees Defendants").   The Board of Trustees Defendants maintain an address at 14 Penn Plaza, 12th Floor, New York, NY 10122.

23.     Defendant, the Investment Committee of the Board of Trustees, includes Defendants Hair, Gagliardi, Brockmeyer, Yao, and at least six other members of the Board of Trustees, named herein as Does 1-6 (collectively, "Investment Committee Defendants"). Plaintiff Snitzer requested the names of the Investment Committee from Kilkelly but was told that it was the Trustess practice not to release this information. Plaintiffs will substitute the real names of Does 1-6 when they obtain the names of these individuals. By virtue of their membership on the Board of Trustees, the Investment Committee Defendants are named fiduciaries under Article 1.6 of the Trust Agreement

and under ERISA pursuant to 29 U.S.C. §§ 1002. The Investment Committee Defendants maintain an address at 14 Penn Plaza, 12th Floor, New York, NY 10122.

24. Defendant, Kilkelly, is the Executive Director of the Plan and the Fund, and is employed by the Board of Trustees. Kilkelly is, by virtue of her responsibility and authority to control the day-to-day administration of the Fund and the Plan, a fiduciary of the Plan. Kilkelly's authority is subject to the terms of the Trust Agreement, the Plan, any written agreement between the Board of Trustees and the Executive Director, and any policies, procedures and other rules that may from time to time, be established by the Board of Trustees. According to the Fund Form 5500 for fiscal year 2016, Kilkelly received $422,667 in compensation for her position and, on information and belief, Kilkelly's compensation was at least $422,667 for fiscal year 2017. Kilkelly's direct compensation in Plan year 2016 was greater than the compensation paid to the investment consultant and the actuary, and many of the Fund's investment managers. The Board of Trustees' authority to designate and employ the Executive Director requires the Board of Trustees to exercise diligent oversight of the Executive Director and to act to correct and remedy breaches of fiduciary duty by the Executive Director. Kilkelly maintains an address at 14 Penn Plaza, 12th Floor, New York, NY 10122.

## IV.    CLASS ACTION ALLEGATIONS

25. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually, on behalf of the Plan, to enforce fiduciary liability to the Plan under 29 U.S.C. §1109(a).

26. In addition, as an alternative to direct individual action on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs bring this action as a class action on behalf of all participants of the

Plan and their beneficiaries (excluding Defendants and their beneficiaries). Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Plan from August 9, 2010 through the date of judgment (the "Class Period"), excluding the Defendants and their beneficiaries (the "Class").

27. This action meets the requirements of Fed. R. Civ. P. 23 for a class action as:

      a.    The Class includes over 50,000 members and joinder of all its members is impracticable.

      b.    There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and committed the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; the amount of losses to the Plan resulting from each breach of fiduciary duty; whether Defendants Brockmeyer, Hair, Yao and Gagliardi should be removed as Trustees; and what Plan-wide equitable and other relief should be imposed in light of Defendants' breaches of duty.

      c.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants continuously throughout the Class Period at issue in this action and all participants in the Plan were harmed by Defendants' breaches.

      d.    Plaintiffs are adequate representatives of the Class because they were participants in the Plan throughout the Class Period, have no interest that is in conflict

with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

     e.     Prosecution of separate actions for the breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the Plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

28.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

29.     Plaintiffs' counsel, Chimicles & Tikellis LLP, and Shepherd, Finkelman, Miller and Shah, LLP, have extensive experience and prosecuting class and other representative fiduciary duty

actions, will fairly and adequately represent the interests of the Class, and are best able to represent the interests of the Class under Rule 23(g).

## V.  SUBSTANTIVE ALLEGATIONS

### A.  The Defendants' Fiduciary Duties To The Plan

30.  The Plan is a defined benefit, non-contributory, multi-employer pension plan maintained in accordance with thousands of collective bargaining agreements between unions and employers in the music industry. The collective bargaining agreements are negotiated by The American Federation of Musicians of the United States and Canada, or one of its 145 local unions. The Plan is funded by employer contributions and investment returns. The Plan is subject to ERISA.

31.  The Plan sponsor is the Board of Trustees of the Fund. The Board of Trustees must include an equal number of Union Trustees and Employer Trustees. The individuals who constitute the Board of Trustees are set forth in ¶ 22, above.

32.  The Trust Agreement requires the Board of Trustees to appoint an Investment Committee of at least six Trustees, which must include an equal number of Employer Trustees and Union Trustees. The Investment Committee is required to have Co-Chairs, including one Employer Trustee and one Union Trustee. On information and belief, the Investment Committee currently includes at least five Employer Trustees and at least five Union Trustees. The Investment Committee members are set forth in ¶ 23, above. Section 7.4 of the Trust Agreement provides that, subject to the actions of the Board of Trustees and the Plan provisions, the functions of the Investment Committee are to:

> (1)  formulate and coordinate general policies respecting the investment of the cash, Securities and Real Property or Interests in Real Property of the Fund, including the promulgation of investment directions, guidelines or objectives…;
> (2)  develop a continuing and prudent overall investment strategy and financial policy for the Trust Fund;

(3)     implement such policies as may be adopted by the Board concerning Trust investments;

(4)     coordinate with the Custodian (and any sub-custodian) a reporting procedure between the Custodian (and any sub-custodian) and the Board (and its Investment Committee);

(5)     recommend to the Board such Custodians, sub-custodians, Investment Managers and such other consultants to ensure that the cash, Securities and Real Property or Interests in Real Property of the Fund are invested prudently and suitably diversified, as well as to carry out the investment program;

(6)     monitor and evaluate (using one or more professional investment evaluation firms, if necessary) the performance of such Custodians, sub-custodians, Investment Managers, insurance carriers, and other investment consultants and investment products in which Trust Fund assets are invested;

(7)     where necessary, recommend to the Board that it terminate the services of any such Custodian, sub-custodian, Investment Manager, insurance carriers, and other investment consultant; and

(8)     generally, exercise those functions and responsibilities which are prudent and appropriate for the supervision of the Trust Fund's investment program and the investment of Trust Fund assets.

33.     The Trust Agreement requires all actions of the Investment Committee to be reported to the Board of Trustees at its next meeting, and requires the Board of Trustees to ratify or repudiate such actions, or take such other actions as it deems appropriate.

34.     The Trust Agreement requires the Board of the Trustees or the Investment Committee to "meet periodically" with the investment managers for the purpose of reviewing the activities of the manager, as well as monitoring the manager's investment performance and compliance with the Board of Trustees' investment guidelines.

35.     Under 29 U.S.C. §1104(a) of ERISA:

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and their beneficiaries: (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of the like character and with like

aims; (C) by diversifying the investments of the plan so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

36.     29 U.S.C. §1105(a) of ERISA provides:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1)…in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstance to remedy the breach.

37.     Section 5.7 of the Trust Agreement provides:

In exercising any and all powers, duties and responsibilities under this Agreement, the Board [of Trustees] shall discharge its duties and responsibilities hereunder with care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aim, and shall diversify Trust Fund assets so as to avoid the risk of large losses (unless, under the circumstances, it is clearly prudent not to do so), consistent with ERISA.

Under Section 5.6 of the Trust Agreement, "the Board [of Trustees] may delegate one or more of its fiduciary responsibilities (other than trustee responsibilities, as defined in Section 405(c)(3) of ERISA)." ERISA Section 405(c)(3) defines "trustee responsibility" as "any responsibility provided in the plan's trust instrument…to manage or control the assets of the plan, other than the power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with section 1102 (c)(3)."

38.     Defendants' fiduciary duties under ERISA and the Trust Agreement require them to determine the prudence of each investment of Fund's assets and to monitor and review the investments, risk tolerance and exposure of the Fund on a continuing basis to determine the continued prudence of the asset allocations, risk and expenses under the particular circumstances facing the Fund. The continuing duty includes the duty to remove imprudent investments and to evaluate the costs of investment managers versus the result produced by the managers to ensure that there is a net financial benefit to the Fund versus alternatives such as passive index strategies. The continuing duty also includes the duty to monitor and manage the risk of the Fund's investments to maintain an efficient investment portfolio which appropriately diversifies and avoids excessive imprudent risk exposure to the Fund's assets and returns in accordance with the circumstances facing the Fund. Defendants' continuing duty exists separate and apart from the duty to exercise prudence in selecting the investments and investment managers and costs at the outset. The monitoring must be done in a manner that is reasonable and appropriate for the particular investments, courses of action, strategies and risk tolerance of the Fund.

39.     The Board of Trustees' authority to designate the Executive Director as a fiduciary and to employ and determine the compensation of the Executive Director requires the Board of Trustees to exercise diligent oversight and to take remedial action for any breaches of fiduciary duty by the Executive Director.

40.     29 U.S.C. §1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. §1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the

> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of such
> fiduciary. A fiduciary may also be removed for a violation of section
> 1111 of this title.

41.     Section 1132 (a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions and his subchapter or the terms of the plan."

##### B.      Vulnerable Financial Condition of the Fund

42.     Over the two fiscal years ended March 31, 2009, the Fund lost approximately $810 million, resulting in a decline of the funded percentage from 108.5% as of April 1, 2007, to 62.6% as of April 1, 2009.  The funded percentage is equal to the value of the Fund assets (determined on the basis of reasonable actuarial methods taking into account market value), divided by the Fund's accrued liability using reasonable actuarial assumptions and the actuary's best estimates.

43.     In an attempt to address the mounting concerns and questions regarding the status of the Fund, Defendants visited local unions across the country and made presentations to local union members.   In their early 2017 roadshows, Defendants attributed the Fund's asset decline to investment losses primarily in high yield bonds. Plaintiff Livant recently requested a more detailed explanation of the decline, and Defendant Kilkelly responded with a chart showing that approximately $194 million of the approximately $200.8 million of the Fund's realized losses from October 1, 2007 through March 31, 2009 were in Corporate Stocks (quoted market price).  Livant requested more detail regarding the apparent discrepancy in the explanations, but received no response.  In a July 1, 2017 newsletter piece to the Fund participants, Defendant Hair asserted that the "myth" of a 40% loss "was tracked back to the trustees' December 2016 letter … that said plan

assets declined by 40% over [the] 18 months. Some have read this to mean that the plan's investment return was negative 40% over that period but -- that was not the case." Regardless of the true details of the loss, the Fund's risk tolerance, exposure and management were, or should have been, matters of immediate, urgent attention and concern to the Defendants. But Defendants charted a risk-based course for Plan recovery, which they continued to imprudently chase to the brink of insolvency.

44. The losses in the 2008-2009 fiscal years left the Fund in poor financial health. Despite overall market gains coming out of 2009 and into 2010, as of April 1, 2010, the start of the 2011 fiscal year, the funded percentage had increased but was still just 72.8%. Thus, despite the general market surge, the Fund did not obtain the full benefit from the surge. For example, the Vanguard Total Stock Market Index Fund gained approximately 50% for the year ending March 31, 2010.

45. The PPA requires an annual actuarial status determination and certification for the fiscal year. The Plan's certification is due by the end of June, 90 days following the end of the fiscal year. On April 15, 2010, the Fund's actuary, Milliman, Inc. ("Milliman"), certified the Fund to be in "critical" status, also known as the "red-zone," for the fiscal year beginning on April 1, 2010 and ending on March 31, 2011. Milliman's certification was based on its determination that the Fund would have an accumulated funding deficiency for the fiscal year. The Fund has been certified in "critical status" for each fiscal year since 2011.

46. The Fund's "critical" status required the Board of Trustees to develop a rehabilitation plan to improve funding based on reasonably anticipated experience and reasonable actuarial assumptions over future years. The Rehabilitation Plan was required to enable the Fund to emerge from critical status by no later than the end of the 10-year "rehabilitation period," or to enable the Fund to emerge or forestall possible Fund insolvency if the Board of Trustees determined that,

based on reasonable actuarial assumptions and upon execution of all reasonable measures, the Fund could not reasonably be expected to recover and emerge from "critical" status by the end of the 10-year period.

47.     The Board of Trustees determined that due to the loss in the 2008-2009 fiscal years, and the amount required annually to pay benefits, the Fund could not reasonably be expected to emerge from "critical" status by the end of the 10-year period. The Trustees adopted the Rehabilitation Plan to improve funding on a path to recovery from "critical" status. The Rehabilitation Plan included reductions in various benefits (including the multiplier) and increases in employer contributions. Under the Rehabilitation Plan, the Fund was projected to recover and emerge from "critical" status by no later than March 31, 2047.

48.     In adopting the Rehabilitation Plan, however, the Board of Trustees hypothesized that a greater reduction in benefits or a greater increase in employer contributions were not viable options to foster recovery of the Fund. Thus, under Defendants' hypothesis, the Fund's net investment returns were vital to the Fund's recovery and future viability. Moreover, the Board of Trustees knew, or should have known, that the recovery and future viability of the Fund were particularly vulnerable to high risk and volatility in the Fund's investment returns in the critical early period of recovery. Thus, gambling with high risk to the near-term returns, with the hope for a future bonanza, was not prudent. Returns in the early years of the recovery have the largest impact on compound gains in the long term. Likewise, losses create an obstacle to future returns, as the Fund requires a higher percentage return than the percentage of the loss to make back what the Fund lost. The Fund's contribution rate was not projected to expand substantially, but the amount of the Fund's annual benefits payments was expected to continue to increase.

49.     Faced with the Fund in "critical status," Defendants imprudently gambled on high returns from the highest risk asset classes and expensive active managers. When they lost, they doubled-down to chase recovery of lost returns. This imprudent gamble cost the Fund hundreds of millions of dollars in lost returns.

**C.      Defendants' Imprudent Investment of Plan Assets In High-Risk, Actively-Managed Emerging Markets Equities**

50.     Beginning in August 2010, Defendants invested a substantial percentage of the assets of the Fund in emerging markets equities, a high-risk and highly volatile asset class. Defendants did so in an attempt to chase recovery of lost returns by gambling on the hope that an overweight allocation to the high risk investment would generate high, above-market returns (a whopping 10.5% estimated annualized return over 20 years). The 10.5% estimated annualized return was based on the hope that projected growth in international emerging markets economies would translate coincidently into oversized returns on equities consistent with returns over the past decade.

51.     Defendants engaged two managers for the investment, which had cost structures among the highest paid by the Fund. Defendants' rationale for engaging the active managers was that the managers would outguess the market and outperform their benchmark. Defendants knew that the average pension plan had 4.5% of total assets allocated to emerging markets equities. As alleged below, Defendants initially approved investing up to 5% of the Fund's assets in emerging markets equities, but in November 2011, they more than doubled the investment policy amount up to 11%, and then further increased that policy to up to 15%.

52.     Emerging markets equities was the highest risk asset class out of the 21 presented by the Fund's consultant, Meketa Investment Group ("Meketa"), with a higher risk just on the basis of volatility than even private equity. It was well-recognized that emerging markets equities exposed

the Fund to many forms of extremely high risk, including, among other risks, political risk and event risk in the emerging markets. Defendants knew, or should have known, that the 10.5% annualized return estimate for the asset class reflected extreme risk and that their outcome-focused allocation to chase this return with the attendant extensive risk was not prudent given the circumstances faced by the Fund.

53.     The growth projected by forecasters for emerging markets economies was based on complicated variables and uncertainties and subject to many sources of risk. A Vanguard research report published in April 2010 questioned whether the reward of returns in emerging markets equities experienced during the preceding decade would continue, as market valuations had risen substantially. *Investing in emerging markets: Evaluating the allure of rapid economic growth*, Joseph H. Davis, Ph.D., Roger Aliaga-Diaz, Ph.D., C. William Cole, Julieann Shanahan, CFA. (Vanguard research April 2010.) Further, the Vanguard report stated: "we caution investors not to significantly overweight emerging markets based simply on the widely held view that their economies will grow faster than those of developed markets because the foundation for that argument is weak." (*Id.* at 10.)

54.     Active management compounded the risks and uncertainty. As alleged in more detail below, active managers who outperform the market do so at the expense of other active investors in their sector. Further, an overwhelming body of evidence, which has repeatedly been confirmed over time in various authoritative studies and analyses, has demonstrated and continues to confirm that active managers generally do not outperform passive indexes and produce superior returns net of costs in the long term, including in international and emerging markets. As Fund fiduciaries responsible for the Fund's investments, Defendants knew, or should have known, this from readily available research and reports. Prudent fiduciaries would be required to continually use duly

informed processes and methods to monitor and confirm that a net monetary return was, in fact, being achieved by the Fund's extensive use of active managers, and whether there were better alternatives for the Fund.

55.    Defendants initially approved an asset allocation policy of up to 5% of total Fund assets to emerging markets equities. Defendants knew that the average pension plan had approximately 4.5% of total assets allocated to emerging markets equities.

56.    The Fund's initial investment of approximately $97 million was allocated to two emerging markets mutual fund managers, Dimensional Fund Advisors ("Dimensional"), which manages the DFA Emerging Markets Value Portfolio, and Artisan Partners ("Artisan"), which manages the Artisan Emerging Markets Fund. These managers had among the Fund's costliest fee structures. Dimensional's fee structure was approximately 0.6% (600 basis points) on all assets, while Artisan's fee structure was approximately 1.16% (1,160 basis points) on all assets. In stark contrast, the cost of the Vanguard Emerging Markets Stock Index Fund Admiral Shares was .0014%, or 14 basis points.

57.    Following an initial gain in late 2010 and early 2011, the market value of the investment in emerging markets plunged nearly 30%. As of September 31, 2011, the market value had declined 26.5% (nearly $28 million) since June 2011, declined 28.7% in 2011 to date and, since the inception in August 2010, had declined 13.3% (which also was 700 bps worse than the benchmark for the managers). The total market value was just $76.5 million, versus the approximately $96 million of Fund assets invested. Thus, nearly $100 million of Fund assets produced no return in over one year and, in fact, lost over $20 million in market value.

58.    Defendants doubled-down with assets and risk, despite increased uncertainty in global economics and heightened risk. Coincident with the plunge in the market value of the Fund's

investment, the outlook for growth in emerging markets came into question by highly credible forecasters, as observed by the International Monetary Fund ("IMF"), a source cited to Defendants by Meketa, and uncertainty increased concerning emerging markets. In September 2011, the IMF's World Economic Outlook ("WEO") statement lowered the world growth projection for 2011 and 2012, including a reduction in the forecast for emerging markets of .2 percentage points for 2011 and .3 percentage points for 2012. *World Economic Outlook September 2011: Slowing Growth, Rising Risks*, International Monetary Fund (September 2011). The WEO statement observed that although growth was expected to remain "fairly robust," "[p]rospects for emerging markets ha[d] become more uncertain again…." (*Id.* at xv.) The WEO statement also observed that "[r]isks are mainly to the downside over the near term." (*Id.* at 3.) The WEO also noted "signs of overheating" in emerging markets. (*Id.* at 9.) Additionally, the WEO also noted that the real GDP growth in emerging and developing economies during the second half of 2011 was "expected to be about 6 1/4 percent, down from about 7 percent during the first half of the year." (*Id.* at 8.)

59.    Despite the increasing risk and uncertainty and lost market value and returns, in November 2011, Defendants chased recovery of lost returns with more risk in an outcome-focused process based on an estimated long-term annualized return of the Fund's total assets of over 8%. This substantially increased the already extreme risk. The changes to asset allocation substantially increased the allocations to the highest risk asset classes, and decreased the allocation to U.S. equities. Defendants more than doubled the emerging markets equities allocation policy from up to 5%, to up to 11% of total assets. Defendants knew that the asset class was the highest risk class in the Fund's portfolio. In recommending the increase "to overweight [the Fund's] allocation to emerging markets equities relative to the broad market, as provided by the MSCI All Country World Index," Meketa stated: "Rationale behind investing in emerging markets is simple: growth."

The "overweighting" of the investment also increased the risk to the Fund in the highest risk asset class, which exposed the Fund to substantial risks in addition to volatility, including political and event risks in the emerging markets. Defendants more than doubled the Fund's exposure versus the 4.5% they knew was allocated by the average plan to emerging markets equities.

60.     The Fund's emerging markets equities investment continued to post declines and fail to generate a return. After Defendants added approximately $50 million to the investment in the first calendar quarter of 2012, as of March 31, 2012, the total market value was $139.5 million, versus the approximately $144.75 million of Fund assets invested. For the fiscal year ending March 31, 2012, the market value of the investment declined by 1,490 bps (which was also 6.1% (610 bps) worse than the benchmark for the managers).

61.     As expected, the Fund's contributions remained relatively flat and benefit payments continued to rise. For the fiscal year 2012, the Fund received $55.5 million in contributions, paid $125.5 million in benefits and paid $18.2 million in administrative expenses. The Fund had net assets at the end of the fiscal year of $1.717 billion, compared with $1.769 billion at the end of fiscal 2011. Benefit payments required the liquidation of Fund investments. Thus, the loss of compound investment returns on the Fund's total assets increased the costs to the Fund.

62.     In the third calendar quarter of 2012 and first calendar quarter of 2013, Defendants added a further, approximately $47 million of assets. For the quarter ending March 31, 2013, the market value of the investment declined 200 bps (2%) (which also was 40 bps worse than the benchmark for the managers). For the fiscal year ended March 31, 2013, the market value of the investment increased, but by only 50 bps (which was 1.5% (150 bps) worse than the benchmark for the managers). As of March 31, 2013, the total market value of the investment was $193.6 million, versus the approximately $193.5 million of Fund assets invested since 2010. The $193.6 million

included the $47 million added in late 2012 and early 2013. Thus, the Fund's investment had lost approximately $47 million of market value in the over two-year period since August 2010.

63. Benefit payments continued to rise, as expected. The Fund received $55.9 million in contributions, paid $131.4 million in benefits and paid $15 million in administrative expenses. As of the end of fiscal 2013, the Fund had net assets of $1.774 billion, compared to $1.717 billion at the end of fiscal 2012.

64. As of June 30, 2013, the market value of the emerging markets equities investment, which constituted approximately 10% of the Fund's assets, had declined to $174.4 million, and had declined by nearly 1000 bps in the quarter ending June 30, 2013. On August 2, 2013, Defendants chased the loss with a further $16 million.

65. At December 31, 2013, the Fund's emerging markets equities investment constituted 12% of total assets, with a market value of $206.6 million. For the fiscal year ending March 31, 2014, the investment had a total market value of $204.7 million, versus the approximately $209.5 million of assets invested over the period since 2010. The market value of the investment declined 310 bps for the fiscal year ending March 31, 2014 (which also was 1.7% (170 bps) worse than the benchmark for the managers).

66. Defendants knew, or should have known, that the risk and uncertainty had escalated. In the report to Defendants for the period ending December 31, 2013, Meketa confirmed in its "Capital Markets Outlook" that "[u]ncertainties around global demand (particularly from emerging markets), stimulative monetary policy, and geopolitical tensions will likely cause heightened volatility." Meketa attributed the underperformance of emerging markets equities to readily knowable factors, including "Federal Reserve 'tapering,'" "China slowdown," and "declining company profitability." Meketa stated that it believed these "legitimate concerns" to be "short-

term" and that "the near-term outlook remains uncertain." Meketa's long-term view on emerging markets remained "unchanged," but the Fund nonetheless remained exposed to the high risk of further injury and lost returns as the Fund struggled to recover.

67.     In addition, Defendants knew, or should have known, that the Fund's exposure to the high risk of emerging markets equities was greater than the $209.5 million. As of December 31, 2013, approximately 4.5% of the Fund's assets were invested in the Vontobel International Equity Fund ("Vontobel"), which was managed by Vontobel Asset Management. In Meketa's "Manager Due Diligence Presentation" regarding Vontobel, Meketa characterized Vontobel's mandate as "International Equities, Developed Markets." However, Meketa reported that Vontobel's 2013 performance suffered due to, among other things, positioning in "Emerging markets (particularly India)." Meketa reported that in 2013, Vontobel had an average weight of 12% in India; that, due "to a combination of slowing GDP growth and macroeconomic/capital flow fears sparked by Fed 'tapering,'" the Indian market declined -4% in 2013…;" and that Vontobel's "overweight to India was the [Vontobel] portfolio's single biggest detractor in 2013."

68.     Benefit payments continued to increase, as expected.  In the 2014 fiscal year, the Fund received a $59.7 million in contributions and $8 million in withdrawal liability contributions, and paid $137.7 million in benefits. The Fund paid $14.2 million in administrative expenses. At the end of fiscal 2014, the Fund had $1.823 billion in assets, compared to $1.774 billion at the end of fiscal 2013.

69.     In early 2014, Defendants terminated Artisan, but continued the same substantial and unreasonable asset allocation to emerging markets equities by liquidating the $71 million investment managed by Artisan and handing the funds to Dimensional. In addition, Defendants again continued their reckless conduct by changing the Fund's asset allocation policy to increase

the already overweight and unreasonable allocation to emerging markets equities from 11% to 15% of total assets. This outcome-focused determination to further chase the estimated 10.5% annualized return on emerging markets equities to drive an estimated 9% annualized expected long-term return on the Fund's aggregate assets, to meet or beat the Fund's actuarial rate of return, was imprudent under the circumstances facing the fund. Again, the increase in the overall estimated return was made primarily by increasing the allocations to the highest risk asset classes.

70. In December 2014, Defendants hired an additional emerging markets equities manager, Driehaus Capital Management ("Driehaus"), which managed the Driehaus Emerging Markets Growth Fund, and Dimensional transferred $70 million of Fund assets to the new manager. As of December 31, 2014, the total market value of the emerging markets equities investment was $194.6 million, versus the approximately $209.5 million invested during the over three-year period since 2010, representing a loss of $15 million.

71. Nonetheless, in March 2015, Defendants sunk a further $30 million into emerging markets equities, adding $15 million of assets each to of Dimensional and Driehaus. As of March 31, 2015, the total market value of the investment was $226.6 million, versus the approximately $239.5 million of assets invested over the period since 2010. The market value of the investment with Dimensional was $138.2 million, and the market value of the investment with Driehaus was $88.4 million, together constituting approximately 13% of the Fund's total assets. Defendants had invested approximately $154.9 million of assets with Dimensional since August 2010, and had invested approximately $15 million of additional assets with Driehaus since December 2014. For fiscal year 2015, the market value of the investment lost 3.8% (which was also 4.2% worse than the benchmark for the managers).

72.     The Fund received $61.2 million in contributions, paid $144.2 million in benefits and paid $13.4 million in administrative expenses. The Fund had assets of $1.818 billion at the end of the fiscal year, compared with $1.823 billion at the end of fiscal 2014.

73.     Defendants painted a rosy picture of the Fund's financial condition and prospects to the Plan participants that was wholly inconsistent with Defendants' high risk imprudent gamble underway in response to the hole they had dug.  For example, in a January 27, 2015 article distributed to Plan participants, Defendant Hair stated that the Plan was "not severely underfunded" and was "not projected to become insolvent."

74.     In April 2015, Defendants sunk a further $2 million into each of the Dimensional and Driehaus investments, bringing the total amount of assets given to Dimensional to $156.9 million and the total to Driehaus to $90.4 million.

75.     By June 2015, insufficient investment returns had left the Fund in dire financial condition, as was evident by multiple measures. According to Meketa's reports to Defendants, the Fund substantially underperformed its Taft-Hartley peers over the preceding five years.  The Fund's asset allocation policy differed substantially from that of its peers, with an excessively overweight concentration in risky and volatile investments. The Fund's 18% target for domestic equities was far below that of its peers; the Fund's international equities target of 27% (which included 15% in emerging markets equities) was far above that of its peers; and the Fund's illiquid risky private equity target of 18% also was far above that of its peers. The Fund's international equities target was 27%, while the median of its peers was 10%. The 25th percentile of its peers was 8%. The 75th percentile of its peers was 15%. The Fund's U.S. equities target was 18%, while the median of its peers was 33%. The 25th percentile of its peers was 26%. The 75th percentile of its peers was 42%. As Meketa confirmed, the substantial underperformance of the Fund versus its peers was due

"mainly to the Fund's sharp overweight to emerging markets and underweight to U.S. equities." Meketa also confirmed that "[t]he overweight to emerging markets equity … had a significantly negative impact on performance." As alleged above, Defendants knew that the average pension plan had 4.5% allocated to emerging markets equities.

76.     In addition, Milliman advised Defendants that the Fund was "one bad year away from "critical and declining" status from an actuarial perspective under the MPRA. Milliman confirmed the existential threat from the risk exposure: "[e]ven if [the] Fund is expected to average 9.0% over the next 20 years, lower returns in the next several years will hamper [the] recovery process." Defendants pivoted to the participants as a potential bail-out source, authorizing Milliman to study MPRA benefit suspensions.

77.     In early 2016, Milliman reported to Defendants that the Fund was "projected to be very close to critical and declining status for the June 2016 PPA actuarial certification" based on then-current assumptions. Based on Milliman's then-current actuarial assumptions, the Fund fell "just short of insolvency in 20 years."  Milliman suggested further discussions up through the May Board of Trustees' meeting regarding the actuarial assumptions, including whether to accelerate the new Milliman experience study to be completed "prior to the PPA actuarial certification due date" and whether to modify certain assumptions in conjunction with the June 2016 PPA actuarial certification "(e.g., mortality assumption)." Milliman's suggestion to Defendants evidences that Defendants knew, or should have known, that the then-current experience study likely underestimated the actuarial liability and the emergency facing the Fund.

78.     For the fiscal year ending March 31, 2016, the emerging markets equities investment lost 1,080 bps (which was 1.2% (120 bps) better than the benchmark). The total market value of the investment was $205.7 million, versus the $243.5 million invested over the period since August

2010. The Dimensional allocation had a market value of $124.3 million and the Driehaus allocation had a market value of $81.4 million.

79.     By April 2016, while the Fund was not in a "critical and declining" status for the June 2016 certification, the Fund's financial health remained dire due to insufficient investment returns. Instead of addressing the Fund's emergency circumstances with due speed and diligence, Defendants decided not to complete the new Milliman experience study until after submission of the actuarial certification in late June 2016.   In the emergency circumstances facing the Fund, prudent fiduciaries would have obtained the best available information as soon as possible. Prudent fiduciaries would have responded to Milliman's suggestion with a directive: if you have better information, give it to us as soon as possible. As the study ultimately showed, the actuarial liability increased by over $280 million, a highly material amount to the Fund and the Fund's status. Defendants imprudently delayed the production of this important information, apparently to avoid disclosure and scrutiny of the true emergency circumstances of the Fund.

80.     For the fiscal year, the Fund received $63 million in contributions, paid $150 million in benefits and paid $14.5 million in administrative expenses.

81.     In June 2016, Defendants amended the Rehabilitation Plan to state that Milliman no longer projected the Fund to emerge from "critical" status and that the Rehabilitation Plan was now being continued to forestall insolvency. This revelation naturally stunned and prompted serious questions from participants over the ensuing months. Plan participants were dismayed that the Fund had not reaped sufficient returns in the bull market since 2009, and Defendants' attempt to blame the 2008-2009 crash for the failure of the Plan to share in the post-crash bull market was not a credible explanation. As alleged below, Defendants responded with a letter to participants in early

December 2016, which misleadingly attributed the Fund's emergency circumstances to recent market conditions.

82.    Milliman provided its new experience study to Defendants in November 2016, which added over $280 million to the Fund's actuarial liabilities based primarily on new updated mortality assumptions, and reported to Defendants that the Fund was on the "cusp of critical and declining status for June 2017 PPA actuarial certification." Milliman projected the Fund would be lowered to "critical and declining" status unless it achieved an investment return of at least 16.1% for the 2017 fiscal year, and projected 10.31% for the fiscal year.

83.    As of December 31, 2016, even with substantial gains in 2016, the emerging markets equities investment had a market value of just approximately $221.6 million, versus the approximately $243.5 invested over the period since 2010. The Dimensional holding had a market value of $136.7 million and the Driehaus holding had a market value of $84.9 million. Over the period since August 2010, Defendants had allocated $156.7 million of assets to Dimensional. Since December 2015, Defendants had allocated $90.4 million of assets to Driehaus, which included the $71 million that had been allocated to Artisan, which provided no return. Further, the investment managers substantially underperformed the benchmark four of five fiscal years. Thus, regardless of the future performance of emerging markets equities, Defendants' imprudent investment of a substantial and unreasonable percentage of Fund assets in the high risk emerging markets equities since August 2010 resulted in substantial lost returns for the Fund.

84.    Further, for fiscal years 2011-2016, the Fund paid the managers over $6 million. The following chart shows the direct compensation paid by the Fund to the emerging markets equities investment managers for fiscal years 2011-2016, as stated in the Fund's Form 5500s:

## DIRECT COMPENSATION PAID BY FUND

| FY | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Dimensional | $667,875 | $954,945 | $797,534 | $604,625 | $406,168 | $96,948 |
| Artisan | - | - | $756,445 | $591,530 | $372,622 | $90,028 |
| Driehaus | $618,532 | $246,289 | - | - | - | - |
| Total | $1,286, 407 | $1,201, 234 | $1,553, 979 | $1,196, 155 | $778,790 | $186, 976 |

85.    At the end of fiscal year 2017, the emerging markets equities investment had a market value of $250.8 million. Despite substantial gains in fiscal year 2017 of 21.8%, the $243.5 million of fund assets invested since 2010 had a market value of just $7 million more.

86.    On May 19, 2017, Defendants reported to the Plan participants that the Fund would not be lowered to a "critical and declining" status for the June 2017 actuarial certification, but indicated the Fund's status likely would be lowered in the near future. Defendants provided no further information at that time. On information and belief, Defendants are managing the Fund's assets and information to advance their special interests in attempting to conceal their imprudence from scrutiny.

87.    Defendants' outcome-focused asset allocation to chase recovery of lost returns with a substantial, unreasonable and excessively risky percentage of Fund assets in managed emerging markets equities, and to continue to increase the investment, caused substantial injury to the Fund and the Plan participants. Defendants knew, or should have known from the outset, that the emerging markets equities asset class exposed the Fund to high risk and that the Fund was particularly vulnerable to high risk in crucial investment returns in the early years of recovery. Defendants also knew, or should have known, that the allocation of the investment to active

managers compounded the already high risk, as overwhelming evidence, which has been repeatedly confirmed by various studies and analyses, demonstrates that active managers (particularly those that charge high fees like the ones hired by Defendants) rarely outguess the market over the longer term to deliver superior returns net of costs and fees, including in emerging markets. Defendants nonetheless sustained and increased the percentage of Fund assets to sharply overweight the allocation and underweight the allocation to U.S. equities, despite stark evidence reflecting the imprudence of the investment given the vulnerable financial circumstances facing the Fund.

88.    Since inception in 2010, the risky and outsized emerging markets investment posted continued declines in market value, underperformed the managers' benchmark and failed to generate any reasonable investment return. Even with a substantial gain of almost 22% in fiscal year 2017, the total market value was only $7 million more than the $243.5 million of Fund assets invested.

89.    Emerging markets equities were a high-risk investment when Defendants first invested Fund assets in that asset class in 2010. That risk grew. Beginning in 2011, Defendants knew, or should have known, that the outlook by numerous credible forecasters, including the IMF, for growth prospects in emerging markets had deteriorated and uncertainty had increased regarding emerging markets economies. While the advent of the deterioration and increased uncertainty was initially surprising to some scholars and forecasters, it was well-recognized as it unfolded. A September 2014 IMF Staff Discussion Note observed: "the IMF's October 2014 [WEO] envisage EM medium-term growth at 3 percentage points below where it was predicted to be when the forecast was made in 2010…," and "[t]he IMF's medium-term outlook for EMs was progressively marked down by more than a half percentage point per year between 2010 and 2013, suggesting

continued deterioration in sentiment toward EMs growth prospects." *IMF Staff Discussion Note,*

*Emerging Market Volatility: Lessons from the Taper Tantrum* (September 2014) (p. 15). A

September 2014 IMF Working Paper likewise observed:

> Most emerging markets started to experience a broad-based economic slowdown within three years of the Lehman fallout. Emerging Asia was the first region to decelerate, with growth slowing down in about 90 percent of the countries in early 2011. Other regions lost steam shortly after, with more than 80 percent of Middle East and South Africa group facing a slowdown by the end of 2011. Latin America and EM Europe decelerated soon after, mostly in late 2012-early 2013....Considering all regions, by 2012Q3 over 85 percent of the EMs in our sample were decelerating simultaneously.....

*IMF Working Paper: Growth Surprises and Synchronized Slowdowns in Emerging Markets – An*

*Empirical Investigation*, Ghada Fayad and Robert Perilli (September 2014) at p. 8. The IMF Paper

further observed:

> The synchronized slowdown surprised many scholars and forecasters. Average real GDP growth in emerging markets was revised down by 1.1 percentage points between the publication of the IMF's [WEO] in the Fall of 2012 and its sequel in the Fall of 2013. This compares to a trimming of less than 0.4 percent for advanced economies..., indicating that the EM slowdown was also influenced by domestic and idiosyncratic factors. In addition, downward revisions in near-term growth were accompanied by revisions in the medium term growth forecast, suggesting that part of the slowdown reflected a reexamination of potential output. For instance, WEO's medium term projection (gauged as the five-year-ahead growth forecast) was revised down by 0.7 percentage points for emerging markets, against a 0.1 percent revision for advanced economies, during this period.

(*Id.* at 9.)

90.    Further, as alleged above, Meketa reported increased uncertainty to Defendants in the

report for the quarter ending December 31, 2013. In addition, as alleged above, Defendants knew,

or should have known, that the Fund's allocation of assets to emerging markets equities was

substantially overweight relative to the broader market, the Fund's Taft-Hartley peers and the average pension fund. This overweight and unreasonable allocation resulted in the Fund substantially underperforming its Taft-Hartley peers. Moreover, as Meketa confirmed to Defendants, the allocation to emerging markets equities had a substantially negative impact on the Fund's investment performance.

91.     Defendants' act of sustaining and increasing the Fund's assets in the emerging markets equities in an outcome-focused process to gamble on high returns from the highest risk asset classes in the vulnerable circumstances facing the Fund, despite the evidence of imprudence for the Fund, constituted a breach of Defendants' fiduciary duties under ERISA. Prudent fiduciaries acting in good faith would not have continued the asset class and allocation under the circumstances alleged herein. Regardless of future performance of emerging markets equities, Defendants' investment of a substantial and unreasonable percentage of Fund assets in the high-risk emerging markets equities investment since August 2010 was imprudent. A large percentage of the Fund's assets produced essentially no return, and cost the Fund over $6 million in management fees. The failure of a return on the assets also increased costs to liquidate assets to fund liabilities.

92.     An investment of $243.5 million of Fund assets over the period since 2010, in the amounts and at the same times stated below and consistent with the Fund's additions to emerging markets equities according to Fund records, would have returned over $96 million in the Vanguard Balanced Index Fund Admiral Shares by March 31, 2017. The hypothetical return is based on the following investments: $63.75 million on 09/30/10; $32.25 million on 10/06/10; $31.5 million on 02/06/12; $17.25 million on 03/26/12; $12.75 million on 07/02/12; $36 million on 03/22/13; $16 million on 08/02/13; $30 million on 03/31/15; and $4 million on 04/01/15.

**D.     Defendants' Imprudent Extensive Reliance On High-Cost Active Managers**

93.     With the Fund in "critical" status and struggling to recover, Defendants allocated the vast majority of the Fund's investments to active managers, without duly informed consideration of passive index strategies or whether the active managers were producing a net financial benefit. Defendants stated to participants in the early 2017 roadshow presentations to union locals that they used index funds "where it makes sense" and used active managers where "index funds are not available or [managers] are likely to outperform index funds." Defendants knew from Meketa that it is difficult to evaluate the skill of active managers; "selecting an appropriate benchmark is crucial," and "the surest method to produce higher investment returns is to lower management fees and other costs."

94.     Defendants knew, or should have known, that attempting to select an active manager that is "likely to outperform index funds" net of the high costs charged by active managers, is almost always an unsuccessful strategy. As Stanford University Professor William Sharpe, the creator of the Capital Asset Pricing Model, explained, investing is a zero-sum game, such that active managers who beat the market do so only at the expense of other active managers in their sector. In *The Arithmetic of Active Management*, William F. Sharpe, The Financial Analysts' Journal Vol. 47, No. 1, January/February 1991, Professor Sharpe observed:

> Over any specified time period, the *market return* will be the weighted average of the returns on the securities within the market, using beginning market values as weights. Each passive manager will obtain precisely the market return, before costs. From this, it follows (as the night from the day) that the return on the average actively managed dollar must equal the market return. Why? Because the market return must equal a weighted average of the returns on the passive and active management segments.

\*\*\*

> ...the costs of actively managing a given number of dollars will exceed those of passive management. Active managers must pay for research and must pay more for trading. Security analysts...must eat, and so must brokers, traders, specialists and other market-makers.
>
> Because active and passive returns are equal before cost, and because active managers bear greater costs, it follow that the after-cost return from active management *must* be lower than from passive management.

(*Id.*) Professor Sharpe also stated:

> The best way to measure a manager's performance is to compare his or her return with that of a *comparable passive alternative*. The latter -- often termed a "benchmark" -- should be a feasible alternative identified *in advance* of the period over which performance is measured. Only when this type of measurement is in place can an active manager (or one who hires active managers) know when he or she is in the minority of those who have beaten viable passive alternatives.

Thus, the performance net of costs must be measured and monitored to determine if there is a net financial benefit to the Fund from active management.

95.     Further, an overwhelming body of evidence demonstrates that active asset managers hardly ever outperform passively managed index funds over the long term net of costs. Indeed, in 2005, Warren Buffet similarly concluded that "active investment management by professionals—in aggregate—would over a period of years underperform the returns achieved by rank amateurs who simply sat still" because "the massive fees levied by a variety of 'helpers' would leave their clients – *again in aggregate* – worse off than if amateurs...invested in an unmanaged low-cost index fund." Buffet publicly offered to bet any willing investment professional $500,000 that they could not select a set of at least five hedge funds that could, over a 10-year period (net of costs and expenses), outperform the Vanguard S&P 500 Index Fund. Only one investment professional took Buffet up on his bet, and the results were as expected. Over the first nine years (2008-2016), the

Vanguard S&P 500 Index Fund gained 84%, whereas the gain from the five actively-managed fund of funds was 2.9%, 7.5%, 8.7%, 28.3% and 62% respectively, for an average of 21.88%. Of particular note, the average annual return on the Vanguard S&P 500 Index Fund over the first nine years was 7.1%, which highlights just how excessive, imprudent and risky Defendants' strategy was of chasing hoped-for, above-market gains of over 8% then up to 9% by gambling on increasingly risky allocations to high risk asset classes. As Buffet explained, very few individuals possess the capability of outperforming the relevant index funds; indeed, he has only identified ten in his lifetime. *See* Buffet's February 2017 Annual Letter to Shareholders, available at http://www.berkshirehathaway.com/letters/2016ltr.pdf.

96.     The conclusion that active asset managers hardly ever outperform passively managed index funds over the long term net of costs also has been confirmed in various studies and analyses. For example, a Vanguard research report published in March 2015, consistent with previous studies, observed that active fund managers as a group have underperformed their stated benchmarks across most of the fund categories and time periods Vanguard considered. *The Case for Index-Fund Investing*, Vanguard research (March 2015), at p. 4-5. The report also concluded that funds invested in "inefficient" market segments "have not delivered on the promise of outperformance." (*Id.* at p. 8.) The report also observed that "[c]onsiderable evidence already exists that the odds of achieving a return that outperforms a majority of similar investors are increased if investors simply aim to seek the lowest possible cost for a given strategy." (*Id.* at p. 12.) The Vanguard report noted that the average dollar-weighed expense ratio for actively-managed emerging markets funds was the highest of the investments studied. (*Id.* at p. 13.)

97.     Similarly, a June 5, 2017 report in the *Wall Street Journal* observed that the recent report by Standard & Poor's ("S&P") "adds impressive support to the large body of evidence suggesting

the superiority of simple index investment strategies over traditional stock picking." *Index Fund Still Beat 'Active' Portfolio Management*, WSJ, June 5, 2017, by Burton G. Malkiel. The report observed:

> For years S&P has served as the de facto scorekeeper demonstrating the dismal record of "active" portfolio managers. During 2016, two-thirds of active managers of large-capitalization U.S. stocks underperformed the S&P 500 large-capital index. Nor were managers any better in the supposedly less efficient small-capitalization universe. Over 85% of small-cap managers underperformed the S&P Small-Cap Index.
>
> When S&P measured performance over a longer period, the results got worse. More than 90% of active managers underperformed their benchmark indexes over a 15-year period. Equity mutual funds do beat the market sometimes, but seldom can they do it consistently year over year.
>
> The same findings have been documented in international markets. Since 2001, 89% of actively managed international funds had inferior performance. Even in less efficient emerging markets, index funds outperformed 90% of active funds. Indexing has proved its merit in various bond markets as well.

(*Id.*)

98.     Despite the mathematical reality and the overwhelming body of evidence regarding the odds of managers not beating passive index investments net of costs in the long term, Defendants remained imprudently devoted to their vast reliance on active managers without any adequate process to measure and evaluate the net benefit, if any, versus available alternatives. For example, in the March 2017 edition of the Fund newsletter, *Allegro*, Defendant Gagliardi responded to a Plan participant's suggestion to forgo "pursuing the fruitless picking of stock pickers" in favor of "follow[ing] the investment advice of actual market beating investors such as Warren Buffet and instead manage her investments as an index fund" by incongruently responding that:

> … the Pension Fund does invest in index funds, where it makes sense to do so. But the trustees are required to diversify assets, for many reasons. While the past eight or so years

have been mostly good for U.S. stocks, that has not always been the case, and over the longer term, it is becoming less and less viable to invest in U.S. stocks and bonds alone, if you want to meet the Fund's actuarial investment return assumption.

99.     Thus, Defendant Gagliardi still lacks understanding of his fiduciary duties to prudently manage Fund investments and to be informed when making decisions impacting those investments. His response begs the fiduciary question: what processes, methods and standards do you have to measure when "it makes sense," versus alternatives? The reports to Defendants obtained by Plaintiffs evidence no adequate process for quantification of the overall net return produced by the active managers. Despite the deficient performance of the Fund since 2011, Defendant Gagliardi appears to have learned nothing, and appears to understand little. Diversification can be achieved via index funds. Nothing requires a fund to invest in high-fee, actively-managed investments. The U.S. stock and bond markets have been the gold standard for long-term net returns, and nothing prevents a fund from prudently adding diversification via a *reasonable* investment in emerging or foreign market investments (in contrast to what Defendants did here, the reckless outsized allocations of assets in emerging market equities). At no time has Defendant Gagliardi or any of his other co-Defendants cogently explained why they made such minimal use of index funds and made outsized use of the riskiest asset class to chase recovery of lost returns much like a gambler seeking to dig out of a hole.

100.    Defendant Brockmeyer, in a May 2014 interview, stated that he is a trustee of 11 pension plans and "spends a lot more time on investment issues as well as everything else pension related than do a lot of the other trustees," and observed that, similar to corporate and public funds, the "best return [] is typically 7.5%, although on a few funds we've lowered the investment return to 7.25%, and that in seeking returns, "we have to protect against a significant downside." *See*

http://marketsmedia.com/broadway-league-manages-diverse-cast-funds/. At the AFM Local 802 meeting in February 2017, Defendants incongruently (and inaccurately) asserted:

> "The risk of these funds is about the same as the risk of any equity portfolio. They are invested in private companies that either grow, stay the same or shrink in size. The fund has chosen to invest with managers who have historically been very successful at adding to company values and increasing their value and selling off at a substantial profit."

101.    Defendants received quarterly reports from investment managers. In addition, Defendants received quarterly Fund Evaluation Reports from Meketa, which provided investment and performance information for the Fund's investments and comparisons of the Fund's performance versus that of its Taft-Hartley peers, and the investment fee and fee structure information for each manager and investment.

102.    Plaintiff Snitzer requested and obtained all of the investment reports provided by the managers and consultants to the Trustees available under ERISA. The reports include no evidence that Defendants employed sufficient processes and methods to render an adequately informed analysis of the overall net economic benefit (or shortfall) being produced by the active managers, versus alternatives such as passive index investments. Meketa reported manager performance versus their benchmarks, the fees and fee structures of the respective managers and generally commented on whether the fees were reasonable and in line with industry standards. Defendants, quite evidently, engaged in no prudent monitoring process. The chart below demonstrates that for fiscal years 2011 through 2017, the Fund's aggregate investments failed to meet the custom benchmark five of seven fiscal years. The custom benchmark was based on indexes corresponding to the Fund's asset classes and allocation.

| Fiscal Year | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|---|
| Total Return on Fund's Aggregate Assets | 12.0% | 0.0% | 5.2% | 8.3% | 8.8% | 2.2% | 12.8% |
| Total Return (net of management fees) | 11.5% | -0.5% | 4.8% | 7.7% | 8.3% | 1.7% | 12.2% |
| Custom Benchmark For The Aggregate Assets | 13.0% | -2.4% | 5.3% | 10.3% | 10.3% | 1.0% | 14.1% |
| Actual Net Return Versus Benchmark | -1.5% | 1.9% | -0.5% | -2.6% | -2.0% | 0.7% | -1.9% |

103. As seen below, according to the Fund's Form 5500s, for fiscal years 2010 through 2016, the Plan paid over $73 million in investment management expenses in direct compensation. On information and belief, the Fund paid at least $10 million in fiscal year 2017, for a total of over $83 million.

| FY | Total investment management expenses |
|---|---|
| 2010 | $8,719,677 |
| 2011 | $10,001,978 |
| 2012 | $10,219,512 |
| 2013 | $10,505,715 |
| 2014 | $11,862,306 |
| 2015 | $11,690,373 |
| 2016 | $10,722,549 |
| TOTAL | $73,722,110 |

104.    Defendants knew, or should have known, that their extensive reliance on high-fee active investment managers was not producing a net economic return worth the substantial costs and risks versus alternatives. As reflected by the studies discussed above, short-term over performance by active managers generally does not continue over the long term.

105.    Meketa's report for the quarter ending December 31, 2013 included an "Active Manager Performance Analysis."    Meketa noted that six of the Fund's investment strategies had outperformed the benchmarks and six strategies had failed to meet the benchmarks. Further, Meketa's "Performance Analysis" included no quantification of the net return (or shortfall) overall being produced by the active managers for the Fund.

106.    Moreover, there is no evidence that Defendants used appropriate methods and processes to monitor and assess the true total cost of the illiquid private equity investments and the true net returns to the Fund. Meketa's calculation and report of the Fund's aggregate asset values and returns relative to the custom aggregate benchmark included the Fund's illiquid private equities

investments, which have no reliable measure of market value. The Internal Rates of Return ("IRRs") reported by the private equities managers do not provide a sufficient basis for fiduciaries to assess the market value, cost and performance of these illiquid investments. *See, e.g. The Big Squeeze: How Many Managers' Fees Crush State Budgets and Workers Retirement Hopes*, American Federation of Teachers (2017), at p. 7. A comparison of the IRR of the private equity investments, versus their peers and same vintage funds, provides an insufficient basis to evaluate the value, performance and costs of the investments.

107.    The Fund documents available to Plaintiffs, including the reports to Trustees requested and obtained by Plaintiff Snitzer under ERISA, include no evidence that Defendants had or used reasonable methods and adequate processes to quantify whether the substantial active management expense for the active management strategies of the Fund was delivering a net return worth the expense and additional risk, versus lower cost alternatives. The fee information provided by Meketa typically addressed the respective managers' fees in terms of reasonableness and industry standards. As alleged below, in a February 22, 2017 presentation to AFM Local 802, Defendants told participants that the Trustees "monitor" management fees, and presented the fees information as in line with Fund peers and mostly "below average." This begs the fiduciary question of whether the extensive active management net of costs is providing a net financial benefit to the Fund's overall performance.

108.    The Fund changed numerous advisors, including investment managers and legal advisors, which added a significant cost to the Fund. Prudent fiduciaries must assess this cost in prudently evaluating alternatives.

109.    A continuing, duly-informed process to review and evaluate the costs-versus-return performance, as well as alternative passive index strategies, was vital to the Fund's well-being and

Defendants' fiduciary duties in the dire circumstances facing the Fund as it struggled to recover. The Fund's investments have underperformed a Vanguard index return of 65% equities (including a 5% allocation to emerging markets equities) and 35% fixed income by hundreds of millions of dollars. The Tables below show the net assets of the Fund based on returns in a hypothetical investment strategy since fiscal year 2010 at assumed annual cost savings of $5 million, $7 million, $10 million and $12 million. The asset allocation begins in 2010 with 60% allocated to the Vanguard Total Stock Market Index Fund Admiral Shares ("VTSAX"), 35% allocated to the Vanguard Total Bond Market Index Fund Admiral Shares ("VBTLX"), and 5% allocated to the Vanguard Emerging Markets Stock Index Fund Admiral Shares ("VEMAX"). Cost savings assumptions are allocated to the three index funds based on their same respective weights. Amounts of available net assets are based on the information included in the Fund's Form 5500s for assets, contributions and benefit payments. Information regarding net assets for fiscal year 2017 is from the Plan's annual funding notice. The shortfall for fiscal year 2016 is estimated at $92 million. The shortfall for fiscal year 2017 is estimated at $100 million. Shortfalls are covered by sales of VTSAX shares (conservatively assumed to be on March 31 at the beginning of each fiscal year) to approximate some rebalancing. Fund underperformance versus index strategy is net of investment fees for VTSAX, VBTLX and VEMAX. Total investment fees for this hypothetical index return are *approximately $1 million per year, in stark contrast to the over $10 million per year paid by the Fund.*

| Fiscal Year | Fund Net Assets Actual ($ millions) | Net Assets Index Strategy $5 Million Savings | Fund Underperformance Versus Index Strategy ($ millions) |
|---|---|---|---|
| FY2010 | $1,657.00 | $1,657.00 | 0.00 |
| FY2011 | $1,769.00 | $1,769.54 | 0.32 |
| FY2012 | $1,717.00 | $1,717.79 | (53.94) |
| FY2013 | $1,773.00 | $1,824.15 | (50.28) |
| FY2014 | $1,823.00 | $1,985.60 | (134.69) |
| FY2015 | $1,818.00 | $2,024.34 | (204.41) |
| FY2016 | $1,697.00 | $1,881.36 | (182.52) |
| FY2017 | $1,800.00 | $1,979.59 | (177.55) |

| Fiscal Year | Fund Net Assets Actual ($ millions) | Net Assets Index Strategy $7 Million Savings | Fund Underperformance Versus Index Strategy ($ millions) |
|---|---|---|---|
| FY2010 | $1,657.00 | $1,657.00 | 0.00 |
| FY2011 | $1,769.00 | $1,773.75 | (3.89) |
| FY2012 | $1,717.00 | $1,778.16 | (60.31) |
| FY2013 | $1,773.00 | $1,832.97 | (59.10) |
| FY2014 | $1,823.00 | $1,970.41 | (146.50) |
| FY2015 | $1,818.00 | $2,039.00 | (219.06) |
| FY2016 | $1,697.00 | $1,897.59 | (198.75) |
| FY2017 | $1,800.00 | $1,999.41 | (197.37) |

| Fiscal Year | Fund Net Assets Actual ($ millions) | Net Assets Index Strategy $10 Million Savings | Fund Underperformance Versus Index Strategy ($ millions) |
|---|---|---|---|
| FY2010 | $1,657.00 | $1,657.00 | 0.00 |
| FY2011 | $1,769.00 | $1,780.06 | (10.20) |
| FY2012 | $1,717.00 | $1,787.72 | (69.87) |
| FY2013 | $1,773.00 | $1,846.19 | (72.32) |
| FY2014 | $1,823.00 | $1,988.14 | (164.22) |
| FY2015 | $1,818.00 | $2,060.97 | (241.03) |
| FY2016 | $1,697.00 | $1,921.93 | (223.09) |
| FY2017 | $1,800.00 | $2,029.14 | (227.10) |

| Fiscal Year | Fund Net Assets Actual ($ millions) | Net Assets Index Strategy $12 Million Savings | Fund Underperformance Versus Index Strategy ($ millions) |
|---|---|---|---|
| FY2010 | $1,657.00 | $1,657.00 | 0.00 |
| FY2011 | $1,769.00 | $1,784.27 | (14.41) |
| FY2012 | $1,717.00 | $1,794.10 | (76.25) |
| FY2013 | $1,773.00 | $1,855.01 | (81.14) |
| FY2014 | $1,823.00 | $1,999.95 | (176.04) |
| FY2015 | $1,818.00 | $2,075.62 | (255.68) |
| FY2016 | $1,697.00 | $1,938.17 | (239.33) |
| FY2017 | $1,800.00 | $2,048.97 | (246.92) |

110. The Table below shows the Fund's underperformance versus hypothetical investment strategies in the same passive index funds, with an annual cost savings assumption of just $7 million and the allocation to U.S. equities of 60%, 65%, 70% and 75%, with 5% allocated to emerging markets equities and the balance to fixed income. The 60% allocation is the same as shown above, with the $7 million annual savings. As in paragraph 110 above, the Vanguard index strategies begin with fiscal year 2010. Underperformance shown is for fiscal year 2017.

| VSTAX Allocation | Fund Underperformance Versus Index Strategy ($ millions) |
|---|---|
| 60% | (197.37) |
| 65% | (284.86) |
| 70% | (370.71) |
| 75% | (458.81) |

### E.     Defendants' Disloyal Withholding of Information From Participants

111. Following the enactment by Congress of the MPRA in December 2014, in mid-February 2015, Defendants Morarity, Ross, Rood and Yao released a statement assuring participants that the MPRA "provisions would apply only to those funds facing imminent insolvency (within 10 or

20 years) … [and] would not apply to the AFM-EPF at present since it is currently projected to be solvent through at least 2047, which is the longest period for which the actuaries have made projections."

112.    Just six months later, Defendants were studying possible benefit suspensions under the MPRA. Yet it was not until December 2016, in a letter to participants following the amendment to the Rehabilitation Plan, that Defendants acknowledged that the Fund's poor investment returns led to the Fund's dire circumstances and possible projected insolvency and "critical and declining" status under the MPRA. Defendants, however, misleadingly attributed the poor returns to recent market conditions. In a letter entitled, *Important Information From the Board of Trustees of the American Federation of Musicians and Employers' Pension Plan* (December 2016), at p. 2, Defendants stated:

> …the five plan years that followed the recession…showed some recovery. Starting in plan year ending March 31, 2010, the Fund experienced gross annual returns of 32.0%, 12.8%, 2.2%, 8.8% and 8.3% for an annual average return of 12.5%. …The past two plan years have not been as kind as the market value of the assets was further dampened by lower returns with a 5.2% return for the plan year ending March 31, 2015 and an essentially flat return (-0.1%) for the plan year ending March 31, 2016.

*(Id.)* Defendants also stated: "[w]hile we are not yet in critical and declining status and therefore these measures [provided by the MPRA] don't apply at present, the Board has discussed it because it is possible that we will be in critical and declining status in the future, even as early as next year." *(Id.* at p. 3.) Defendants did not disclose that the Fund was, in fact, "on the cusp" of "critical and declining" status or Milliman's then-current projections regarding the extraordinary 16.1% investment return that would be required to avoid "critical and declining" status for the June 2017 certification.

113.    In early 2016, Defendants decided not to accelerate the Milliman new experience study until after the June 2016 actuarial certification. Defendants knew, or should have known, that an accelerated new experience study would provide critical information to the Fund and its participants given the emergency circumstances facing the Fund. Milliman's suggestion to consider the acceleration indicates Defendants knew, or should have known, the results likely would negatively impact the projections regarding insolvency. When it was finally completed, the new experience study showed that the Fund's actuarial liabilities increased by more than $280 million. On information and belief, Defendants decided against accelerating the study in order to avoid transparency and delay disclosure of critical information to the Plan participants.

114.    By February 15, 2017, Milliman reported to Defendants that the Fund was "more likely than not to be in C&D [critical and declining status] for 2017 certification," and needed an overall return of 14.1% for the Plan year ending March 31, 2017 or a significant increase in contribution levels to avoid "critical and declining" status. Just days later, on February 22, 2017, Defendants made a presentation at a meeting of AFM Local 802 as part of a roadshow to union locals nationwide, purportedly due to the flood of questions from stunned participants arising from the December letter. Several Defendants, including Brockmeyer, Gagliardi, Hair, Matts and Ruthizer, and representatives of Milliman, Meketa and Plan counsel, participated. Despite extensive questions raised by Plan participants, Defendants' presentation did not disclose Milliman's projections regarding the likely "critical and declining" status for the June 2017 actuarial certification and the need for the Plan to achieve an unlikely 14% return to avoid a "critical and declining" status for the June 2017 certification, or Milliman's then-current projection of a 10% return for the fiscal year. Defendants referred to the projections as of March 31, 2016 as "strong investments returns so far for the current fiscal year," and the $281 million increase in liabilities

under Milliman's new study, but did not disclose the 14% hurdle or Milliman's investment return projections.

115. In addition, Defendants presented to the participants the Fund's returns over the past "5 years" as of December 31, 2016, versus the benchmarks for the asset classes "gross of fees." Essentially the same information was included, with more extensive information in Meketa's quarterly report for the quarter ending December 31, 2016 provided to Defendants on or before February 17, 2017. The presentation to the Plan participants did not include, among other things, information regarding performance net of fees, or the 6.9% "5 year" return on the Fund's total aggregate assets versus the custom benchmark return of 7.8%. Similarly, the 0.8% gross return on emerging markets equities over the past "5 years" provided to participants did not show the -1.3% gross return since September 2010, as shown in the Meketa report or the return's net of fees.

116. Likewise, Defendants presented "Positive Results" in returns for fiscal years' 2010-2014 "gross of fees" as 32.0%, 12.8%, 2.2%, 8.8% and 8.3%, as in the December letter. Defendants did not present to the participants the returns' "net of fees," which were 31.3%, 12.2%, 1.7%, 8.3% and 7.7%. Further, Defendants stated that the Trustees "monitor" fees, presented the number of active investment managers as about "in line" with a $1 billion fund, and presented the active management fees as mostly "below average," with total fees "slightly above average for all union plans." Such monitoring does not quantify whether the selected managers' overall returns were delivering a benefit to the Fund "net of fees" versus alternatives, which is necessary for a prudent fiduciary. Defendants' statement that active managers are used where "they are likely to outperform index funds," begs the fiduciary question: are the managers producing a net financial benefit?

117.   On May 12, 2017, Plaintiff Snitzer requested that Defendant Kilkelly to provide the names of the Trustees who populate the various Board of Trustees Committees, including the Investment Committee. Snitzer received no response and, therefore, on May 18, 2017, repeated the request. On May 18, 2017, Defendant Kilkelly responded that it was the Trustees' practice not to release this information.

118.   Plaintiffs and the Plan participants are entitled to know the identities of the fiduciaries managing the Plan and the Fund's investments where the Trustees have delegated functions to committees. On information and belief, Defendants are withholding this information to advance their own special interests and to avoid questions and scrutiny of the actions and inactions of the Board of Trustees, which employs Defendant Kilkelly. Consistent with this approach, during an AFM Local 802 meeting in 2011, when Plaintiff Snitzer asked Defendant Kilkelly to provide reasonable information about the Fund's decline in fiscal 2008-2009, including a description of the particular investments that caused the loss, Defendant Kilkelly claimed she had no legal obligation and refused to do so. Only until very recently did the Fund disclose that an approximate $600 million (29%) decline in investment value in the crash was attributable to "high yield bonds." Defendants' hide-the-ball approach toward Plan participants is contrary to Defendants' duties under ERISA and inconsistent with Defendant Gagliardi's promise in the *Allegro* article that: "We are also trying to keep our members as informed as possible about the Fund."

119.   On May 19, 2017, Defendants reported to the Plan participants that the Fund will not be in "critical and declining" status for the June 2017 actuarial certification, but indicated that the Fund very likely will be soon. Thus, the Fund remains in dire emergency circumstances. Meketa's summary report for fiscal year 2017 provided to Defendants in June shows a total return net of

fees of 11.5%. In line with Milliman's statements in February, the Fund apparently is on the brink of a "critical and declining" status and impending jeopardy to the benefits.

120.    As alleged herein, Defendants have disloyally withheld important information regarding the Fund from the Plan participants in breach of their fiduciary duty to act solely in the interest of the participants. The failure of transparency evidences a governance culture inconsistent with fiduciary duties.

     **F.**    <u>**Defendants Brockmeyer, Hair, Gagliardi and Yao Should be Removed as Trustees**</u>

121.    ERISA authorizes the Court to remove a fiduciary who has breached his or her duties and poses a continuing threat of further injury to a plan. As alleged herein, Defendants Hair and Brockmeyer are Co-Chairs of the Board of Trustees. On information and belief, Defendants Hair, Gagliardi, Yao and Brockmeyer are members of the Investment Committee. Defendants Hair, Gagliardi, Yao and Brockmeyer have presided over the breaches alleged herein and pose a threat of further breaches, injury and losses to the Fund, justifying an Order to remove them as Trustees.

**COUNT I**

**Violations of ERISA §404(a)(1)(A)-(D)**

**by the Investment Committee Defendants**

122.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

123.    As fiduciaries of the Plan, the Investment Committee Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the plans they serve and "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing

that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

124. The functions of the Investment Committee under the Trust Agreement are alleged in ¶ 33, above.

125. As alleged herein, during the period in which the Fund has been in "critical" status, the Investment Committee Defendants breached their fiduciary duties under ERISA to prudently invest the Fund assets and to monitor and manage risk in the Fund's investments under the financial circumstances facing the Fund. The Investment Committee Defendants determined and recommended to the Board of Trustees an outcome-focused asset allocation to chase recovery of lost returns with high-risk international emerging markets equities. The Investment Committee Defendants sustained and increased the allocation of Fund assets and high-risk exposure to the emerging markets equities despite the high risk of the asset class, substantial and continuing declines in the market value of the investment, increased uncertainty in emerging markets, substantial underperformance by the managers versus their benchmark, substantial underperformance of the Fund versus its peers due to the substantial overweight of the investment and the mounting, substantially negative impact of the Fund's investment returns. As of March 31, 2017, the approximately $243.5 million of Fund assets invested in emerging markets equities over the period since 2010 had a market value of just $250.8 million. Regardless of any future performance in emerging markets equities, Defendants' imprudence in the investment, monitoring and management of risk in the Fund's investments resulted in substantial lost investment returns,

which were vital to the Fund and its recovery. The lost returns were further compounded by the costs of liquidating the Fund assets to pay liabilities.

126.     In addition, as alleged herein, the Investment Committee Defendants imprudently determined, recommended and spent over $83 million of Fund assets for extensive reliance on active managers for fiscal years 2010-2017 for a substantial majority of the Fund's assets, as the Fund failed to produce returns, net of costs, exceeding the custom benchmark for the Fund's aggregate assets five of seven fiscal years. The Investment Committee Defendants failed to engage in reasonable and adequate processes and methods to evaluate the overall reward, if any, produced by the active managers net of costs for the Fund, versus risk and cost imposed on the Fund versus alternatives. The Fund's investments in the aggregate failed to meet the established benchmark five of seven fiscal years.

127.     On information and belief, the Investment Committee Defendants did not understand and failed to give appropriate consideration to the risks, or disregarded the risks, when they selected, sustained and increased the asset allocation in the high-risk emerging markets equities to chase recovery of lost returns to meet or beat the actuarial return assumption, under the circumstances facing the Fund.

128.     On information and belief, the Investment Committee Defendants failed to engage in an adequately informed process to monitor and duly consider the costs of active managers versus the net return, if any, and alternative strategies, including passive strategies, needed to determine whether the heavy asset allocation to active managers produced an overall net benefit to the Fund, as the managers failed to deliver a superior return net of costs on the Fund's aggregate assets net of costs five of seven fiscal years.

129.    Through the foregoing conduct, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, the Investment Committee Defendants breached their fiduciary duties to the Plan and its participants and beneficiaries and are liable to restore all losses to the Plan resulting from their investment decisions.

130.    As a result of the Investment Committee Defendants' breaches, the Plan, Plaintiffs, and the other participants and beneficiaries have suffered many millions of dollars of financial losses and lost returns that would have been earned on prudent investment of the Plan's assets.

**COUNT II**

**Violations of ERISA § 404(a)(1)(A)-(D)**

**by the Board of Trustees Defendants**

131.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.    As fiduciaries of the Plan, the Board of Trustees Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii)

defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

133.    The authority and responsibilities of the Board of Trustees under the Trust Agreement are alleged in ¶¶ 3, 33-35, 38, above. The Board of Trustees Defendants had the authority and responsibility for the overall design and operation of the Plan and the Fund and the investment of the assets except to the extent that such responsibility had been delegated by the Board of Trustees to the Executive Director, a Custodian or an Investment Manager.

134.    The Board of Trustees Defendants were required to manage the Fund and its assets for the benefit of the participants under the particular circumstances of the Fund toward recovery.

135.    The Board of Trustees Defendants were required to approve, ratify, reject or take such other action as was appropriate with respect to actions and decisions by the Investment Committee, including the asset allocation and risk management policies and decisions, and the decisions to expend Fund assets for active management of investments.

136.    The Board of Trustees Defendants breached their fiduciary duties under ERISA to invest the Fund assets prudently and to monitor and manage risk in the Fund's investments. As alleged herein, during the period the Fund has been in "critical" status, the Board of Trustees Defendants approved the outcome-focused asset allocation to high-risk asset classes to chase recovery of lost returns with high-risk international emerging markets equities, despite evidence of the imprudence

of the risk exposure for the Fund, gambling on projected growth in international emerging markets and the ability of the investment managers to outguess the market net of costs in pursuit of an unreasonably high expected return on the Fund's overall investments. On information and belief, the Board of Trustees Defendants failed to understand the risk, or disregarded the risk, in approving the sustained and increased allocation of Fund assets to emerging markets equities under the vulnerable circumstances facing the Fund. As of March 31, 2017, the approximately $243.5 million of Fund assets invested in emerging markets equities over the period since 2010 had a market value of just $250.8 million. Regardless of any future performance in emerging markets equities, the Board of Trustees Defendants' imprudence in the investment, monitoring and management of risk in the Fund's investment resulted in substantial lost returns, which were vital to the Fund and its recovery.

137. In addition, as alleged herein, the Board of Trustees Defendants approved the imprudent expenditure of over $83 million of Fund assets for fiscal years 2010-2016 on active investment managers for a substantial majority of the Fund's assets as the Fund failed to produce returns, net of costs, exceeding the custom benchmark for the Fund's aggregate assets. The Board of Trustees Defendants failed to engage in reasonable processes and methods to evaluate the reward, if any, produced by the active managers' net of costs for the Fund, versus the risk and cost imposed on the Fund. The Fund's investments in the aggregate failed to meet the established benchmark four of six fiscal years.

138. As alleged herein, the Board of Trustees Defendants disloyally withheld important information from Plan participants regarding the Fund's emergency condition and the imminent jeopardy of the benefits. On information and belief, the Board of Trustees Defendants did so to avoid scrutiny of their investment and risk management by Plan participants. In addition, the

Executive Director of the Plan denied Snitzer's request for the identities of the Trustees who populate the Fund's committees, stating that it was the Trustees' practice not to disclose this information. The Board of Trustees Defendants breached their fiduciary duties with such a practice, as participants were and are entitled to know the identities of the Fund fiduciaries to which Board of Trustees' authority and discretion are delegated. The failure of transparency evidences a governance culture inconsistent with fiduciary duties.

139. Further, under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, appoints other fiduciaries, has an ongoing duty to monitor the performance of those persons whom the fiduciary is empowered to remove. An appointing fiduciary therefore must, at reasonable intervals, ensure that the fiduciary it has appointed is acting in compliance with the terms of the Plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the Plan.

140. The Board of Trustees Defendants breached that duty to monitor by, *inter alia*:

    a. Failing to properly monitor the performance of the Investment Committee Defendants to determine whether the Investment Committee was prudently selecting and recommending an appropriate allocation for the assets of the Plan; and

    b. Failing to properly monitor the Investment Committee Defendants to ensure that the Committee was not pursuing an excessively expensive, risky and volatile investment strategy, when other strategies that performed better, with lower fees and expenses, were available for investment of the assets of the Plan.

141. By the foregoing, the Board of Trustees Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them

benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); (c) failed to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C); and (d) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

142.    As a result of their breaches, the Board of Trustees Defendants caused the Plan to suffer losses for which they are liable.

## COUNT III

### Violations of ERISA §404(a)(1)(A)-(B)

### by Defendant Kilkelly

143.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

144.    As a fiduciary of the Plan, the Executive Director was required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" and (B) to discharge her duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

145.    Defendant Kilkelly, as Executive Director, is a fiduciary in the administration of the day-to-day affairs of the Fund, and is required to use the Fund and its assets, including Plan information, solely in the interests of the participants. As alleged herein, Defendant Kilkelly refused Snitzer's request to identify the Trustees who populate the Board of Trustees Committees. The failure of transparency evidences a governance culture inconsistent with fiduciary duties.

146.    By the foregoing, Defendant Kilkelly (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

## COUNT IV

### Co-fiduciary Liability Under ERISA §405

### Against All Defendants

147.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

148.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

(1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2) the fiduciary fails to comply with ERISA §404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

(3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

149.     Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the excessive and imprudent investment of the assets of the Plan in emerging markets equities investments and the extensive reliance on active investment managers, yet they knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

150.     Defendants knew that the Plan's allocation policy had a substantial and unreasonable percentage of assets allocated to emerging markets equities, which exposed the Plan to reckless and unreasonable risk. Defendants also knew the Plan paid over $10 million per year for investment management, yet the investments failed to deliver a benefit for the added risk and cost of active managers.

151.     Defendants also knew that this important information was not disclosed to the Plan participants.

152.     Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts I-IV.

153.     As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA §405(a)(1) and (2).

154.     Had Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members have suffered losses.

**PRAYER FOR RELIEF**

155.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue each of the Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for (a) recovery of losses to the Plan, (b) the recovery of any profits resulting from the breaches of fiduciary duty, and (c) such other equitable or remedial relief as the Court may deem appropriate, including the removal of Defendants Brockmeyer and Hair as Trustees.

156.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

157.    WHEREFORE, Plaintiffs, on behalf the Plan, themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court award the following relief:

A.    A declaration that the Defendants breached their fiduciary duties under ERISA;

B.    An Order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plan to jointly and severally restore all losses to the Plan which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to ERISA §405;

C.    An Order requiring (a) the disgorgement of profits made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with their breach of fiduciary duties or violations of ERISA, (c) an Order requiring the Plan to divest itself of the investment in emerging markets equities and to move the Fund's assets to passively managed investments in the same or a prudent asset class such as index funds, or (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D. Ordering, pursuant to ERISA §206(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plan;

E. Removing Defendants Hair, Gagliardi, Brockmeyer and Yao, and such other Trustees who, as the evidence may show, breached their fiduciary duties to the Plan, and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiffs or any member of the Class are participants or beneficiaries;

F. Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of the Plan's investments and/or selection of investments and/or to oversee the divestment of the Plan's imprudent investments and reduction of investment management costs;

G. Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

H. Awarding Plaintiffs and the Class their attorneys' fees and costs and prejudgment interest pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I. Awarding pre-judgment and post-judgment interest; and

J. Awarding all such other remedial or equitable relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

158.    Pursuant to Fed. R. Civ. P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## NOTICE PURSUANT TO ERISA SECTION 502 (h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

Dated: July 14, 2017

OF COUNSEL:

**CHIMICLES & TIKELLIS LLP**
Robert J. Kriner, Jr. (#2546)
222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, DE 19899

**CHIMICLES & TIKELLIS LLP**
Steven A. Schwartz
PA ID No. 50579
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

/s/Laurie Rubinow (LR6637)
James E. Miller
Laurie Rubinow
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
lrubinow@sfmslaw.com

*Attorneys for Plaintiffs, the Proposed Class and the Plan*

W0031863.17