I4Q7SNIC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANDREW SNITZER and PAUL LIVANT,
     et al.,
 4
                    Plaintiffs,
 5             v.                              17 Civ. 5361 (VEC)

 6   THE BOARD OF TRUSTEES OF THE
     AMERICAN FEDERATION OF MUSICIANS
 7   and EMPLOYERS' PENSION FUND,
     et al.,
 8
                    Defendants.
 9
     ------------------------------x
10                                            New York, N.Y.
                                              April 26, 2018
11                                            10:00 a.m.

12   Before:

13                    HON. VALERIE E. CAPRONI

14                                            District Judge

15                         APPEARANCES

16   CHIMICLES & TIKELLIS LLP
          Attorneys for Plaintiffs
17   BY:  STEVEN A. SCHWARTZ

18        ROBERT J. KRINER JR.

19   SHEPHERD FINKELMAN MILLER & SHAH LLC
          Attorneys for Plaintiffs
20   BY:  LAURIE RUBINOW

21   COHEN WEISS & SIMON LLP
          Attorneys for Defendants
22   BY:  ZACHARY N. LEEDS
          JANI K. RACHELSON
23
     PROSKAUER ROSE LLP
24        Attorneys for Defendants
     BY:  DEIDRE A. GROSSMAN
25        STEVEN A. SUTRO

I4Q7SNIC

```
1              (Case called)

2              (In open court)

3              MR. SCHWARTZ:  Good morning, your Honor.  Steve

4    Schwartz from Chimicles & Tikellis for the plaintiffs.

5              THE COURT:  Good morning.

6              MR. KRINER:  Your Honor, Robert Kriner from Chimicles

7    & Tikellis for the plaintiffs.

8              THE COURT:  Good morning.

9              MS. RUBINOW:  Good morning, your Honor.  Laurie

10   Rubinow, Shepherd Finkelman Miller & Shah, for the plaintiffs.

11             THE COURT:  Are you all with the same firm?  I wasn't

12   listening to the firm.

13             MR. KRINER:  Mr. Schwartz and I are with Chimicles &

14   Tikellis.

15             MS. RUBINOW:  And Shepherd Finkelman Miller & Shah.

16   Thank you.

17             THE COURT:  For the defendants?

18             MR. LEEDS:  Zachary Leeds, Cohen Weiss and Simon.

19             THE COURT:  You all can sit down.  Plaintiffs can sit

20   down.

21             MS. RACHELSON:  Jani Rachelson, Cohen Weiss and Simon,

22   same firm.

23             MR. RUMELD:  Myron Rumeld from Proskauer Rose.  Good

24   morning.

25             MS. GROSSMAN:  Deidre Grossman, Proskauer Rose.  Good
```

I4Q7SNIC

1  morning.

2          MR. SUTRO:  Steven Sutro, Proskauer Rose.

3          THE COURT:  All right.  Good morning, everybody.  OK.

4  Proskauer, or defendants, this is your motion.

5          MR. RUMELD:  Yes, it is.  Can I proceed from here, or

6  do you want me at the lectern?

7          THE COURT:  Wherever you are more comfortable.  If you

8  are going to proceed from them, you are going to have to pull a

9  microphone so it's somewhere close to you.

10          MR. RUMELD:  Thank you.  Good morning, your Honor.  In

11  order to withstand a motion to dismiss, the complaint must

12  allege facts that if proven would support an inference that the

13  plan fiduciaries engaged in an imprudent process.

14          There are two significant caveats to that general rule

15  that apply in ERISA investment loss cases like this one.

16  First, as the Second Circuit said in Pension Benefit Guaranty

17  Corporation v. Morgan Stanley, the allegations must be

18  evaluated in context; and, second -- and relatedly to this

19  notion of context -- the riskiness of any particular investment

20  shouldn't be evaluated in isolation but, rather, the evaluation

21  should be in the context of all the plan's investments.

22          THE COURT:  Of course.

23          MR. RUMELD:  Agreed, of course.  But in this case we

24  have a great deal of contextual facts even at the motion to

25  dismiss stage which really results from the fact that before

the original complaint was filed the plaintiffs had access to

all the investment reports that were cited in the original

complaint, and then in response to our motion to dismiss, the

complaint was amended before we moved again; and the amended

complaint then made reference to all the minutes that we had

produced in the interim.

        So, we have all of those contextual facts that are

documented, that the court wouldn't normally have access to in

a typical motion to dismiss.  And, as indicated in our papers,

these contextual facts remove any plausible inference of

fiduciary breach because they show, first of all, that with

respect to each of the principal claims in this case, the

challenged decisions were the product of abundant process --

prudence claims are really claims that focus on process -- and

that process included detailed consultation with qualified

professionals, in particular Makita the investment consultant

and Milliman the plan actuary.

        This is not a case where one can draw an inference

that just because there were losses experienced with certain

investments that this means somebody was asleep at the switch.

        THE COURT:  I don't read the plaintiffs' complaint to

be that.  The original complaint was close to that, but that's

not how I read the current complaint.

        I read the current complaint as saying that the

fiduciaries were simply acting imprudent in overweighting the

I4Q7SNIC

```
1    fund with risky investments.  That's sort of -- I got your
2    claim sort of generally.
3              MR. RUMELD:  OK.
4              THE COURT:  So I guess one question I would have for
5    the defendants is:  Is it fair game for me to consider the fact
6    that your plan appears to be out of whack relative to peer
7    plans in terms of how heavily weighted it was in two
8    particularly risky types of investments:  Emerging markets and
9    private equity.
10             MR. RUMELD:  So, I think that's one of those areas
11   where the reference to contextual facts comes in.  It's
12   certainly fair game for you to consider that.
13             THE COURT:  OK.
14             MR. RUMELD:  But it's also fair game for you to
15   consider that the trustees got contemporaneous advice from
16   their experts that showed that this was not the normal
17   situation.  If they continued to seek investment returns of
18   seven and a half percent per year -- which was the investment
19   assumption -- they have a report from their actuary that said
20   this fund is going to be circling the drain eventually for the
21   very simple reason -- which is also well documented -- that the
22   plan's expenses, the cost of paying benefits -- which is
23   something that happens in mature plans where there are a lot of
24   retirees relative to the number of active people -- this plan
25   was going to continue to run a deficit even if it got seven and
```

I4Q7SNIC

 1    a half percent returns.

 2            THE COURT:  The trustees were in a difficult position

 3    with this fund, there is no question about it; and that seems

 4    clear from the minutes.  And they still I guess are in a

 5    difficult position, though maybe it's getting a little better

 6    now.  But they were in a difficult position.

 7            But even trustees in a difficult position, that

 8    doesn't absolve them from all decision making.

 9            MR. RUMELD:  I agree.  And I think for purposes of

10    evaluating whether they acted prudently, there isn't one answer

11    to the exclusion of others to what to do in a situation like

12    that.  Their job is to conduct an evaluation, consult with the

13    appropriate professionals; and if their decision is among the

14    prudent decisions that one could have made in those

15    circumstances, then I think your Honor is supposed to let the

16    case go and realize that there isn't a basis for finding a

17    breach of fiduciary duty.

18            We have referred in our papers to the stochastic

19    model.  I had to get a little bit of education myself on this,

20    but as the report itself says the model runs 10,000 scenarios

21    for each allocation policy there being considered, and after

22    running those 10,000 scenarios with an eight percent rate of

23    return and a seven and a half percent rate of return and a nine

24    percent rate of return it basically says that over an extended

25    period of time -- which is the relevant period of time for a

I4Q7SNIC

1     fund like this -- it also said, incidentally, that under any of

2     the models there was no risk of the plan going insolvent in the

3     very short term.  There is definitely a greater risk of going

4     down more when more aggressive, but in the short term there was

5     no risk of the plan going insolvent, and in the long term there

6     were many more scenarios under which the seven and a half

7     percent targeted allocation model was going to run the plan

8     under.  And, while, yes, it was taking on more risk, there were

9     actually fewer scenarios in which the plan was going to go

10    under if it pursued a nine percent rate of return.

11          Now, there is no question that we've had some

12    unfortunate circumstances in that the international emerging

13    market equities had a couple of bad years after they put some

14    money in -- though actually after they added more, the recent

15    year has been very, very good, as we indicate in our papers,

16    and that clearly made the situation --

17          THE COURT:  It's very good from a lower level.

18          MR. RUMELD:  From a lower level, yes.  But again we're

19    taking --

20          THE COURT:  This is the problem of looking at one year

21    returns.  Right?  You can have great one year returns, but if

22    you look at it over five years it's horrible.

23          MR. RUMELD:  I completely agree, your Honor.  And if

24    you review the paperwork, all of the reports from Makita were

25    focused on 20 year return periods and prepared the allocation

I4Q7SNIC

1   model looking at the 20 return period.

2            And, among other things, if you flip the pages of the

3   report, it's not just the targeted returns.  It talks about,

4   for example, the probability of achieving a seven and a half

5   percent rate of return, and it shows that there is a higher

6   probability over a 20 year period of achieving a seven and a

7   half percent rate of return than there is with the models that

8   are targeting a lower level of return, and that's because in

9   longer periods of time aggressive investments tend to do

10  better.

11           Now, it's also true if we kind of proceed from the

12  overall riskiness of the portfolio to why specifically emerging

13  market equities, there is numerous quotations and references to

14  Makita statements, and it's right in Makita's reports

15  themselves.  They endorse these products at the beginning, at

16  the middle, at the end, and they were specifically questioned

17  by the trustees:  Are you sure we're supposed to be putting

18  more money in emerging market equities if our two funds haven't

19  been doing well the last couple of years?  And their very clear

20  statements and their thought-out statements explain that, if

21  anything, the losses they've experienced in the last year or

22  two makes these securities undervalued by the market right now.

23  And there was a concern that domestic equities may have priced

24  themselves out.  You know, there are ways to look at price

25  range ratios; there are objective metrics that consultants use.

1          But the point is there can't be any question about

2     process here.  In the typical case you get a complaint, the

3     complaint points to investment losses.  If there are extensive

4     investment losses over a period of time, or there's funds that

5     are offered that charge a lot more than comparable funds that

6     perform better net of those fees, the court is entitled to say,

7     look, it's reasonable to question whether somebody was asleep

8     at the switch here or not doing their job, so we have to send

9     the parties off to discovery.

10          But here we have the benefit of these reports, and

11     before we all get -- you know, we have done a lot of discovery

12     already somewhat voluntarily.  When we met with you last time

13     we told you about that.  And we have already produced, I don't

14     know, tens of thousands of documents, and we're on the verge of

15     producing tens of thousands of e-mails, and after that we're

16     going to be doing lots and lots of depositions.  And I think if

17     your Honor looks at that PBGC case -- and after the PBGC case

18     that case really got an endorsement from the Supreme Court in

19     the Dudenhoffer case -- there is a legitimate concern by the

20     Second Circuit and Supreme Court that we're not supposed to

21     open the door to this kind of discovery unless at the pleadings

22     stage there is really some there there; I mean you can say that

23     there is a rational inference to be drawn, not that we chose

24     bad investments but that we weren't doing our job in how we

25     chose them.

I4Q7SNIC

1          Now, let me just transition, because although your

2     Honor didn't mention it, I think it's fair to say that the

3     complaint in addition to accusing us of taking on too much risk

4     also accuses us of investing in actively managed funds to the

5     exclusion of the passive index funds.

6          THE COURT:  I was just about to get to that.

7          MR. RUMELD:  OK, so then my timing is good.

8          THE COURT:  Your timing was impeccable.

9          MR. RUMELD:  OK.  So here too this is one of those

10    things that if you only look at the reports and you don't have

11    anything else, you can say, hmmm, here are all these actively

12    managed funds, they didn't out perform the index funds.  I will

13    say parenthetically that I think it's absurd to be talking

14    about what three index funds would have done.  I mean, sure,

15    with the benefit of hindsight we would have all left our money

16    in the stock market the last five years and we would have done

17    very nicely.  To compare that to a portfolio, a billion and a

18    half dollar portfolio, with over a dozen different investments

19    vehicles, and to suggest that it could have possibly been more

20    prudent to be just in three; I think that's kind of ridiculous.

21          But getting back to the question on index versus

22    active, what we see here with this more robust record is, one,

23    there was a movement towards index funds.  The fund has

24    substantially more index funds and substantially less money

25    invested in active managers than it did when Makita was first

I4Q7SNIC

1    hired.  They told them when they got hired this is one of the

2    things we're going to do for you; we focused on the fees; and

3    they acted that way.

4         On the other hand, we don't see this whole scale shift

5    to index funds, because Makita specifically and repeatedly --

6    and repeatedly in response to questions from trustees and their

7    counsel specifically on this issue -- said, look, there are

8    some areas of the economy like large cap domestic equities

9    where the market is very efficient and we don't really believe

10   active managers outperform the index funds in the long run so

11   why not save the basis points.  But there are other segments of

12   the economy that are less efficient like small cap or

13   international securities where there is a lot of friction, and

14   there is a lot less efficient trading of information, and in

15   these areas you either need to maintain actively managed funds

16   or have some mixture of the two.

17        So, what you see when you look at the fund's portfolio

18   that with some of these other parts of the economy, some of

19   these other sectors, there is a mixture of actively managed

20   funds and passively managed funds.

21        You also see -- because there is an accusation that

22   there is an absence of process to review how these guys are

23   doing -- I think we had like a dozen different exhibits cited

24   in our papers where specific investment managers were reviewed,

25   some were replaced.  There is this allegation that if we held

I4Q7SNIC

| | |
|---|---|
| 1 | on to managers for a long period of time we must not be doing |
| 2 | our job.  But in each of those cases Makita gives an |
| 3 | explanation that it sometimes takes a longer period of time in |
| 4 | which to evaluate managers, or a certain manager isn't really |
| 5 | expected to match the benchmark because he's not just investing |
| 6 | the same as the indexes; he's doing something a little |
| 7 | differently. |
| 8 | But the point is every one of these managers was |
| 9 | vetted, and the decision -- it wasn't the absence of a decision |
| 10 | when they kept an investment manager; it was a decision to keep |
| 11 | him based on the advices of Makita. |
| 12 | THE COURT:  So I read the plaintiffs' argument to be |
| 13 | it was standardless, that is, there was no -- aside from what |
| 14 | Makita said -- and I read all of the exhibits that you pointed |
| 15 | me to on this -- |
| 16 | MR. RUMELD:  Thank you. |
| 17 | THE COURT:  This is an issue of great interest to me |
| 18 | personally in term of how you make a decision whether to stay |
| 19 | with an investment manager or just go to index funds.  I was |
| 20 | hoping for some great insight; I did not get that. |
| 21 | What I got was that Makita -- there is no question |
| 22 | that there were times when there were trustees who said:  Why |
| 23 | are we still with this manager?  You know, they're way off the |
| 24 | benchmark or whatever.  And Makita's response was something |
| 25 | like you just said.  And they would go forward then with it. |

I4Q7SNIC

1          But there was no –– at least I couldn't tell from the

2     minutes that you gave me –– that you wanted me to decide on ––

3     what the trustees really were using aside from what Makita

4     said.  And it wasn't clear that Makita had a standard either as

5     opposed to kind of a gut feeling that we need to hang in with

6     this manager for a year or two more.  But it was not clear to

7     me that there was any kind of standard, leading to the question

8     of whether a fiduciary needs a standard.

9          MR. RUMELD:  So, let me try and respond in a couple of

10    components here.  And I don't want to get into a battle of

11    semantics with your Honor, because "standard" could mean a few

12    different things.

13          So, for example, there is an allegation in the

14    responding papers that Makita said after three to five years we

15    should be making a decision to get rid of the manager if he's

16    not performing well.

17          If you read what that paragraph says in the minutes,

18    they don't say that.  They say in general three to five years

19    is a benchmark you would be looking at, but every single

20    manager you have to evaluate in the context of what is going

21    on, so maybe in three to five years but not necessarily.

22          I give that as an example, your Honor, because ––

23          THE COURT:  I don't know what that means.

24          MR. RUMELD:  Well, the point is that every

25    circumstance has to be evaluated individually so there isn't ––

1    the advice they got from their professional is don't have a

2    hard and fast rule.  Historically the biggest mistakes that

3    multi employer funds make is when they bolt from an investment

4    manager because he has two or three years of bad performance,

5    and they exit him right before he rebounds, because the

6    consultants would say you really have to evaluate over a market

7    cycle.

8         It helps to keep in mind here that Makita comes

9    onboard in 2010 or so; most of these managers that were being

10   criticized in the papers were managers that Makita originally

11   added to this fund so they haven't been there for a long time.

12   If Makita recommended them, that means they were managers that

13   they had already vetted internally and were comfortable with.

14         Now, if a manager -- if the leading guy passes away or

15   retires and there is an issue whether they are the same smalls

16   in that fund, then that's a reason to get rid of the fund.  But

17   if the manager is actually managing consistently with the

18   investment philosophy that Makita endorsed, then Makita's

19   advice sometimes is, look, just because this investment

20   philosophy hasn't panned out for the last year or two doesn't

21   mean that this doesn't make sense.  We can't make decisions in

22   the rearview mirror; we have to make decisions going forward.

23         And, frankly, that's the same point about the emerging

24   market equities.  I don't think there is any question that if

25   we evaluated whether to stay in, let alone increase emerging

I4Q7SNIC

market equities, based on its performance in the first couple

of years, everybody would have exited the emerging market

equities.

But what Makita says is we are looking at these

investments, we are looking at the future, we're looking at the

economy, we are looking at the populations of these countries

that are growing, they're looking at all of these factors --

which they understand completely much better than I do -- and

they're saying, look, if we look into the future, we think this

is what we think, and we're not going to be guided by the past.

That's the same analysis that's going on with these managers.

So, getting back to your question is there a standard,

I would say there is a process, and the process is these folks

meet every quarter.  By the way, if you sort of look at the

various minutes, there isn't just board of trustees minutes.

There is board of trustees, there is investment committee,

there is strategic planning, there is communication, and there

are three or four committees that I don't think would deem

sufficiently relevant to this case yet to get involved with.

These are folks that meet extensively on a quarterly

basis, and every single quarter Makita prepares one of these

reports, and it does report on every single manager broken up

by sector.  And, if you look at the reports, you will see at

the end there is a set of specific recommendations, including

recommendations to keep a manager who they call to the

I4Q7SNIC

trustees' attention and say, yeah, he's not doing well but we think we should let it ride for a while.

And if you look at the history of Artisan, the emerging market manager that performed poorly and was eventually let go, there was a period of time where the trustees were challenging Makita and said what about this, and they said not yet; we don't see anything fundamentally wrong with what they're doing; but if they continue to perform badly, we'll take another look. And that's what happened. With the benefit of hindsight, I'm sure the trustees would say the same thing, gee, we should have gotten rid of these guys a year or two earlier.

But there is a process. And I am a little resistant to use the word "standard," because I think what we're reading Makita to be saying is don't get locked into a hard and fast rule; every single situation needs to be judged by its circumstances.

So, I think the important word here is that there is a process. There is a consistent process of getting reports from Makita, soliciting their advice, and then reacting to their advice in deciding what to do.

I also point out that some of the minutes reflect the fact that the trustees specifically asked for some more reporting from Makita. There is a reference to 2012, 2013. In fact, there is support that the plaintiffs cite for the

I4Q7SNIC

proposition that the trustees were aware that there wasn't a
process.  That's not what those minutes say.  What the minutes
say is the trustees asked Makita to provide additional
information about some of the managers and to come in and give
their global view about the economy.  So they asked for more
process.  That doesn't mean there wasn't a process before that.
We have all those reports before that.

         So, you know, obviously we are asking for a lot at a
very early stage of a case, and it's a little bit frustrating
for me since our two firms represent hundreds of multi-employer
plans, so somebody like Jani Rachelson goes to these meetings
all the time.  So, there is a certain body of information that
one has from doing this that we can't possibly capture in the
papers.

         But I do think that this fund has an extraordinarily
robust, documented record of what it did, and we think it
really would be a crying shame to put these trustees through
what could be years of extensive discovery when we don't really
think there is any reason to think that there was something
wrong with their process.  There may have been something wrong
with some of the outcomes, and even there the jury may still be
out.

         Let me just to close say what you said before is true,
this fund is still in trouble.  There are some serious issues
that have to be decided, whether to support certain pieces of

I4Q7SNIC

1  legislation that may allow funds like these to have some other

2  remedy if the investments are doing a little better.  They

3  haven't gone into that critical and declining status yet even

4  though we were very close.  Maybe we will stay out of it.

5  There is a whole question whether that's a good or bad thing

6  because clinical declining status actually creates an

7  opportunity that some people may think is a good idea.  We

8  would just prefer if the trustees could just continue to focus

9  on what their real job is and not be preoccupied by this

10 litigation.

11          THE COURT:  I think we need more musician, young

12 musicians, that's what we need.

13          OK.  Who is arguing for the plaintiff?

14          MR. SCHWARTZ:  Good morning, your Honor.  Steve

15 Schwartz.  And I agree we do need more young musicians.

16          Before I get into the EMEs and the private equity and

17 how they took money from domestic equities to fund that, I want

18 to step back to talk about where the problem started.  The

19 problem really starts with the target return, the goal of what

20 the return is, because that drives all the investment

21 decisions.

22          Now, in 2014 defendant Brockmeyer gave an interview to

23 I think it was Allegra Magazine, and he said something that we

24 agree with.  He said that he spends a lot more time on

25 investment issues than a lot of the other trustees, and the

I4Q7SNIC

best return is typically 7.5 percent even though in a few funds

we've lowered the investment target to 7.25, and that in

seeking returns we've got to protect against a significant

downside.

That actually is something we agree with, a statement

by one of the key defendants, and it tells you what the metric

is.  And the problem that started all these problems was that

the fund's target return was 7.5 percent; they had the

shortfall coming out of the '08 recession because of the '08

recession losses and because of the demographics of the music

industry which we don't have to get into even though it's very

interesting; and faced with that problem what they decided to

do was set a new target return of 8 percent, and it wasn't an

analysis that when given the opportunities in the market, given

what's available, given the realities of the market -- because

the market is the same for someone who is in a hole and someone

who is doing really well -- they set the 8 percent number

simply because that's the long-term 20-year number they needed

to get out of the hole.  It was a reverse engineering process.

So, they go to Makita and say let's ratchet up the target

return from seven and a half to a 8 percent, give us some ideas

on how we could get this extra market return.

So it's not just the active managers trying to beat

the market.  They try to start to beat the market by changing

the target return.  And all the decisions about EMEs and

I4Q7SNIC

 1    private equity is really derivative of that attempt to ratchet

 2    up the target return.  And as we go over time what we will see

 3    is when I go through it that when it didn't work initially and

 4    they dug the hole even deeper, they just ratchet up the target

 5    return from 8 to 9 percent.  And going from seven and a half to

 6    9 percent is a massive shift in what you think you're going to

 7    get, and that is very much like the gambler who is doubling

 8    down or tripling down trying to take riskier and riskier bets.

 9              THE COURT:  Is your contention that given historic

10    returns and for purposes of a Taft-Hartley plan, aiming at a

11    nine percent return is just kind of per se too risky, that no

12    fiduciary does that?

13              MR. SCHWARTZ:  Your Honor --

14              THE COURT:  No reasonable fiduciary return is the

15    seven and a half percent that we're all used to, because that's

16    just what you're going to get and aiming at a higher return is

17    necessarily too risky for a pension fund?

18              MR. SCHWARTZ:  No, we are not making a per se argument

19    on the target return.  We're also not making a per se argument

20    on can you never use active managers.  We're not making per se

21    arguments.

22              As Mr. Rumeld pointed out in the Pension Benefit

23    Guaranty case and other cases, you have to look at everything

24    in context.  And as held in the Sacerdote v. NYU case -- which

25    is about to go to trial -- you can't parse each claim

I4Q7SNIC

1    individually.

2            So, what we have tried to present to your Honor -- I

3    think we have done it -- is present a compelling case giving

4    the reasons why they got into the wrong philosophy and made a

5    mistake, the specific investment decisions that were a mistake

6    given specific warnings about those investments and what would

7    happen if there were short term losses, then doubling down, and

8    then a tripling down, with the overlay of all the active

9    managers which created its own risks all in an attempt to beat

10   the market.

11           So, we have a comprehensive set of facts or, in the

12   parlance or the lingo of the Pension Benefit Guaranty case, we

13   have all these surrounding circumstances where we think each of

14   them individually is very compelling -- and I do think seven

15   and a half to nine percent, given the statement from one of the

16   key trustees, I think that is a really strong claim.  But then

17   they acted on it, and they acted on it like a drunken gambler

18   chasing losses, and those combination of facts to me even under

19   any standard -- whether it's a heightened standard under

20   Pension Benefit Guaranty, under the usual plausibility standard

21   that was used in the Sacerdote v. NYU case, under a summary

22   judgment standard, if we looked at this kind of like summary

23   judgment because we have all these documents, no matter what

24   the standard is, we have a compelling narrative here where all

25   of our claims fit together with various facts, both target

I4Q7SNIC

returns, specific decisions, next set of decisions where they
double down, decisions where they triple down, and to me when
you combine all of those and add in some of the questionable
disclosures that they made, I think we have a compelling case
that there is something wrong here, and what was wrong was
while I don't think the process was good at all -- and we do
have process allegations here -- I think your Honor did hit the
nail on the head, that the decisions themselves are just a
combination of risky bet taking that really doesn't make sense.
And it's not hindsight that they dug their hole even deeper by
making those decisions, because they were told by Makita and by
Milliman at the outset that given where the fund is -- and the
problems with the fund was going to be funding down the road,
not this year or next year -- that if you didn't do well in the
short term -- and doing well can mean either making gains or it
can mean not having bad losses -- but if you did poorly in the
short term, because of the power of compounding over the next
ten, 20 years you're not going to dig yourself out of the hole.

          So, I appreciate that maybe EMEs did OK during one of
the more recent years, but if you take a four year period, if
you want to get seven and a half percent and you get zero,
zero, seven and a half and seven and a half for each four
years, it averages to seven and a half percent per year, but
that is a much different result than if it was seven and a half
each year because of the power of compounding, and that's how

I4Q7SNIC

they dug themselves in the hole even more by starting out with

the EMEs.

THE COURT:  Do I correctly understand your argument

about the active managers, that your beef is there did not seem

to be from the trustees' perspective -- other than listening to

Makita -- and it was not clear to me, are you claiming that

Makita had some kind of a conflict, that they shouldn't have

been listening to Makita anyway?

MR. SCHWARTZ:  Well, I don't say that they shouldn't

have listened to Makita anyway.  There is a conflict which is

not a central part of our litigation but we point it out, that

because Makita wanted to get a more lucrative position, there

was a financial incentive for Makita to do what the trustees

wanted to do and to not push hard against the trustees' desire

to ratchet up the target return.

Now we cited in our papers that it was the trustees

that directed Makita to raise the target return, and then when

Makita makes recommendations they're fitting the

recommendations into the target return.  It's just like if

someone comes to me and says, Steve, try to make $50 million

the next two years but not from the practice of law but from

investing.  Well, if that's what I'm trying to do, I'm not

going to do an index fund, I'm not going to do an actively

managed Fidelity fund, I'm going to have to start making crazy

bets to do that.

1            So, there is a noncentral but there is something that

2     at least the trustees should have been cognizant of that Makita

3     may have some reasons to not push as hard as they should.  And

4     this comes into play where Makita in fact -- along with First

5     Eagle, another one of their advisors -- while the trustees were

6     ratcheting up the EMEs up to 15 percent compared to four and a

7     half percent on the typical fund -- Makita was divesting its

8     portfolio of EMEs, and First Eagle was also doing that and

9     saying we're in a -- I would like to say unusual but it's

10    happened in other cases -- where Makita's so-called advice was

11    the opposite of what Makita was actually doing with its own

12    money, and that to me raises a very serious question.  It's one

13    of those --

14            THE COURT:  Well, it raises a question about their

15    advice, but Makita isn't a defendant in this case.

16            MR. SCHWARTZ:  Right.  But the defendants knew that

17    Makita made the opposite bet with its own money, because they

18    were told that at the meetings, and the defendants knew that

19    First Eagle made the opposite bet because, they were told that

20    in its meetings, and that's from their notes.

21            So, what we have is trustees who know Makita is making

22    the opposite bet, and they are taking their EMEs which started

23    at six percent in the initial investment, which was higher than

24    the four and a half of the typical fund, and when they

25    ratcheted it to 11, and they ratchet to 15, but their advisors

I4Q7SNIC

1    are making a different bet with their own money, that to me is

2    one of those surrounding circumstances under the Pension

3    Benefit Guaranty case where a decision that looks very reckless

4    if you just look at the decision looks even more reckless when

5    you know that, that the advisers are making the opposite bet.

6    It makes it more reckless when you know from the Brockmeyer

7    interview that they're really stretching the target return.

8            So, there is a combination of reasons for each of the

9    claims that we raise, all of which interrelate with each other

10   and hold together and provide support for each other which

11   really I think drives home the point that these trustees, no

12   matter what kind of advice they may have gotten, they're making

13   very, very outsized risky bets that made very little context in

14   terms of the position of the fund, when they were told that if

15   you lose money or don't do well in the early years, you're

16   going to never dig out of the hole because the way you dig out

17   of a hole in this context is to have compounding over many

18   years.  And with all of the riskier bets necessarily comes a

19   higher degree of volatility, and that's what they got caught

20   in.  They got caught in the trap where the volatility of the

21   EMEs and the private equity put them in a bigger hole, and they

22   would be in a better --

23           THE COURT:  I'm sorry, let me interrupt for a second.

24   So your complaint is about both private equity and EME.

25           MR. SCHWARTZ:  Yes.

I4Q7SNIC

1      THE COURT:  And what is your complaint relative to

2  firing active managers?  Did I correctly understand your

3  complaint that your real complaint seemed to be that the

4  trustees didn't really have a standard for making decisions?

5      MR. SCHWARTZ:  They didn't have a standard.  They

6  started with a hundred percent, which I don't even know how

7  someone starts at a hundred percent given the body.

8      THE COURT:  A hundred percent active managers.

9      MR. SCHWARTZ:  Yeah, they start with a hundred, and so

10  while I appreciate they went from a hundred percent to 70

11  percent beginning to end of the time period that's within the

12  statute of limitations, our case starts at the beginning where

13  it was a hundred percent and stayed at a hundred percent for a

14  while.  That decision in and of itself to me is indefensible to

15  have a hundred percent in active management.

16      Then what you see is that the process -- there is no

17  standard for the process.  And there was a case that they cited

18  which I think is very helpful for us where they talked about

19  the process they had in that case, and the gist of it is that

20  for each -- I will pull the case in a second -- for each

21  manager they had a series of five categories of how each active

22  manager was doing, whether it should be a strong hold, weak

23  hold, watch, negative.  And the problem.

24      THE COURT:  This is what these trustees did.

25      MR. SCHWARTZ:  No, no, not these trustees.  This is in

I4Q7SNIC

1  a case, and I will pull the case in a few minutes when I find

2  it.  I apologize.

3          But these trustees the active managers did poorly, and

4  we know from the e-mails from plan counsel they didn't do

5  poorly for one year, three years or five years.  The numbers

6  were ugly, and plan counsel acknowledge they were ugly, and if

7  we actually transparently conveyed that information to

8  participants, there would be a riot, and they would get sued

9  just like they have been sued.

10          What the trustees did was when they were faced with

11  managers who had done poorly over a number of years, the

12  response was, well, we will give them a little more time and we

13  will wait; and then after more years they finally switched,

14  often times from going from one active manager to another

15  active manager, which doesn't make sense.

16          One good example is for active manager Next Century,

17  there was several years of underperformance from the time they

18  hired Next Century.  They actually did I guess a good thing

19  from a process point of view of bringing in the guy from Next

20  Century to give a presentation, and a trustee asked him, well,

21  how much longer should we give you before we can see if your

22  strategy works; and he said one year.  Well, they don't ditch

23  Next Century for two years after that.

24          So, even when the active manager said all I need is

25  one year, if I haven't performed, then, yes, you should get rid

I4Q7SNIC

of me, after another year of bad performance they didn't get

rid of him; they waited around for a whole other year until

they ditched Next Century.

And that's kind of an example of what is the process

and standards.  The standards was basically we will get rid of

them when we get around to it, as opposed to stepping back and

saying does using active managers really make sense; is there

any way that we're ever going to really not only find the rare

active manager that can somehow beat the market but we are the

ones who are going to be smart enough to identify that smart

unicorn active manager.

And when you've made the same mistake not one year or

three years but for five or six years, that to me says that

there is no really process that's going on there; and we just

get into fact questions that just cannot be resolved on a

motion to dismiss.

And even with respect to the EMEs, they start out --

they actually made the decision to go into the EMEs based on

Makita's recommendation that there were going to be

inefficiencies and an active manager can find those

inefficiencies and get an above-market return.  They made the

decision to go to six percent EMEs before they identified these

magical active managers.

Then they find the two active managers that start,

Dimensional and Artisan.  Artisan does poorly, as Mr. Rumeld

I4Q7SNIC

mentioned, but Dimensional did poorly too.  And the response

was since Artisan did worse poorly, to ditch Artisan and to

send the money from Artisan to Dimensional which had been

underperforming, and eventually they sent that piece of the

money from Dimensional to Dry House which also did poorly.

So, basically they are doing a whack a mole game from

going from one active manager to the other active manager, not

really stepping back and saying, well, if all the literature

says there are just very few magical active managers that can

truly beat the market, maybe the fundamental thing of what we

are doing is wrong.

THE COURT:  But isn't it the literature more -- it's

more sophisticated than that?  It's not that -- there clearly

are segments where it makes no sense to be in an active managed

fund.  Blue chip stocks, for example, it's just insane to do

that, although there are managers who do that.

I thought the trustees' argument was a little more

nuanced than that, it is as to certain segments of the market

an index fund doesn't really make sense because there is a lot

of variance in terms of how well different advisors do; it's

not an efficient, incredibly deep and liquid market; and,

therefore, having active managers who could actually do the

individual research, etc., is more important in certain markets

than in others.  And I'm not sure that that is contrary to the

accepted body of financial thought relative to index funds.

I4Q7SNIC

1          MR. SCHWARTZ:  I disagree but only partially.  The

2    literature is very broad based; it's not just the S&P 500.  And

3    the place where they got hurt was with the midcap stocks where

4    the literature is just as appropriate as it is with the S&P

5    500.

6          And if you take a look at the board minutes -- and I

7    think your Honor identified what the real issue was -- Makita

8    said to them we think this is a sector, midcaps, where we think

9    there are inefficiencies and we think some managers can

10   identify those inefficiencies and do better than the market in

11   good times, and in bad times hedge against even worse losses.

12   And that was basically it.  That was the pitch from Makita, and

13   that was it.

14         There was no elongated discussion, elongated

15   presentation which gave a fair balance of here are the pluses

16   of going active, here are the minuses, this is what the

17   literature shows over many studies over a long period of time,

18   and so when you make a choice be very careful.

19         And when you step back and say, well, did these

20   particular trustees, did they really understand what they were

21   doing, well, we talked about in paragraph 129 where another one

22   of the key trustees, Gagliardi, he was asked a specific

23   question from one of the plan participants why do you keep on

24   trying to outguess the market with active managers.  And I

25   won't read the answer to you.  His answer was nonsense, but his

I4Q7SNIC

1    answer reflects a complete lack of understanding of what the

2    real choices that you identified.

3              Is it possible that there could be some specific

4    sector where someone has some real sector-specific and

5    manager-specific information where it might make sense?  Warren

6    Buffett says no, but I'm not going to say that you have to make

7    that decision on a motion to dismiss.  But these managers did

8    not go into that kind of detail and analysis.  And even at the

9    end of the day when they've lost their bets and gotten their

10   clocks cleaned, one of the key members of one of the key

11   subcommittees still has no way to respond to that question from

12   a plan participant, when you think that would be an issue that

13   he was all over and had a complete understanding.

14             And I don't want to harp too much on plan counsel's

15   e-mail about how the active managers work, but it's not a

16   record where it could have been better; it's an ugly record,

17   and the underperformance you could have said it was an ugly

18   record one, two, three years before they made any moves.  And

19   going from a hundred to 70 percent, that is not that big of a

20   shift.  If they would have gone from a hundred percent to 30

21   percent, then I think it would be much harder for me to say,

22   well, at least they were making some reasoned decisions.

23             But going from a hundred to 70 is basically meaning at

24   some point way too late you're getting rid of the low hanging

25   fruit.  But I think that one of the critical parts of the

I4Q7SNIC

active manager claim is that it's consistent with our claim

they're making very risky bets with the emerging markets

equities and the private equity, and pretty much everything

they did during this time period was one outsized risky bet on

top of another outsized risky bet, and they kept on increasing

it and ratcheting it up over time.

           You don't see those facts in the Pension Benefit

Guaranty case.  In that case there was one investment mortgage

backed securities, there were some rumblings that there were

some risks with that, but a lot of people invested in those

too.  It was not the same kind of inform this is really, really

risky.  There was no fund specific circumstances about short

term returns in that case.  And there was one investment

decision which started I think at 10 percent, and then it

decreased over time.  There is no doubling and tripling down in

the Pension Benefit Guaranty case.  And the loss that occurred

was a one-time market crash where everyone got slaughtered in

that market crash.  In contrast with the EMEs, it was not a

one-time market crash.  In fact, when they lost initially, they

just kept on doubling and tripling down, and they dug deeper

holes as they doubled down.  And did it have a period where it

did well more recently?  Yeah, but the volatility can quick

right back, but the problem is they've already lost that money

and the compounding for that money, and they will never get it

back.

I4Q7SNIC

1            THE COURT:  That's a little bit backwards.

2            I mean I hear you, but there is no guaranty in life

3      and definitely not in investments.  And the normal view --

4      which is good advice -- is to try to buy low, right, so as the

5      market -- so as that sector is in trouble, that's the time to

6      buy that sector.  Don't buy it when it's high, right?

7            I mean a rational decision can be made.  Now whether

8      that justifies increasing the percentage as opposed to saying

9      let's not bail on the decision to go to eight percent or nine

10     percent or whatever it was in emerging markets.  I think your

11     complaint is a little different, which is, far from just

12     investing low, they were saying let's jump in further and

13     further and further into what is an outsized risky bet for a

14     pension fund.  It's one thing for your individual IRA.

15            OK.  I think I got your point.

16            MR. SCHWARTZ:  And I agree with that synopsis.  And if

17     they had stopped with the six percent and never went to 11 or

18     15, it might be harder for me and your Honor to discern what

19     was really going on in terms of are they just riverboat

20     gamblers.  When they go from the six to the 11 and then to the

21     15, moving the private equity from three to 18, even though the

22     average fund only has four percent in private equity, and

23     you're taking it from domestic equities -- it would be one

24     thing if they said we're going to take a portion of our high

25     risk portfolio and shift it to another different high risk bet.

I4Q7SNIC

1     What they did is they took the bread-and-butter domestic

2     equities, and they stole from that to fund these two bets, and

3     so it's the combination of factors, and as the cases say, the

4     combination of factors is the way that that courts should

5     review these on a motion to dismiss.

6               THE COURT:  OK, thank you.

7               MR. RUMELD:  Can I just reply very briefly?

8               THE COURT:  Briefly.

9               MR. RUMELD:  I think there is one theme I want to

10    discuss in reply here, which is, there is an essential

11    equivocation in Mr. Schwartz's comments as to whether he is

12    blaming the trustees for following the advice of their

13    consultants or for disregarding the advice of their

14    consultants.

15              Now, in my book, if you fire an investment manager

16    contrary to the advice of your investment consultant, I think

17    you're much more likely to get into trouble if the investments

18    go in one direction after that, than if you follow the advice

19    of the investment consultant.

20              What did our consultants say?  If you look at this

21    Exhibit 27, the stochastic model I referred to before, on page

22    13 there is a chart that shows what is going to happen over a

23    long period of time under various annual rates of return.  And

24    for the seven and a half percent rate of return it shows that

25    within 20 years, 2034, the fund will be 49 percent funded,

I4Q7SNIC

meaning it has less than half the money it needs to pay

benefits.  And a couple of pages earlier they talk about

financial measures and they say 80 percent is used as a proxy

for a plan headed towards financial health; 50 percent used as

proxy for 'plan headed toward financial peril, a/k/a tipping

point.'"

THE COURT:  50 percent what?

MR. RUMELD:  50 percent funded.  So, they get a report

from their actuary that says if we let it ride, if we keep

investing consistent with the seven and a half percent

assumption, we're telling you that within a 20 year period you

will be less than 50 percent funded, and less than 50 percent

funded means headed toward financial peril, passing the tipping

point.

So I would submit to you, your Honor, that no matter

what isolated quotation from Chris Brockmeyer they can refer

to, if you are presented from your actuary with a piece of

paper that says if you just keep doing what you're doing, your

fund is going down the tubes, these are times for extraordinary

measures.  And that's what happened, OK?

THE COURT:  I think the question though is whether the

extraordinary measures were too extraordinary for the actions

of the fiduciaries.

So, look, I am sympathetic to the situation the

trustees found themselves in, but when I hear the emerging

I4Q7SNIC

markets, they ultimately put how much --

MR. SCHWARTZ:  15 percent.

THE COURT:  -- 15 percent, and private equity at 10 percent or nine percent?

MR. SCHWARTZ:  18 percent.

THE COURT:  18 percent.  That's just -- I mean again I understand the situation the fund was in, but that is extraordinarily risky.  I mean, yes, if the risk pays off, mazel tov, but the reason that it's risky is that you also have a risk that you're not going to get that return, that you're going to lose money.  That's why the investment is risky.

MR. RUMELD:  Yeah.  And with respect, your Honor, that's why we hire professionals who can evaluate risk in the aggregate.

THE COURT:  Let me ask you something.  If your fund had been 75 percent in emerging markets and 20 percent in private equity because Makita said that will get you fully funded in 15 years, would the plaintiff be able to say that's a breach of fiduciary duty, that is simply too risky, you can't put an ERISA fund in that level of risk?

MR. RUMELD:  I think under those circumstances some of the other metrics that appear in those reports, including likelihood of going under in the short term because of a short-term risk would have pointed against doing that, because obviously there is some point at which you are taking on too

I4Q7SNIC

1    much risk because you're not going to be there for the long

2    term.

3            But if you look at these reports, they have

4    probability of achieving seven and a half percent, probability

5    of a negative return over a 20 percent period, probability of

6    what they call those three stigma events, something happening.

7    And actually even if you look at the report where they go to

8    the nine percent target and the 15 percent, the movement on the

9    margin is really relatively small if you look at those risk

10   factors.

11           At the end of the day I ask that your Honor focus on

12   the process.  There is nothing wrong with the process, with

13   taking these extraordinary circumstances, asking your

14   consultant what to do, being presented with four or five

15   choices, and actually picking amongst the more conservative of

16   those choices -- because if you look at that report with the

17   various asset allocation models, yeah, 15 percent sounds

18   extraordinarily high, but the other choices had more risk

19   attached to them.  They actually took the more conservative of

20   the nine percent approaches there.

21           So, we all have our own stigmas about certain

22   investments being risky.  Oh, and by the way, the notion

23   pulling away from domestic equities, let's be real here,

24   domestic equities are incredibly volatile.  All we have to do

25   is look back the last week or the last month to know that.

I4Q7SNIC

Domestic equities aren't the safe investments.

THE COURT:  Well, they're volatile in the short term; they're not volatile in the long term.

MR. RUMELD:  And also when they move from eight percent to nine percent, they didn't steal from domestic equities, that's false.  When they went to eight percent, they moved some of the domestic equities, but they moved from one equity investment to another that their consultant said had a better chance in the long term of getting them the returns they needed.

In any event, my point is it's not imprudent to follow the advice of your consultant.  If they want to make a case that Makita didn't know what they were doing, or Milliman didn't know what they were doing, those folks will be happy to defend themselves, I promise.  But there is only one instance in these papers that was cited where the trustees did not follow Makita's advice, and that was in 2016 when they suggested derisking -- not just only emerging market equities but all of the equities because of this situation in China -- it was described as a temporary measure.  The trustees felt it was too much like market timing and didn't do it, and the truth of the matter is if they had followed Makita's advice they would have been in worse shape because the equities did very well in that period of time.

But if you look at any of the advice before then or

I4Q7SNIC

1    after, they're consistently recommending to keep and increase

2    the investments in emerging market equities.

3         So, it may sound weird to be this heavily invested,

4    but I think the question for your Honor is did these guys

5    follow or not follow the advice of their consultants.  And if

6    they followed the advice of their consultants, can I really say

7    there was a breach of fiduciary duty or a breach of the

8    process?  Thank you, your Honor.

9         THE COURT:  Thank you.

10        MR. SCHWARTZ:  Can I make one quick point about the

11   stochastic modeling?

12        THE COURT:  No.

13        OK, I'm prepared to rule on the defendants' motion to

14   dismiss.  The motion is granted in part and denied in part.  As

15   to Counts One and Two the motion is denied; as to Count Three,

16   the motion is granted.

17        Much of the defendants' brief reads like a motion for

18   summary judgment, and we're just not at that stage.  I reviewed

19   all of the material that the defendant submitted -- based on

20   their argument that the court can consider such materials

21   without converting the motion to a motion for summary judgment

22   if the plaintiff relies on them and if the actual documents

23   contradict plaintiffs' allegations.  I do not find that the

24   materials to contradict the complaint, Although I will say that

25   the gestalt of the board minutes is likely to cause the

I4Q7SNIC

plaintiffs difficulty at trial or at summary judgment.

Plaintiffs' allegations come down to three main complaints:  First, the trustees breached their fiduciary duty by investing substantial percentages of the fund in emerging markets equity and private equity, the first of which is very volatile and risky, and the second of which is illiquid; Second, without standards to evaluate the value of active management for various classes of assets within the fund, they opted to use actively managed funds rather than passive index funds which are cheaper, and they failed to take prudent action against underperforming investment managers; and, third, they failed to keep the plan participants fully informed about the fund.

Before shifting to defendants' specific arguments, let me say that I do not find Pension Benefit Guaranty Corp. v. Morgan Stanley to be an impediment to the complaint.  Schnitzer has alleged specific information that was available to the fund regarding the near term risk of investing in emerging market equities which, he argues, should have caused a prudent fiduciary to limit the fund's near term exposure to such investments.  Far from doing so, he argues, the fund doubled down and increased the percentage of the fund invested in an asset class that was losing money and that a prudent fiduciary would have recognized at the time was likely to continue to do so for the near future.

I4Q7SNIC

 1          Defendants argue, in essence, that the decision to

 2    invest substantial funds in emerging markets and private equity

 3    was not a breach of their fiduciary duty but was instead a

 4    reasoned decision by the trustees to increase the probable

 5    returns to the fund, even though that meant taking on

 6    additional risk to maintain the long term solvency of the fund.

 7    As to active management, they argue that many portions of the

 8    fund are passively managed and that the decision to use active

 9    managers is not per se a breach of fiduciary duty.  As to

10    providing plan participants with information about the fund,

11    they argue that much of plaintiffs' complaint is about internal

12    discussions that ultimately were resolved in terms of full

13    transparency and, in any event, plaintiff has neither alleged

14    causation nor harm from the failure THO disclose.

15          At the motion to dismiss stage, defendants' arguments

16    are not compelling.  The court is not unsympathetic to the

17    positions the trustees found themselves in after the 2008

18    recession.  They were highly motivated to adopt an investment

19    strategy that increased the probability that the fund would be

20    solvent in the out years.  The question is whether the strategy

21    they adopted was so risky that it is outside the bounds of what

22    a prudent fiduciary would do.  In that regard, the fact that

23    this fund was significantly overweighted in volatile and

24    illiquid asset classes (specifically EME and private equity)

25    vis-a-vis it's Taft-Hartley peers, nudges plaintiffs' claim

I4Q7SNIC

across the line from possible to plausible.  Similarly, as to

plaintiffs' complaint about active management, it is again

clear from the materials presented that the issue of investment

management fees was of concern to the trustees.  It appears

that at many of the investment committee meetings, one or more

investment managers came under fire for consistently

underperforming the relevant standard.  Sometimes, but rarely,

the manager was dismissed; more generally, Makita persuaded the

board to stay the course and not change managers.  There was

also discussion at committee meetings which clearly reflects

Makita's view of the world -- that active management is

worthwhile for certain asset classes where there is a

"substantial spread between percentile rankings."  That's from

Defendant's Exhibit 56.  Although, I believe I saw something

like that in numerous different meetings.  Although the

defendants are correct there is nothing per se wrong with

active management, plaintiffs' complaint that as fiduciaries

the trustees should have some criteria they use to decide

whether active management was actually worth the cost and for

deciding to fire active managers who were not doing a good job.

Plaintiff alleges there were no standards and nothing in the

defendants' documents demonstrates that there were.

          I'm saying standards.  Maybe process would be a better

word.

          Plaintiffs' argument -- given the financial industry

I4Q7SNIC

1    literature that he cites -- is, again, plausible.

2              Finally, I agree with the defendants that plaintiffs'

3    allegations regarding nondisclosure do not include allegations

4    showing plaintiffs were harmed.  I do not view this as fatal

5    because nondisclosure is not a stand-alone claim.  Instead,

6    it's just one of three ways in which plaintiff alleges the

7    trustees violated ERISA.  Keeping those allegations in Counts

8    One and Two will have no impact on discovery, because

9    regardless of whether it's a stand-alone claim, the evidence of

10   trustees trying to hide the ball from the fund's beneficiaries

11   is relevant to the ERISA claims of breach of fiduciary duty and

12   is therefore a fair target for discovery.

13             In sum, plaintiff has plausibly alleged an ERISA

14   violation, albeit one that will have a tough row to hoe to get

15   past summary judgment.

16             As to Count Three of the amended complaint, it is

17   dismissed.  Plaintiff responded to defendants' motion relative

18   to that count only in a footnote.  That is not adequate to

19   preserve the claim.  See In Re Crude Oil Commodity Litigation,

20   06 Civ. 6677.  It appears at 207 WL 1589482 at page 3.

21             OK.  You have a schedule for discovery, correct?

22             MR. KRINER:  We do.

23             THE COURT:  Do you need anything further from me at

24   this stage?

25             MR. SCHWARTZ:  Not from plaintiffs, your Honor.

I4Q7SNIC

1              MR. RUMELD:  No, your Honor.  Thank you.

2              THE COURT:  Thank you all.

3                                 - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25