

ONE HAVERFORD CENTRE
361 WEST LANCASTER AVENUE
HAVERFORD, PA 19041
PHONE: 610-642-8500
FAX: 610-649-3633

STEVEN A. SCHWARTZ
SAS@CHIMICLES.COM

July 9, 2019

**VIA ECF AND ELECTRONIC MAIL**
Hon. Valerie E. Caproni, U.S.D.J.
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007
Email: CaproniNYSDChambers@nysd.uscourts.gov

    Re:    *Snitzer et al. v. The Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, et al.*,
            Case No. 1:17-cv-05361-VEC

Dear Judge Caproni:

    We are counsel for the Plaintiffs in the above-referenced action. We write jointly with Defendants' counsel to provide the Court with a pre-conference status report, as required by the Court's March 1, 2019 Order (Dkt. No. 109), in anticipation of the status conference scheduled for July 12, 2019.

1. **Existing deadlines, due dates, and/or cut-off dates.** The parties have completed fact discovery, exchanged opening and rebuttal reports for the parties' respective experts (six in total) and deposed four of the six experts. The depositions of the parties' two remaining experts are scheduled and will be completed by the July 31, 2019 deadline set by the Court. *See* Dkt. No. 117.

2. **Outstanding motions.** There are no outstanding motions before the Court. Plaintiffs do not anticipate filing a motion for class certification because, should the Court enter a monetary judgment against Defendants, any damages will be based on damages suffered by the AFM Pension Plan, and will therefore be paid into the Plan, as opposed to being allocated to specific Plan participants. The parties, however, at Defendants' request, are discussing the prospect of a stipulation to a non-

    opt out class and will update the Court on these discussions at the conference.

3. **Status of discovery.** *See* number 1 above.

4. **Status of settlement discussions.** The parties have engaged mediator Robert A. Meyer, Esq., of JAMS, to mediate this matter. A preliminary all-hands meeting, which included an exchange of extensive briefs and other materials, was held on August 8, 2018. The parties agreed that the case could not be settled at that time. Formal mediation had been scheduled for February 6, 2019. The parties exchanged extensive supplemental briefs but the mediation was postponed shortly before February 6 because it was determined that a mediation would not be productive at that time. The parties exchanged supplemental briefs and participated in a mediation with Mr. Meyer on April 30, 2019. The parties and the mediator remained in close contact for a short period of time thereafter, but the parties have not reached a settlement. There are no continuing discussions presently and no further mediation sessions have been scheduled.

5. **Anticipated length of trial and whether the case is to be tried to a jury.** Plaintiffs anticipate that a trial will take ten (10) to fifteen (15) days. Defendants anticipate that, absent Court imposed restrictions on the scope of testimony that is considered relevant (which could be rendered pursuant to the staged trial process proposed by Defendants outlined below), the trial will take four weeks. The parties agree that this ERISA case is to be tried without a jury.

6. **Motions for summary judgment or to exclude expert testimony.**

    a. **Motions for Summary Judgment**

        i. **Plaintiffs' Position**: Per the Court's Individual Practices at Paragraph 4(H): "Absent good cause, the Court generally will not consider summary judgment motions in non-jury cases." By the time of trial, the parties will have deposed approximately 30 witnesses and marked well over 300 exhibits at depositions. Plaintiffs do not believe summary judgment motions will be useful in this case. As discussed at the last Status Conference, the key issue in the case is a fact-intensive determination of whether the Trustees met their duties under ERISA. In this case, summary judgment proceedings will be wasteful, inefficient and largely

duplicative of the evidence to be presented at trial and in connection with the pretrial filings, including proposed findings of fact and trial briefs, discussed below. Similarly, Plaintiffs believe the "staged" trial suggestion by Defendants suffers from the same problems. Defendants' suggestion that the Court can somehow make findings regarding limited matters such as "objective prudence" without a full factual record is illogical in this matter. The Court will be required to consider and determine, as a factual matter, whether Defendants acted imprudently in making and losing a series of increasingly-risky bets. The undisputed record reflects that the Trustees' asset allocations were objectively out of the norm. For example, the parties' experts cite data from the Wiltshire Trust Universe Comparison Service and from the Plan's former Investment Consultant Meketa showing the Plan's stark departure in terms of asset allocation from other large Taft-Hartley plans. The data shows the median large Taft-Hartley plan had no less than 45% of assets invested in domestic equities; the Trustees here reduced the Plan's actual domestic equity allocation from 40% in 2009 to as low as 19%. The reduction in the domestic equity allocation was accompanied by an increase in the allocation to Emerging Markets Equities to as high as 15%, even though the average plan had no more than 4.5%; an increase of the total allocation to international equities of up to 30%, even though the median Taft-Hartley Plan had no more than 12%; and an increase of up to 26% in alternatives including Private Equity and Real Estate, whereas the median plan had no more than 12%. Defendants' allocations to risky asset classes were so far out of the norm that none of the witnesses, including Defendants' experts, have identified any other Taft-Hartley or other large pension plan with a similarly uber-aggressive asset allocation. As a result of the Trustees' losing bets, the Plan missed out on much of the domestic equity bull market and underperformed its Taft-Hartley peers. The suggestion that the Court could dismiss Plaintiffs' claims given these skewed bets on risky and illiquid asset classes and the evidence reflecting the Trustees' dysfunctional process (as set forth in Plaintiffs' prior submissions) based on a

        summary "staged" process is absurd and will needlessly result in convoluted and protracted proceedings.

    ii.    **Defendants' Position:** Defendants continue to believe that the extensive written record in this case more than suffices to enable the Court to dismiss Plaintiffs' claims – in whole or substantial part – as a matter of law. However, in light of the misgivings communicated by the Court about entertaining a motion for summary judgment, Defendants have set forth below an alternative proposal for a staged trial that they believe is responsive to the Court's directive that the parties submit "strategies for streamlining the next stage of the litigation . . . ." (Dkt. No. 109). *See also* March 1 Tr. at 15-16 (inviting the parties to submit their positions "on whether it makes sense to go to summary judgment or not, and any creative ideas [the parties] might have for something that might be in between").

  b.    **Motions to Exclude Expert Testimony**

    i.    **Plaintiffs' Position:** Because of the fact-intensive nature of the case, the testimony of the parties' respective experts will be largely derivative of the facts to be presented at trial and in connection with the pre-trial filings, including proposed findings of fact and pre-trial briefs, discussed below. So too will the "fit" of the testimony of the parties' respective experts. The case, moreover, will be tried to Your Honor, not a jury, so the typical prejudice concerns that *Daubert* is designed to protect against are irrelevant. Accordingly, Plaintiffs believe it will be wasteful and duplicative for the parties to file and seek rulings on disqualification under *Daubert* prior to trial. Plaintiffs believe it makes the most sense for the parties to address issues regarding the admissibility, weight and fit of the anticipated testimony of the parties' respective experts at trial based on guidance from the Court at the final pretrial conference as discussed below after the Court has had an opportunity to review the parties' proposed findings of fact and responses thereto so any pre-trial *Daubert* motions can be evaluated in context. Similarly, as discussed below, Plaintiffs believe Defendants' suggestion to front load expert testimony before hearing *any*

      testimony from fact witnesses as an alternative to *Daubert* motion practice is illogical, unworkable and inefficient.

    ii.    **Defendants' Position:** As discussed below, the staged trial recommended by Defendants would obviate the need for Defendants to file motions to exclude portions of Plaintiffs' expert testimony; but Defendants would otherwise seek to file such motions.

7. **Final Pretrial Conference:** In order to promote efficiency, streamline trial, and minimize the burden on the Court, the parties propose that the Court set a date for the final pretrial conference that provides the Court with sufficient time to review what the parties expect will be extensive pre-trial filings so that the Court can provide the parties with guidance regarding the conduct of trial.

8. **Trial Date:** The parties request that the Court set a trial date in the first quarter of 2020.

9. **Proposals to Streamline Proceedings**

    a. **Plaintiffs' Position:** In order to streamline trial and promote efficiency and minimize the burden on the Court, plaintiffs propose that the parties file, by December 31, 2019 competing detailed proposed findings of fact (with the opportunities for responses and replies) and conclusions of law, supported by evidence including documents and deposition testimony, that, as discussed in more detail below, will become part of the record to be considered by the Court at trial; and also file pre-trial memoranda of law that address the key legal issues. Plaintiffs further propose that the Court set a date for the final pretrial conference, in January or February 2020, and several weeks in advance of the actual trial date, that provides the Court with sufficient time to review what the parties expect will be extensive pre-trial filings so that the Court can provide the parties with guidance regarding the conduct of trial.

    Plaintiffs propose that the Court conduct the trial consistent with the standard procedures in a bench trial. First, the Court should consider the parties' respective proposed findings of fact, responses thereto, and supporting evidence, as part of the trial record. Second, the parties should be permitted the opportunity to make opening statements. Third, Plaintiffs should proceed first to

present their case by calling fact and expert witnesses. Because most of the fact witnesses will be Defendants or non-party consultants of Defendants, Plaintiffs have no objection to permitting Defendants, during Plaintiffs' case-in-chief, to not only cross examine the witnesses called by Plaintiffs, but also to conduct any direct examination they wish of such witnesses to avoid the necessity of having the same witnesses testify at different times. Fourth, after Plaintiffs finish their case-in-chief, Defendants can present their defense, including their experts. Fifth, Plaintiffs can then present rebuttal witnesses/evidence as appropriate, including rebuttal experts. Sixth, the parties can make closing statements. Seventh, the parties can submit supplemental post-trial proposed findings of fact and conclusions of law as permitted by the Court. Eighth, the Court will then make findings of fact and conclusions of law and enter judgment based on the evidence presented.

Plaintiffs oppose Defendants' unusual proposal to bifurcate trial in a manner that requires the parties' respective experts to testify before *any* fact witnesses testify and for the Court to then make rulings based solely on the experts' testimony and in the absence of live testimony of fact witnesses at trial. Plaintiffs also oppose Defendants' unusual suggestion to bifurcate trial in a manner that requires the Court to first make an aggregate damages judgment against all Defendants and then require the parties to participate in a second mini-trial to allocate those damages as to each individual Defendant. Section 7.2 of the Agreement and Declaration of Trust establishing the Fund requires all Trustees to properly exercise their fiduciary duties with respect to the investment and asset allocation decisions challenged in this litigation. In addition, ERISA provides for joint and several liability of Trustees for the types of monetary claims asserted in this litigation,[1] particularly

---

[1] "ERISA imposes joint and several liability on defendants…As a consequence, when two or more persons' torts together cause an injury, each tortfeasor is liable to the victim for the total damages." *In re WorldCom Inc., ERISA Litig.*, 339 F. Supp. 2d 561, 568 (S.D.N.Y. 2004), citing *In re Masters Mates & Pilots Pension v. Riley*, 957 F.2d 1020, 1027 (2nd Cir. 1992) (internal quotations omitted); *see also Lyms, Inc. v. Millimaki*, 2013 U.S. Dist. LEXIS 38362, at *47-48 (S.D. Cal. Mar. 19, 2013), citing *Katsaros v. Cody*, 568 F. Supp. 360 (E.D. N.Y. 1983), *aff'd*, 744 F.2d 270 (2d Cir. 1984) ("Where ERISA liability is established against two or more defendants, liability will be joint and several.").

since the Investment Committee as a whole recommended the challenged investment and asset allocation decisions and the Board of Trustees as a whole approved those challenged decisions. Moreover, no Trustee has testified that he or she dissented from the asset allocation decisions challenged by Plaintiffs. With respect to certain of the injunctive relief sought by Plaintiffs, such as removal of certain Trustees, Plaintiffs agree that they will need to present specific evidence and obtain a specific ruling from the Court with respect to such individual Trustees.

b. **Defendants' Position:** Defendants would like to present an alternative proposal for a staged trial, pursuant to Federal Rule of Civil Procedure 42(b). In our view, proceeding in this fashion could substantially streamline the trial proceedings by enabling the Court to evaluate, as the case proceeds, which of Plaintiffs' claims remain viable and the scope of additional testimony needed to be considered to properly evaluate any viable claim. Our proposal does not conflict with Plaintiffs' proposal – with which we largely concur – that the Court reconvene with the parties several weeks in advance of the trial, after having had an opportunity to review the parties' pre-trial submissions. (Defendants do not believe that it is necessary to have sequential sets of proposed findings of fact and thus that the pre-trial submissions can be completed before the end of the year). The Court may prefer to take up Defendants' proposal for a staged trial at that subsequent conference (and to request that the issue be briefed in advance), but we thought it would be appropriate to alert the Court to our proposal now, so that the Court can also consider it at the July 12 conference. Defendants believe that Plaintiffs' various other proposals for the conduct of the trial should be taken up at the pre-trial conference, when there will be more clarity on the scope of the trial. Defendants would not in any event agree that the opening and closing statements should be truncated in a complex case of this nature.

In sum, there are two components to Defendants' proposal for a staged trial:

First, Defendants propose that the Court initially hear the testimony from the parties' experts on procedural prudence, objective prudence, and damages. On the basis of the expert testimony, coupled with the pre-trial submissions, the Court should

be in a position to (i) entertain motions challenging the viability of certain of Plaintiffs' claims for failure to establish a claim of objective imprudence,[2] and/or for failure to establish a claim for recoverable damages[3]; and (ii) determine the scope and order of

---

[2] The case law recognizes that, if a challenged decision is objectively prudent – meaning, "a hypothetical prudent fiduciary would have made the same decision anyway" – the court need not inquire into the process pursuant to which that decision was made. *Sacerdote v. New York University*, 328 F. Supp. 3d 273, 285 (S.D.N.Y. 2018) (entering judgment for defendants on several breach of fiduciary duty claims based on finding that the decisions were not objectively imprudent). *See also Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (dismissing fiduciary breach claims where plaintiff failed to allege facts establishing, under ERISA's objective prudence standard, that a "prudent man in like circumstances" would have made a different investment decision); *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839, 2016 WL 7494320, at *9 (D. Conn. Dec. 30, 2016) (dismissing fiduciary breach claims for failure to plead facts establishing that fiduciary conduct was objectively imprudent, noting that "parties are generally shielded from fiduciary liability if a 'hypothetical prudent fiduciary' would have reached the same decision") (quotation omitted), *aff'd by summary order*, 718 F. App'x 3, 7 (2d Cir. 2017).

As Defendants can explain further at the conference, there are objective prudence issues here, such as the reasonableness of the Defendants' asset allocation decisions, which can be adjudicated based on the expert testimony. Among other things, the expert testimony will address whether objective imprudence can be established based on evidence regarding the percentage of Plan investments in particular securities, as Plaintiffs contend, as opposed to the risk profile of the Plan investments as a whole; and whether Plaintiffs have a valid basis for challenging the Plan's targeted returns, as opposed to asset allocation policies that were designed by their consultant to achieve those targeted returns.

[3] *Sacerdote*, 328 F. Supp. 3d at 285 (collecting cases requiring an ERISA plaintiff to prove plan losses in order to sue for fiduciary breach under ERISA Section 502(a)(2)); *see also Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir.1998) (Jacobs, J., with Meskill, J., concurring) ("Causation of damages is ... an element of the [ERISA] claim, and the plaintiff bears the burden of proving it."). As Defendants can explain further at the conference, Defendants believe that, with respect to certain of Plaintiffs' claims there are no viable damages theories; and that as to other claims, several of Plaintiffs' damages theories can be dismissed as a matter of law. An early ruling on some of these issues

Hon. Valerie E. Caproni, U.S.D.J.
July 9, 2019
Page 9

any factual testimony that is still needed to properly adjudicate the remaining claims, including testimony relating to any outstanding issues impacting the evaluation of the objective prudence issue, and any issues relating to procedural prudence.

Hearing the expert testimony first would obviate what would otherwise be Defendants' request to file a *Daubert* motion directed at the sole expert Plaintiffs have identified for their case in chief.  It would also avoid Defendants having to move to strike portions of the testimony of the Plaintiffs' two rebuttal experts, either on *Daubert* grounds or on the grounds that the proffered testimony is not legitimate rebuttal.  Defendants believe that there are significant aspects of Plaintiffs' claims that will not be viable in the absence of supporting expert testimony, and thus that the Court should not permit testimony of factual witnesses on these issues unless the expert testimony is found to be admissible.  But if the Court were prepared to hear from the expert witnesses first, there would be no need to address these issues via motion practice.

Second, Defendants propose that the Court defer consideration of testimony relevant to evaluating issues of individual liability until it has first determined whether there is a basis for finding liability at all.  Contrary to Plaintiffs' assertions, the principle of joint and several liability does not obviate the need for the Court to first determine, on an individualized basis, whether and the extent to which each individual defendant is liable.  This is particularly true here in light of the dismissal of claims for co-fiduciary liability.  Given the numerous different factual circumstances pertaining to each Defendant's tenure as a Trustee, participation in various Plan committees, and grounds for supporting the challenged decisions, the evidence relating to these individualized issues will likely be cumbersome, and there may well be a need to add several Trustees as trial witnesses just for the sake of addressing individual liability issues.  There is a reasonable chance, however, that the need to consider this evidence could be avoided altogether, either because Defendants prevail on the merits of the fiduciary breach claims or

---

could conceivably reinvigorate settlement discussions, which to date have been unsuccessful.

      because the parties resolve the case after an initial finding of a fiduciary breach.

10. **Miscellaneous.**

   a. The parties currently expect that all witnesses will be able to testify in person at trial. To the extent, due to unavoidable scheduling or health reasons, any witnesses might not be able to testify in-person at trial, the parties shall promptly notify each other of the reasons and work cooperatively to make arrangements for any such witnesses to testify live via video link or, if necessary, to permit the taking of a videotaped trial deposition of such witnesses. The parties have agreed that no witness shall be permitted to testify at trial unless the other party has had an opportunity to depose such witness before trial.

   b. Without seeking any affirmative relief at this time, Defendants wish to alert the Court to a potential Article III standing issue that has surfaced in light of the U.S. Supreme Court's recent decision to grant *certiorari* in *Thole v. U.S. Bank, N.A.*, No. 17-1711, 2019 WL 2649833 (U.S. June 28, 2019) to address, among other things, whether "an ERISA plan participant or beneficiary [may] seek restoration of plan losses caused by fiduciary breach under 29 U.S.C. 1132(a)(2) without demonstrating individual financial loss or the imminent risk thereof."[4]  Although Defendants have preserved as an affirmative defense lack of Article III standing, they have not until now raised the issue in motion practice because the Court of Appeals for the Second Circuit – unlike its sister circuits – has recognized a participant's standing to sue in a "representative" capacity for Plan losses even if the alleged breach did not reduce or jeopardize his/her own benefits.  *See Fletcher v. Convergex Grp., LLC*, 679 F. App'x 19, 20-21 (2d Cir. 2017) (summary order) (recognizing defined benefit plan participant's representative standing to recover plan losses allegedly caused by breach and prohibited transactions) (relying on *L.I. Head Start Child Development Services, Inc. v. Economic Opportunity Commission of Nassau County, Inc.*, 710

---

[4] Although *Thole* was decided on statutory standing grounds, in granting *certiorari*, the Supreme Court instructed the parties to brief "[w]hether petitioners have demonstrated Article III standing."  *Id*.

      F.3d 57, 67 n. 5 (2d Cir. 2013) (recognizing a participant's standing to sue for plan losses "in a derivative capacity" without any individual loss of benefits)). The Supreme Court's anticipated ruling could conceivably call into question these authorities, thereby requiring this Court to revisit whether, in fact, Plaintiffs have standing to proceed with their claims.

  **c.** Plaintiffs believe the Defendants' suggestion that the Supreme Court's grant of *certiorari* in *Thole* is potentially relevant to Article III standing in this case is incorrect. *Thole* involved an overfunded plan under which the employer was bound to fund any shortfall and *certiorari* was granted on Plaintiffs' application to reverse the dismissal on a motion to dismiss. The circumstances in the Plan here could not be more starkly different. The Trustees have recently announced publicly that the Plan will be in "critical and declining" status and will apply to the Treasury for benefit cuts. Moreover, the notion that the Plaintiffs suffered no financial impact by the $100-$300 million damages asserted is without any foundation.

  Other than as stated above, the parties are not aware of any other issue that they would like to address at the upcoming conference, and do not have any other information that they believe may assist the Court in advancing the case to settlement or trial.

  We thank the Court for its attention to this matter.

            Respectfully submitted,

            Steven A. Schwartz

SAS/sas

cc:  All Counsel via email and ECF