**LAW OFFICE OF HARVEY S. MARS LLC**
322 West 48th Street, Ste 6R
New York, New York 10036-1308
_____

**HARVEY S. MARS**                         (212)765-4300
                            hsmlaborlaw@harveymarsattorney.com


April 3, 2020


BY ECF

The Honorable Valerie E. Caproni
United States District Judge Southern District of New York
40 Foley Square, Room 240
New York, New York 10007
Email: CaproniNYSDChambers@nysd.uscourts.gov


        Re:    Snitzer, et al. v. The Board of Trustees of the
                   AFM-Employers' Pension Fund, et al.,
                   Case 17-05361 (VEC)

Dear Judge Caproni:


      I represent the Associated Musicians of New York, Local 802, the largest AFM local in the country. Local 802 has 5,924 active members, representing the largest concentration anywhere of active participants in the AFM-EPF pension plan, which has 20,336 active participants. Local 802 represents the musicians who play on Broadway, Lincoln Center, classical music, dance, indie rock, jazz clubs – in short, the backbone of culture and entertainment in New York City.

      Many of our members will be severely impacted by the crisis at the AFM-EPF pension fund. That crisis – and the trustees' role in it – has become the source of significant political upheaval within our Union. In late 2018, a rank and file musician, Adam Krauthamer, defeated the long-standing President of Local 802, Tino Gagliardi, in a landslide election. In the election campaign, Mr. Gagliardi vociferously defended his conduct as a trustee of the AFM-EPF, and he also defended his fellow trustees. Eleven of twelve members of the Local 802 Executive Board were also swept out by wide margins.

      To the members of Local 802, this case has represented a unique opportunity to understand why their pensions – and their way of life – are threatened. The trustees' disclosures

to our members have consistently argued that the cause of the crisis is due to factors beyond their control. On the other hand, the little evidence that has emerged from the case indicates that the trustees' own conduct was a primary cause of the shortfalls at the pension plan. As things stand, the record is sealed, and this case could end without meaningful disclosure to the membership.

Plaintiffs have asked the Court to require the defendant trustees to make the reports submitted by the experts hired by the plaintiffs and defendants available to class members. We endorse that request but would also ask that the deposition transcripts and exhibits of the experts also be disclosed, together with the deposition transcripts and exhibits of the two lead trustees, Christopher Brockmeyer and Ray Hair.

Local 802 believes that if the Court were to order such disclosure, this would have several salutary effects: (a) it would help our members understand why their financial futures have become destabilized; (b) it would help Local 802 leadership evaluate the fairness of the settlement; (c) to the extent mismanagement by the trustees is ongoing, it would help membership evaluate whether to replace those trustees through Union democratic processes; and (d) to the extent AFM-EPF trustees sit on other entertainment benefit plan boards – and several of them do – it would help assess whether these individuals pose any threat to good governance on those other boards.

Local 802 therefore supports the plaintiffs' application to require the trustees to make the reports submitted by the experts hired by the plaintiffs and defendants available to class members, and Local 802 further requests that the expert deposition transcripts and exhibits also be disclosed, together with the transcripts and exhibits of the Brockmeyer and Hair depositions.

<u>Trustees' and Plaintiffs' Recent Statements</u>

Recently, plaintiffs and defendants have made starkly differing statements regarding the facts of this case, the evidence obtained in discovery, and the strengths and weaknesses of the reports and deposition testimony of the parties' experts. For example, this past weekend the trustees sent a blast email to Plan participants claiming that their experts Borzi and Franklin said that the "trustees' decision-making process met or exceeded industry standards of prudence" and that the "trustees' process was second to none." Local 802 and other class members cannot meaningfully evaluate those statements unless we see exactly what those experts said, and the reasons for their opinions, what plaintiffs' experts said in response, and how the trustees' experts held up at their depositions.

The plaintiffs and defendants have also made starkly differing statements regarding the likely impact of the governance provisions of the settlement. For example, the trustees' blast email claimed that the settlement provision requiring the trustees to hire an "independent fiduciary" will essentially be meaningless. They said: "The trustees agreed to work with an experienced independent fiduciary who will no doubt confirm what Ms. Borzi and Mr. Franklin already did – that the Board utilizes an excellent decision-making process with respect to Plan investments." The effectiveness of the governance provisions, and especially the impact of the

2

independent fiduciary, and the new OCIO monitor, is an important aspect of the settlement. To evaluate that impact and the truthfulness of the trustees' statements, and plaintiffs' differing statements, we need to see more information, particularly the expert reports. The trustees' blast email relies heavily on their experts' statements but provides no context.

The Settlement Agreement also relies on the expert reports and the impact of those reports on the effectiveness of the governance provisions. For example, according to plaintiffs' declaration at paragraph 17 regarding the proposed independent fiduciary Mr. Irving, plaintiffs "made sure that he was familiar with the issues raised in that litigation and read key court documents including the parties' expert reports so he would be familiar with the specific weaknesses of the Trustees and understand the fiduciary breaches they committed as reflected by the evidence summarized in Plaintiffs' expert reports." This statement appears to be true since the Settlement Agreement at section 8.1.3 requires the independent fiduciary to read those reports and to make sure the new OCIO Monitor reads those reports so they know what the Trustees did during the past decade and what types of fiduciary breaches to be on the lookout for. But the Trustees say the reports will show that the Trustees did nothing wrong and therefore need no help. We need to see those reports to make sure the requirements for the new independent fiduciary and OCIO monitor are not illusory.

The trustees' blast email also criticized the plaintiffs' lawyers, saying they "did not prove their case" and did nothing other than rely on "wild claims and flashy language instead of anything resembling facts or common sense, and their current framing of the settlement follows the same tired playbook," that their claims had "no evidentiary support" and "needed to settle because they weren't going to win," and that: " The plaintiffs' lawyers can pocket the balance of the settlement proceeds if it's approved—about $10 million. They are the ones who profited by using their unsupported mudslinging..." While we seriously doubt that the Trustees' insurers agreed to pay $27 million for claims with "no evidentiary support" on the eve of a trial that plaintiffs "weren't going to win," the simple fact is that every dollar paid to the plaintiffs' lawyers is one less dollar that goes to the Plan. Given these serious charges that the Trustees have made against the plaintiffs' lawyers, neither Local 802 or class members can evaluate the lawyers fee request unless they see whether the lawyers actually developed a strong evidentiary record for plaintiffs' claims that resulted on a recovery of the majority of the insurance, or whether all they did is negotiate a nuisance settlement. While we doubt the veracity of the trustees' assertions, we and class members need to make sure that the lawyers' fee request is reasonable.

Case Law Supports Disclosure

Our request is supported by case law. Courts have recognized the importance of permitting class members an opportunity to review discovery for the purpose of evaluating their decision to join, opt-out, or object to a class action settlement. For example, in In re NASDAQ Market-Makers Antitrust Litig., this Court granted a class member's request to review the discovery produced in the case. 182 F.R.D. 69, 72 (S.D.N.Y. 1998). The Court did so even

where the class member had a relatively modest claim and the discovery produced was voluminous:

> Admittedly, the effort to review the extensive discovery documents in this action seem disproportionate to Bessette's interest in this action. According to the plaintiffs, the discovery in this case includes more than 3,000,000 pages of documents, more than 10,000 hours of audiotape, more than 250 deposition transcripts taken in this action or obtained from the government, and many interrogatory answers. Bassette's interest arises from her trades of 100 shares of a Class security. Whether such an endeavor is cost-effective, however, is Bassette's decision. Accordingly, Bassette's motion to review the discovery materials under the same terms and conditions already established in this action is granted in the interests of justice.

Id.

Other Courts have held similarly. See J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc., No. C-1-01-704 (S.D. Ohio Jul. 14, 2003) ("Due to the established importance by courts in regard to discovery and choosing to remain or opt-out of a class action, the Court finds that Movants ought to have access to discovery materials."). The Court in J.B.D.L. granted the motion even over the objection of the defendant. See also Salmonson v. Bed Bath & Beyond, Inc., CV 11-2293 SVW (SSx), 2012 U.S. Dist. LEXIS 199384, *26-27 (C.D. Cal. Apr. 27, 2012) ("With respect to any discovery produced by BBB to Plaintiff, Objectors are entitled to such discovery. 'Parties to the settlement agreement should generally provide access to discovery produced during the litigation phases of the class action (if any) as a means of facilitating appraisal of the strengths of the class positions on the merits.'") (quoting Manual for Complex Litigation, Fourth, § 21.643 at p.328 (2004)); In re Carbon Black Antitrust Litig., No. 03-10191-DPW, ECF No. 106 (D. Mass. 2004) (granting large corporate class member's motion to intervene for the limited purpose of modifying the protective order to gain access to discovery in the case in order to determine if it wanted to participate in the class action).

In fact, it is not uncommon for class members to be allowed the opportunity to review discovery produced in the case. See e.g., Wahl v. Am. Sec. Ins. Co., No. C08-00555-RS, 2011 U.S. Dist. LEXIS 59559, *18 (N.D. Cal. Jun. 2, 2011) (including in preliminary approval order that "[c]lass Counsel shall make available for inspection by any Class Member during regular business hours, at the Class Member's expense, the documents produced through discovery to Class Counsel by Defendant in this Action."); In re Ins. Brokerage Antitrust Litig., No. 04-5184 (FSH), 2007 U.S. Dist. LEXIS 11163, at *64 (D.N.J. Feb. 16, 2007) (noting that objectors were given access to discovery materials.); Duhaime v. John Hancock Mut. Life Ins. Co., No. 96-10706-GAO, 1997 U.S. Dist. LEXIS 23943, *21 (D. Mass. June 13, 1997) (including in preliminary approval order that "[l]ead Counsel shall make available to any Class Member during regular business hours, at the Class Member's expense, the documents produced through discovery to Lead Counsel by defendants in this Action, and deposition transcripts and attached exhibits generated in this Action.").

Other cases have, in the context of denying requests by objectors to conduct their own discovery, cited approvingly where the objectors had been given access to the discovery received

by the plaintiffs.  See, e.g., In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig., 418 F.3d 277, 316 (3d Cir. 2005) ("On the other hand, we recognized that discovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors.") (emphasis added) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)); City of Detroit v. Grinnell Corp., 495 F.2d 448, 463-64 n.9 (2d Cir. 1974) (denying additional discovery where objectors' counsel had been given access to the discovery received by the plaintiffs but spent minimal time reviewing it); Rivera-Platte v. First Colony Life Ins. Co., 143 N.M. 158, 187, 173 P.3d 765, 794 (Ct. App. NM. 2007) ("When objectors have been properly denied independent discovery, that denial is frequently based on the premise that they could have availed themselves of the discovery already undertaken.") (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 325 (3d Cir. 1998)).

      Thank you for your attention to this matter.

      Respectfully submitted,

*Harvey S. Mars*

Harvey S. Mars

Cc: All Counsel of record (BY ECF)