UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANDREW SNITZER and PAUL LIVANT, individually and as representatives of a class of similarly situated persons, on behalf of the American Federation of Musicians and Employers' Pension Plan,<br><br>                                          Plaintiffs,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND, THE INVESTMENT COMMITTEE OF THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND, RAYMOND M. HAIR, JR., AUGUSTINO GAGLIARDI, GARY MATTS, WILLIAM MORIARITY, BRIAN F. ROOD, LAURA ROSS, VINCE TROMBETTA, PHILLIP E. YAO, CHRISTOPHER J.G. BROCKMEYER, MICHAEL DEMARTINI, ELLIOT H. GREENE, ROBERT W. JOHNSON, ALAN H. RAPHAEL, JEFFREY RUTHIZER, BILL THOMAS, JOANN KESSLER, MARION PRESTON,<br><br>                                          Defendants. | No. 1:17-cv-5361 (VEC)<br><br>**ORDER** |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__07/30/2020__

VALERIE CAPRONI, United States District Judge:

WHEREAS the Court has received additional objections and other communications from class members since July 24, 2020;

IT IS HEREBY ORDERED that the attached class member communications are filed on ECF for purposes of maintaining an accurate public record.  All attachments were postmarked on or before July 27, 2020.

**SO ORDERED.**

**Date:  July 30, 2020**
**        New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**



DANIEL R. WALFISH  dwalfish@walfishfissell.com  +1.212.672.0521
405 Lexington Avenue, 8th Floor  New York, NY 10174  www.walfishfissell.com

July 29, 2020

**Via email to Chambers**

Hon. Valerie E. Caproni
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re: <u>Snitzer et al. v. Board of Trustees of AFM-EPF, et al.</u>, No. 17 Civ. 5361 (VEC)

Dear Judge Caproni:

We represent an Ad Hoc Coalition ("Coalition") consisting of nearly 70 individuals opposed to the settlement in the above-referenced matter ("Objectors"). On Monday, July 27, we submitted, via hard copy delivery to the courthouse and soft copy transmission to the Chambers email account, an Objection of Ad Hoc Coalition Opposed to the Class Action Settlement ("<u>Objection</u>"), with six exhibits.

It has just come to our attention that, because of an administrative oversight by counsel, we inadvertently omitted from the Objection the names and signatures of two additional members of the Coalition who had timely executed signature pages for the Objection and supplied them to counsel so they could join the Objection. Accordingly, we respectfully request that the Court accept a corrected version of the Objection, which we are transmitting electronically together with this letter. The only change to the Objection is to add the two omitted names and signature pages. We have consulted with counsel for the parties, who do not object. We apologize for the oversight.

On behalf of all Objectors, we thank the Court for its consideration of the Objection.

Respectfully submitted,

Daniel Walfish

Encl.

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANDREW SNITZER and PAUL LIVANT, individually and as class representatives, on behalf of the American Federation of Musicians and Employers' Pension Fund,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE BOARD OF TRUSTEES OF THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND, et al.,<br><br>                    Defendants. | 17 Civ. 5361 (VEC) |

**OBJECTION OF AD HOC COALITION**
**OPPOSED TO THE SETTLEMENT AGREEEMENT**

Daniel Walfish
Rachel Penski Fissell
WALFISH & FISSELL PLLC
405 Lexington Avenue 8th floor
New York, NY 10174
Tel.: 212-672-0521
Email: dwalfish@walfishfissell.com

*Attorneys for Objectors*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

LEGAL STANDARD ............................................................................................................. 6

REASONS TO REJECT THE SETTLEMENT ...................................................................... 7

I.      The Non-Monetary Relief Is Inadequate ................................................................... 7

        A.      The Asset Allocation Procedures Invite Business As Usual ......................... 8

        B.      The Neutral Independent Fiduciary Provisions Are Insufficient .................. 8

                1.      The NIF Position Is Toothless ............................................................ 8

                2.      The NIF Should Have Decision-Making Power .................................. 8

                3.      Class Counsel's Theory that the NIF Will Either Deter the Trustees
                        or Expose Them to Liability Is Flawed ............................................. 14

                4.      The NIF's Term Is Too Short ........................................................... 15

        C.      Current Plan Counsel Has Disqualifying Conflicts, Undermining the Integrity of the
                Settlement and Underscoring the Need for NIF Empowerment .................. 16

        D.      The Disclosure Provisions Are Too Weak and Need To Be Strengthened ................. 17

        E.      Class Counsel's Arguments Defending the Adequacy of the
                Non-Monetary Relief Are Not Supported or Persuasive ........................... 19

II.     The Release Is Not "Narrowly Tailored" ............................................................... 20

III.    Class Counsel's Discussion of Supposed Litigation Risks Is Wrong and Also
        Irrelevant To Assessing the Adequacy of the Non-Monetary Relief ................... 22

CONCLUSION ................................................................................................................... 25

LIST OF EXHIBITS ........................................................................................................... 26

APPENDIX: LIST OF OBJECTORS AND SIGNATURES ............................................... 27

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Cases*

*Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987) .................................................................... 12, 20

*Brotherston v. Putnam Investments, LLC*, 2017 WL 2634361 (D. Mass. June 19, 2017) ........... 24

*Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018) ...................................... 24

*Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006) ............................................................................ 20

*Clark v. Duke Univ.*, No. 16-cv-1044 (D.N.C.) ......................................................................... 10

*Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237 (2d Cir. 1989)............................................. 24

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985) ................................................................ 24

*Hugler v. Byrnes*, 247 F. Supp. 3d 223 (S.D.N.Y. 2017) .......................................................... 20

*In re Traffic Exec. Ass'n E. R.R.*, 627 F.2d 631 (2d Cir. 1980) ................................................... 7

*Katsaros v. Cody*, 744 F.2d 270 (2d Cir. 1984)......................................................................... 20

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)......................................................... 16

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995 .................................. 7

*McGinn v. DeSoto, Inc.*, No. 90 C 4481, 1990 WL 251753 (N.D. Ill. Dec. 21, 1990)........... 16-17

*Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-cv-9936 (LGS) (S.D.N.Y.)............. 10, 14

*Rievman v. Burlington N. R.R. Co.*, 118 F.R.D. 29 (S.D.N.Y. 1987) ........................................... 7

*Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018) ........................................... 19, 25

*Selby v. Principal Mut. Life Ins. Co.*, No. 98 Civ 5283 (RLC),
    2003 WL 22772330 (S.D.N.Y. Nov. 21, 2003) .......................................................................... 7

*Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020)...................................................................... 12

*Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015) ......................................................................... 23

*Statutes*

29 U.S.C. § 1001 ................................................................................................................ 20

29 U.S.C. § 1109 ................................................................................................................ 20

29 U.S.C. § 1113 ................................................................................................................ 21

29 U.S.C. § 1132 ................................................................................................................ 16

*Rules*

N.Y. R.P.C. 1.7 ................................................................................................................. 16

N.Y. R.P.C. 3.7 ................................................................................................................. 16

*Other Authorities*

Restatement (Third) of Trusts § 90 ...................................................................................... 6

Restatement (Third) of Trusts § 100 .................................................................................. 24

SEC Investor Bulletin: Hedge Funds, *at* https://www.sec.gov/files/ib_hedgefunds.pdf .............. 19

Mangiero, Susan and Mitchell H. Shames, INSIGHT: Calling ERISA Ghostbusters—The Rise of
   Independent Fiduciaries, *at* https://news.bloomberglaw.com/employee-benefits/insight-calling-
   erisa-ghostbusters-the-rise-of-independent-fiduciaries (Feb. 26, 2020) ..................................... 2

Williamson, Christine, Funds Turn Back Clock in Return to Active Equity, Pensions &
   Investments (Feb. 4, 2019), *available at*
   https://www.pionline.com/article/20190204/PRINT/190209954/funds-turn-back-clock-in-
   return-to-active-equity ............................................................................................................. 6

The members of the settlement class identified in the Appendix hereto ("<u>Objectors</u>"), appearing through undersigned counsel, respectfully submit jointly this Objection of Ad Hoc Coalition Opposed to the Settlement Agreement, together with exhibits.[1] Undersigned counsel (which have not objected to a class action settlement in the past five years) intend to appear at the Fairness Hearing on behalf of Objectors, none of whom has objected to a class action settlement in the past five years.

## <u>INTRODUCTION</u>

Discovery in this ERISA breach of fiduciary duty case revealed overwhelming evidence of imprudence, mismanagement, and incompetence by the Trustees in investing Fund assets, as well as dishonesty in Trustees' communications with plan participants. These revelations require *meaningful prospective relief* as well as narrow releases so that the class members have recourse to address and prevent this behavior on an ongoing and future basis.

But the Proposed Settlement provides neither. The governance reforms – agreed to by Class Counsel with an incentive to emphasize monetary recovery and defense counsel with disqualifying conflicts of interest – are an invitation to continue business as usual. The revised "asset allocation procedures" leave the failed incumbents in full control of setting "return and risk objectives" as well as "asset allocation targets." The newly installed Neutral Independent Fiduciary ("<u>NIF</u>") has a strictly *advisory* role, with no decision-making authority whatsoever. The NIF should be

---

[1] The following Objectors submitted *pro se* objections to the Court before they retained counsel: Phillip Ayling, James Mike Brignardello, Robert Buchanan, John Mark Casstevens, John Clark, Christopher Deschene, Armen Donelian, Dennis Dreith, Stuart Duncan, Larry Franklin, Mitchell Holder, Jody Jarowey, Joel McNeely, Kenneth Munday, Steven Nathan, Jay Rosen, and Jeffrey Southworth. As to those individuals, this is an amended Objection, intended to supersede those individuals' prior submissions. Expert reports and depositions cited herein are available at the Settlement Web Site, *at* http://www.afm-epfsettlement.com/Pages/CourtDocuments.html. Plan documents were obtained from the AFM-EPF web site, *at* https://www.afm-epf.org/AFMSiteMap.aspx. Throughout this submission page references to motion papers and other docket entries (cited as "DE __") are to the ECF header/PDF page number, not the pagination used inside the document. "<u>Proposed Settlement</u>" or "<u>Agreement</u>" refers to DE 139-1. "<u>Prelim. Approval Mot.</u>" refers to DE 138. "<u>Fee Mot.</u>" refers to DE 167. We use the term "<u>Fund</u>" to refer to the American Federation of Musicians and Employers' Pension Fund.

*empowered* to effect real change. Class Counsel's own governance expert has written that in order to be effective, a NIF needs to be given genuine "authority" and "clout," the ability to "correct" "deficiencies," and a suitably broad mandate.[2] In concrete terms, the NIF needs to be able to cast a vote on the Board. The NIF's mandate should also be broadened to include, at a minimum, actuarial matters and participant communications in order to prevent the Trustees from again misleading participants about the Fund's condition and the status of their benefits. In a similar vein, the Board Co-Chairs and longtime employer-side Investment Committee Chair should change.

Class Counsel suggests that the lack of a vote does not matter because the NIF's mere presence at certain board and committee meetings will lead to the creation of a "written record" that will deter Trustees or render them liable to the extent their imprudent behavior persists. Both points are misplaced. Contrary to Class Counsel's description of the Agreement, there is, with one exception, no requirement that the NIF's individual views *ever* are recorded – let alone a mechanism for ensuring that they are acted on. The Trustees can muzzle him if they wish.

The other governance provisions also are window dressing, and need to be strengthened. For example, the Agreement's requirement that the credentials of a new Trustee be disclosed publicly *after the Trustee's appointment is finalized and before he/she takes office* is not much use to the class. The credentials disclosure needs to happen *before* the appointment decision is made, while the individual is still merely a candidate, to give class members a chance to raise any objections with union leadership and through other channels. The requirement that a quarterly

---

[2] Susan Mangiero and Mitchell H. Shames, INSIGHT: Calling ERISA Ghostbusters—The Rise of Independent Fiduciaries, *at* https://news.bloomberglaw.com/employee-benefits/insight-calling-erisa-ghostbusters-the-rise-of-independent-fiduciaries (Feb. 26, 2020) [appended as Exhibit 2].

investment report be posted is only as good as the information provided in the report, and the form that the parties have agreed on obscures as much as it discloses.

Meanwhile, there is no sign that the Trustees have changed their ways. Class Counsel's response: not to worry, we negotiated a release that lets class members file a lawsuit for any post-November 2017 behavior. The idea that class members should have to file a whole new lawsuit (one with potential limitations issues) just to put a stop to ongoing fiduciary breaches challenged in the case is practically an admission of the *in*adequacy of the settlement.

What is more, although Class Counsel boasts that the releases and covenants not to sue ("Release") leave open claims based on conduct that post-dates the Amended Complaint, that is simply not what the Release actually says. Rather, the Release language invites an argument that the Release bars suit for any conduct at any time, including after November 2017 and on into the future, that has any connection to the allegations in the Amended Complaint. So *even if* Class Counsel were right (they are not right) that the governance provisions in their current form guarantee a documentary record of ongoing mismanagement, it is not clear that any class member will be able to use such evidence. The special unfairness of the Proposed Settlement is that – in stark contrast to the picture painted by Class Counsel – it *both* fails to prevent ongoing and future breaches *and simultaneously extinguishes or hampers the assertion of claims based on such breaches*.

## FACTUAL BACKGROUND

It is not seriously disputed that the Trustees (1) adopted an extraordinarily aggressive target for investment returns, (2) chose to make extremely high allocations within the equity portion of their portfolio to risky and illiquid investments in an attempt to meet that target (specifically drawing down a large portion of the domestic equity investment in order to fund large bets on

3

emerging markets and private equity), resulting in portfolios so unorthodox as to be unheard of,[3] (3) relied on active managers far in excess of the Fund's peers even when passive alternatives were available,[4] and (4) that the Fund would be in much better shape today if the Trustees had made more orthodox investing decisions.

The core defense was strikingly weak: that the "objectively prudent" thing to do – the thing any other prudent person would have done in the shoes of these Trustees – was to make bold bets if those were the ones that stood a chance of averting a possible long-range insolvency. A defense expert offered the eyebrow-raising theory that it can be, and here was, rational to "pull the goalie," referring to an aggressive move deployed by losing hockey teams shortly before the clock runs out.[5] The defense also offered an underwhelming "procedural prudence" defense.[6]

---

[3] Defendant Christopher Brockmeyer, the employer-side Board and Investment Committee Co-Chair, by his own count sits on the board of 22 ERISA funds (*see* http://depthome.brooklyn.cuny.edu/theater/people_faculty_adjunct_brockmeyer_christopher.html), and admitted that none of them used a riskier asset allocation than this one. Brockmeyer Dep. 30-31. Or as Brockmeyer stated publicly, the allocations here were "very aggressive, *especially for the Taft-Hartley*, a very aggressive portfolio." Mangiero Report ¶ 67 (quoting podcast; emphasis added).

[4] *See, e.g.*, Mangiero Report ¶ 110. The defense did not dispute this. In 2009, the Fund had 0% of its assets in index funds. By the time the litigation was filed, the number had reached a still-paltry 11%. Defense expert Borzi's Report 20-21.

[5] Franklin Report 1-2, 18-20. The fallacy of course is that hockey is binary: a team either wins or loses, and it does not matter by how much. With a defined-benefit plan *the timing of when a plan becomes insolvent, and the magnitude of the insolvency, are extremely important*. *See, e.g.*, Pitts Report ¶ 36. Taking a shot at avoiding projected insolvency in the year 2050 is imprudent if it creates serious risks of a projected 2035 insolvency – which in substance is what happened in this case. The defense [DE 184 at 21, 22, 25] makes much of stochastic modeling conducted by their expert, except that (1) the Trustees consulted no such stochastic models in making their 2010 and 2011 decisions, and (2) the 2014 stochastic study contemporaneously used to support the 2015 allocation cautioned on practically the first page "that a riskier asset allocation produces[] [i]ncreased potential for insolvency," over the long haul, DE 41-26 at 4. The defense has never explained why it was prudent to assume that risk – one that materialized to devastating effect.

[6] The defense process expert notably chose not to "afford[] great weight to" the damning emails that emerged in discovery, preferring to rely instead on formal meeting minutes and notes largely created by plan counsel as well as on such superficial facts as that committees existed, meetings occurred, and advisors were involved. Borzi Report 9-10 & n.6 (explaining sources relied on); *id.* at 12 (opining that "regularly scheduled quarterly meetings" are "[n]ormally" "sufficient for the trustees to discharge their duties prudently"); *id.* at 14 (noting that, even though everyone or almost everyone on the 16-person Board lacked a finance/investing background, all of the Trustees "received 'on the job' training through presentations and seminars"); *see also id.* at 14-27 (reviewing involvement of professionals).

4

Plenty of maturing defined-benefit pension funds fared poorly in 2008, became stressed, and are facing net outflows. Yet there is no evidence that any other pension fund reacted to the stress the way this one did.[7] These Trustees, without understanding the risks they were taking on, made a long-shot bet that they could avoid a long-run problem, and in so doing foreseeably hastened and worsened a more immediate crisis.[8] The Trustees compounded the effects of their misguided asset allocation with an over-reliance on active managers – with no criteria or process for choosing active over passive management, and insufficient understanding of how manager fees impact performance.[9]

Nor is there any indication that the incumbents have learned any lessons. Even Class Counsel confess that they and their clients remain "frustrated at the Trustees' continuing imprudent investment risk-taking." Fee Mot. 34. The asset allocations approved by the Board to this day remain exotic, opaque, and illiquid.[10] (The Plan's switch over to an "Outside Chief Investment Officer" (OCIO) model is not, as the defense argues, a "fundamental[] change[] in processes," DE 184 at 17; target returns and asset allocations remain the Board's responsibility. *See* Agreement § 8.1.4.) For instance, as of June 2019 a staggering 34.1% of Plan assets was allocated to Hedge Funds and Private Equity. *See* Ex. 1 hereto; Agreement Ex. 5 at 11 [DE 139-1 at 72].[11]

---

[7] July 9, 2019 Letter [DE 118] 3 (Class Counsel pointed out that "none of the witnesses, including Defendants' experts, have identified any other Taft-Hartley or other large pension plan with a similarly uber-aggressive asset allocation.").

[8] According to a 2018 report by a respected actuarial firm commissioned by a group of plan members (Exhibit 3 at 1), the Trustees have "place[d] the Plan in a very small minority of highly dysfunctional multiemployer plans."

[9] For years, key Trustees did not understand that (or did not know whether) key performance information they were shown was *gross*, not net, of the substantial fees charged by active managers. *See* Witz Report ¶ 121 (citing documents and testimony); Mangiero Report ¶¶ 138-139 (citing documents). Union-side Investment Committee Co-Chair Phillip Yao testified: "the amount of fees we were paying in relation to whatever performance we had was not something that I fretted over." Mangiero Report ¶ 97.

[10] We have compiled information on asset allocations/targets for the Fund at relevant points in time in Exhibit 1.

[11] The Private Equity and Hedge Fund percentages are way above the norm for Large Taft-Hartley Plans, just as the allocation to public equity is way below the norm. *See id.* Ex. 5 at 20 [DE 139-1 at 81]. And *within* public equity, the allocation to U.S. equities is on the very low end, just as the allocation to developed international is literally off the high end of the chart even when comparing just to the 12 other plans whose asset classifications supposedly permit comparison with the Fund (*see* discussion at page 18 below). *Id.* Ex. 5 at 21 [DE 139-1 at 82].

5

And the Fund still over-relies on high-cost, predictably under-performing active management even in the traditional public equities portion of its portfolio. For all the money the Plan spent on managers, those investments, net of fees, underperformed the chosen benchmark by about 1% a year from September 2017 to December 2019. Agreement Ex. 5 at 3 [DE 139-1 at 64]. That is a significant shortfall, and one that would have been avoided through the use of low-cost passive managers. Thus there continue to be serious questions about *why it is that this Fund persists in its addiction to active managers* (or as one union-side Investment Committee member wrote to two others in May 2017, "why we pay so much to managers to not even keep up with the markets," Mangiero Report ¶ 139). While *some* active management is permissible, the *core* of the public equity component of a pension fund in this day and age should be *passively indexed.*[12] As one of the other Investment Committee members pointed out in the same email thread: "History has borne out that, in most cases, passive beats active." Mangiero Report ¶ 135.[13]

## **LEGAL STANDARD**

Because the Proposed Settlement would bind all members of the class,[14] the Court must above all assess whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(c)(2)(C) (emphasis added). Thus the Court's "primary concern is with the substantive terms of the

---

[12] *See* Restatement (Third) of Trusts § 90 cmt. f (fiduciaries have a duty to seek "the lowest level of risk *and cost* for a particular level of expected return" (emphasis added)); *see also, e.g.*, Christine Williamson, Funds Turn Back Clock in Return to Active Equity, Pensions & Investments (Feb. 4, 2019) (as of September 2017, 63.3% of US equity investments held by the 200 largest defined benefit plans was passively invested), *available at* https://www.pionline.com/article/20190204/PRINT/190209954/funds-turn-back-clock-in-return-to-active-equity.

[13] The three Investment Committee members on this thread were union Trustees Yao, Moriarity, and Rood – *not* Hair, who as union president and Board Co-Chair wields absolute power on the union side of the Board (*see* Exhibit 4 §§ 3.8, 3.10), and who (according to Moriarity) was "seemingly ***uninformed***, unable and unwilling to adequately articulate [his] reasoning," Mangiero Report ¶ 150 (emphasis added).

[14] The Court's orders, reflecting counsel's input, state that there are over 114,000 members of the class. *E.g.*, DE 163 at 3; DE 151. Class Counsel states that the $26.85 million award translates to $750 for each "active and retired Plan participant[]," Prelim. Approval Mot. 9 – which equals 35,800 people. The latter number is far closer to the number of people with a genuine stake in the Fund and this case. *See* DE 151 at 3; *see also* the Fund's Form 5500, excerpted in Exhibit 5 hereto.

settlement: 'Basic to this . . . is the need to compare the terms of the compromise with the likely rewards of litigation.'" *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079-80 (2d Cir. 1995) (internal quotations and citations omitted); *see also In re Traffic Exec. Ass'n E. R.R.*, 627 F.2d 631, 633 (2d Cir. 1980) ("[T]he most significant factor for the district judge is the strength of plaintiffs' case balanced against the settlement offer."). While the Court is not required to conduct a trial on the merits, it "is required to explore the facts sufficiently to make an intelligent comparison between the amount of the compromise and the probable recovery." 627 F.2d at 633. Crucially, where, as here, plaintiffs are seeking *injunctive or other non-monetary relief* for the class, this comparison must be performed with respect to the *non-monetary*, or *equitable*, components of the proposal. *See Selby v. Principal Mut. Life Ins. Co.*, No. 98 Civ. 5283 (RLC), 2003 WL 22772330, at *2-*3 (S.D.N.Y. Nov. 21, 2003) (approving class action settlement under *Traffic* because "the proposed injunctive relief adequately addresses the problem that was originally alleged to be the cause of inaccurate denials of benefits"); *Rievman v. Burlington N. R.R. Co.*, 118 F.R.D. 29, 32-33 (S.D.N.Y. 1987). Thus a case that, if tried, is highly likely to result in a finding of breach of fiduciary duty and ensuing prospective equitable relief (in addition to an award of mostly uncollectible money damages) cannot properly be settled with a proposal that affords almost meaningless non-monetary remedies, *invites* a recurrence, and operates to extinguish future claims based on a recurrence.

## REASONS TO REJECT THE SETTLEMENT

### I.      The Non-Monetary Relief Is Inadequate

The governance provisions do little or nothing to remedy or prevent ongoing and future breaches of fiduciary duty, instead installing a disempowered figurehead.[15]

---

[15] The discussion here is not meant to be an exhaustive catalogue of every problem with the Agreement.

## A.  The Asset Allocation Procedures Invite Business As Usual

Under Agreement § 8.1.4, the Board of Trustees expressly retains responsibility for setting the asset allocation policy, and is practically invited to continue on the same imprudent course. The failed incumbents are still in charge of setting "the Plan's investment return and risk objectives" – even though discovery made clear that this group of Trustees cannot be trusted to *understand*, let alone prudently balance, risk and reward.[16] And although the new "OCIO monitor" (confusingly also referred to as an "investment consultant") will "provide[] proposed asset allocation targets," this is made "subject to" a veto by the Trustees (but not the NIF) of "*any* proposed targets." Agreement § 8.1.4. This is despite the fact that discovery revealed that the Trustees imprudently adopted "ultra-aggressive," "unorthodox," and "exotic" allocations[17] without understanding the risks they were taking on.[18]

## B.  The Neutral Independent Fiduciary Provisions Are Insufficient

### 1.    *The NIF Position Is Toothless*

The centerpiece of the governance provisions is the appointment of the NIF, who will "serve as an additional, nonvoting, neutral trustee," a "nonvoting member of the Investment

---

[16] Mangiero Report ¶¶ 72, 144 (reviewing case evidence that "clearly indicate[s] Trustees' intent to ramp up risk to seek higher returns" without "first assessing how much risk the AFM Plan could tolerate"); Witz Report 29-30 n.26 (same); Witz Report ¶ 21 (Trustees were warned that to try to make up a projected funding shortfall by aiming for increased investment returns was a "highly risky roll of the dice."); Mangiero Report ¶ 128 (quoting meeting notes reflecting that the plan's actuary advised the Trustees that any allocation that would support the investment return the Trustees were demanding "would increase the risk of insolvency").

[17] Quotations are from case evidence cited in Witz Report ¶¶ 51-54.

[18] *See, e.g.*, Mangiero Report ¶ 25 ("According to minutes from a multi-day November 2011 meeting, *little was said about investment risks associated with [Emerging Markets Equities] and [Private Equity]*," even though meeting minutes reflected that "'the primary purpose of the first two days of the Committee meetings was to discuss possible modifications to the Fund's current asset allocation'" (emphasis added)), ¶ 45 (Trustees "did not carry out a comprehensive assessment of investment risks when . . . they twice made the decision to further increase the Plan's investment in [Emerging Markets Equities and Private Equity] in magnitudes that far exceeded allocations made by most, if not all, other large Taft-Hartley plans."), ¶ 30 (deposition testimony from Co-Chair Hair and other Trustees "shows their level of risk literacy was insufficient and yet they never sought adequate training or asked detailed questions of advisors or fund managers or otherwise developed a clear understanding about how to measure important investment risks.").

Committee," and an advisory resource to the actual Trustees on the Investment Committee (but not other trustees). Agreement § 8.1.5. The NIF, in other words, will be toothless. Under the governing documents for this Fund, *all decisions are made by vote of the Trustees and only by vote of the Trustees*.[19] Without a vote, the NIF has no decision-making role.

The Agreement states that the NIF will "function in all respects (*other than voting authority*)" as an Investment Committee Co-Chair and "will participate in Investment Committee meetings, deliberations and decisions, *with all the authority and responsibilities of a Trustee* with respect [t]o the Plan's investments (*other than voting authority*)." Agreement § 8.1.5.1(b), (c). The Agreement similarly allows the NIF to sit in on "the portion of the Board meetings" regarding investments, "*with all the authority and responsibilities of a Trustee . . . (other than voting authority*)." *Id*. § 8.1.5.1(d). Again, these are oxymorons. Trustees of this Fund have no "authority" and "responsibility" separate from their voting power. (Trustees are sometimes polled for their vote through informal emails and phone calls outside of formal meetings[20]; it is not clear whether or how the NIF would participate in this process.) The Investment Committee role described in the Agreement is essentially a ceremonial post.

The Agreement spells out some additional tasks for the NIF. The NIF is to "[m]ake recommendations . . . regarding changes (if any) in the processes pursuant to which the Investment Committee performs its responsibilities." Agreement § 8.1.5.1(f). The Agreement pointedly avoids requiring that these recommendations be presented in writing, and does not say what the Trustees are to do with the (likely oral) recommendations, which means that the Trustees are free to ignore them. The NIF also is to prepare, "*[i]n coordination with the Trustees and the OCIO*," "a written

---

[19] Agreement and Declaration of Trust [Exhibit 4] § 6.4 ("*all* actions of the Board shall be taken by" vote).
[20] Exhibit 4 §§ 6.4(c), 7.4(c).

9

report regarding *possible changes* to the Plan's Investment Policy Statement." *Id.* § 8.1.5.1(g) (emphasis added). This task does result in a written report, but one that apparently is *not* prepared independently (but rather "[i]n coordination with the Trustees and the OCIO") and so would require the NIF in cases of disagreement to defer to the Trustees and their OCIO as to the contents of the report. The above provisions should be converted into requirements, familiar in ERISA (and other kinds of) settlements, that the outsider prepare *independent written recommendations* on the relevant subject and/or that if a recommendation is not followed, everyone's views and reasons are documented.[21]

### 2.    *The NIF Should Have Decision-Making Power*

The NIF should be empowered to exercise genuine oversight and effectuate real change. In practical terms that means the NIF needs to be given voting power. At the same time, the Co-Chairs and the longtime employer-side Investment Committee Co-Chair should change – perhaps with the NIF stepping into an actual Chair role at both the Investment Committee and Board levels.

Class Counsel's mantra, apparently quoting an unspecified communication with one of their experts, is that the non-monetary relief is "'a big win'" (or "'a real win'") and provides "'excellent protective [or protection] infrastructure.'" Prelim. Approval Mot. 14, 18, 35, 44; DE 139 at 10; Fee Mot. 18, 30, 34. The expert in question is presumably Susan Mangiero, Class Counsel's expert on governance. Prelim. Approval Mot. 33.

---

[21] *E.g.*, Settlement Agreement § 7.1 & Approval Order, *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-cv-9936 (LGS) (S.D.N.Y.) (S.D.N.Y. Aug. 24, 2018 & Mar. 1, 2019) (DE 322-1, 347) (settlement required that an independent fiduciary issue a "written opinion" as to certain conduct at issue); Settlement Agreement § 10.4 & Approval Order, *Clark v. Duke Univ.*, No. 16-cv-1044 (D.N.C. Jan. 16, 2019 & June 24, 2019) (DE 149-2, DE 164) (fiduciaries required to obtain recommendation from independent consultant on whether to solicit bids for certain services; if consultant says yes but fiduciaries decide no, everyone's reasons have to be documented, and the consultant has to issue a written report).

But these reforms are not a "big win" and the protection they provide is not "excellent" – and the Court can take that directly from Ms. Mangiero. In a recent article about independent fiduciaries, Ms. Mangiero explained that whether a NIF succeeds "depends on a panoply of factors, not the least of which *is the authority granted to them to ensure that a robust process exists, is implemented, and when needed, revised . . . .*" (*See* Ex. 2 hereto & footnote 2 above; emphasis added.) The NIF here has no such "authority" to "ensure" anything. Ms. Mangiero also stressed the importance of "protection allowing the independent fiduciary to rigorously watch over the actions of in-house ERISA investment committee members *and outside vendors with impunity*. No one is well-served if a supposedly objective third party . . . *has limited clout to prevent undue risk-taking by others.*" *Id*. (emphasis added). But here the proposed NIF has zero "clout to prevent undue risk-taking." (As noted above, the setting of risk/return objectives and the asset-allocation approval power is vested in voting Trustees alone.) Ms. Mangiero also notes that "[a]n independent fiduciary should have the latitude to renegotiate vendor contracts." *Id*. This NIF has no such latitude, and at best can comment on choices made by others. Ms. Mangiero again (*id*.):

> The independent fiduciary must *brutally assess any deficiencies regarding how in-house ERISA fiduciary decisions were made in the past **and then correct them***. *This scrutiny could result in major changes such as revising the investment policy statement for the plan*, working with outside ERISA counsel and in-house Human Resources *to improve participant communications*, and/or *hiring a firm to carry out a governance audit.*

The NIF here is empowered to "correct" nothing. Further, the Agreement does not contemplate any role by the NIF in a "governance audit," even though governance is lacking in key respects here, such as the allegiance of plan counsel. (*See* I.C. below.) The NIF's role is limited to "the Plan's investments," Agreement § 8.1.5.1(a)-(d), as opposed to other important subjects, such as actuarial matters. Although the Agreement leaves open the *possibility* of expanding the NIF's duties, it does not *require* it. *Id*. § 8.1.5.1(h).

11

The NIF here also is not given any role in "participant communications," let alone the ability to "improve" them. Class Counsel asserts that the proposed governance reforms "are designed to prevent the Trustees from ever again blindsiding Plan Participants like they did from 2010 through the end of 2016," Prelim Approval Mot. 1 n.1, but that is simply not true. *Nothing* in the Agreement begins to address disclosures regarding *Fund condition* (as opposed to investment performance), let alone Trustees' plans to cut benefits. In fact, the Settlement secures *no relief whatsoever for the class* on Plaintiffs' claim based on dishonest (*i.e.* disloyal) communications.[22] This point is particularly frustrating to Objectors, who are outraged that the Trustees, in a deliberate effort to hide their imprudent investing and its disastrous results, undeniably deceived participants for many years about the condition of the Fund and the nature of its investments.[23] Had the Trustees made truthful disclosures prior to 2016, participants would have had time and an opportunity to adjust their retirement planning to reflect the reality, known to the Trustees years in advance, that the Fund was in dire circumstances and therefore that the benefits promised to participants might be cut. The failure not to make timely, accurate disclosure of this risk was unconscionable; it materially and adversely impacted the retirement security of

---

[22] Am. Compl. ¶¶ 17, 18(a), 177, 179(b), 180(a). The Court expressly sustained those claims *even though* it ruled that loss was not adequately alleged. DE 90 at 43. And rightly so: As long as a plaintiff satisfies Article III standing, as the Plaintiffs here unquestionably do, *cf. Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621-22 (2020), lack of causation and damages is not a reason to withhold *injunctive relief* for a proven breach of fiduciary duty. *See, e.g.*, *Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987).

[23] For example, notices the fiduciaries sent in 2014 and 2015 to their financially unsophisticated beneficiaries (huge numbers of whom did in fact "open . . . mail from the Plan," DE 184 at 32, and read it) state that if the Fund were simply to meet its then-current actuarial assumptions, insolvency was *not* projected. *See* Ex. 6 hereto at ECF 2, 3. But the basic defense theory here is that by this time, merely *meeting* the assumptions was projected to result in insolvency – supposedly making it prudent for the Trustees to aim for higher returns. *See* Franklin Report 7 ("the risk of insolvency was . . . evident . . . in 2015"). The Trustees stated in 2015 (Ex. 6 at ECF 3): "the Plan's actuary projects that if the Plan meets its current assumptions, the Plan will remain solvent *over the actuary's 20 year projection period*" – misleadingly omitting that (i) the actuaries in fact had projections for longer periods, and (ii) these showed insolvency. Franklin Report 18 (by 2015, actuaries were projecting insolvency in "roughly 20 to 30 years").

thousands of families. The NIF therefore must be given a decision-making role with respect to communications to Plan participants.

No one has yet explained *why* the NIF cannot have genuine decision-making authority and a broader role. The closest Class Counsel have come is to claim in a footnote that even if the NIF *could* vote, it would not matter "because his vote could never trump the majority vote of the duly elected AFM union president Raymond Hair and his appointees." Prelim. Approval Mot. 10 n.3. This does not make sense. The Fund's governing documents provide, as is common for Taft-Hartley plans, for "unit voting" by camp: the union Trustees collectively cast one vote, as do the employer Trustees. Decisions are made by a 2-0 vote (or a vote of 1 in favor and 1 abstaining, and there are also special procedures for resolving deadlocks).[24]

There is no reason why this structure cannot be adjusted to accommodate a decision-making NIF.[25] The NIF could be given at least a third unit vote, so his agreement would be required in case of a disagreement between union and employer Trustees. Or, better yet, to allay concerns that the union and employer Trustees could "gang up" on him, the NIF could be given two unit votes, so that his assent would be required for most Board actions, though the other Trustees acting together would be capable of deadlocking him. Or if that is too *much* power, the Fund could do away with unit voting, and each Trustee plus the NIF could be given an individual vote, forcing each fiduciary to take his role seriously[26] and allowing the NIF to break ties in the event of unanimity within each caucus. The point is, there are a range of possibilities, and none of them is especially difficult to imagine or to implement.

---

[24] Exhibit 4 § 6.4.

[25] The mutually agreed NIF, Andrew Irving, states that he has "*serv[ed] as an independent fiduciary with authority to make decisions for Taft-Hartley plans* and other benefit plans subject to ERISA in lieu of the plans' board of trustees or decision-makers," DE 139-2 ¶ 6 (emphasis added). Clearly this has been done before.

[26] *Cf.* Hair Dep. 317:16 – 22 (employer-side trustee boasted in an email that "I was not sleeping through the meetings, which is perhaps more than at least one union trustee can say.").

In sum, according to criteria supplied by "perhaps the leading fiduciary expert in the country," Prelim. Approval Mot. 24, the non-monetary provisions of the Agreement are inadequate. Objectors' request for a duly empowered NIF – in line with industry standards as outlined by Ms. Mangiero – is a reasonable ask given the evidence here, and there is ample precedent for it. *See* Settlement Agreement § 7.1 & Approval Order, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-cv-9936 (LGS) (S.D.N.Y.) (S.D.N.Y. Aug. 24, 2018 & Mar. 1, 2019) (DE 322-1, 347) (approved settlement required that all future decisions regarding certain conduct challenged in the case "be delegated to an independent fiduciary," who also would provide an independent "written opinion" as to other conduct at issue); *see also* footnote 25 above.

3.      *Class Counsel's Theory That the NIF Will Deter the Trustees or Expose Them to Liability Is Flawed*

Class Counsel also suggests that the lack of a vote does not matter because the NIF provisions will lead to the creation of a "written record" that will either deter the Trustees from "tak[ing] similar imprudent investment risks" in the future or else expose them to liability. Prelim. Approval Mot. 9, 10, 14; Fee Mot. 10. There are three major problems with this premise. The first is that Class Counsel have mischaracterized the Agreement. Although the NIF *is* required to state (orally) his assessment on matters considered by the Investment Committee,[27] the NIF is *not* required to make – and has no authority to make – what Class Counsel terms "a written record [of] any material disputes between himself and the Trustees," Prelim. Approval Mot. 10 (emphasis added). One searches the Agreement in vain for any general obligation to make a *written* record of disagreements (material or otherwise) between the NIF and the Trustees. To be sure, there is an express obligation to make a written record of any disagreement regarding a candidate to serve as

---

[27] Agreement § 8.1.5(e) (NIF "responsible to state his/her assessment . . . for all matters under deliberation or subject to a decision or vote related to the Investment Committee").

monitor of the OCIO. *See* Agreement Ex. 6.[28] However, with this sole exception, *nothing in the Agreement prevents the Trustees from ignoring, muzzling, or burying the NIF's views.*[29]

The second problem with the get-prudent-or-get-sued theory is that *class members should not have to go to the trouble and expense of bringing another lawsuit to redress ongoing or recurring practices exposed in this lawsuit.* That this might be required is practically an *admission* of the *in*adequacy of the prospective relief.

The third problem with Class Counsel's theory is that the Release is phrased in a way guaranteed to elicit the argument that the Trustees and their vendors/advisors get a free pass for all practices and courses of conduct that were at issue in the Amended Complaint and continue into the present and future. (*See* Section II below.) Thus it is not clear that any relevant "record" (even assuming that the Trustees were to create one) could be put to any use.

4.     *The NIF's Term Is Too Short*

The NIF's term – four or five years – simply is too short. This Fund has long-term problems. The statute of limitations does not require the Court in fashioning equitable relief or considering its adequacy to close its eyes to the fact that the Trustees' mismanagement began well before 2011. A longer-lasting mechanism for reining in the Trustees is needed.[30]

---

[28] There are also provisions ensuring documentation surrounding the *OCIO monitor's* proposed asset allocation targets and the *Trustees'* veto of same – but that does not guarantee any record of the *NIF's* views. Agreement § 8.1.4.

[29] Deposition testimony reflects that the Trustees approve minutes of meetings, that there is jockeying over the contents of the minutes, and that Trustees and/or their counsel are well aware that minutes of meetings are a potential source of adverse evidence. *E.g.*, Albert Dep. 176:19-177:3; Brockmeyer Dep. 145:17-147:5, 148:23-149:16, 152:12-154:4, 158:3-21.

[30] Yet another problem: Although the Agreement does not say how the NIF is to be paid, presumably the money will come from Fund assets – which is to say, from the class. This is unfair. The NIF's fees are likely to add up, as Andrew Irving is a New York City-based former senior partner at a major national law firm with many decades of legal and consulting experience whose time likely commands many hundreds of dollars an hour. *See* DE 139-2 at 5-6. While perhaps a drop in the overall bucket, as a matter of fairness, the fees of a newly installed fiduciary should be paid by the Defendants (or their insurer), not the plaintiff class, since it was the breaching fiduciaries whose behavior created the need for the NIF.

### C. Current Plan Counsel Has Disqualifying Conflicts, Undermining the Integrity of the Settlement and Underscoring the Need for NIF Empowerment

Class Counsel claims that the relatively recent departure of Rory Albert from Proskauer, (one of the plan's two counsels) and the replacement of Bredhoff & Kaiser (the plan's other counsel) with the Cohen, Weiss firm "will help bring new blood into the mix," Prelim Approval Mot. 13-14. On the contrary: these firms are subject to serious ongoing conflicts of interest that have adversely impacted the Fund and the class. The Cohen, Weiss firm (like Bredhoff before it) and Proskauer are *plan counsel*,[31] paid millions of dollars annually out of the class members' retirement money (*see* Exhibit 5 hereto, last page) to protect the interests of the *plan and its membership*.[32] Here, however, the same firms appear as defense counsel for the individual Trustees in a lawsuit brought on behalf of the *plan* seeking to have the Trustees make the *plan* whole for the Trustees' breaches of fiduciary duty.[33] (As if that were not enough, the firms' own legal advice was a major issue in the case, plus Mr. Albert, a key witness for Plaintiffs' side of the case, was still at Proskauer during the time of his deposition, which was defended by Proskauer.[34])

Just as in shareholder derivative suits director counsel and company counsel should not be the same, so too here the defense firms should have been disqualified a long time ago either from defending the Trustees in this case or from their role as plan counsel. *McGinn v. DeSoto, Inc.*, No. 90 C 4481, 1990 WL 251753, at *4 (N.D. Ill. Dec. 21, 1990) (applying ABA Model Rule 1.7(b), since adopted in New York, to disqualify the same counsel from simultaneously representing plans

---

[31] *See* https://www.afm-epf.org/AboutAFM-EPF/ExecutiveDirectorConsultants.aspx (listing "Plan Counsel").

[32] Albert Dep. 23:23-24:25 (explaining that in his role as plan counsel, his client is the Fund and its beneficiaries).

[33] *See* Am. Compl. caption & ¶¶ 29, 44, 190; 29 U.S.C. § 1132(a)(2) *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985) (actions by ERISA participants under § 1132(a)(2) are on behalf of "the plan as a whole").

[34] When the Court flagged the counsel-witness issue, defense counsel's explanation was: "we have no expectation that any of the partners will say something adverse to their clients," DE 112 at 10 – apparently forgetting that "their clients" include the plan, which in this action has interests *adverse* to the Trustees whom counsel has been representing. *See* N.Y. R.P.C. 3.7(b)(1), 1.7(b)(3), (b)(4). Needless to say the plan (acting through conflicted Trustees) could not have given informed consent to the conflicted representation.

and trustees in breach of fiduciary duty action: "the interests of the plans conflict with those of the individual [fiduciary] defendants"). Class Counsel for some reason elected not to do anything about the morass of conflicts here. But the firms' dual (and dueling) loyalties – coupled with the usual incentives of Class Counsel to focus on *early monetary relief* – do call the integrity of the Proposed Settlement into question. The competing loyalties are also a stark illustration that the NIF needs to be given input and authority on governance matters, and needs to be able to engage with outside service providers of his own choosing who are not beholden to the Trustees – or in Ms. Mangiero's words, "to renegotiate vendor contracts."

### D.  The Disclosure Provisions Are Too Weak and Need To Be Strengthened

The Agreement requires public disclosure of the bios and qualifications of a Trustee-elect "at least four weeks before the effective date of any new Trustees' [sic] appointment to serve on the board" (Agreement § 8.1.6) – in other words, *after* a Trustee has already been selected but before he/she has taken office.[35] This timing is pointless. This information should plainly be posted for a *proposed Trustee before he or she has been selected*, so that Plan participants have an opportunity to evaluate new candidates and raise any objections with union leadership or through other channels. Furthermore there is absolutely *no* reason that bios and qualifications should not be provided for *all* Trustees, including incumbents.

The Agreement also requires public posting of "a quarterly investment report, in substantially the same form as Exhibit 5 [to the Agreement], prepared by the OCIO comparing the Plan's asset allocation to the asset allocation of Large Taft-Hartley Plans [i.e. multiemployer plans

---

[35] Class Counsel mischaracterizes this provision of the Agreement, stating that Trustees must "provide Plan Participants with at least four weeks' notice of the identity and qualifications *before any appointment of any new Trustees*, so that Plan Participants have the opportunity to evaluate and raise any objections regarding those *prospective new Trustees*." Prelim. Approval Mot. 13 (emphasis added); *see also id*. at 23 (inaccurately claiming that the Agreement requires "advance notice of the identification of each new *proposed trustee*").

with > $1B in assets] and containing a running cumulative comparison of Plan's actual equity performance since October 2017 versus an appropriate index benchmark." Agreement § 8.1.2. Class Counsel states that this provision "will effectively prevent the Trustees from hiding such critical information from the participants they represent." Prelim. Approval Mot. 13. However, much of the information will remain hidden.

The Exhibit 5 disclosure is a step in the right direction, but it is inadequate. First, *it does not compare the Fund to all other Large Taft-Hartley plans as the Agreement requires*, but only to 12 out of 45 peers, supposedly because this minority is the group that "reported public equity classifications consistent with AFM-EPF's classifications." Agreement Ex. 5 at 21 [DE 139-1 at 82]. Translation: the basic categories used by the Trustees are sufficiently outside the norm that intelligent comparison with the mainstream is impossible.

Indeed, the asset categories used in Exhibit 5 are opaque and seemingly overlapping. The following are each sub-categories under "Global Equity": U.S. Equity (7.9%), Developed ex. U.S. Equity [i.e. developed international equity] (12.5%), Emerging Markets Equity (6.2%), and Global Managers (16.2%). *See id*. Ex. 5 at 11 [DE 139-1 at 72]. What is meant by "Global Managers," and into what categories (U.S. equity, international developed, emerging markets) do the 16.2% of Plan Assets so classified really fall? The Exhibit makes a half-hearted, and imperfect, attempt to deal with this. *Id*. Ex. 5 at 21 [DE 139-1 at 82] ("Global Equity managers are apportioned to [U.S., developed international, and emerging markets] based on their benchmark composition." But the benchmark does not indicate *what an active fund manager actually owns.*)

Similarly, as of December 2019 a staggering additional 16.7% of Plan assets was allocated to "Hedge Funds," split into "Hedged Equity" and "Absolute Return." *Id*. Ex. 5 at 11 [DE 139-1 at 72] What do these terms mean? "Hedge funds" are not an asset *class*; they are a loose term for

a(n expensive) category of asset *manager*[36]; and the two sub-categories here ("Hedged Equity" and "Absolute Return") are jargon that says exactly nothing about the underlying asset class (or the risk). A hedge fund can invest in U.S. equities, emerging markets, fixed income, and many things besides, including all sorts of exotic derivative instruments. What percentages of Plan assets entrusted to hedge fund managers are actually in U.S. equities, developed international, emerging markets, traditional fixed income, real estate, none of the above, etc.?

Next: focusing just on the "Global Equity" performance (and setting aside the definitional problem that many of the assets classified in Hedge Funds may properly belong to other categories), apparently annualized performance September 2017 to December 2019 lagged the benchmark by 0.9 percent. Agreement Ex. 5 at 3 [DE 139-1 at 64], 6th line. Troublingly, it is impossible to know from Exhibit 5 exactly what accounts for this underperformance – there is no information on historic performance for any time period longer than a year for almost any of the individual investments/managers. Better disclosures are needed.

### E. Class Counsel's Arguments Defending the Adequacy of the Non-Monetary Provisions Are Not Supported or Persuasive

The non-monetary relief here needs to be measured on the same yardstick as the equitable relief that would be awarded after Plaintiffs (in all probability) proved fiduciary breach at trial. Class Counsel argues that the Governance Provisions here "likely exceed the injunctive relief achievable even after a successful trial," and that removal of a fiduciary "is an extraordinary remedy that is rarely ordered in civil cases, particularly where, as here, there is no evidence that the trustees stole or diverted plan assets for their personal use." Fee Mot. at 31.[37] But Class Counsel

---

[36] *See, e.g.*, SEC Investor Bulletin: Hedge Funds, *at* https://www.sec.gov/files/ib_hedgefunds.pdf.

[37] The only support Class Counsel offers for this argument is *Sacerdote v. N.Y.U.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018), but that case is off-point for a host of reasons – including that the court there found no breach and so never needed to rule on remedies.

themselves pressed for removal of Trustees in a case that did not allege that any Trustees misappropriated assets. *See* Am. Compl. at 86 (Prayer for Relief ¶ E); July 9, 2019 Letter from Steven A. Schwartz [DE 118] at 7.

Class Counsel's demand was hardly far-fetched. Under ERISA, "[t]he issuance of a permanent injunction is not limited to cases in which the fiduciary has engaged in self-dealing. [29 U.S.C. § 1109(a)] is intended to be remedial and protective, and the court must determine the appropriateness of such a remedy in light of all the circumstances of the case." *Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006); s*ee also Hugler v. Byrnes*, 247 F. Supp. 3d 223, 236-37 (S.D.N.Y. 2017) ("The removal of a fiduciary 'and the appointment of a person to serve in their stead is appropriate under the statute when [the fiduciary has] engaged in 'repeated or substantial violation[s] of [his] responsibilities.'" (quoting *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984) (internal quotation marks omitted)). *Imprudent* fiduciaries can do at least as much long-term harm to plan assets as *disloyal* fiduciaries. *E.g.*, *Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir. 1987).

Had this case gone to trial, the Court might well have stripped some individuals from the Board (an express statutory remedy designed to further ERISA's driving purpose of preventing the failure of defined-benefit plans, *see* 29 U.S.C. § 1001(a), 1109(a)), and in all likelihood would have required that the Board be subjected to extensive oversight. The Court also might have required that the Board be supplemented with empowered expertise, inasmuch as some of the problems here seem to have been due to the Board's population by Trustees who simply were not equipped to discharge their responsibilities.[38] In a settled context, the relief can be *somewhat* less

---

[38] None of the Trustees on the Union side had expertise in finance, investing, or actuarial matters. *See also* Witz Report ¶ 55 (employer-side Trustees recognized that they lacked "time or expertise" to discharge the investment function).

intrusive than if the case had gone to trial, but in exercising its discretion (and its equitable powers), the Court still must ensure that the non-monetary relief is adequate and reasonable.

## II.   The Release Language Is Not "Narrowly Tailored"

Class Counsel claims that the Release is "narrowly tailored," Prelim. Approval Mot. 35, and that class members can "fil[e] their own lawsuit regarding the Trustees' investment decisions from November 2017 to the present," Fee Mot. 34-35. But the theoretical ability to maintain suit for post-October 2017 conduct, assuming it exists, is cold comfort when (1) there is a ticking three-year clock running from a plaintiff's "actual knowledge," 29 U.S.C. § 1113(2), (2) October/November 2020 is less than three months from now (Class Counsel had to conduct "an extensive *six*-month investigation" before launching this case, Prelim. Approval Mot. 23-24), and (3) to top it all off, an injunction is in place (preliminary now, DE 163 at 8, and permanent upon approval of the settlement, *see* DE 139-1 at 54 ¶ 12), enforceable in contempt, against commencing suit based on a Released Claim – which will discourage any class member (and its counsel) dissatisfied with the proposed remedies in this case from testing whether a claim based on post-November 2017 conduct is preserved or released.

The even larger problem, though, is that there appears to be no such "November 2017 to the present" carve-out in the Agreement – it was invented by Class Counsel. The "Released Claims" are broadly defined as any claims that "were asserted in the Complaint or Amended Complaint, **_or_** that arise out of, *relate in any way to*, are based on, *or have any connection with any of the factual or legal allegations asserted in the Complaint or Amended Complaint*, including, **_but not limited to_**, those that . . . have any connection with decisions made, prior to the OCIO Management Date [i.e. October 1, 2017], regarding" investment-related subjects, disclosures, and fiduciary breach. Agreement § 2.22.1 (emphasis added).

The reference to an October (not November) 2017 date and to the switch to an OCIO comes after "including but not limited to", and the language does not parse in a way that temporally limits the Release in the way Class Counsel claims. In fact, Agreement § 9.3 provides that "the release of future entities or persons included among the Released Parties in Section 2.22 shall be limited to *those Released Claims that are based on conduct preceding the Settlement Effective Date*." This language makes sense only if the Release covers conduct *after* 2017 *up to* the Settlement Effective Date *and also* (for all Released Parties other than the future entities or persons protected by § 9.3) beyond into the future – or so a defendant is likely to argue in a future case.

In other words: To the extent that imprudent behavior XYZ (i) was challenged in the Amended Complaint *or has any arguable connection with anything challenged in the Amended Complaint*, (ii) has continued from October/November 2017 to this day and/or (because the governance provisions are so weak) continues or recurs in the future, and (iii) a future suit is filed challenging imprudent behavior XYZ based on the Trustees' acts or omissions in 2018 or 2020 or 2022, the defense is sure to argue release, covenant not to sue, res judicata (and theoretically there is also a risk of contempt). Thus, even as the Agreement fails to prevent ongoing and future breaches, it also *extinguishes or hampers the assertion of claims based on such breaches*.

## III. Class Counsel's Discussion of Supposed Litigation Risks Is Wrong and Also Irrelevant To Assessing the Adequacy of the Non-Monetary Relief

Class Counsel argues settlement adequacy largely by pointing to (1) supposed risks and constraints associated with a potential *damages award*, and (2) a limited supply of insurance money as a source of *collection*. Prelim. Approval Mot. 35-40. But the supposed limit on the amount of *damages* potentially recoverable here is not relevant to the question of what *equitable* relief is appropriate. In fact, the opposite is true. To the extent that available insurance constrains what would otherwise be a much larger dollar recovery, that would be a reason for the settlement

to have *stronger*, not weaker, non-monetary provisions – to ensure that the *overall* relief is adequate and fair to the class even if the monetary recovery is limited.[39]

And indeed, the insurance policy does seem to be the main constraint here. Class Counsel significantly understates the likelihood of obtaining a very high-dollar judgment assuming the Court were to find liability. Class Counsel suggests that ERISA's "six-year statute of limitations prohibited Plaintiffs from recovering damages for [imprudent] investment allocation decisions made before July 2011." Prelim. Approval Mot. 10. But while damages *suffered* outside the limitations period (here, during 2010 and the first half of 2011) may not be recoverable, damages suffered *inside* the limitations period because of a failure to correct an imprudent decision made *outside* the limitations period are surely recoverable. *E.g.*, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) ("Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones."). As of the outset of the limitations period, the Trustees as fiduciaries had *liability* for failing to correct an imprudent asset allocation that they or their predecessors had made outside the limitations period. Thus the aggressive 2010 asset allocation (*see* Prelim. Approval Mot. 17) is very relevant to the damages recoverable.

Class Counsel sheepishly points out that Plaintiffs' damages theory rests on the "notion" that because of the imprudent allocations, "the Plan missed out on substantial additional gains that would have been achieved as a result of prudent asset allocation during the extraordinary domestic

---

[39] There is another reason why the monetary payment here is not much consolation: The insurance money in a meaningful sense comes from the *class members*. The Fund annually pays $2 million a year for insurance (*see* Exhibit 5 hereto, last page), the lion's share of which we understand to be the D&O premiums. Multiplied by the 12 years during which the Fund's fiduciaries have botched the 2008 financial crisis and its aftermath, that would add up to much of the proposed insurance payment here – a reminder that the house always wins. Add to that the fact that after a case like this is settled, the *future premiums* on the liability insurance – again paid using class members' retirement money – are sure to rise significantly. Thus while we have no basis to dispute that the $50 million policy limits (net of defense costs) are a practical ceiling on the potential *collection* here (although Class Counsel raises a tantalizing doubt about even that, *see* Prelim. Approval Mot. 30 n.7), the Court, in assessing fairness and adequacy, should consider that the insurance payout essentially consists of the defendants using the class members' own retirement money, paid over time, to buy themselves out of this case.

equity bull market run from 2010 to 2017." *Id.* at 46. Class Counsel suggests that this "'should have earned more'" theory had only iffy chances of success, making a recovery in or approaching the nine figures implausible. *Id.* In reality Plaintiffs' damages theory rests on well-settled ERISA and trust law: If a fiduciary invests imprudently, the recoverable loss is the difference between the resulting value of plan assets *and the value they would have had if they had been invested prudently*. *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989) ("If, but for the breach, the Fund would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable"); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned . . . with what the Plan would have earned had the funds been available for other Plan purposes"); *see also* Restatement (Third) of Trusts § 100 (2012).[40]

Class Counsel's discussion also completely ignores the substantial provable damages from the Trustees' over-reliance on active managers when passive alternatives were available. The *defense damages expert* valued this claim alone at $30 million (assuming liability is established); the Plaintiffs' expert's figures were at least twice as high.[41]

Class Counsel (Prelim. Approval Mot. 45-46; Fee Mot. 25-26) suggests that two recent cases that ended in verdicts for the defense are cautionary tales. Class Counsel points out that in *Brotherston v. Putnam Investments, LLC*, 2017 WL 2634361, at *12 (D. Mass. June 19, 2017), the trial court "found that the plaintiffs 'failed to establish a prima facie case of loss,'" despite "a persuasive showing that the fiduciaries were 'no paragon of diligence' and that the defendants had

---

[40] Quoting *Dardaganis*, Class Counsel alludes to "uncertainties in fixing damages." Prelim. Approval Mot. 44. Class Counsel strips that phrase from context. What the Second Circuit actually said was that a court "should presume that, but for the breach, the funds would have been invested in the most profitable of the alternatives" and "*uncertainties in fixing damages will generally be resolved against the wrongdoer*." 889 F.2d at 1244 (emphasis added).

[41] *See* Carron Rebuttal Report ¶ 63; Witz Report ¶ 130 & page 70 Fig. 10.

failed to monitor the plan's investments." Prelim. Approval Mot. 46. What Class Counsel does *not* mention is that the First Circuit vacated and remanded this ruling because the district court – having tentatively concluded that Defendants breached their fiduciary duties – analyzed "loss" incorrectly. 907 F.3d 17, 31, 42 (1st Cir. 2018).

Class Counsel also mischaracterizes *Sacerdote*. There, unlike here, the decisions made by NYU relating to recordkeeping systems and other matters (all of them far less consequential than the subject matter of this case) were (unlike the decisions at issue here) clearly well-founded and well-supported. Class Counsel makes much of the trial court's criticism of several NYU functionaries for a "concerning lack of knowledge relevant to [their] Committee's mandate," 328 F. Supp. 3d at 280, 291-92. But those were quibbles that played only a minor role in the opinion; the committee did include knowledgeable people and NYU, very much unlike the Trustees here, made objectively reasonable decisions.

## **CONCLUSION**

This is not a case in which the defendants have changed their ways, or leadership has turned over. It is one in which the fiduciary breaches exposed by the lawsuit continue to the present day. The Agreement itself not only does almost nothing about it; it also hinders *class members* from doing anything about it. The incumbents' latitude needs to be checked with an independent fiduciary empowered in ways Class Counsel's own expert has explained are best practices. Class Counsel worked hard on this case and developed a compelling record of years-long incompetence, mismanagement, and dishonesty by the Trustees, but unfortunately the Proposed Settlement is inadequate, unfair, and unreasonable. The Court should decline to approve it.

Dated: July 27, 2020

Respectfully submitted,

WALFISH & FISSELL PLLC

By: _Daniel Walfish_____

    Daniel Walfish
    Rachel Penski Fissell
    405 Lexington Ave 8th floor
    New York, NY 10174
    Tel.: 212-672-0521
    Email: dwalfish@walfishfissell.com

    *Attorneys for Objectors*

## <u>List of Exhibits</u>

Exhibit 1: Compilation of asset allocation targets

Exhibit 2: Mangiero article

Exhibit 3: Report of Bolton Partners

Exhibit 4: Trust Agreement, as amended

Exhibit 5: Excerpts from the Plan's IRS Form 5500 for plan year ending Mar. 31, 2019

Exhibit 6: Participant communications

## Appendix: List of Objectors and Signatures[42]

Steven Nathan

Phillip Ayling

John R. Blane

Robert Stephen Brewster

Mike Brignardello

Pat Buchanan

Robert Buchanan

Peter Cannarozzi

John Mark Casstevens

Jack Cavari

John Clark

Felicia Collins

James Cox

Stephanie Cummins

Jacqui Danilow

Clint de Ganon

Christopher Deschene

Armen Donelian

Dennis Dreith

Glenn Drewes

Dan Dugmore

Bruce Dukov

Stuart Duncan

Robert Elhai

Mason Embry

Tony Finno

---

[42] The list has been corrected in accordance with counsel's July 29 letter to the Court.

Randall D. Ford

Shannon Ford

Larry Franklin

Allison Brewster Franzetti

Steve Gelfand

Owen Hale

Shari Hoffman

Mitchell L. Holder

Jody Jarowey

Jefferson Jarvis

Patrick Johnson-Whitty

John Jorgenson

JoAnn Kane

Randa Kirshbaum

Robert Kondor

Chuck Leavell

Paul Leim

Chris Leuzinger

Wesley Lee Little

Kerry Marx

John McDaniel

Joel McNeely

Greg Morrow

Kenneth Munday

Craig E. Nelson

Ron Oates

Warren Odze

Mark Olen

29

Daniel J. Parks

Weldon Dean Parks

Larry Paxton

Jay Rosen

Steven Schaeffer

Adam Shoenfeld

Jeffrey Southworth

David A. Spinozza

C. Michael Spriggs

Edgar M. Struble

Kenneth Wild

John David Willis

Glen A. Worf

Carol Zeavin

Dated: July 27, 2020

Objector Name: STEVEN J. NATHAN

Signed: _[signature]_

Address: 205 Sweetgum Ct
Nashville TN 37221

Phone Number: 615-403-1275

Email Address: STEVE@STEVENATHANmusic.com

Dated: July 27, 2020

Objector Name: Phillip W. Ayling

Signed: _Phillip W. Ayling_

Address: 3027 Punta Del Este

Hacienda Heights, CA 91745

Phone Number: 626.336.9853

Email Address: mroboe@earthlink.net

Dated: July 27, 2020

Objector Name:      **John R Blane**

Signed:

Address:            **1649 Huntington Ln.**

                    **Highland Park, IL 60035**


Phone Number:       **847 579-9900**

Email Address:      **John@BlaneMusic.com**

Dated: July 27, 2020

Objector Name:     ROBERT STEPHEN BREWER

Signed:     _____

Address:     564 BRIXHAM PARK DR

FRANKLIN, TN 37069

Phone Number:     615 · 414 · 5905

Email Address:     brewbeat@comcast.net

Dated: July 27, 2020

Objector Name: Mike Brignardello

Signed:

Address: 112 Sweethaven Court

Franklin, TN 37069

Phone Number: 615 293-1993

Email Address: bassnashville@gmail.com

Dated: July 27, 2020

Objector Name: PAT BUCHANAN

Signed: Patrick J. Buchanan

Address: 123
Saddlebridge Ln.
Franklin, TN. 37069

Phone Number: 615 - 300 . 1115

Email Address: Pbpb62 @ G.mail. CB

Dated: July 27, 2020

Objector Name:   Robert Buchanan

Signed:

Address:   4001 Knobhill Drive

Sherman Oaks, CA, 91403

Phone Number:   818-985-2581

Email Address:   robbiebuchanan@mac.com

Dated: July 27, 2020

Objector Name:   Peter Cannarozzi

Signed:   *Peter Cannarozzi*

Address:   6 Stuart St

Newton NJ 07860-2218

Phone Number:   201-982-1699

Email Address:   petecannarozzi@gmail.com

Dated: July 27, 2020

Objector Name:  JOHN MARK CASSTEVENS
Signed:  John Mark Casstevens
Address:  6404 STONEHAVEN Dr
NASHVILLE TN 37215

Phone Number:  615 517 1283
Email Address:  mcass @ comcast not

Dated: July 27, 2020

|  |  |
|---|---|
| Objector Name: | JACK CAVARI |
| Signed: | |
| Address: | 620 Sunset Ave |
| | Haworth, NJ 07641 |
| | |
| Phone Number: | 201-385-3891 |
| Email Address: | jcavari@verizon.net |

Dated: July 27, 2020

Objector Name: _John, Clark_

Signed: _[signature]_

Address: _711 Amsterdam Ave #16N_
_New York, NY 10025_

Phone Number: _917. 612. 3225_

Email Address: _jtcsr1@gmail.com_

Objector Name: **Felicia Collins**

Signed:

Address: 16 Dudley Heights

Albany, N.Y. 12210

Phone Number: 917-721-8148

Email Address: feeva09@gmail.com

Dated: July 27, 2020

Objector Name: James Cox (Jim Cox)

Signed:

Address: 5447 Oliffa Info

Long Beach, CA 90815

Phone Number: (562) 801-9835

Email Address: MRMcCUORE@yahoo.com

Dated: July 27, 2020

Objector Name: STEPHANIE CUMMINS

Signed:

Address: 800 PARK AVE
FORT LEE NJ 07024

Phone Number: 845 893-3723

Email Address: cellopaws @gmail.com



Dated: July 27, 2020

Objector Name: Jacque Danilow
Signed: Jacques Danilow
Address: 100 Park Ave.
Ft. Lee, N.J.
07024

Phone Number: 917 441-2511

Email Address: Jacdanilow@aol.com

Dated: July 27, 2020

Objector Name: Clint de Ganon

Signed: Clint de Ganon

Address: 219 Birchwood Ave.
Nyack, NY 10960

Phone Number: 845-353-6277

Email Address: clintdeganon@gmail.com

Dated: July 27, 2020

Objector Name:     Christopher Deschene

Signed:

Address:     719 Emory Drive
             Chapel NC 27517

Phone Number:     919 428-6721

Email Address:    christopher.deschene@gmail.com

Dated: July 27, 2020

Objector Name: Armen Donelian

Signed: Armen Donelian

Address: 338 Kip Road
Hudson, NY
12534

Phone Number: 917-974-7446

Email Address: armen.donelian@gmail.com

Dated: July 27, 2020

| | |
|---|---|
| Objector Name: | Dennis Dreith |
| Signed: | |
| Address: | 4830 Reforma Road |
| | Woodland Hills |
| | CA 91364 |
| Phone Number: | 1-818-943-0846 |
| Email Address: | dennis@dennisdreith.com |

Dated: July 27, 2020

Objector Name:     GLENN DREWES

Signed:            [signature]

Address:           7 MEADOWWOOD LANE
                   GLEN HEAD, NY 11545

Phone Number:      (516) 902-8448

Email Address:     drewblue@optonline.net

Dated: July 27, 2020

Objector Name: DAN DUGMORE

Signed: Dan Dugmore

Address: 1065 Lewis Rd
CHAPMANSBORO
TN 37035

Phone Number: 615 202 6518

Email Address: dandugmore49@gmail.com

Dated:      July 27, 2020

Objector Name:    Bruce Dukov

Signed:

Address: 23728 Adamsboro Drive Newhall, CA 91321

Phone Number:    661-478-2605

Email Address:    bdukov@mac.com

Dated: July 27, 2020

| | |
|---|---|
| Objector Name: | Stuart Duncan |
| Signed: | _(signature)_ |
| Address: | 970 Plaza Way |
| | Carson, NV 89703 |
| Phone Number: | 634 175.5053 |
| Email Address: | duncan663@aol.com |

Dated: July 27, 2020

Objector Name:   Robert Elhai

Signed:

Address:   2114 Girard Av S

Minneapolis MN 55405

Phone Number:   612 308 8305

Email Address:   relhai@icloud.com

Dated: July 27, 2020

Objector Name: _Mason Embry_

Signed: _Mason Embry_

Address: _3401 Harborwood Cir._

_Nashville, TN 37214_

Phone Number: _412-973-0210_

Email Address: _mason@masonembry.com_

Dated: July 27, 2020

Objector Name:   Tony Finno

Signed:

Address:   1090 Roosevelt Ave.

New Milford , NJ 07646

Phone Number: 201-907-0646

Email Address: tfinno @aol.com

Objector Name:     RANDALL D. FORD

Signed:            Randall D Ford

Address:           530 RICHMAR DRIVE

                   NASHVILLE, TN 37211


Phone Number:      615-333-1573

Email Address:     RDF@COMCAST.Net

Dated: July 27, 2020

Objector Name: SHANNON FORD

Signed:

Address: 4323 42ND ST.

#E 10

SUNNYSIDE, NY 11104

Phone Number: 917-838-2070

Email Address: sford91@GMAIL.COM

Dated: July 27, 2020

Objector Name: LARRY FRANKLIN

Signed: _____

Address: 108 Newton Nook

Brentwood, TN 37027

Phone Number: 615 - 300 - 6931

Email Address: larryfranklin @ comcast.net

Dated: July 27, 2020

Objector Name: _Juliet Brenner-Bonzelli_

Signed: _William Brenner Bonzelli_

Address: _14 Dartmouth Rd_

_Cranford NJ 07016_

Phone Number: _908 303-1919_

Email Address: _jbrenn4 8863@gmail.com_

Dated: July 27, 2020

Objector Name: _Steve Gelfand_

Signed: _Steve Gelfand_

Address: _2530 Independence Ave_
_#1B_

Phone Number: _718-548-9383_

Email Address: _Steve.gelfand@icloud.com_

Dated: July 27, 2020

Objector Name: Owen Hale

Signed: Owen Hale

Address: 38150 DG Holley Rd
Pearl, River, LA. 70452

Phone Number: 615-491-3897

Email Address: rhale1110@att.net

Dated: July 27, 2020

Objector Name:      Shari Hoffman

Signed:

Address:            4854 Regalo Road

                    Woodland Hills, CA 91364


Phone Number:       212-779-1155

Email Address:      shoffman@teg-intl.com

Dated: July 27, 2020

Objector Name: MITCHELL L. HOLDER

Signed:

Address: 845 Cypress ST.
THOUSAND OAKS, CA. 91320

Phone Number: 805-358-9990

Email Address: mcholder@earthlink.net

Dated: July 27, 2020

Objector Name: Jody Jarowey

Signed:

Address: 719 Emory Drive

Chapel Hill NC 27517

Phone Number: 919 428-6723

Email Address: JJarowey@gmail.com

Dated: July 27, 2020

Objector Name: Jefferson Jarvis

Signed: *(signature)*

Address: 5104 Springlake Way
Baltimore, MD 21212

Phone Number: (615) 319 - 2859

Email Address: jeffjarvis @ zoho.com

Dated: July 27, 2020

Objector Name:   Patrick Johnson-Whitty

Signed:

Address:   401 43rd Ave Apt 207

San Francisco CA 94121

Phone Number:   210-421-1095

Email Address:   pwjohnso@gmail.com

Dated:      July 27, 2020

Objector
Name:       JOHN JORGENSON

Signed:     _____

Address:    271 EUGENIA DR.
            VENTURA, CA 93003

Phone
Number:     615 545 9020
Email Address: jjorgen106@AOL.COM

Dated: July 27, 2020

Objector Name: JoAnn Kane

Signed: John Kane

Address: 6690 Sills Road
Clinton, WA 98236

Phone Number: 360.579.1261

Email Address: Q2943@WHIDBEY.COM

Dated: July 27, 2020

Objector Name: RANDA KIRSHBAUM

Signed: Randa Kirshbaum

Address: 698 WEST EN AVE.
Apt. 2C
NY    NY    10025

Phone Number: 646 596 0231

Email Address: randafay212@gmail.com

Dated: July 27, 2020

Objector Name:    ROBERT KONDOR

Signed:    _____

Address:    9 Cotswold Drive
North Salem NY
10560

Phone Number:    818 634-0759

Email Address:    RKONDOR @ME.COM

Dated: July 27, 2020

Objector Name:    Chuck Leavell

Signed:

Address:    665 Charlane Dr

Dry Branch, Ga3 31020

Phone Number:    478 9453872

Email Address:    cltreeman@charlane.com



Dated: July 27, 2020

Objector Name: PAUL W LEIM

Signed:

Address: 1005 Mountaineer Dr.
Franklin, TN 37069

Phone Number: 615/598-0840

Email Address: PAul @ PaulLeim.com

Dated: July 27, 2020

Objector Name: _Chris Leuzinger_

Signed: _[signature]_

Address: _109 Brookline Ct_

_Franklin, TN_

_37069_

Phone Number: _615-347-4310_

Email Address: _bluezinger@comcast.net_

Dated: July 27, 2020

Objector Name: Wesley Lee Little

Signed:

Address: 2647 Woodberry Dr.

Nashville, TN  37214

Phone Number: 615-947-6868

Email Address: wes@weslittle.com

Dated: July 27, 2020

Objector Name: Kerry Marx

Signed:

Address: 2028 Artesian Drive

Nolensville TN 37135

Phone Number: 615-300-6234

Email Address: kmarxmail@gmail.com

Dated: July 27, 2020

Objector Name: John McDaniel

Signed:

Address: 5660 NE 21st Rd

Fort Lauderdale

FL 33108

Phone Number: 917 860 6863

Email Address: johnmcd.music @ gmail

Objector Name:    Joel McNeely

Signed:

Address:          5307 Scott Robertson Rd.

                  Hidden Hills, CA 91302


Phone Number:     818-606-9363

Email Address:    joelmcn94@gmail.com

Dated: July 27, 2020

Objector Name: GREG MORROW

Signed: *[signature]*

Address: 1204 Saddle Springs DR
Thompson's Station, TN
37179

Phone Number: 615 - 513 - 0094

Email Address: gringostarr@msn.com

Dated: July 27, 2020

Objector Name: Kenneth Munday

Signed: [signature]

Address: 5468 Vista Del Arroyo Dr.
La Crescenta, Ca
91214

Phone Number: 818 957 6367  8189706079

Email Address: kenneth_munday@yahoo.com

Dated: July 27, 2020

Objector Name: _Craig E. Nelson_

Signed: _Craig E. Nelson_

Address: _7416 Hallows Drive_

_Nashville, Tn. 37221_

Phone Number: _615 243. 2214_

Email Address: _Craignelson2@mac.com_

Dated: July 27, 2020

Objector Name: Ron Oates

Signed: *[signature]*

Address: 601 Banlin Drive
Nashville, TN
37221

Phone Number: (615) 646-8582

Email Address: productions@ronoates.com

Dated:     July 27, 2020

Objector
Name:          Warren Odze

Signed:

Address:       579 W 215TH St 10A

               NY NY 10034

Phone
Number:        917 806 4641

Email Address:

               warrenodze@gmail.com

Dated: July 27, 2020

Objector Name:   Mark Olen

Signed:

Address:   8535 Menard ave

Morton Grove, IL 60053

Phone Number:   847-967-0486

Email Address:   markolen@sbcglobal.net

Dated: July 27, 2020

Objector Name:     Daniel J Parks

Signed:

Address:     1861 Long Hollow Pike,
Gallatin, TN 37066

Phone Number:     615-300-4496

Email Address:     dannyparksemail@gmail.com

Dated: July 27, 2020

Objector Name:     Weldon Dean Parks

Signed:

Address:           12400 Ventura Blvd

                   1175

                   Studio City CA 91604

Phone Number:      818-422-9879

Email Address:     DeanP@aol.com

Dated: July 27, 2020

Objector Name: Larry Paxton

Signed: Larry Paxton

Address: 1718 N. Observatory Dr.
Nashville, TN 37215

Phone Number: 615-300-7678

Email Address: larry@larrypaxton.com

Dated: July 27, 2020

Objector Name: Jay ROSEN

Signed:

Address: 19312 VOSLE LN
TARZANA, CA 91356

Phone Number: 818 932 8090

Email Address: JROSEN4@SOCAL.RR.COM

Dated: July 27, 2020

Objector Name:  STEVEN SCHAEFFER

Signed:

Address:  11610 ACAMA ST.

STUDIO CITY, CA 91604

Phone Number:  (818) 326-5380

Email Address:  steve@schaef.net

Dated: July 27, 2020

Objector Name: _ADAM SHOENFELD_

Signed: _____

Address: _2082 DELAWARE DRIVE_

_NOLENSVILLE TN_

_37135_

Phone Number: _615-500-1713_

Email Address: _ADAMSHOENFELD@MAC.COM_

Dated: July 27, 2020

Objector Name:     JEFF SOUTHWORTH

Signed:

Address:           35 CAVALRY RD.
                   WESTPORT, CT 06880

Phone Number:      203-247-4005

Email Address:     jsouth2207@gmail.com

Dated: July 27, 2020

Objector Name: _David A. Spinozza_

Signed: _David A. Spinozza_

Address: _389 Under Mountain Rd_
_Salisbury, CT 06068_

Phone Number: _860 - 596 - 4044_

Email Address: _dspinozza@gmail.com_

Dated: July 27, 2020

Objector Name: C. Michael Spriggs

Signed: _____

Address: 1102 Murray Creek Lane.
Franklin. Tn
37069

Phone Number: 615-516-6329

Email Address: Michaelspriggs@me.com

Dated: July 27, 2020

Objector Name:        Edgar M. Struble

Signed:               Edgar M.        Digitally signed by Edgar M.
                      Struble         Struble
                                      DN: cn=Edgar M. Struble, o, ou,
                                      email=edgar@edgarstruble.com,
                                      c=US
                                      Date: 2020.07.23 15:26:06 -04'00'

Address:              24821 Parchman Ave

                      Newhall, CA  91321

Phone Number:         818-209-8519

Email Address:        edgar@edgarstruble.com

Dated: July 27, 2020

Objector Name:     KENNETH  WILD.

Signed:            Kenneth Wild

Address:           23244 FRIAR ST.

                   WOODLAND HILLS, CA.

                   91367

Phone Number:      310·990·5590

Email Address:     kenwild05@yahoo.com

Dated: July 27, 2020

Objector Name:   JOHN DAVID WILLIS

Signed:   D Willis

Address:   9488 FOOTHILLS DRIVE
BRENTWOOD, TN 37027

Phone Number:   615-300-6955

Email Address:   WILLISOUND2 @ ME. COM

Dated: July 27, 2020

Objector Name: Glen A. Worf

Signed:

Address: 5180 Pine Hill Rd.

Nashville, TN 37221

Phone Number: (615) 423-3102

Email Address: glennworf@mac.com

Dated: July 27, 2020

Objector Name:  Carol Zeavin

Signed:  Carol Zea

Address:  70 Riverside Drive
Apt. 3B
New York, NY 10024

Phone Number:  917-301-0929

Email Address:  zeavincarol @ gmail.com

# EXHIBIT 1

# Target Allocations as of Feb. 2010 and Sept. 2010

| Sector | Feb-2010 Target Allocation | Sep-2010 Target Allocation |
|---|---|---|
| (1) | | ( |
| Cash and Equivalents | 0 % | 0 % |
| Domestic Equity | 27 | 26 |
| Emerging Markets Debt | 0 | 0 |
| Emerging Markets Equity | 6 | 6 |
| Hedge Funds | 5 | 5 |
| High Yield Bonds | 8 | 8 |
| Infrastructure | 4 | 4 |
| International Developed Markets Equity | 16 | 16 |
| Investment Grade Bonds | 14 | 12 |
| Natural Resources | 0 | 3 |
| Private Equity | 3 | 3 |
| Real Estate | 10 | 10 |
| TIPS | 7 | 7 |

(Adapted from April 9, 2019 Carron Report, p. 12, Ex. 2.)

# November 2011 asset allocation targets

| Asset Class | November 2011 Allocations (%) |
|---|---|
| U.S. Equity | 16 |
| Developed Foreign Equity | 8 |
| Emerging Markets Equity | 11 |
| Private Equity | 15 |
| Investment Grade Bonds | 8 |
| TIPS | 6 |
| High Yield Bonds | 5 |
| Emerging Markets Debt | 8 |
| Infrastructure | 3 |
| Natural Resources | 5 |
| Hedge Funds | 5 |

(Excerpted from April 9, 2019 Witz Report p.41.)

# February 2015 asset allocation targets

| Asset Class | February 2015 Allocations (%) |
|---|---|
| U.S. Equity | 18 |
| Developed Foreign Equity | 12 |
| Emerging Markets Equity | 15 |
| Private Equity | 18 |
| Investment Grade Bonds | 10 |
| TIPS | 7 |
| High Yield Bonds | 0 |
| Emerging Markets Debt | 3 |
| Infrastructure | 0 |
| Natural Resources | 5 |
| Hedge Funds | 0 |
| Real Property Investments | 12 |

(Excerpted from April 9, 2019 Witz Report p.46.)

## ALLOCATION (%)

DECEMBER 31, 2019

| | CURRENT MARKET VALUE | ALLOCATION AS OF AUG 2019 | ALLOCATION AS OF SEP 2019 | ALLOCATION AS OF OCT 2019 | ALLOCATION AS OF NOV 2019 | CURRENT ALLOCATION |
|---|---|---|---|---|---|---|
| Total Pension Plan (Net of All Fees)* | $1,842,938,898 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Global Equity* | $776,306,213 | 42.8 | 42.2 | 42.5 | 42.3 | 42.1 |
| U.S. Equity* | $134,342,999 | 7.9 | 8.0 | 8.0 | 7.6 | 7.3 |
| Developed ex. U.S. Equity* | $224,662,698 | 12.5 | 12.4 | 12.4 | 12.1 | 12.2 |
| Emerging Markets Equity* | $120,357,449 | 6.2 | 6.4 | 6.4 | 6.2 | 6.5 |
| Global Managers* | $296,943,066 | 16.2 | 15.4 | 15.8 | 16.3 | 16.1 |
| Hedge Funds* | $301,594,350 | 16.7 | 16.3 | 16.3 | 16.6 | 16.4 |
| Hedged Equity* | $166,285,299 | 9.5 | 9.1 | 9.1 | 9.3 | 9.0 |
| Absolute Return* | $135,309,052 | 7.2 | 7.2 | 7.2 | 7.2 | 7.3 |
| Private Equity*3,4 | $325,547,635 | 17.4 | 17.7 | 17.9 | 18.0 | 17.7 |
| Private Real Estate*4 | $5,227,376 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 |
| Private Credit*3,4 | $122,218,766 | 6.6 | 6.6 | 6.7 | 6.7 | 6.6 |
| Fixed Income* | $268,161,437 | 14.8 | 15.2 | 14.8 | 14.9 | 14.6 |
| Cash and Cash Equivalents*5 | $76,568,856 | 4.0 | 5.5 | 3.6 | 3.5 | 4.2 |
| Synthetic Cash6 | -$32,685,736 | -2.8 | -3.9 | -2.2 | -2.3 | -1.8 |

December 31, 2019 asset allocation information
(Excerpted from Settlement Agreement Ex. 5, DE 139-1 at ECF p.72.)



Rows marked with " * " contain preliminary data.

## InvestorForce Public Equity Summary

Taft-Hartley Plans ≥ $1B; data as of 6/30/19

**Disclaimer:** While this is provided for informational purposes, the utility of this comparative information is limited. The investment allocation of any plan, including AFM-EPF, is developed based on a variety of factors unique to the plan, such as investment goals and philosophy, funding levels, risk tolerance and time horizon. Accordingly, this comparison, standing alone, does not indicate the appropriateness of any particular allocation.



Certain asset allocation information as of June 30, 2019 (Excerpted from Settlement Agreement Ex. 5, DE 139-1 at ECF p.82.)

| | Total Public Equity | US Equity | Developed ex-US Equity | Emerging Markets Equity |
|---|---|---|---|---|
| AFM-EPF | 42.2% | 17.5% | 16.6% | 8.1% |
| Maximum | 61.3% | 41.9% | 10.1% | 14.6% |
| Average | 45.6% | 23.4% | 4.4% | 6.3% |
| Minimum | 24.1% | 2.4% | 0.2% | 2.1% |

**Notes:**

All data is as of 6/30/2019 and there were 45 Taft-Hartley plans ≥ $1b reporting returns as of 6/30/2019.

Of those, 12 reported public equity classifications consistent with AFM-EPF's classifications.

For all 12 plans, the sum of the equity sub-asset classes did not equal the total equity percentage for the plan. We cannot account for this.

AFM-EPF's Global Equity managers are apportioned to the 3 categories above based on their benchmark composition, and AFM-EPF is not included in the 12 reported plans.

Different funds may report allocations and classify investments inconsistently.

C A

Sources: AFM-EPF data from Cambridge Associates and comparative data from InvestorForce

# EXHIBIT 2

Benefits & Executive Compensation News

# INSIGHT: Calling ERISA Ghostbusters— The Rise of Independent Fiduciaries

By Susan Mangiero and Mitchell H. Shames

Feb. 26, 2020, 4:01 AM

-------------------------------------------------------------------

-------------------------------------------------------------------

Settlement of ERISA lawsuits are increasingly including the hiring of an independent fiduciary to oversee plan processes. With a nod to the movie Ghostbusters, two fiduciary experts examine the reasons for the trend, the role of an independent fiduciary, and how ERISA investment committee activity likely changes when they're required.

-------------------------------------------------------------------

If recent settlement trends are any indication, ERISA-savvy independent fiduciaries will be working around the clock.

Just like the heroes in *Ghostbusters*, the 1984 blockbuster movie, neutral arbiters will continue wrestling with the ghouls of sub-par practices to attempt to save the day for retirement plan participants. Whether they succeed depends on a panoply of factors, not the least of which is the authority granted to them to ensure that a robust process exists, is implemented, and when needed, revised to reflect prudence and prevailing facts and circumstances.

The Employee Retirement Income Security Act of 1974 (ERISA) and the Department of Labor each consistently rely upon independent fiduciaries to protect the economic interests of plan participants. Transactions involving company securities or the purchase of annuity contracts raise potential risks of self-dealing but can be facilitated through the use of an independent fiduciary.

Furthermore, the DOL requires the use of an independent fiduciary any time a plan sponsor or financial institution requests individual exemptive relief from the self-dealing prohibited transactions rules. Whether by statute, regulation, or administrative relief, the ERISA environment is no stranger to the protections associated with engaging independent fiduciaries.

What's different now is a movement by the plaintiff's bar to set in place operational changes with respect to plan management. Increasingly, reforms sought by attorneys are in addition to any pre-trial or intra-trial financial settlement or, when a court opines against defendants, economic damages.

Demands typically reflect plan design, amount of monetary harm (alleged or adjudicated), nature of fiduciary breach complaints, negotiating leverage of each side, relevant regulatory opinions, and case precedents. Mandates range from simple to complex. Some are relatively inexpensive to implement. Others require a large budget.

Not all directives are universally agreed upon as the singular way to add value for participants. Consider vendor selection. Defined contribution plan stewards and their advisers still wax about the cost-benefit tradeoffs of issuing a request for proposal (RFP) versus relying on consultant bench-marking. Defined benefit plan decision-makers continue to debate the merits of liability-driven investing or restructuring with the help of an insurance company. An automatic, one-size-fits-all approach is no substitute for procedural prudence.

**ERISA Bill Murrays and Sigourney Weavers**

Enter the independent fiduciaries, the ERISA Bill Murrays and Sigourney Weavers, to navigate how best assets are handled "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

They stand atop the governance infrastructure of a qualified plan, waging war against conflicts and bad practices. The engagement of an independent fiduciary signals change. Her presence can enhance the critical rebuilding of trust among plan participants that often disintegrates during class action litigation. In a tight labor market, companies rely on a generous benefit mix to attract and retain talent. Enlightened sponsors, including those who settle without admitting fault, want employees to value their retirement plans.

The hiring of an independent fiduciary occurs after all parties agree on the need to engage one. The recruitment process includes steps such as identifying which individuals and firms should be considered, the basis on which they will be evaluated for the job, how much to pay them, and for how long. Equally important, a binding agreement must be finalized.

Contract terms will vary by situation. What should not vary is protection allowing the independent fiduciary to rigorously watch over the actions of in-house ERISA investment committee members and outside vendors with impunity. No one is well-served if a supposedly objective third party rubber stamps decisions or has limited clout to prevent undue risk-taking by others.

As the term implies, two separate determinations must be assessed when considering a firm (or individual) for this position. The firm must be both "independent" and a "fiduciary." Independence requires the firm have no other relationships with the plan sponsor or the retirement plan which could give rise to a conflict of interest.

As a fiduciary, the firm should demonstrate its expertise in fiduciary matters. Due to the multi-disciplinary nature of ERISA decision-making, an independent fiduciary will often be supported by persons with experience, knowledge and credentials in governance, investment management, operations, and technology.

Significant case law over the past decades has given rise to a robust set of standards related to the fiduciary management of retirement plans. Professional fiduciaries are not only learned about these practices, they place fiduciary practices at the center of their business model.

**Integrating the Independent Fiduciary**

Integrating an independent fiduciary, once hired, can be challenging, especially if there are some who resist the role. Additionally, the independent fiduciary will need to quickly learn about the pre-existing structure of plan administrators and service providers.

An essential early step is the independent fiduciary's assessment of the current procedures which govern a specific plan. Court decisions are clear and unambiguous that procedural prudence is a key element in fulfilling fiduciary responsibility. Beyond that, an independent fiduciary should review documentation as well a sponsor's support staff abilities. An independent fiduciary needs assurance that sponsor resources are available so she can eliminate process elements that don't work and make requisite improvements.

Procedural prudence requires a precise allocation of settlor and fiduciary responsibilities among the various professionals engaged in the management of a specified retirement plan. ERISA affords significant flexibility in delegating certain duties as long as properly vetted service providers are regularly and thoroughly monitored.

An independent fiduciary should have the latitude to renegotiate vendor contracts. This activity would, inter alia, reflect the independent fiduciary's appraisal of the reasonableness of fees paid to outsiders, taking the value of services rendered into account.

Abiding by fiduciary best practices likewise requires the maintenance of contemporaneous written records. Such documents would embody procedures relied on by plan fiduciaries as well as tracking how, why, and when plan fiduciaries make decisions.

The independent fiduciary must brutally assess any deficiencies regarding how in-house ERISA fiduciary decisions were made in the past and then correct them. This scrutiny could result in major changes such as revising the investment policy statement for the plan, working with outside ERISA counsel and in-house Human Resources to improve participant communications, and/or hiring a firm to carry out a governance audit.

Once the initial assessment occurs, the independent fiduciary will regularly monitor the ERISA fiduciary decision-making process. At least annually, and potentially more often, an assessment must be made by the independent fiduciary as to whether the procedural prudence apparatus is being effectively utilized, as well as determining whether new facts or contexts should force adjustments of the process, no matter how longstanding.

Providing fiduciary responsibility is a dynamic process. The work of an ERISA fiduciary is never done nor should it be. Once an independent fiduciary's contract has expired, in-house fiduciaries must continue the process of self-examination, alone or with the reinforcement of relevant third party experts.

With aggregate ERISA litigation settlements and court decisions totaling billions of dollars, independent fiduciaries can play a vital role in helping sponsors stay below the radar of plaintiff's counsel. If a lawsuit has already been filed, an independent fiduciary can assist with mediation, pre-trial settlement, or post-resolution upgrades. Even without proton packs and green slime detectors, effective independent fiduciaries are modern day action heroes.

*This column does not necessarily reflect the opinion of The Bureau of National Affairs, Inc. or its owners.*

**Author Information**

*Susan Mangiero (PhD, CFA) is the founder and managing director of Fiduciary Leadership LLC, a senior governance consultant, and author of Risk Management for Pensions, Endowments and Foundations. An Accredited Investment Fiduciary Analyst, Certified Fraud Examiner and forensic economist, she has served as an expert witness on multiple ERISA and non-ERISA cases involving issues related to fees, investment selection, investment monitoring, performance reporting, derivatives, risk management, valuation, hedge funds, private equity funds, and company securities.*

Mitchell H. Shames is the founder and managing director of Harrison Fiduciary Group LLC. An attorney and formerly the general counsel of State Street Global Advisors, he is a leading expert, with 30 years of experience in fiduciary practices and structuring investment products for both domestic and global financial institutions.

*The information provided by this article should not be construed as financial or legal advice.*

© 2020 The Bureau of National Affairs, Inc.   All Rights Reserved

# EXHIBIT 3



April 4, 2018

Adam Krauthamer
Musicians for Pension Security

*Re: American Federation of Musicians and*
*Employers' Pension Fund*

Dear Adam,

As you know, I have been engaged by Musicians for Pension Security (MPS), an organization which represents the concerns of certain participants of the AFM – EPF Pension Plan (the Plan). I have been asked to provide my observations to assist all parties – the participants and the trustees – to find solutions and approaches that may avoid the necessity to certify the Plan as critical and declining as of March 31, 2018, and to avoid the need to suspend the accrued retirement benefits of Plan participants.

I am not the Plan's or the Retirement Board's actuary. I do not have all the data and models that the Plan's actuary has so I am somewhat limited in what I can do. However, there is a lot I know and at the end of this letter I will give you some idea of where the plan assets are headed and what certain changes might mean to the Plan.

There are approximately 1,400 multiemployer pension plans in this country. Of these, only 104 are in critical and declining status, and of those 104, only 15 have applied to the United States Treasury for reduction in benefits. These 15 represent a mere 1.1% of all multiemployer plans. If the Trustees declare the Plan to be in critical and declining status, and then decide to make application to the U.S. Treasury to reduce benefits, they place the Plan in a very small minority of highly dysfunctional multiemployer plans.

Plans can and do recuperate from setbacks. A study by the Plan's actuary has shown that 60% of multiemployer plans in critical status are projected to emerge from critical status in the future. (Milliman, Multi-employer Pension Funding Study, 2016)

My own recent experience confirms that when trustees and the union make the plan a priority, troubled plans can often stabilize themselves. As recently as 2009, one of my plans - the Baltimore Teamsters pension plan - had a Funded Ratio of 49%; however, through a combination of (1) increases in employer contributions; (2) benefit changes, such as, what your plan went through when your benefit formula was changed from 4.65% to 1%; and (3) slow administrative expense growth of less than 1% per year; the Funded Ratio is now 89% and on its way to being 100% funded. Starting in 2010, the Baltimore Teamster's Rehabilitation and Funding Improvement Plans included a plan for 6.6% annual contribution increases which almost all employers agreed to and which was a key part to their recovery.

Mr. Adam Krauthamer
April 4, 2018
Page 2

Many of my key points in this letter will be about the impact of raising contributions. While sustaining increases of 6% per year over a long period of time (like the Baltimore Teamster Plan) can be difficult, some of the plans that have filed to cut benefit with the US Treasury Department have also included substantial contribution increases, for example: about 10% per year for five years for the Alaska Ironworkers and 5.6% per year for a few years for the Ironworkers Local 16 plan.

I note that in the last 10 years at the Central States Teamsters pension plan, the trustees had a "primary schedule" that required employers to agree to five years of 8% compounded annual contribution rate increases, three years of 6% compounded increases, and then continuous 4% compounded annually increases. (Central States Teamsters MPRA Suspension Application, section 18.7). This was in an industry plagued with problems such as high diesel fuel prices, insolvent employers, and the deregulation of the industry. These industry conditions led to rampant employer withdrawals and high numbers of orphan participants.

The AFM Plan is not experiencing these problems. Employer withdrawals at the Plan are quite low and seem to pose no significant threat. Similarly, the proportion of orphans (i.e., employees in the Plan whose employers have gone bankrupt) is also quite low. Moreover, the demographics of the Plan are far more favorable than most of the critical and declining plans with which I am familiar. This suggests to me that the opportunity for higher employer contributions to the Plan is real.

Let me be clear, however, that without changes, there need to be benefit cuts to your Plan and even with changes, cuts will likely be needed without Congressional help. The amount of expected cuts that the Trustees need to decide on will depend a lot on the assumptions about the future. Certainly, the most important one is the expected future return on assets. The higher the assumption, the smaller the cuts, but the more risk that the cuts will not be sufficient to keep the plan from becoming insolvent. While the Trustees can change the investment mix, they have no control over the stock market. Therefore, my focus has been on one thing that the Trustees and the Union do have more control over: the level of future contributions.

At this point, most of the contributions to your plan are being used to reduce the unfunded liability. The Trustees will factor into their decisions the amount of future contributions when determining whether to cut benefits and by how much. Bringing in more contributions means smaller cuts.

In my opinion, at this point you may not be able to avoid cutting retiree benefits like the Baltimore Teamsters did; however, a recovery could take place at the Plan by raising contributions faster than currently assumed. Specifically, I recommend two things for your consideration:

1. Delaying any cuts for three years; and

2. During the next three years ask for larger contribution increases.

**Bolton Partners, Inc.**

Mr. Adam Krauthamer
April 4, 2018
Page 3

Here is some background, my rationale, and some numbers:

The actuarial assumption used by the Plan's actuary in December 2017 for annual increases in employer contributions is known as the Industry Activity Assumption (IAA). The IAA for the Plan has been set by the AFM-EPF trustees and their actuary at 2.5%. This is less than the rate of national wage inflation this past year which was 2.9%. In my experience, an IAA that is less than the rate of wage inflation is probably too low unless the industry is in decline, which does not seem to be the situation for this Plan.

In this regard, I note that there have been times in the Plan's history when much higher levels of employer contributions have been achieved. For example, between 2003 and 2007, the Plan achieved average annual increases of 6.23%. (May 18, 2011 Milliman Presentation, page 3). This suggests that with some energetic bargaining with employers, higher IAA's are justifiable. Yet for the Trustees, the Plan actuary, and the Treasury to be comfortable with a higher IAA assumption for the future may require results at the bargaining table. My understanding is that you have a lot of labor contracts but roughly they are on a three-year cycle which I factored into my recommendation.

What happens if the Plan or union (1) delays benefit cuts for three years; (2) can negotiate an average of a 6% contribution increase over this bargaining cycle or (3) assumes that they continue to get 6% per year for five years and then assume 2.9% per year thereafter? Milliman estimated in 2016 that $32 million per year in benefits payments could be avoided if cuts were not delayed. That means that there will be about $100 million less in assets in three years than there otherwise would be. However, if 6% per year contribution increases were bargained for and the Trustees (and Treasury officials) were comfortable with the higher assumptions, then over $319 million more could be raised over the next 20 years, which is one of the time horizons the Trustees must look at. The $319 million would need to be adjusted to today's dollars and some of the total would go for more benefits for current employees. However, this would cover the delay in cuts for three years and result in smaller cuts in three years, or whenever the Plan is in the Critical and Declining category.

Attached is a graph showing projected Plan assets under two scenarios. One line shows a projection of plan assets based on numbers from a presentation done by the Plan's actuary (Milliman) in December that assumes the 2.5% annual contribution increases. Since I do not have all their data, I created my base-line graph trying to match and extend their numbers. From there, I modeled what would happen if we gradually increased assets by increasing contributions not by the assumed 2.5%, but by 6% for five years and 2.9% thereafter, as I discussed earlier. I was also asked to assume the trustees can reduce plan expenses by 10%. The second line (my Alternative projection) shows a material improvement, a five-year delay in "insolvency", but not enough to fully solve the problem.

We do not know how the trustees want to reduce benefits, or by how much. I understand that for them to throw out numbers creates a risk of disappointment, however, in the last couple of years we saw estimates of a 23.3% potential cut and, adding to that, additional 1.5% cuts for every year of delay. Based on the assumptions and methods used, these could be correct. If we

Mr. Adam Krauthamer
April 4, 2018
Page 4

assume we can get the types of contribution increases illustrated in the attached graph, the cuts could be closer to either: (1) 13% now (although cuts might not be immediately possible if the plan is not Critical and Declining), or (2) no cuts for three years and about 18% in three years (if the plan in three years is Critical and Declining).

Ultimately this will be the Trustees' and Treasury's call.  As I indicated, it is my opinion that the Plan's Industry Activity assumption of 2.5% is probably too low.  If you think you can have negotiated contribution increases of 6% for five years, my recommendation is to ask the union to make that their goal and ask the Trustees to wait three years.

If the Trustees keep their 2.5% Industry Activity Assumption and show they expect the fund to run out of money within 20 years, they could propose cuts, starting at the end of an approval process, in about a year. However, if the U.S. Treasury agrees with me that he Industry Activity Assumption is probably too low, then the application could be rejected.  If it is approved, one could ask whether the Plan could just make the larger cuts now and restore some if we get larger contribution increases? Maybe, but probably not for many years and at that point, it would be too late for some retirees.

## Actuarial Certification

The undersigned credentialed actuary is a member of the Society of Actuaries and meets the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this letter.  We are not aware of any conflicts of interest that would impair the objectivity of this work.

We are available to answer questions relevant to this analysis and will provide additional information as necessary.

Sincerely,

**BOLTON PARTNERS, INC.**

Thomas Lowman, FSA, MAAA, Vice President

Attachment: Graph



**EXHIBIT 4**

AGREEMENT AND DECLARATION
OF
TRUST ESTABLISHING
THE AMERICAN FEDERATION
OF
MUSICIANS AND EMPLOYERS'
PENSION FUND

(As Amended And Restated Effective as of April 1, 2005)

**AGREEMENT AND DECLARATION OF TRUST
ESTABLISHING THE AMERICAN FEDERATION
OF MUSICIANS AND EMPLOYERS'
PENSION FUND**

<u>TABLE OF CONTENTS</u>

Page

ARTICLE I      DEFINITIONS .................................................................................................3

1.1      Administrative Committee.................................................................................3
1.2      Agreement or Trust Agreement .......................................................................3
1.3      Audit Committee................................................................................................3
1.4      Authorized Person.............................................................................................3
1.5      Beneficiary .........................................................................................................3
1.6      Board...................................................................................................................3
1.7      Code....................................................................................................................3
1.8      Collective Bargaining Agreement....................................................................4
1.9      Collective Trust..................................................................................................4
1.10    Committee...........................................................................................................4
1.11    Covered Employee or Employee ......................................................................4
1.12    Custodian............................................................................................................5
1.13    Employer, Employers or Contributing Employers .........................................5
1.14    Employer Trustee ..............................................................................................5
1.15    ERISA.................................................................................................................5
1.16    Executive Director.............................................................................................5
1.17    Foreign Securities .............................................................................................5
1.18    Instruct or Instructions.....................................................................................5
1.19    Investment Committee ......................................................................................5
1.20    Investment Manager..........................................................................................5
1.21    Investment Manager Account ..........................................................................6
1.22    National Collective Bargaining Agreement....................................................6
1.23    Plan .....................................................................................................................6
1.24    Real Property or Interests in Real Property ..................................................6
1.25    Securities or Security ........................................................................................6
1.26    Trust, Trust Fund, or Fund..............................................................................7
1.27    Trustee(s) ...........................................................................................................7
1.28    Union...................................................................................................................7
1.29    Union Trustee.....................................................................................................7

ARTICLE II     NAME, PURPOSE AND OPERATION OF TRUST................................8

2.1      Name ...................................................................................................................8
2.2      Purpose...............................................................................................................8
2.3      Operation............................................................................................................8
2.4      Participation by Contributing Employers ......................................................8
2.5      Obligations of Contributing Employers..........................................................9

i

ARTICLE III   TRUSTEES ............................................................................................10
   3.1   Composition of Trustees .................................................................................10
   3.2   Acceptance of Trust and Trusteeship..............................................................10
   3.3   Selection of Trustees......................................................................................10
   3.4   Written Appointments and Acceptances..........................................................10
   3.5   Term of Office ...............................................................................................10
   3.6   Resignations ..................................................................................................11
   3.7   Removal of Employer Trustees ......................................................................11
   3.8   Removal of Union Trustees ............................................................................11
   3.9   Successor Employer Trustees..........................................................................11
   3.10  Successor Union Trustees ..............................................................................11
   3.11  Powers of Successor Trustees .........................................................................11
   3.12  Use of Corporate Trustee. ..............................................................................12

ARTICLE IV   PLAN OF BENEFITS............................................................................14
   4.1   Benefits. ........................................................................................................14
   4.2   Written Plan of Benefits.................................................................................15
   4.3   Insurance Contracts........................................................................................15
   4.4   Exclusive Benefit. .........................................................................................15
   4.5   No Assignment of Benefits ............................................................................16

ARTICLE V   POWERS AND DUTIES OF TRUSTEES .............................................17
   5.1   Receipt of Payments. .....................................................................................17
   5.2   Payment of Benefits ......................................................................................17
   5.3   Expenses. ......................................................................................................17
   5.4   Insurance Contracts........................................................................................18
   5.5   General Powers. .............................................................................................19
   5.6   Committees. ...................................................................................................27
   5.7   Standard of Care ............................................................................................28
   5.8   Reliance on Written Instruments and Advice of Professionals. .......................28
   5.9   Indemnification .............................................................................................28
   5.10  Bonding ........................................................................................................29
   5.11  Fiduciary Insurance.......................................................................................29
   5.12  Deposit and Withdrawal of Funds..................................................................30
   5.13  Delegation of Power ......................................................................................30
   5.14  Discretionary Authority. ................................................................................30
   5.15  Execution of Documents................................................................................31

ARTICLE VI   MEETINGS AND DECISIONS OF TRUSTEES ..................................32
   6.1   Officers. ........................................................................................................32
   6.2   Calling of Meetings.......................................................................................32
   6.3   Quorum .........................................................................................................32
   6.4   Vote of Trustees. ...........................................................................................32
   6.5   Minutes of Meetings ......................................................................................33
   6.6   Arbitration. ....................................................................................................33

ARTICLE VII  ALLOCATION OF RESPONSIBILITIES ........................................35
 7.1 The Executive Director. ...............................................................................35
 7.2 The Board. ....................................................................................................36
 7.3 Administrative Committee. ...........................................................................37
 7.4 Investment Committee. .................................................................................39
 7.5 Audit Committee. ..........................................................................................41

ARTICLE VIII  INVESTMENT MANAGERS ......................................................44
 8.1 Appointment of Investment Managers. .......................................................44
 8.2 Authorization. ...............................................................................................44
 8.3 Acknowledgments. .......................................................................................45
 8.4 Direction by Investment Manager ...............................................................45
 8.5 Review by Board. ..........................................................................................45
 8.6 Issuance of Orders. .......................................................................................45
 8.7 Investment Guidelines ..................................................................................46
 8.8 Proxies or Other Ancillary Rights. ..............................................................46

ARTICLE IX   PAYMENTS TO THE FUND .......................................................47
 9.1 Employer Contributions. ..............................................................................47
 9.2 Effective Date of Employer Contributions ..................................................47
 9.3 Mode of Payment. .........................................................................................47
 9.4 Default in Payment. ......................................................................................48
 9.5 Enforcement Actions ....................................................................................50
 9.6 Payments Required by Court Award ............................................................50
 9.7 No Waiver of Other Rights. ..........................................................................50
 9.8 Remittance Reports. ......................................................................................51
 9.9 Audits. ...........................................................................................................51

ARTICLE X      AMENDMENT; TERMINATION; AND TRANSFER OF ASSETS ...............54
 10.1 Amendment ...................................................................................................54
 10.2 Limitation of Amendments ...........................................................................54
 10.3 Termination. ..................................................................................................54
 10.4 Transfer of Assets. ........................................................................................55

ARTICLE XI   ACCOUNTS OF THE BOARD .....................................................57
 11.1 Board to Maintain Trust Accounts ...............................................................57
 11.2 Valuation .......................................................................................................57

ARTICLE XII  MISCELLANEOUS ......................................................................58
 12.1 Situs. .............................................................................................................58
 12.2 Choice of Law ..............................................................................................58
 12.3 Counterparts ..................................................................................................58
 12.4 Titles; Plurals; and Gender. ..........................................................................58
 12.5 Service of Process .........................................................................................58
 12.6 Validity of Trustees' Accounts and Instruments ..........................................58
 12.7 Definitions. ....................................................................................................59

12.8    Notices ......................................................................................................59

12.9    Severability ..............................................................................................59

12.10   Legal Compliance ....................................................................................59

12.11   Successor Provisions of Law ...................................................................60

12.12   Entire Agreement .....................................................................................60

12.13   Construction .............................................................................................60

12.14   Inurement .................................................................................................60

12.15   Rights In Fund ..........................................................................................60

12.16   Trust Grants No Interest to Employees....................................................60

12.17   Duration of Agreement ............................................................................60

12.18   Interpretation of Agreement ....................................................................60

ARTICLE XIII  WITHDRAWAL LIABILITY ........................................................62

12.1    In General..................................................................................................62

### AGREEMENT AND DECLARATION OF TRUST ESTABLISHING THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND

**THIS AGREEMENT AND DECLARATION OF TRUST,** amended and restated as of the 1st day of April 2005, establishing the AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND (the "Fund"), by and among (a) HAROLD BRADLEY, HAL ESPINOSA, WILLIAM L. FOSTER, THOMAS F. LEE, DAVID LENNON, WILLIAM MORIARITY, MELINDA WAGNER, ED WARD and PHIL YAO (who, with their successors designated in the manner provided herein, are hereinafter collectively referred to as the "Union Trustees") on behalf of THE AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, AFL-CIO (collectively, the "Union") and as Union Trustees; and (b) IRVING W. CHESKIN, J. NICHOLAS COUNTER, III, ARNOLD KAPLAN, JOANN KESSLER, MARION PRESTON, ALAN H. RAPHAEL, JEFFREY RUTHIZER, NORMAN K. SAMNICK and HARRIET SLAUGHTER (who, with their successors designated in the manner provided herein, are hereinafter collectively referred to as the "Employer Trustees") on behalf of the Employers contributing to the Plan (collectively, the "Employers") and as Employer Trustees (the Union Trustees and the Employer Trustees being hereinafter collectively referred to as the "Board" or the "Trustees").

# W I T N E S S E T H :

**WHEREAS**, the Employers and the Union have executed, and it is expected that from time to time hereafter they will execute, collective bargaining agreements, participation or similar agreements (collectively, "Collective Bargaining Agreements") which, among other things, require periodic Employer contributions to the Fund; and

**WHEREAS**, the Employers and the Union became parties to an Agreement and Declaration of Trust establishing the Fund, dated October 2, 1959 and as amended and restated as of February 13, 1992, September 29, 1994, and September 25, 1997, and as from time to time thereafter amended (the "Existing Trust"), the assets of which have been and will continue to be used for the exclusive purpose of (a) providing retirement and related benefits to certain employees of the Employers ("Covered Employees") eligible to participate in the American Federation of Musicians and Employers' Pension Plan, as amended (the "Plan") and their dependents or beneficiaries ("Beneficiaries"); and (b) defraying the reasonable administrative and other expenses attributable to the operation of the Fund and the Plan; and

**WHEREAS**, it was and continues to be mutually agreed among the Employers and the Union that the Fund and Plan shall be established, operated and administered by the Trustees; and

**WHEREAS**, the Trustees now desire to amend and restate the Existing Trust, to incorporate, inter alia, various amendments made to the Existing Trust since it was last amended and restated and other modifications desired by the Board.

**NOW, THEREFORE**, for and in consideration of the promises and mutual covenants herein contained, it is hereby mutually understood and agreed by the Trustees (and, through them, the Employers and the Union) as follows:

2

# ARTICLE I

## DEFINITIONS

Whenever used in this Agreement, unless the context otherwise requires, the following words shall have the respective meanings set forth below:

**1.1** "**Administrative Committee**" shall mean the Committee described in Section 7.3.

**1.2** "**Agreement**" or "**Trust Agreement**" shall mean this Agreement and Declaration of Trust, as may from time to time hereafter be amended, which establishes the funding vehicle for the Plan for the benefit of Covered Employees and certain of their Beneficiaries, and sets forth the respective rights, obligations and responsibilities of the Executive Director, the Board, and any Committees duly authorized by the Board to take any actions hereunder.

**1.3** "**Audit Committee**" shall mean the Committee described in Section 7.5.

**1.4** "**Authorized Person**" shall mean, with respect to the Trust Fund, the Co-Chairs of the Board, any individual Trustee or member of any Committee of Trustees duly authorized by the Board to execute documents or otherwise represent the Board or said Committee, and the Executive Director where the Executive Director has been duly authorized by the Board to represent the Board or the Trust Fund in connection with a specific matter. With respect to an Investment Manager Account, the term "Authorized Person" shall mean any officer (or partner) of the Investment Manager or any other person or persons as may be duly designated pursuant to advance written notice by such officer (or partner) to the Board. With respect to a Custodian, the term "Authorized Person" shall mean any officer of said Custodian.

**1.5** "**Beneficiary**" shall mean a Covered Employee's spouse, or such other person or entity entitled under the terms of the Plan to receive benefits, if any, under the Plan following the death of the Covered Employee.

**1.6** "**Board**" shall mean the individuals from time to time acting collectively as the Board of Trustees under this Agreement, which shall also be the "named fiduciary" (as that term is defined in Section 402(a)(2) of ERISA) and the "administrator" (as that term is defined in Section 3(16)(A) of ERISA) of the Plan, appointed to control and manage the operation and overall administration of the Plan and the Trust Fund.

**1.7** "**Code**" shall mean the Internal Revenue Code of 1986, as from time to time amended, and all rules and regulations promulgated pursuant thereto.

3

**1.8** "**Collective Bargaining Agreement**" shall mean any collective bargaining, participation, or other written agreement between an Employer and the Union or between an Employer and the Trust Fund (or, where the Trust Fund is the employer, written minutes of a meeting of the Board) requiring an employer to make contributions to this Trust Fund on behalf of its Covered Employees, which is in force and effect and is acceptable to the Board (through Board approval or otherwise in accordance with procedures it establishes).   Any such Collective Bargaining Agreement shall be deemed to specifically incorporate the terms and conditions of this Agreement and the Plan and, by executing such Collective Bargaining Agreement, each Employer that is a party to such agreement thereby agrees to comply with and be legally bound by each and every provision of the Plan and this Agreement (as such documents may from time to time be amended by the Board) as if the Employer actually executed such documents.

**1.9** "**Collective Trust**" shall mean any group, pooled, common, commingled or collective trust fund maintained by a bank, trust company or broker-dealer, in which assets of employee benefit plans subject to ERISA and the Code may be invested. The trustees of such Collective Trust shall become trustees of the allocable share of the Trust Fund assets transferred and deposited with such Collective Trust, and shall have sole and exclusive authority and discretion to manage and control (including the power to invest and reinvest) such Collective Trust assets. The Board shall not be liable for any act or omission of any trustee or other fiduciary of a Collective Trust, or be under any obligation to invest or otherwise manage any assets of the Trust Fund that have been transferred thereto. The provisions of the agreement establishing such Collective Trust shall be deemed to be incorporated by reference into this Agreement (to the extent that the provisions thereof are not inconsistent with the terms of this Agreement or violative of ERISA, the Code or other applicable law).

**1.10** "**Committee**"   shall mean the Administrative Committee, the Audit Committee, the Investment Committee, or any other committee or subcommittee duly appointed and authorized by the Board to act pursuant to this Agreement.

**1.11** "**Covered Employee**" or "**Employee**" shall mean an individual employed by an Employer to render services pursuant to the terms of a Collective Bargaining Agreement, including a shareholder of a corporation or an owner of a limited liability company ("LLC") duly organized and operated under the laws of a State of the United States who is employed by that corporation or LLC to render service as a musician.   Notwithstanding the foregoing, a Covered Employee or Employee may in no event mean: (i) a self-employed person or sole proprietor that is an Employer (including, without limitation, a band leader) who is acting as his or her own employee; (ii) the spouse of a person described in (i); (iii) a partner of a partnership that is an Employer who is acting as an employee of such

4

partnership; or (iv) an owner of an LLC who was a member of the plaintiff class in the *Rochetti* action that was settled in 1991.

**1.12** "**Custodian**" shall mean one or more banks, trust companies, or broker-dealers selected by the Board as a "Corporate Trustee" (as that term is defined in Section 3.12) and/or custodian of Trust Fund Securities.

**1.13** "**Employer**", "**Employers**" or "**Contributing Employers**" shall mean any employer acceptable to the Board (through Board approval or otherwise in accordance with procedures it establishes) that heretofore or hereafter is required or otherwise undertakes to contribute to the Plan and/or the Trust Fund on behalf of its Covered Employees pursuant to a Collective Bargaining Agreement. The term "Employer", "Employers" or "Contributing Employers" shall not include unincorporated self-employed persons or sole proprietorships with no other employees, or partnerships that have no employees other than partners.

**1.14** "**Employer Trustee**" shall mean each individual named in Section 3.3(a) or designated as an Employer Trustee pursuant to the procedures set forth in Section 3.9.

**1.15** "**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as from time to time amended, and all rules and regulations promulgated pursuant thereto.

**1.16** "**Executive Director**" shall mean any individual, person or entity that has been appointed by the Board pursuant to Section 7.1 to control the day-to-day administration of the Plan and operation of the Trust Fund.

**1.17** "**Foreign Securities**" shall mean any securities described in Section 404(b) of ERISA and 29 C.F.R. § 2550.404b-1.

**1.18** "**Instruct**" or "**Instructions**" shall mean written communications signed by an Authorized Person (including, without limitation, instructions received by facsimile, electronic mail or any other electronic system, whereby the receiver of such communication is able to verify with a reasonable degree of certainty the identity of the sender of such communication).

**1.19** "**Investment Committee**" shall mean the Committee described in Section 7.4.

**1.20** "**Investment Manager**" shall mean any person or entity that has been appointed by the Board pursuant to this Agreement to manage, acquire or dispose of any Securities or other property of the Trust Fund who is, and has acknowledged in writing to the Board that it is, (a) a fiduciary (within the meaning of Section 3(21) of ERISA) with respect to the assets held in its

Investment Manager Account; and is (b) either (1) an investment manager registered in good standing under the Investment Advisers Act of 1940, (2) a bank (as defined in said Act) located within the United States, or (3) an insurance company qualified under the laws of more than one state to manage, acquire or dispose of employee benefit plan assets. The Board shall have the right, in its sole and absolute discretion, to appoint the Custodian as an Investment Manager for all or a portion of the Trust Fund Securities or other property.

**1.21** "**Investment Manager Account**" shall mean that portion of the Trust Fund which has been segregated by the Board for investment management by one or more Investment Manager(s), each of which shall constitute a separate Investment Manager Account.

**1.22** "**National Collective Bargaining Agreement**" shall mean any Collective Bargaining Agreement to which the American Federation of Musicians of the United States and Canada, AFL-CIO is a party.

**1.23** "**Plan**" shall mean the detailed rules and regulations of the American Federation of Musicians and Employers' Pension Plan, and any amendments or modifications thereto from time to time adopted by the Board, setting forth the basis on which the eligibility for benefits and the nature, type, form, amount and duration of benefits shall be made to Covered Employees and Beneficiaries, which shall be funded under the Trust Fund.

**1.24** "**Real Property**" or "**Interests in Real Property**" shall mean, in general, all real property and interests therein of whatever nature and personal property, both tangible and intangible, directly or indirectly associated or connected with the use of real property (including, without limitation, direct or indirect equity or other investments in real estate, interests in partnerships and other joint ventures having an interest in real property, participating or convertible mortgages or other debt instruments convertible into interests in real property by the terms thereof, options to purchase real estate, leaseholds, leasebacks, investments in group, collective or commingled real estate funds, and investments in securities issued by real estate investment trusts). For purposes of this definition, real property includes any property treated as real property either by local law or state law or for Federal income tax purposes.

**1.25** "**Securities**" or "**Security**" shall mean, except as may otherwise be provided in a written agreement or investment guidelines between the Board and an Investment Manager, all Trust Fund securities of any and every kind wherever situated, and any rights or interests therein, including, but not limited to, (a) common and preferred stocks, including the stock of an Employer (or any parent, subsidiary or other person associated or affiliated therewith) to the extent permitted by ERISA; (b) obligations of the United States Government or any

6

government of a state of the United States (and any of their agencies and instrumentalities); (c) bonds, debentures, notes and other evidences of indebtedness, including bonds, debentures or notes of an Employer (or any parent, subsidiary or other person associated or affiliated therewith) to the extent permitted by ERISA; provided, however, that the making of such investment will not result in more than 3% of the Trust Fund (calculated as of the time of the investment) being invested in bonds, notes or debentures of such Employer; (d) savings and time deposits (including, without limitation, any deposits bearing a reasonable rate of interest that the Custodian, or a bank or similar financial institution appointed as a trustee or custodian hereunder by the Board, makes in itself or in any parent, subsidiary or other person associated or affiliated therewith, to the extent permitted by law); (e) bankers' acceptances; (f) commercial paper (including participations in pooled commercial paper accounts); (g) Collective Trusts; (h) Foreign Securities (including, without limitation, American Depository Receipts); (i) participation units or certificates issued by investment companies or investment trusts; (j) collateral trust notes; (k) equipment trust certificates; (l) life insurance, retirement income, guaranteed investment, annuity and other forms of insurance policies or contracts; (m) bank investment contracts; (n) private equity, venture capital, hedge funds, fund of funds limited liability companies, partnerships, limited partnerships and other forms of alternative investments; and (o) any options, warrants or other instruments representing rights to receive, purchase, or subscribe for the same or evidencing or representing any other rights or interest therein appurtenant to such Securities.

**1.26** "**Trust**," "**Trust Fund**," or "**Fund**" shall mean all cash, Securities and other property which at the time of reference shall have been deposited in the trust account established pursuant to this Agreement or held by a Custodian, including any portion thereof which has been segregated in an Investment Manager Account or held under a group trust or Collective Trust, and any Real Property or Interest in Real Property at any time held by the Trust Fund.

**1.27** "**Trustee(s)**" shall mean collectively the individual Employer Trustees and the individual Union Trustees.

**1.28** "**Union**" shall mean the American Federation of Musicians of the United States and Canada, AFL-CIO, and any local unions (and certain related entities) duly affiliated therewith; provided, however, that for all purposes of Articles III and X, the term Union shall mean solely the American Federation of Musicians of the United States and Canada, AFL-CIO.

**1.29** "**Union Trustee**" shall mean each individual named in Section 3.3(b) or designated as a Union Trustee pursuant to the procedures set forth in Section 3.10.

# ARTICLE II

## NAME, PURPOSE AND OPERATION OF TRUST

**2.1**   **Name**.  The Trust shall be known as the "American Federation of Musicians and Employers' Pension Trust."

**2.2**   **Purpose**.  The Trust is established for the exclusive purpose of providing certain pension and related benefits to Covered Employees and their Beneficiaries under the Plan, and shall further provide the means for financing and maintaining the operation and administration of the Trust and the Plan in accordance with this Agreement, the Plan, and applicable law.

**2.3**   **Operation**.

(a)  It is intended that this Trust shall be established and operated in a manner that shall qualify it as an organization exempt from income taxation under Section 501(a) of the Code. Notwithstanding anything to the contrary contained herein, the Trust shall be operated exclusively for such purposes as will comply with Section 501(a) of the Code. To the extent that anything herein is inconsistent with the Code, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of the Code.

(b)  It is further intended that this Trust shall be established and operated in a manner that complies with ERISA. To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of ERISA.

(c)  The Trust shall also be established and operated as a "jointly-administered" pension fund within the meaning of, and in accordance with, Section 302(c) of the Labor Management Relations Act of 1947, as amended. To the extent that anything herein is inconsistent with said Act, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of said Act.

**2.4**   **Participation by Contributing Employers**.  Any Employer may participate in the Trust and the Plan by:

(a)  Executing a Collective Bargaining Agreement, or otherwise establishing a consistent pattern of contributing to the Trust Fund on behalf of its employees pursuant to a Collective Bargaining Agreement;

(b)  Designating a date on which such participation shall become effective;

(c)  Designating the categories of employment and its Covered Employees for participation in the Plan; and

(d)  Acceptance by the Board of the participation by such Employer in the Plan and Trust.

**2.5  <u>Obligations of Contributing Employers</u>**.   By executing or complying with the terms of a Collective Bargaining Agreement, each Employer shall be deemed (without any further action) to have:

(a)  Reviewed, understood, adopted and agreed to all provisions of this Agreement and the Plan (and any amendments to such Agreement or Plan), which documents shall be deemed to have been incorporated by reference into such Collective Bargaining Agreement;

(b)  Authorized the Employer Trustees to act as its agent and execute this Agreement and the Plan on its behalf;

(c)  Agreed to comply with and be bound unconditionally to said Plan and Trust, any amendments thereto, as well as all of the decisions of the Trustees and the Executive Director; and

(d)  Agreed to pay the costs of the Plan by means of periodic contributions to the Fund on behalf of its Covered Employees as set forth in a Collective Bargaining Agreement, as well as any additional payments to the Fund required pursuant to the decision of the Trustees, the terms of this Agreement, the Plan or a Collective Bargaining Agreement.

# ARTICLE III

## TRUSTEES

**3.1   Composition of Trustees**.  The number of Trustees under this Agreement shall be designated by the Board from time to time, provided that there shall be at least seven (7) Employer Trustees and at least seven (7) Union Trustees and no more than ten (10) Employer Trustees and ten (10) Union Trustees. There shall always be an equal number of Employer Trustees and Union Trustees (except in situations in which a Trustee vacancy is pending and waiting to be filled).

**3.2   Acceptance of Trust and Trusteeship**.  The Trustees appointed hereunder hereby accept the Trust created and established by this Agreement and consent to act as Trustees thereof by assuming the responsibility for the operation and administration of the Trust.  By their signature to this Agreement, or any counterpart or copy hereof, each Trustee hereby agrees to accept the trusteeship and to act in their capacities as trustees and fiduciaries of the Trust Fund in accordance with the provisions of this Agreement.

**3.3   Selection of Trustees**.

(a)  The current Employer Trustees shall be: IRVING W. CHESKIN, J. NICHOLAS COUNTER, III, ARNOLD KAPLAN, JOANN KESSLER, MARION PRESTON, ALAN H. RAPHAEL, JEFFREY RUTHIZER, NORMAN K. SAMNICK and HARRIET SLAUGHTER. In no event shall the Union or a Union Trustee be entitled to designate an Employer Trustee.

(b)  The current Union Trustees designated by the Union shall be: HAROLD BRADLEY, HAL ESPINOSA, WILLIAM L. FOSTER, THOMAS F. LEE, DAVID LENNON, WILLIAM MORIARITY, MELINDA WAGNER, ED WARD and PHIL YAO.  In no event shall the Employers or an Employer Trustee be entitled to designate a Union Trustee.

**3.4   Written Appointments and Acceptances**.   Except for the appointments of the initial Trustees under this Agreement, copies of the written appointments of successor Trustees shall be provided to the Board as soon as practicable after the appointments. Each Trustee shall signify his or her acceptance of the trusteeship in writing and in person at a meeting of the Board.

**3.5   Term of Office**.  Each Trustee appointed under this Agreement shall continue to serve as such until his or her death, incapacity, resignation or removal as herein provided.

**3.6**   __Resignations__.  A Trustee may resign, and shall be fully discharged (to the extent permitted by law) from further duty or responsibility hereunder, upon giving at least sixty (60) days advance written notice to the Board, or such shorter notice as the Board may accept as sufficient, in which notice there shall be stated a date when such resignation shall take effect; and such resignation shall take effect on the date specified in the notice, unless a successor Trustee shall have been appointed (as provided by Section 3.9 or Section 3.10) at an earlier date, in which event such resignation shall take effect immediately upon the successor Trustee taking office.

**3.7**   __Removal of Employer Trustees__.  Any Employer Trustee may be removed from office at any time, with or without cause, (a) by a majority vote of the Employer Trustees then in office; or (b) in accordance with the procedure described in Section 3.9(b).

**3.8**   __Removal of Union Trustees__.  Any Union Trustee may be removed from office at any time, with or without cause, in the sole discretion of the Union, by an instrument in writing signed by the duly authorized President of the Union and filed with the Board.

**3.9**   __Successor Employer Trustees__.

(a)  In the event that any Employer Trustee shall die, become incapable of acting hereunder, resign, or be removed pursuant to Sections 3.7 or 3.9(b) (by a petition which omits to name a successor) or, in the event of an increase in the number of Trustees, the Employer Trustees then in office may by majority vote designate a person to fill the position of Employer Trustee thus made available.

(b)  An Employer Trustee may be removed and a successor Employer Trustee appointed by the filing of a petition with the other Employer Trustees containing the signatures of Employers that were responsible for 50% or more of the contributions made to the Trust Fund by all Employers during the last complete six (6) month period ended June 30 or December 31 immediately preceding the submission of such petition.

**3.10**   __Successor Union Trustees__.  In the event that any Union Trustee shall die, become incapable of acting hereunder, resign, or be removed pursuant to Section 3.8, or in the event of an increase in the number of Trustees, the duly authorized President of the Union shall designate a successor Union Trustee by the filing with the Board of a certificate in writing.

**3.11**   __Powers of Successor Trustees__.  Any successor Trustee under this Agreement shall immediately, upon his or her designation as a successor Trustee and his or her acceptance of the trusteeship in writing filed with the Board,

11

become vested with all rights, powers, privileges and duties of a Trustee hereunder with like effect as if originally named as Trustee.

### 3.12  Use of Corporate Trustee.

(a)  At any time and from time to time, the Board may appoint, as a Corporate Trustee or Custodian, a bank, trust company or broker-dealer located within the United States.

(b)  The Board may, pursuant to Instructions, delegate to the Corporate Trustee or Custodian:

      (1)  the power to hold the Fund or a portion of it as sole trustee of a trust separate from the Fund created by this Trust Agreement (and not as an agent of the Trustees or as co-trustee hereunder with the Trustees);

      (2)  the power to invest and reinvest the Fund (or applicable portion) in the Corporate Trustee's sole discretion (pursuant to the powers set forth in Section 5.5 as may be duly delegated to it by the Board);

      (3)  the power to lend Trust Fund Securities (pursuant to Section 5.5(u)); and

      (4)  such other duties and powers as the Board may deem advisable.

(c)  The Board may enter into and execute a trust, custodial or other written agreement with the Corporate Trustee or Custodian, which agreement shall contain such provisions as the Board may deem advisable. Upon execution of such agreement with the Corporate Trustee or Custodian, the Board may transfer and convey to the Corporate Trustee or Custodian any part or all of the Securities, Real Property or Interest in Real Property, or other property of the Fund acceptable to the Corporate Trustee or Custodian, and thereupon the Board shall be forever released and discharged from any responsibility or liability with respect to such assets so transferred as to any period subsequent to such transfer and with respect to the investment and reinvestment thereof by the Corporate Trustee or Custodian. Notwithstanding such transfer, the Board shall continue to carry on its administrative and supervisory functions under the Plan in accordance with the provisions of the Plan and this Agreement.

(d)  The Board may, at any time, remove the Corporate Trustee or Custodian in the manner provided in the trust or other agreement between the Board and the Corporate Trustee or Custodian. In the event that a Corporate Trustee or Custodian is appointed, such Corporate Trustee or Custodian shall, if and when removed by the Board, cause to be transferred to the Board any Trust Fund Securities, real, personal or other property or records then in its possession, along

with a final accounting of the Securities or other property of the Fund held and/or managed by the Corporate Trustee or Custodian pursuant to said agreement.

# ARTICLE IV

## PLAN OF BENEFITS

### 4.1   Benefits.

(a)   The Board (or its duly authorized designee) shall have the full and exclusive right, power and authority, in its sole and absolute discretion, to determine all questions of the nature, type, form, amount and duration of benefits (including, without limitation, matters pertaining to the interpretation and application of reciprocity and portability agreements with other funds and plans) to be provided to Covered Employees and their Beneficiaries. However, no benefits other than pension, retirement, disability and such other related benefits as the Board may from time to time determine, may be provided to Covered Employees and Beneficiaries or paid for under the Trust.

(b)   Payment of benefits under the Plan shall be made directly from the Fund by the Board (or the Executive Director, the Custodian, or other duly authorized agent) or may be provided for by the purchase and delivery of such insurance contracts, policies or certificates, to such persons, in such manner, and at such time as the Board shall decide.

(c)   The Board (or its agents) shall be fully protected in making, discontinuing or withholding benefit payments from the Fund, or purchasing or delivering insurance contracts, policies or certificates (or instructing the insurers with respect thereto), all in reliance upon information received from the Contributing Employer respecting the status of any Covered Employee employed by such Employer. Each Contributing Employer shall indemnify and hold harmless the Fund, the Board, each Trustee and each of the Fund's employees and agents from the consequences of relying on any information or directions furnished to the Board, the Executive Director, any Committee member or their agents by such Contributing Employer.

(d)   If for any reason (including, without limitation, mistake of fact or law, or reliance on any false or fraudulent statements, information or proof submitted by a claimant) benefit payments are made to any person from the Fund in excess of the amount which is due and payable under the Plan, the Board (or the Executive Director or any Committee or other designee duly authorized by the Board) shall have full authority, in its sole and absolute discretion, to recover the amount of any overpayment (plus interest and costs). That authority shall include, but shall not be limited to, (1) the right to reduce benefits payable in the future to the person who received the overpayment, (2) the right to reduce benefits payable to a surviving spouse or other beneficiary who is, or may become, entitled to receive payments under the Plan following the death of that person, and/or (3) the right to

14

initiate a lawsuit or take such other legal action as may be necessary to recover any overpayment (plus interest and costs).

(e)  When any benefit payment, or the purchase or delivery of any insurance contract, policy or certificate (or any payment thereunder) is to be made in accordance with the terms of the Plan when the person entitled to receive such benefit maintains or attains a given age or status, or when a certain condition exists regarding such person, any such payment, purchase, delivery or instruction made, discontinued or withheld by the Board in good faith, without actual knowledge or notice of the prescribed change in the age, status or condition of the payee, shall be considered to have been properly effected by the Board.

    4.2    **Written Plan of Benefits**.  The specific detailed basis upon which the eligibility for benefits, types and forms of benefits payable (and any restrictions thereon), and the payment of benefits to Covered Employees and Beneficiaries, is to be specified in (and determined under) the Plan, as amended by the Board from time to time.

    4.3    **Insurance Contracts**.  The written plan of benefits comprising the Plan may consist, in part, of contracts with one or more insurance companies.

    4.4    **Exclusive Benefit**.

(a)  Notwithstanding anything to the contrary contained in this Agreement, it shall be impossible at any time prior to the satisfaction of all liabilities with respect to the Covered Employees under the Plan (or their Beneficiaries) for any part of the Trust Fund, other than such part as is required to pay taxes, fees and expenses of the administration and operation of the Plan, to be used for or diverted to purposes other than for the exclusive benefit of Covered Employees (or their Beneficiaries); provided, however, that to the extent permitted by the Code, ERISA and other applicable law, in the event that any Employer contribution to the Trust Fund has been (1) made by a mistake of fact or law (including, without limitation, any contribution to the Trust Fund inadvertently made on the basis of overscale wages), (2) conditioned on the qualification of the Plan under Sections 401 or 501 of the Code, and the Plan receives an adverse determination with respect to its qualification, or (3) conditioned upon the deductibility thereof under Section 404 of the Code, and all or a part of such deduction has been disallowed; then the Board may (but shall not be required to) in its sole and absolute discretion, return such contribution (or the value thereof, if less) to the Employer prior to the expiration of six months after a determination by the Audit Committee (or its duly authorized designee) as to (1) above, one year following the adverse determination under (2) above, or one year following the disallowance of the deduction under (3) above (but only to the extent of the disallowance).

15

(b)  The determination as to whether an Employer has made a contribution or other payment to the Trust Fund by a mistake of fact or law, and whether such contribution or payment should be returned to the Employer, shall be made in the sole and absolute discretion of the Board or the Audit Committee (or either of their duly authorized designees) in accordance with ERISA and other applicable law, taking into account all of the evidence submitted by such Employer to demonstrate that such contribution or payment was made by mistake; provided, however, that the Employer shall have the burden of proving that such contribution or payment was made by mistake. The decision of the Board or the Audit Committee (or either of their duly authorized designees) as to whether such contribution or payment was made by mistake, and whether it should be returned to the Employer, shall be final and binding on the Employer.

**4.5   No Assignment of Benefits**.   Except with respect to "qualified domestic relations orders" (as defined in Section 206(d)(3) of ERISA), voluntary and revocable assignments (as permitted by Section 206(d)(2) of ERISA), or as may otherwise be provided in the Plan, ERISA or the Code:

(a)  No benefit payable at any time under the Plan prior to receipt thereof by a Covered Employee (or Beneficiary or estate), shall be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment or encumbrance of any kind, nor shall any retirement benefit, until actually paid to the Covered Employee (or Beneficiary or estate), be in any manner subject to the debts or liabilities of said Covered Employee (or Beneficiary or estate);

(b)  Any attempt to alienate, sell, transfer, assign, pledge or otherwise encumber any such benefit, prior to receipt thereof by the Covered Employee (or Beneficiary or estate), in violation of the restrictions set forth in the preceding sentence shall be void and of no effect;

(c)  Benefit payments (or portions thereof) under the Plan or Trust shall not in any way be subject to any legal process, execution, attachment or garnishment, be used for the payment of any legal claim against any such person, or be subject to the jurisdiction of any bankruptcy court or, insolvency proceedings by operation of law or otherwise.

16

# ARTICLE V

## POWERS AND DUTIES OF TRUSTEES

### 5.1   Receipt of Payments.

(a)  The Board (or such other person or entity acting on behalf of, and duly authorized by, the Board) is hereby designated as the entity authorized to receive the Employer contributions hereafter made to the Trust, and is hereby vested with all rights, title, and interest in and to such monies and all interest accrued thereon and appreciation thereof.

(b)  The Board agrees to receive all Employer contributions and to hold them in trust hereunder for the uses and purposes of the Trust and the Plan, and may deposit all or a portion of such monies with such Custodians as they may designate for this purpose.

### 5.2   Payment of Benefits.  The Board shall pay out of the Trust, at the time or times and in the manner specified in the Plan, the benefits provided for therein. The payment of benefits shall be in accordance with the written Plan referred to in Section 4.2.

### 5.3   Expenses.

(a)  The Board shall use and apply the assets of the Trust for the following purposes:

(1)   To pay from the Trust Fund, or provide for the payment of, all reasonable and necessary expenses of collecting Employer contributions and administering the affairs of the Trust, including, without limitation, all expenses which may be incurred in connection with the maintenance, operation and administration of the Plan and the Trust, including, but not limited to:

(A) the fees and compensation of consultants, actuaries, accountants, attorneys and any other persons employed by the Board or the Executive Director to render services to the Fund or the Plan;

(B) the payment of fees, expenses and other costs of holding or investing the assets of the Fund;

(C) the fees and expenses of any Investment Manager or Custodian as may be appointed by the Board;

(D) any taxes;

17

(E) the expense of maintaining mailboxes, bank accounts and safety deposit boxes (if any);

(F) the cost of implementing and maintaining any accounting, auditing, computer, recordkeeping and any other systems which the Board has determined to be necessary or appropriate for the establishment, operation or administration of the Trust Fund or the Plan.

(2) To pay from the Trust Fund or provide for the payment of, subscriptions, charges, deposits or other payments under benefits contracts; and to pay or provide for the payment of premiums on the policy or policies of insurance, if, when and to the extent such premiums shall become due.

(b) The Trustees shall not receive any compensation from the Trust for the performance of their duties as Trustees, but shall be reimbursed from the Trust Fund for all reasonable, actual and necessary expenses which they incur in the performance of their duties as Trustees hereunder, including, without limitation, in connection with their education as fiduciaries of the Plan and Trust Fund.

### 5.4   **Insurance Contracts**.

(a) The Board may enter into such insurance contracts and policies, including group annuity contracts, make such premium or other payments thereon, make such elections thereunder, agree to any alteration, modification or amendment thereof, and take such actions with respect thereto as the Board shall, in its sole discretion, determine. With respect to any such insurance contract the Board is, in its discretion, authorized to assume all the rights, privileges and benefits thereunder and ownership thereof, and to take all actions required of or permitted thereunder, and the insurance carrier or organization with which such group contracts are in effect shall not be required to inquire into the authority of the Board.

(b) In no event shall any insurance company issuing any contract or contracts to the Board under this Agreement be considered a party or parties to this agreement nor to any modification or amendment thereto or any agreement supplemental thereto. Nothing in this Agreement nor in any modification, amendment or supplement thereto shall in any way be construed to enlarge, change, vary or in any way affect the obligations of an insurance company except as expressly provided in a contract issued by it.

(c) Any insurance company may deal with the Board in accordance with the terms and conditions of the contract between the insurance company and the Board and in such manner as the Board and the insurance company shall therein agree, without the consent of any other person or persons interested in this Trust.

18

     **5.5**   **General Powers**.   Notwithstanding any limitations imposed generally by any present or future state statute or rule of law concerning investments by trustees (and in addition to, and not by way of limitation of, such other powers as are set forth herein or otherwise conferred by law), the Board is hereby empowered, in its sole and absolute discretion:

(a)   To purchase, sell (for cash or on credit), receive, subscribe for, invest and reinvest Trust Fund assets in any Securities and any Real Property or Interest in Real Property, free from any limitations imposed by state law on investments of trust funds, and to retain such Securities or Real Property or Interest in Real Property in the Trust Fund, or exchange any such Securities or Real Property or Interest in Real Property for other property (or interests therein), or grant options to acquire such Securities or Real Property or Interest in Real Property; and the Board may determine the prices and terms of all such sales, exchanges and options and may execute any and all contracts, conveyances and other instruments containing covenants and warranties binding upon the Plan or the Fund and containing provisions excluding the personal liability of the Trustees;

(b)   To use or cause to be used the facilities of the Depository Trust Company or the Federal Reserve Book-Entry System, subject to such rules, regulations and orders as may be adopted by the Securities and Exchange Commission thereunder; including, without limitation, the right to

     (1)   hold, receive, exchange, release, deliver and otherwise deal with the Securities and other property of the Trust Fund (including stock dividends, rights and other items of like nature), and to receive and remit all income and other payments thereon and take all steps necessary and proper in connection with the collection thereof;

     (2)   register such Securities in the name of any nominee or nominees used by the Depository Trust Company or the Federal Reserve Book-Entry System;

     (3)   pay for Securities purchased and sold through the clearing medium employed by the Depository Trust Company or the Federal Reserve Book-Entry System for transactions of participants acting through it; and

     (4)   register any Securities or other property held in the Trust Fund in the name of a nominee or nominees with or without the addition of words indicating that such Securities or other property are held in a fiduciary capacity, provided, however, that said nominee be a bank, trust company or broker-dealer;

(c)   To cause any Securities, Real Property or Interest in Real Property, or other property at any time held by the Trust Fund to be registered in its own name as

trustees, or in the name of a Custodian, trustee or nominee (with or without the disclosure of any fiduciary relationship), and to hold in bearer form any Securities or other property at any time held in the Trust Fund so that they will pass by delivery;

(d)  To:

    (1)  sell for cash or on credit, grant options, convert, exchange for other Securities or property, redeem, transfer and dispose of any Securities or other property in the Trust Fund, by private agreement or public auction, for cash, Securities or other property and/or credit; and

    (2)  make delivery of Securities or other property that have been sold for the Trust Fund upon receipt of payment therefor; provided that all payments for such Securities or property to be made in cash, by a certified check, a treasurer's or cashier's check of a bank, by effective bank wire transfer through the Federal Reserve Wire System or, if appropriate, outside of the Federal Reserve Wire System and for credit to the Trust Fund;

(e)  To release and deliver Trust Fund Securities to the issuer thereof (or its agent) when such Securities are called, redeemed, retired or otherwise become payable; provided, however, that, in any case, the cash or other consideration for such release and delivery is in the Trust Fund or is to be delivered to the Board simultaneously with the delivery of such securities;

(f)  To exercise voting rights, either in person by limited or general power of attorney, or by proxy, with respect to all Securities or other property, and generally to exercise with respect to Trust Fund assets all other rights, powers, and privileges as may be lawfully exercised by any person owning similar property in its own right, unless the responsibility for exercising such rights, powers, or privileges has been delegated by the Board or its Investment Committee to an Investment Manager (pursuant to Section 8.8 of this Agreement);

(g)  To:

    (1)  exercise any conversion privilege and/or subscription right available in connection with any Securities or other property at any time held in the Trust Fund, and to make any payments in connection with such exercise;

    (2)  join in, dissent from or oppose the reorganization, consolidation, merger, recapitalization, liquidation, sale, mortgage, pledge or lease of corporate property with respect to any corporations in which the Trust Fund may be interested (including the exercise of options, the making of agreements or

subscriptions and the payment of expenses, assessments or subscriptions, which may be necessary or advisable in connection therewith), and to hold and retain any Securities or other property which it may so acquire;

(3)   deposit any Securities or other property with any protective, reorganization or similar committee, and to pay or agree to pay any part of the expenses and compensation of any such committee and any assessments levied with respect to such Securities or property so deposited; and

(4)   exercise all other ancillary rights or duties necessary to implement any of the powers contained herein;

(h)  To:

(1)   pool all or a portion of the Trust Fund in one or more Collective Trusts and to transfer and deposit, at any time and from time to time, all or a portion of the assets of the Trust Fund to any Collective Trust; and

(2)   withdraw any portion of the Trust Fund so transferred, and to execute such documents and other instruments as, from time to time, may be necessary to implement the foregoing;

(i)  To invest all or part of the Trust Fund in deposits which bear a reasonable interest rate in any bank, trust company, broker-dealer or similar financial institution supervised by the United States or any State (including deposits of a Custodian, to the extent permitted by ERISA);

(j)  To:

(1)   compromise, compound, submit to arbitration or settle any debt or obligation owing to or from the Trust Fund;

(2)   enforce or abstain from enforcing any right, claim, debt or obligation;

(3)   reduce or increase the rate of interest on extension, or otherwise modify, foreclose upon default, or enforce any such obligation; and

(4)   sue or defend suits or legal proceedings against the Fund, the Plan, the Trustees or their agents or employees, or to protect or enforce any interest in the Fund and to represent the Fund, the Plan, the Trustees or the Executive Director in any suits, arbitrations or other dispute resolution proceedings in connection with any matter in any court or before any administrative agency, body or tribunal;

(k)  To apply for, purchase, receive, retain, administer, surrender, transfer or assign any life insurance, retirement income, endorsement or annuity policy or contract, and pay the premium and exercise the rights, privileges, options and benefits contained in any such contract;

(l)  To organize or acquire an interest in corporations, partnerships, limited partnerships, limited liability corporations, and/or joint-ventures under the laws of the United States, any State or other jurisdiction to acquire and hold title to any Securities or Real Property or Interest in Real Property, or to acquire an interest in another such entity holding such Securities or Real Property or Interest in Real Property, held in connection with the Plan or the Trust Fund;

(m)  To take any and all actions, including the filing of requests for determinations, rulings and other forms of administrative guidance with the United States Department of Labor (including requests for exemptive or other administrative relief from the provisions of Section 406 of ERISA and Section 4975 of the Code, or other provisions of ERISA or the Code), the Internal Revenue Service, or the Pension Benefit Guaranty Corporation, and the commencement of and participation in lawsuits in connection therewith; all as the Board determines to be necessary, appropriate or desirable to carry out any of the foregoing powers or otherwise in the best interests of the Plan or the Trust Fund;

(n)  To:

   (1)  lease or purchase such premises, materials, supplies and equipment, and employ and retain such administrative, secretarial, clerical, and other assistance or employees as the Board or the Executive Director may deem necessary or proper, and to pay their reasonable expenses and compensation and all other expenses attributable to the operation of the Plan out of the Trust Fund;

   (2)  implement and maintain any accounting, auditing, computer, recordkeeping and any other systems which the Board has determined to be necessary or appropriate for the establishment, operation or administration of the Trust Fund or the Plan;

   (3)  retain attorneys, investment advisers, accountants, actuaries, appraisers, architects, banks, contractors, engineers, consultants, property managers, insurance brokers and any other persons or entities in connection with the operation, management, or administration of the Trust Fund or the acquisition, sale or other disposition of any property for or by the Trust Fund, and pay, as expenses of the Trust Fund, any of their necessary and reasonable fees; and

   (4)  retain one or more Custodians or other banks, trust companies, broker-dealers, or similar depositories to act as a trustee and/or custodian of Trust

22

Fund Securities and property, and to define the scope and responsibilities of each such trustee or custodian;

(o)  To appoint ancillary or subordinate trustees or custodians to hold title to or other indicia of ownership of Foreign Securities or other property of the Plan or Trust Fund in those jurisdictions, domestic or foreign, in which the Board is not authorized to do business, and to define the scope of the responsibilities of each such ancillary or subordinate trustee or custodian; provided, however, that such ancillary or subordinate trustees or custodians shall comply with all requirements of Section 404(b) of ERISA, and the regulations promulgated pursuant thereto, in the event that assets of the Trust Fund are invested or reinvested in Foreign Securities;

(p) To establish and implement a funding policy for the Plan and create, accumulate and maintain as part of the Trust Fund such margins or reserves as the Board determines to be prudent or desirable in connection with the sound and efficient administration of the Plan and the Trust Fund (including, without limitation, reserves for existing and potential obligations and liabilities of the Trust Fund and administrative expenses);

(q)  To:

> (1)  delegate to other fiduciaries (including Committees) the responsibilities or duties involved in the operation and administration of the Plan under the direction of the Board (other than trustee responsibilities, as defined in Section 405(c)(3) of ERISA) to the extent consistent with ERISA; and

> (2)  engage an Executive Director or such other person or persons as it may deem necessary or desirable to conduct the day to day operations of the Plan and the Fund and delegate such of its administrative duties to such persons, agents, or organizations as it may deem advisable (including, without limitation, to a duly appointed Committee).

(r)  To enter into agreements among themselves allocating their responsibilities, obligations and duties with respect to the administration of the Plan and the management and control of the Trust Fund assets; provided, however, that the remaining Trustees comprising the Board shall not be liable for any loss resulting to the Trust Fund resulting from the acts or omissions of those Trustees accepting the allocation of such specified fiduciary responsibilities (except as may otherwise be required by ERISA);

(s)  To enter into agreements with other pension or retirement plans and trusts providing for the reciprocity of pension credits and portability of pension accruals as between this Plan and such other plans and trusts and to merge the Trust Fund

23

and Plan with other employee pension benefit plans (provided that the Trustees determine that such merger is prudent and would further the interests of Covered Employees and Beneficiaries); provided, however, that in the case of any merger or consolidation with, or transfer of assets and liabilities to, any other pension or retirement plan or trust, provisions shall be made so that each Covered Employee affected thereby on the date thereof would receive a benefit immediately after the merger, consolidation or transfer (as if the Plan or the Trust then terminated) that is equal to or greater than the benefit that he or she would have been entitled to receive immediately prior to the merger, consolidation or transfer (as if the Plan or the Trust then terminated);

(t)   To:

(1)   borrow monies from any person or persons on behalf of the Plan or the Trust Fund, or on behalf of any corporation, partnership or joint venture in which the Plan or the Trust Fund has an interest;

(2)   pledge all or a portion of the Trust Fund as security or collateral to any person or persons in order to obtain financial accommodations (including agreements to issue letters of credit or other forms of credit) from a bank, trust company, broker-dealer or other financial institution (including the Custodian, to the extent permitted by ERISA) on behalf of the Plan or the Trust Fund, or on behalf of any corporation, partnership, or joint venture in which the Plan or the Trust Fund has an interest; and

(3)   for any sums so borrowed or accommodations or credit obtained, issue one or more promissory notes (or other instruments or documents), and/or pledge, hypothecate, assign or otherwise transfer all or any part of the Plan or the Trust Fund assets as collateral and/or issue guaranties in order to obtain such loan, credit or other form of credit;

(u)   To:

(1)   lend any Trust Fund Securities to banks, trust companies, or nationally-recognized brokers or dealers;

(2)   secure the same in any manner;

(3)   receive compensation therefor out of any amounts paid by or charged to the account of the borrower; and

(4)   during the term of any such loan, permit the loaned Securities to be transferred into the name of and voted by the borrower or others; provided, however, that such loans are fully consistent with ERISA and the Code and that cash or other collateral satisfactory to the Board, having a fair market value (as of

24

the close of business on the business day immediately preceding the date of such loan) equal to at least one hundred two (102%) percent of the then fair market value of the Securities loaned, is pledged to the Trust Fund by the borrower, and continues to be maintained in such manner until such loan is repaid;

(v)   To:

(1)   retain, manage, administer, operate, lease for any length of time, develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any Real Property or Interest in Real Property at any time held by the Trust Fund;

(2)   modify, extend, renew or otherwise adjust any mortgage or lease, including the waiver of rentals;

(3)   purchase or otherwise acquire, sell, exchange or otherwise dispose of any such Real Property or Interest in Real Property at public or private sale, at such prices, at such time or times upon such terms, and for such purposes as may be necessary or desirable;

(4)   borrow money, and for the purpose of securing the repayment thereof, to pledge, mortgage, grant a security interest in or otherwise encumber any Real Property or Interest in Real Property of the Trust Fund;

(5)   purchase, take and hold any Real Property or Interest in Real Property subject to mortgages or other liens or encumbrances, irrespective of by whom the same were made;

(6)   foreclose, to reduce the rate of interest on, and to consent to the extension of or make any other modification of loans, whether or not secured by mortgages on any Real Property or Interest in Real Property or on any personal property, or to accept a deed in lieu of foreclosure;

(7)   join a voluntary partition of any Real Property or Interest in Real Property;

(8)   demolish or cause to be demolished any structures on any Real Property or Interest in Real Property if such action is necessary or desirable;

(9)   make loans of any type (including, without limitation, variable, participating, convertible or indexed loans), whether secured or unsecured, in connection with any Real Property or Interest in Real Property of the Trust Fund;

(10)   enter into joint ventures or otherwise own or participate in entities that own or acquire any Real Property or Interest in Real Property (including

25

associations, corporations, general or limited partnerships, or trusts), and to acquire stock, ownership interests, or securities in such entities, including by means of a tender offer;

(11)  hold any Real Property or Interest in Real Property either in the name of the Trust Fund or in a separate nominee trust without disclosing the ownership of the Trust Fund;

(12)  operate through one or more corporations or other entities, wholly or partially owned by the Trust Fund, whether or not exempt from Federal income taxation or other taxes;

(13)  keep and maintain any property in good state of repair and upkeep, to obtain insurance for any Real Property or Interest in Real Property, and to pay the taxes, upkeep, repairs, carrying charges, maintenance and premiums of insurance with respect to any Real Property or Interest in Real Property;

(14)  organize or acquire one or more corporations, wholly or partly owned by the Trust, each of which shall be exempt from Federal income taxation under Section 501(c)(2) or (c)(25) of the Code and each of which shall have been organized for the exclusive purpose of holding title to any Real Property or Interest in Real Property, collecting income therefrom and turning over the entire amount thereof, less expenses, to the Trust or other entities exempt from Federal income taxation under Section 501 of the Code; and

(15)  retain, monitor and terminate property managers, accountants, attorneys, developers, mortgage bankers, environmental consultants and others providing services with respect to any Real Property or Interest in Real Property, which persons, to the extent permitted or not prohibited by ERISA, may be affiliates of an Investment Manager or other service provider to the Trust Fund (such services to include, without limitation, matters of compliance of such properties with all applicable laws, rules and regulations);

(w)   To effect insurance for any Real Property or Interest in Real Property or any other physical properties and assets of the Trust Fund in such amounts and against such risks as, in the Board's good faith judgment, shall be in accordance with customary and sound business practices applicable to such properties or assets in the appropriate geographic area;

(x)  To attend to legal matters in connection with the making of investments for the Trust Fund by taking or causing to be taken such acts as, in the sole discretion of the Board, are necessary or appropriate to comply with all applicable laws, rules and regulations in connection with the making, validity or enforceability of such investments;

26

(y)  To:

(1)    make, execute and deliver any and all conveyances, indemnities, waivers, releases or other instruments in writing necessary or desirable for the operation of the Fund or the Plan, or the accomplishment of any of the foregoing powers; and

(2)    execute written agreements with any person or entity (including, without limitation, any Employer and/or the Union) which the Board may deem prudent, necessary or desirable for the operation of the Fund or the Plan, the accomplishment of any of the foregoing powers, or the protection of the assets of the Trust Fund; and

(z)  Generally, to perform all acts (whether or not expressly authorized herein) which the Board may deem necessary and prudent for the protection of the assets of the Trust Fund.

**5.6  Committees**.

(a)  In addition to the Administrative Committee (established pursuant to Section 7.3), the Investment Committee (established pursuant to Section 7.4), and the Audit Committee (established pursuant to Section 7.5), the Board may delegate one or more of its fiduciary responsibilities (other than trustee responsibilities, as defined in Section 405(c)(3) of ERISA) to one or more other Committees.  Where the Board has elected to hold a joint meeting with a Committee, unless otherwise agreed by the Board, all actions taken by the Trustees attending such meeting will be taken in accordance with Section 6.4(a) and will be considered ratified without further Board action.

(b)  Each such Committee shall comprise two or more Trustees and shall comprise an equal number of Employer Trustees and Union Trustees to the extent the Committee may be exercising authority delegated by the Board. The Employer Trustees shall designate Employer Trustees to serve on such Committee and the Union Trustees shall designate Union Trustees to serve on such Committee.

(c)  Except as otherwise provided by ERISA, to the extent that such responsibilities are so delegated, the remaining Trustees comprising the Board shall not be liable for any loss to the Trust Fund resulting from the acts or omissions of any Committee.

(d)  No more than one representative of each Contributing Employer shall be permitted to serve on each Committee.

  **5.7** **Standard of Care**.  In exercising any and all powers, duties and responsibilities under this Agreement, the Board shall discharge its duties and responsibilities hereunder with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and shall diversify Trust Fund assets so as to avoid the risk of large losses (unless, under the circumstances, it is clearly prudent not to do so), consistent with the requirements of ERISA.

  **5.8** **Reliance on Written Instruments and Advice of Professionals**.

(a) Each Trustee shall be fully protected in acting upon any instrument, certificate, or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

(b)  Each Trustee shall be entitled to rely conclusively upon, and shall be fully protected in any action taken by him or her in good faith in relying upon, any opinions or reports furnished to him or her by any actuaries, accountants, attorneys, consultants or specialists appointed or designated by the Board in connection with the administration of the Plan or the Fund (or the investment of Fund assets).

  **5.9** **Indemnification**.  Except as may otherwise be required by ERISA or other applicable law:

(a)  The Trustees shall not be personally answerable for any liabilities or debts of the Plan or the Trust Fund incurred by them as Trustees, but said debts and liabilities shall be paid out of the Trust Fund;

(b)  No Trustee shall be personally liable for any error of judgment or for any Claims (as that term is defined in paragraph (e) below) arising out of any act or omission of such Trustee or for any acts or omissions of any other Trustee, or any agent elected or appointed by or acting for the Trustees, except as provided in paragraph (e) below;

(c)  The Trustees shall not be personally liable for the proper application of any part of the Trust Fund or for any other liabilities arising in connection with the administration of the Plan or the Trust Fund, except as provided in paragraph (e) below;

(d)  The Trustees may from time to time consult with legal counsel and shall, to the extent permitted by ERISA or other applicable law, be fully protected in acting upon the advice of said counsel with respect to legal questions affecting the Plan or the Trust Fund; and

(e)  To the extent not covered by insurance, the Trust Fund shall protect, indemnify and hold harmless the Board, each individual Trustee, each Committee member, and the Executive Director (and their employees and other agents), from and against any and all liabilities, damages, taxes, judgments, debts, assessments, penalties, losses, expenses, costs and claims, including, without limitation, (1) reasonable attorneys' fees and court costs; (2) actuarial and related consulting costs; (3) accounting and auditing costs; (4) investment management, trustee and custodian costs; (5) insurance premiums and related costs; and (6) other professional fees (hereinafter collectively referred to as "Claims") incurred by any such person(s) as a result of any act, omission or conduct committed by said person(s) in connection with the performance of his or her powers, duties, responsibilities or obligations under the Plan, the Trust, this Agreement, ERISA, the Code or other applicable laws, except with respect to Claims arising from such person's own fraud or willful misconduct.

**5.10  <u>Bonding</u>**.  Any person required to be bonded under the provisions of ERISA, including without limitation, the Trustees, Executive Director, Investment Managers, Custodians (and any employees, agents or other representatives of the Trust handling monies, Securities and negotiable paper on behalf of the Trust or otherwise entrusted with any portion of the Trust Fund), shall be bonded under a fidelity bond issued by an insurance carrier in an amount no less than that required by Section 412 of ERISA. The Board shall, in its sole discretion, have the authority to require the bonding of any other employee, agent, representative or fiduciary of the Trust (including, without limitation, an Investment Manager or Custodian) and to require bonds above the minimum amount.  The cost of premiums for such bonds for the Trustees, the Executive Director and any other Fund employee shall be paid out of the Trust Fund.

**5.11  <u>Fiduciary Insurance</u>**.  The Board may purchase with Fund assets and maintain a policy or policies of fiduciary liability (or errors or omissions) insurance covering the Trust Fund, the Trustees, the Executive Director and, if the Board so determines, any other person to whom a fiduciary responsibility with respect to the Plan or Fund has been allocated or delegated, to protect such persons against any and all Claims (as that term is defined in Section 5.9(e)) arising out of such fiduciary's breach of his or her fiduciary responsibility to the Plan or the Trust Fund (the proceeds of which may be used to satisfy the obligations of the Trust Fund set forth in Section 5.9). The insurance contemplated herein shall permit recourse in consideration of the insurer against the fiduciary in case of a breach of his or her fiduciary obligations or

responsibilities to the Trust Fund (although the insurer shall have the right to eliminate such recourse by the payment of an additional premium by such fiduciary or by the organization that appointed such fiduciary to the Board).

### 5.12   Deposit and Withdrawal of Funds.

(a)  All monies received by the Board hereunder shall be deposited with the Custodian, or such other banks or trust companies (insured by the Federal Deposit Insurance Corporation) or other broker-dealers or similar financial institutions (insured by the Securities Investor Protection Corporation) as the Board may designate as Custodians or other trustees of all or a portion of the assets of the Trust.

(b)  The requisite signature authority required for all checks, drafts, vouchers or other withdrawals of monies from such account or accounts shall be in accordance with resolutions from time to time adopted by the Board, and the Board may delegate such authority to any two Trustees (one of whom must be an Employer Trustee and the other a Union Trustee), to the Executive Director, or to any other person as the Board, in its sole discretion, shall determine.

### 5.13   Delegation of Power.  Except as otherwise provided by ERISA, the Board may delegate any of its ministerial powers or duties hereunder to any one or more agents or employees and/or to one or more Trustees.

### 5.14   Discretionary Authority.

(a)  The Board or, where applicable, a Committee (or either of their duly authorized designees) shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret this Agreement, the Plan and any other Plan or Trust documents and to decide all matters arising in connection with the operation or administration of the Plan or the Trust and the investment of Plan assets.

(b)  Without limiting the generality of the foregoing, the Board or, where applicable, a Committee (or either of their duly authorized designees) shall have the sole and absolute discretionary authority to:

(1)    take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan to Covered Employees or their Beneficiaries;

(2)    formulate, interpret and apply rules, regulations and policies necessary to administer this Agreement, the Plan or other Plan documents in accordance with their terms;

(3)    decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan or other Plan documents;

(4)    resolve and/or clarify any ambiguities, inconsistencies and omissions arising under this Agreement, the Plan or other Plan documents; and

(5)    process, and approve or deny, benefit claims and rule on any benefit exclusions.

All determinations made by the Board (or, where applicable, the Executive Director or any Committee duly authorized by the Board) with respect to any matter arising under the Plan, Trust Agreement and any other Plan documents shall be final and binding on all parties affected thereby.

### 5.15   Execution of Documents.

(a)  The Co-Chairs are authorized to collectively execute on behalf of the Board all documents necessary for the accomplishment of any action taken by the Board; provided, however, that such action is reflected in written minutes of a Board meeting.

(b)  The Board may authorize by resolution any Union Trustee and any Employer Trustee (or any group composed of an equal number of Union and Employer Trustees), or an employee of the Trust Fund, to execute any Instructions, notices or other instruments in writing; and any such Instruction, notice or instrument so signed shall have the same force and effect as though signed by the Board.

(c)  All persons, corporations, partnerships, groups or associations may accept any notice or instrument signed in accordance with this Section 5.15 as duly authorized and binding on the Board.

(d)  The Board may, in its sole and absolute discretion, designate and authorize an employee or employees of the Trust Fund to sign documents or checks upon such separate and specific bank account or bank accounts as the Board may designate and establish for such purpose.

# ARTICLE VI

## MEETINGS AND DECISIONS OF TRUSTEES

### 6.1 Officers.

(a) The Board shall elect two (2) Co-Chairs from among the Trustees, one of whom shall be a Union Trustee and the other an Employer Trustee.

(b) The term of such officers shall commence on the date of their election and continue until their successors are elected.

(c) During even-numbered calendar years, the Co-Chair who is a Union Trustee shall preside over meetings of the Board. During odd numbered calendar years, the Co-Chair who is an Employer Trustee shall preside over meetings of the Board.

### 6.2 Calling of Meetings.

(a) The Board shall endeavor to meet at least three (3) times per year, and at such other times as the Board may reasonably decide; except that either Co-Chair may call a special meeting of the Board, at any time, by giving at least five (5) business days advance written notice of the time and place thereof to the other Co-Chair and all other Trustees.

(b) Any two (2) Employer Trustees and two (2) Union Trustees may likewise call a meeting of the Trustees, at any time, by giving at least ten (10) business days advance written notice of the time and place thereof to the Co-Chairs and to all other Trustees.

(c) Meetings of the Board may be held at any time by telephone conference with proper advance notice (as prescribed by either paragraph (a) or (b) above).

(d) Meetings of the Board may also be held at any time, without notice, in person or by telephone conference; provided, however, that a majority of the Employer Trustees and a majority of the Union Trustees consent thereto in writing.

### 6.3 Quorum. Four Employer Trustees and four Union Trustees shall constitute a quorum for the purpose of transacting business.

### 6.4 Vote of Trustees.

(a) Except as otherwise provided in this Section 6.4, all actions of the Board shall be taken by either (1) a vote of two to zero, or (2) a vote of one and one abstention. The Employer Trustees, as a unit, shall have one vote, and the Union

32

Trustees, as a unit, shall have one vote. The Employer Trustees shall determine how they cast their vote on any matter, except as provided elsewhere in this Section 6.4, by a majority vote of the Employer Trustees present and attending the meeting. The Union Trustees shall determine how they cast their vote on any matter, except as provided elsewhere in this Section 6.4, by a majority vote of the Union Trustees present and attending the meeting.

(b)  The vote of any absent Trustee may be cast in accordance with a written proxy delivered to any other Trustee present at the meeting of the Trustees (or a Committee meeting); provided that such authorization and proxies shall be valid only at the Trustee (or Committee) meeting immediately succeeding its execution.

(c)  In addition to decisions made at meetings, each Trustee may also be polled with respect to an issue by the Executive Director or either Co-Chair (or any of their designees) either in writing (including e-mail) or by telephone without the necessity of having a meeting; provided however, that any action taken in a telephone poll must be consented to in writing (including e-mail) by each Trustee who voted for the action taken either before or as soon as practicable following the vote (but no later than thirty (30) days after the vote).

(d)  In the event that any matter presented for decision by the Board cannot be decided due to a deadlock (as defined in Section 6.6(b)), the matter shall then be resolved by arbitration (as provided by Section 6.6).

      **6.5**   <u>**Minutes of Meetings**</u>.   The Board, Committee or the Executive Director (or their duly authorized designees) shall maintain minutes of all Board and Committee meetings, but such minutes need not be verbatim. Copies of such minutes shall be provided to all Trustees.

      **6.6**   <u>**Arbitration**</u>.

(a)  Whenever the Board is unable to decide a question during a meeting due to a deadlock among the Trustees (as defined in Section 6.6(b)), either Co-Chair shall submit the question for decision to such impartial arbitrator as the Board shall select (pursuant to the voting procedures contained in Section 6.4) or, if it is unable to agree on such selection within fifteen (15) business days after the deadlock arose, either Co-Chair or a majority of either the Employer Trustees or Union Trustees may petition the American Arbitration Association (hereinafter, the "AAA") for the appointment of an arbitrator pursuant to the Labor Rules of the AAA. If neither Co-Chair nor a majority of the Employer Trustees or Union Trustees petitions the AAA, then any two (2) Trustees may petition the United States District Court for the Southern District of New York for the appointment of an impartial umpire.

(b)  A deadlock for purposes of this Agreement shall mean either:

    (1)  a majority of the Employer Trustees or a majority of the Union Trustees cannot agree upon the manner in which their unit should cast its vote and do not agree to abstain as a unit; or

    (2)  one unit of the Board votes for a motion and the other unit votes against it; or

    (3)  the inability to take an action with respect to an issue presented due to the lack of a necessary quorum at two successive meetings.

(c)  The failure of any Trustee to attend the arbitration hearing as scheduled and noticed by the AAA or by the arbitrator shall not delay the arbitration, and the arbitrator is authorized to proceed to take evidence and issue his or her decision as though such Trustee were present.

(d)  In the event that such arbitrator, having been selected, shall resign or for whatever reason shall fail or refuse to act within a reasonable time after his or her selection, the AAA shall be requested to appoint another arbitrator; provided, however, that should the AAA fail to act within fifteen (15) business days after the request, or should the Board be unable to agree on another arbitrator within fifteen (15) business days after the AAA is requested to act, an arbitrator shall be appointed by the United States District Court for the Southern District of New York upon the petition of any two (2) Employer Trustees or two (2) Union Trustees.

(e)  The arbitrator, after hearings, of which all interested parties as stated in the submission shall have due notice and opportunity to be heard, shall promptly announce his or her award in writing to the Trustees and such award shall be final and binding on all parties concerned as though it was embodied in a resolution duly adopted by the unanimous vote of the Board.

(f)  All hearings of the arbitrator shall take place in the City of New York unless otherwise specifically mutually agreed upon.

(g)  All reasonable expenses of the arbitration (including, without limitation, the fees of the AAA, attorneys and the arbitrator) shall be paid from the Trust Fund.

# ARTICLE VII

## ALLOCATION OF RESPONSIBILITIES

### 7.1   The Executive Director.

(a)   Where the Board has employed an Executive Director, the Executive Director shall have the responsibility and authority to control the day-to-day administration of the Trust Fund, subject to the terms of this Agreement, the Plan, any written agreement between the Board and the Executive Director, and any policies, procedures and other rules that may from time to time be established by the Board.

(b)   Such responsibilities shall include, without limitation, the following:

(1)   functions assigned to the Executive Director under the terms of this Agreement, the Plan, or any written agreement between the Board and the Executive Director;

(2)   functions assigned to the Executive Director by the Board;

(3)   determinations as to the eligibility for, and the amount of, benefits for Covered Employees (and their Beneficiaries), and the certification thereof to the Board;

(4)   hiring of administrative, clerical, legal, actuarial, accounting, and other professional persons to provide necessary services to the Trust Fund and the Plan (with the advance approval of the Board);

(5)   payment of any fees, taxes, expenses, charges or other costs incidental to the operation and management of the Trust Fund and the Plan;

(6)   preparation and filing of all government and other reports required to be filed by the Plan and the Trust under ERISA or the Code (including, without limitation, the Plan's annual Form 5500 and Summary Annual Report, Summary Plan Descriptions, and Summaries of Material Modifications); and

(7)   maintenance of all records of the Trust Fund and the Plan, other than those required to be maintained by Investment Managers, Custodians and other persons duly designated by the Board, and provision of regular reports to the Board (or its Committees).

**7.2**   **The Board**.

(a)  The Board shall have the authority and responsibility for the overall design and operation of the Plan and Trust Fund and the investment of the assets attributable thereto (except to the extent that such responsibility has been delegated by the Board to the Executive Director, a Custodian or an Investment Manager).

(b)  Such responsibilities shall include, without limitation, the following:

(1)   design of the Trust, including the right to amend, modify or terminate this Agreement at any time;

(2)   design of the Plan, including the right to amend, modify or terminate such Plan (in whole or in part) at any time;

(3)   maintenance of the qualification of the Plan, and the tax-exempt status of the Trust, under the Code;

(4)   designation of fiduciaries of the Trust Fund and Plan (including, without limitation, the Executive Director, Investment Managers, Custodians, and members of the Administrative Committee, Investment Committee, Audit Committee and other Committees);

(5)   retention of all accounting, actuarial, administrative, clerical, legal and other professionals to provide service to the Fund;

(6)   exercise of those fiduciary functions provided for in the Plan, or this Agreement, or those necessary for the prudent operation or administration of the Plan (except such functions as are delegated to a Committee, the Executive Director, an Investment Manager or Custodian, or to other fiduciaries of the Trust or the Plan); and

(7)   generally, exercise of those functions and responsibilities which the Board deems necessary and appropriate for the prudent operation and administration of the Plan or Trust, and the protection of Trust Assets, which functions have not been duly delegated to the Executive Director, a Committee or another fiduciary of the Plan or the Trust Fund.

(c) The Board may, by the adoption of a written resolution, delegate to any Committee or a specific Trustee or group of Trustees the authority to act on behalf of the Board to the extent, and within the time limitations set forth, in any said resolution. If said resolution delegates the right to take discretionary action to the Executive Director, a Committee or a specific Trustee or group of Trustees, then the action taken pursuant to said resolution shall constitute conclusive evidence of

36

the proper exercise of the discretion granted to the Executive Director, such Committee or a specific Trustee or group of Trustees.

### 7.3 <u>**Administrative Committee**</u>.

(a)  The Board shall appoint an Administrative Committee consisting of at least four (4) Trustees (or such other number of Trustees as the Board shall, in its sole discretion, determine), having an equal number of Employer Trustees and Union Trustees, who shall serve at the sole pleasure of the Employer Trustees and Union Trustees, respectively. Employer Trustee members of the Administrative Committee shall be appointed by the Employer Trustees, and Union Trustee members of the Administrative Committee shall be appointed by the Union Trustees. The members of the Administrative Committee shall select a Chairperson from their number.

(b)  Subject to the actions of the Board and the provisions of the Plan, the functions of the Administrative Committee shall be to:

(1)    establish procedures for the administration and operation of the Plan, including the acceptance and processing of applications for pension benefits;

(2)    determine the eligibility of Covered Employees and Beneficiaries for retirement benefits, and the amount and form of payment of such benefits;

(3)    calculate (or to authorize the Trust's Executive Director, staff, actuaries or other service providers to calculate) pension benefit amounts;

(4)    review, and approve (or deny), appeals for pension payments, or other benefit claims, submitted by Covered Employees and Beneficiaries that have been denied by the Executive Director or appeals to review state domestic relations orders which have been determined by the Executive Director not to be qualified;

(5)    prepare, approve and adopt the administrative expense and operating budget of the Fund office, including determining the salaries and fringe benefits of all Fund employees (other than the three highest paid employees of the Fund office, whose compensation and fringe benefits shall be fixed by the Board);

(6)    adopt and administer a pension plan for the staff of the Fund and serve as the "named fiduciary" and "administrator" of such plan for purposes of ERISA;

(7)    approve the attendance by, and reimburse the reasonable expenses of, individual Trustees at educational conferences or other meetings in accordance

with trustee travel and expense guidelines established from time to time by the Board;

(8)    review, approve and pay all reasonable and necessary expenses for the establishment, operation and administration of the Trust and the Plan (including, without limitations, the payment of the clerical, administrative, legal, actuarial, accounting, and other professional expenses); and

(9)    generally, exercise those functions and responsibilities which the Administrative Committee deems necessary and desirable for the prudent administration of the Plan or Trust, and to make recommendations to the Board with respect to such other matters as relate to the administration or operation of the Plan.

(c)   The Administrative Committee shall endeavor to meet at least three (3) times per year, upon such notice as it may from time to time determine. A quorum of the Administrative Committee shall consist of at least two (2) Employer Trustees and two (2) Union Trustees who are members of the Administrative Committee. All decisions of a quorum shall be agreed to by either (1) a vote of two to zero, or (2) a vote of one and one abstention. The Employer Trustees, as a unit, shall have one vote, and the Union Trustees, as a unit, shall have one vote. The Employer Trustees shall determine how they cast their vote by a majority vote of the Employer Trustees who are members of the Administrative Committee and who are present and attending the meeting. The Union Trustees shall determine how they cast their vote by a majority vote of the Union Trustees who are members of the Administrative Committee and who are present and attending the meeting. In addition to decisions made at meetings, the Administrative Committee may also be polled either in writing (including by facsimile or electronic mail) or by telephone by the Executive Director or the Chairperson (or his or her designee) without the necessity of having a meeting, in which event, any action to be taken must be carried by the same vote as that required at a meeting of the Administrative Committee and, if polled by telephone, must be confirmed in writing by each member of the Administrative Committee who participated in the poll as soon as practicable following the vote (but no later than thirty (30) days after the vote). If a matter cannot be agreed upon due to failure to reach the required vote, it shall be referred for decision to the Board at its next meeting.

(d)   All actions of the Administrative Committee shall be reported to the Board at its next meeting, and the Board shall ratify or repudiate such actions, or take such other action as the Board deems appropriate.

(e)   The Administrative Committee shall refer all questions of interpretation and application of the Plan, and questions that may arise in connection with the

operation of the Plan, which it cannot resolve itself to the Board for final resolution.

(f)   Any member of the Administrative Committee may resign by delivering his or her written resignation to the Board and to the other members of the Administrative Committee, and the Employer Trustees or Union Trustees, as applicable, thereafter shall have the right to appoint another Trustee in his or her place; provided, however, that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee.

### 7.4   **Investment Committee**.

(a)   The Board shall appoint an Investment Committee consisting of at least six (6) Trustees (or such other number of Trustees as the Board shall, in its sole discretion, determine), having an equal number of Employer Trustees and Union Trustees, who shall serve at the sole pleasure of the Employer Trustees and Union Trustees, respectively. Employer Trustee members of the Investment Committee shall be appointed by the Employer Trustees, and Union Trustee members of the Investment Committee shall be appointed by the Union Trustees. The members of the Investment Committee shall select a Chairperson from among their number.

(b)   Subject to the actions of the Board and the provisions of the Plan, the functions of the Investment Committee shall be to:

(1)   formulate and coordinate general policies respecting the investment of the cash, Securities and Real Property or Interests in Real Property of the Fund, including the promulgation of investment directions, guidelines or objectives (as authorized by Section 8.7);

(2)   develop a continuing and prudent overall investment strategy and financial policy for the Trust Fund;

(3)   implement such policies as may be adopted by the Board concerning Trust investments;

(4)   coordinate with the Custodian (and any sub-custodian) a reporting procedure between the Custodian (and any sub-custodian) and the Board (and its Investment Committee);

(5)   recommend to the Board such Custodians, sub-custodians, Investment Managers and such other consultants to ensure that the cash, Securities and Real Property or Interests in Real Property of the Fund are invested prudently and suitably diversified, as well as to carry out the investment program;

(6)   monitor and evaluate (using one or more professional investment evaluation firms, if necessary) the performance of such Custodians, sub-custodians, Investment Managers, insurance carriers, and other investment consultants and investment products in which Trust Fund assets are invested;

(7)   where necessary, recommend to the Board that it terminate the services of any such Custodian, sub-custodian, Investment Manager, insurance carriers, and other investment consultant; and

(8)   generally, exercise those functions and responsibilities which are prudent and appropriate for the supervision of the Trust Fund's investment program and the investment of Trust Fund assets.

(c)   The Investment Committee shall endeavor to meet at least three (3) times per year, upon such notice as it may from time to time determine. A quorum of the Investment Committee shall consist of at least two (2) Employer Trustees and two (2) Union Trustees who are members of the Investment Committee. All decisions of a quorum shall be agreed to by either (1) a vote of two to zero, or (2) a vote of one and one abstention. The Employer Trustees, as a unit, shall have one vote, and the Union Trustees, as a unit, shall have one vote. The Employer Trustees shall determine how they cast their vote by a majority vote of the Employer Trustees who are members of the Investment Committee and who are present and attending the meeting. The Union Trustees shall determine how they cast their vote by a majority vote of the Union Trustees who are members of the Investment Committee and who are present and attending the meeting. In addition to decisions made at meetings, the Investment Committee may also be polled either in writing or by telephone by the Executive Director or the Chairperson (or his or her designee) without the necessity of having a meeting, in which event, any action to be taken must be carried by the same vote as that required at a meeting of the Investment Committee and, if polled by telephone, must be confirmed in writing by each member of the Investment Committee who participated in the poll as soon as practicable following the vote (but no later than thirty (30) days after the vote). If a matter cannot be agreed upon due to failure to reach the required vote, it shall be referred for decision to the Board at its next meeting.

(d)   All actions of the Investment Committee shall be reported to the Board at its next meeting, and the Board shall ratify or repudiate such actions, or take such other action as the Board deems appropriate.

(e)   Any member of the Investment Committee may resign by delivering his or her written resignation to the Board and to the other members of the Investment Committee, and the Employer Trustees or Union Trustees, as applicable, shall have the right to appoint another Trustee in his or her place; provided, however,

40

that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee.

### 7.5   **Audit Committee**.

(a)   The Board shall appoint an Audit Committee consisting of at least six (6) Trustees (or such other number of Trustees as the Board shall, in its sole discretion, determine), having an equal number of Employer Trustees and Union Trustees, who shall serve at the sole pleasure of the Employer Trustees and Union Trustees, respectively. Employer Trustee members of the Audit Committee shall be appointed by the Employer Trustees, and Union Trustee members of the Audit Committee shall be appointed by the Union Trustees. The members of the Audit Committee shall select a Chairperson from their number.

(b)   Subject to the action of the Board and the provisions of the Plan, the functions of the Audit Committee shall be to:

(1)   monitor the actions of the Fund's internal and outside auditors and coordinate with the Fund's internal and outside auditors, including the establishment and carrying out of a reporting procedure between such auditors and the Audit Committee;

(2)   develop a compliance audit program with respect to all matters related to Employer contributions to the Fund, and supervise the Fund's internal and outside auditors in conducting such compliance audits;

(3)   develop procedures and guidelines with respect to the form and manner of the remittance or other reports Employers are required to file with the Fund;

(4)   except where such determination is made by the Board, determine, in its sole and absolute discretion (or duly authorize the Executive Director to determine, in the Executive Director's sole and absolute discretion), whether an Employer has made a contribution or other payment to the Fund by mistake of fact or law, and whether such contribution or payment should be returned to the Employer (pursuant to Section 4.4);

(5)   establish, in consultation with the Board, procedures with respect to all matters related to the determination and collection of delinquent Employer contributions (unless such function is delegated to another Committee), and take all actions permitted or required under such procedures;

(6)   establish, in consultation with the Board, and carry out, procedures with respect to all matters related to the enforcement of the rules set forth in this

Agreement and in the Plan regarding Employer contributions to the Fund, and the collection of delinquent Employer contributions;

      (7)   recommend to the Board to terminate, on a prospective basis, the participation of a Contributing Employer in the Plan and Fund; and

      (8)   assess an Employer all reasonable costs and expenses (including, without limitation, all audit, accounting, and legal fees) incurred in collecting its contributions or other payments due to the Fund (in accordance with the provisions of Article IX).

(c)  The Audit Committee shall endeavor to meet at least three (3) times per year, upon such notice as it may from time to time determine. A quorum of the Audit Committee shall consist of at least two (2) Employer Trustees and two (2) Union Trustees who are members of the Audit Committee. All decisions of a quorum shall be agreed to by either (1) a vote of two to zero, or (2) a vote of one and one abstention. The Employer Trustees, as a unit, shall have one vote, and the Union Trustees, as a unit, shall have one vote. The Employer Trustees shall determine how they cast their vote by a majority vote of the Employer Trustees who are members of the Audit Committee and who are present and attending the meeting. The Union Trustees shall determine how they cast their vote by a majority vote of the Union Trustees who are members of the Audit Committee and who are present and attending the meeting. In addition to decisions made at meetings, the Audit Committee may also be polled either in writing or by telephone by the Executive Director or the Chairperson (or his or her designee) without the necessity of having a meeting, in which event any action to be taken must be carried by the same vote as that required at a meeting of the Audit Committee and, if polled by telephone, must be confirmed in writing by each member of the Audit Committee who participated in the poll as soon as practicable following the vote (but no later than thirty (30) days after the vote). If a matter cannot be agreed upon due to failure to reach the required vote, it shall be referred for decision to the Board at its next meeting.

(d)  All actions of the Audit Committee shall be reported to the Board at its next meeting, and the Board shall ratify or repudiate such actions, or take such other action as the Board deems appropriate.

(e)  The Audit Committee shall refer all questions of interpretation and application of the Plan, and questions that may arise in connection with the operation of the Plan, which it cannot resolve itself to the Board for final resolution.

(f)  Any member of the Audit Committee may resign by delivering his or her written resignation to the Board and to the other members of the Audit

Committee, and the Employer Trustees or Union Trustees, as applicable, thereafter shall have the right to appoint another Trustee in his or her place; provided, however, that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee.

# ARTICLE VIII

## INVESTMENT MANAGERS

### 8.1   Appointment of Investment Managers.

(a)  In its sole and absolute discretion, the Board may, from time to time, by notice to the Custodian, appoint one or more Investment Managers to manage and invest (including the power to acquire and dispose of) all or a portion of the assets of the Trust Fund.  Such appointments shall generally be made in consultation with the Investment Committee.

(b)  In the event that more than one Investment Manager is appointed, the Board or the Investment Committee shall separately segregate, or request the Custodian or sub-custodian to segregate, each portion of the assets constituting the account to be managed by each respective Investment Manager into a separate Investment Manager Account.

(c)  The Board or the Investment Committee may also supervise and direct the investment of any portion of the Trust Fund that is not subject to the management and control of an Investment Manager, by exercising any of the powers set forth in Section 5.5 with respect to the Securities or Real Property or Interests in Real Property of the Trust Fund so invested.

### 8.2   Authorization.

(a)  Any appointment of an Investment Manager shall be authorized by the Board, and shall become effective as of the date specified by the Board or the Investment Committee. The Investment Manager shall also identify to the Board or the Investment Committee the person or persons authorized to give Instructions or directions to the Board on behalf of the Investment Manager.

(b)  The Investment Manager shall have full discretion and authority, to the extent required, permitted or not prohibited by ERISA and other applicable law, to invest and reinvest the portion of Trust Fund assets allocated to it by the Board, without further notice, consent or approval of any party, except as expressly provided to the contrary in this Agreement or any agreement between the Board and the Investment Manager, and subject to any directions or guidelines as may be delivered from time to time to the Investment Manager by the Board (pursuant to Section 8.7).

(c)  The duties, responsibilities and compensation of each Investment Manager shall be expressed in writing in a written agreement to be entered into and executed on behalf of the Board and by such Investment Manager.

(d) The Board or the Investment Committee shall meet periodically with any Investment Manager appointed hereby for the purpose of reviewing the activities of the Investment Manager, monitoring its investment performance (including the voting of any proxies that the Investment Manager has been delegated the right to vote), its compliance with any Investment Guidelines that may have been promulgated by the Board or Investment Committee (pursuant to Section 8.7).

   **8.3** **Acknowledgments**.  The Board or the Investment Committee may require any Investment Manager to furnish it with a certificate acknowledging that it:

(a)  is a fiduciary (within the meaning of Section 3(21) of ERISA) with respect to its Investment Manager Account; and

(b)  complies with the requirements of an investment manager (as set forth in Section 3(38) of ERISA).

   **8.4** **Direction by Investment Manager**.  Each Investment Manager shall have the exclusive authority to manage, acquire and dispose of any Securities or other property held in its Investment Manager Account and, subject to its written agreement with the Board and any Investment Guidelines, may exercise with respect to such Securities or other property all of the powers set forth in Section 5.5, except subsections (j) through (z) (unless the Board or the Investment Committee has explicitly consented in writing to the Investment Manager exercising the powers set forth in such subsections).

   **8.5** **Review by Board**.  Notwithstanding anything to the contrary contained in this Agreement, neither the Board, the Investment Committee nor any Trustee shall be responsible or liable for any acts or omissions of any Investment Manager or be under any obligation to invest or otherwise manage any assets contained in an Investment Manager Account, except those assets over which it has specifically assumed investment management duties.

   **8.6** **Issuance of Orders**.  Subject to the terms of the investment management agreement between the Board and each Investment Manager:

(a)  Each Investment Manager shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders and Instructions for the purchase or sale of Securities held in its Investment Manager Account directly to a broker-dealer; and

(b)  All transactions by an Investment Manager shall be made upon such terms and conditions, and from or through such principals and agents, as the Investment Manager shall direct (consistent with the provisions of ERISA).

    **8.7**   **Investment Guidelines**.  The investment powers of any Investment Manager may be subject to any general or specific investment directions or guidelines that from time to time may be delivered to it by the Board or the Investment Committee (in its sole discretion), expressing the investment objectives, restrictions and policies of the Board or the Investment Committee with respect to the Securities and other property contained in an Investment Manager Account. Notwithstanding the preceding sentence, the issuance of any specific investment directions or guidelines by the Board or the Investment Committee shall not in any manner be construed as an acceptance by the Board or Investment Committee of any investment management or supervisory powers in connection with Trust Fund assets managed by an Investment Manager (and neither the Board nor the Investment Committee shall, as a result of issuing such directions or guidelines, be liable for any acts or omissions of an Investment Manager with respect to such assets, or be under any obligation to invest or otherwise manage such assets).

    **8.8**   **Proxies or Other Ancillary Rights**.

(a)  The Board or the Investment Committee may delegate to an Investment Manager the sole right to exercise (as it deems prudent and solely in the interest of Covered Employees and Beneficiaries), any proxies, conversion privilege or subscription right, and any other right to make an investment decision with respect to the Investment Manager Account assets (including, without limitation, the voting of proxies and exercise of all other rights of shareholders appurtenant to Investment Manager Account assets) as from time to time the Investment Manager in its discretion deems prudent.

(b)  Each Investment Manager to whom such right has been delegated shall issue to the Investment Committee a set of policy guidelines explaining the Investment Manager's positions and likely voting pattern pertaining to proxies.

(c)  Such Investment Manager shall also issue a report to the Investment Committee, at least annually, indicating the proxies that were voted on the Trust Fund's behalf and an explanation as to why they were voted in such manner.

(d)  Such Investment Manager shall also give the Custodian such instructions or directions as may be necessary, and thereupon execute and complete all such certificates, proxies, consents and other documents necessary or appropriate to effectuate any proxy voting powers or other ancillary rights delegated to it under this Agreement.

# ARTICLE IX

## PAYMENTS TO THE FUND

**9.1** **Employer Contributions**.

(a)  In order to carry out the purpose hereof, each Employer shall contribute to the Trust Fund the amount required by the applicable Collective Bargaining Agreements at any time in force and effect, and nothing in this Trust Agreement shall be deemed to change, alter or amend any of the terms or provisions of any such Collective Bargaining Agreements regarding the rate and amount of contributions except as may otherwise be provided in this Section 9.1.

(b)  In addition, each Employer shall contribute to the Trust Fund on behalf of each employee whose exclusion from participation in the Fund is later determined by the Board, or a governmental agency or court or administrative tribunal, to violate the terms of the Plan or to result in the Trust Fund's failure to satisfy the requirements of the Code applicable to tax-qualified pension plans, including without limitation part-time employees on behalf of whom the Employer is required to make contributions under Section 410 of the Code and employees for whom the Employer has maintained a waiting period in violation of Section 1.12 of the Plan.  Contributions shall be at the rate set forth in the Collective Bargaining Agreement for similarly situated employees commencing as of the first date on which contributions would have been required, but for the exclusion of participation.

(c)  The rate and amount of contribution shall at all times be based solely on, and no more than, the scale wages (as defined in the Collective Bargaining Agreement) received by Covered Employees.  The minimum contribution rate shall be 4% of scale wages and the maximum contribution rate shall be 15% of scale wages; provided that the Board shall review proposed contribution rates of less than 4% or greater than 15% and may approve variances in such minimum and maximum contribution rates, on a case-by-case basis, in its sole and absolute discretion.

**9.2** **Effective Date of Employer Contributions**.  All contributions shall be made effective as of the date specified in the applicable Collective Bargaining Agreements between the Union and the Employer, and said contributions shall continue to be paid as long as the Employer is so obligated pursuant to said Collective Bargaining Agreements.

**9.3** **Mode of Payment**  All contributions shall be made payable to "American Federation of Musicians and Employers' Pension Fund," or shall be paid in such other manner and form as may be prescribed by the Board.

**9.4**   **Default in Payment**.

(a)  Employer contributions to the Trust Fund are due no later than:

(1)   with respect to contributions due under any National Collective Bargaining Agreement, or any other Collective Bargaining Agreement that becomes effective before June 1, 2005:

(a)   the due date for such contributions as set forth in the applicable Collective Bargaining Agreements, but no later than the last day of the month immediately following the calendar quarter in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(b)   if the Collective Bargaining Agreement does not specify a due date for Employer contributions to the Trust Fund, the last day of the month immediately following the month in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(2)   with respect to contributions due under any Collective Bargaining Agreement, other than a National Collective Bargaining Agreement, that becomes effective on or after June 1, 2005 (or that become effective earlier, but are renewed or extended effective on or after that date), the last day of the calendar month immediately following the calendar month in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(3)   notwithstanding anything in Section 9.4(a)(1) or (2) of this Trust Agreement to the contrary, with respect to contributions (i) that are due from an Employer that has an outstanding delinquency to the Fund at the time the contribution obligation arises, and (ii) on which the Board (in its sole and absolute discretion) has determined the Employer is at risk of defaulting, any date on or after the due date for the payment of the wages on which the contributions are due, as prescribed by the Board, on a case-by-case basis, in its sole and absolute discretion.  The Board shall notify an Employer as soon as reasonably practicable following the Board's determination that the provisions of this Section 9.4(a)(3) will be invoked and applied to the Employer.

(b)  In addition to any other enforcement remedies that may exist under this Agreement or any applicable Collective Bargaining Agreements, the Board or the Audit Committee is authorized and empowered to initiate whatever actions or proceedings the Trustees determine, in their sole discretion, to be proper and necessary for the enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, proceedings at law or in equity, arbitration, mediation, other dispute resolution mechanisms and any other remedies that

generally would be available for the enforcement of said obligation to contribute to the Trust Fund). Venue for such actions or proceedings shall be in New York County, New York or, in the sole discretion of the Board or the Audit Committee, in any other location authorized by law.

(c) In the event that any Employer shall fail to make required Employer contributions to the Trust Fund when due, the Board may and is empowered, in its sole and absolute discretion, to terminate, on a prospective basis, the participation of the Employer in the Plan and Trust Fund, and the crediting of future service credit to Employees of such terminated Employer. Nothing in this Section 9.4(c) shall affect or otherwise modify any other rights of the Board or the Audit Committee (as may be set forth in this Agreement, the Plan or any Collective Bargaining Agreement, or as may be provided by applicable law) against such Employer for the collection of any delinquent Employer contributions to the Plan or Trust Fund (including, but not limited to, those rights and actions set forth in this Article).

(d) A delinquent Employer shall be liable for all costs and expenses incurred in effectuating its contributions or other payments due to the Trust Fund including but not limited to:

      (1)    The employer's audit costs (as provided in Section 9.9(g));

      (2)    The Trust Fund's audit costs as provided in Sections 9.4(e) and 9.9(f);

      (3)    attorneys' fees;

      (4)    court costs;

      (5)    other costs and expenses attributable to the collection of such contributions or other payments; and

      (6)    interest for every calendar year (or portion thereof) during which the delinquent contribution remained unpaid, calculated at the annual prime rate of interest quoted in The Wall Street Journal on the first business day of that calendar year, plus five percent, compounded monthly, or, if greater, any minimum interest charge established by the Trustees.

(e) In addition to the right to assess an Employer with audit costs provided in Section 9.9(f), the Board or the Audit Committee shall also have the right to assess an Employer with all reasonable costs and expenses (including, without limitation, all audit, accounting, and legal fees) attributable to the audit of the Employer's payroll, wage, and related business records with respect to the contributions which the Employer is obligated to make to the Fund; provided,

however, that the Board or the Audit Committee has determined that such Employer has been delinquent in remitting such contributions or payments to the Fund, and the aggregate amount of such delinquency, plus all accrued interest thereon and the cost of the audit, exceeds twenty percent (20%) of the actual audited amount determined by the Fund's auditors to be due the Fund.

9.5   **Enforcement Actions**.  In addition to any other remedies to which the Board or the Audit Committee may be entitled hereunder, in the event that an Employer fails to make required contributions to the Trust Fund, in accordance with the terms and conditions of this Agreement and any rules or guidelines promulgated by the Board or the Audit Committee pursuant hereto (hereinafter collectively referred to as "Unpaid Contributions"), the Board may bring an action on behalf of the Trust Fund pursuant to Sections 502(g)(2) and 515 of ERISA to enforce the Employer's obligation to contribute to the Trust Fund.

9.6   **Payments Required by Court Award**.  In any action under this Article IX in which a judgment is awarded by a court in favor of the Plan, the Trust, or the Board, the Employer shall pay to the Trust, in accordance with the court's award, the following amounts:

(a)  all Unpaid Contributions due and payable; plus

(b)  interest on such Unpaid Contributions (computed in accordance with Section 9.4(d)); plus

(c)  an amount equal to the greater of:

(1)   the interest on the Unpaid Contributions (computed in accordance with Section 9.4(d)), or

(2)   twenty percent (20%) of the Unpaid Contributions; plus

(d)  attorneys' fees, costs of the action, reasonable expenses attributable to any audit of the Employer's payroll, wage, and related business records with respect to Unpaid Contributions or payments, and any other related expenses; and

(e)  such other legal or equitable relief as the court deems appropriate.

9.7   **No Waiver of Other Rights**.

(a)  The failure of any Employer to make Employer contributions to the Trust Fund when due shall not relieve any other Employer of its obligations to make Employer contributions to said Trust.

(b)  Nothing in this Article IX shall be construed as a waiver or limitation on the right of the Plan, the Trust, the Board, or the Audit Committee to enforce an Employer's contribution obligation in any other type of proceeding, and the provisions of this Article IX shall be without prejudice to the rights of the Union to enforce the provisions of any Collective Bargaining Agreement to which it is a party.

(c)  The Board or the Audit Committee (or either of their duly authorized designees) shall have the exclusive authority to compromise or discharge Employer contributions to the Trust and any other Employer obligations that arise under this Trust Agreement.

>>> 9.8    **Remittance Reports**.

(a)  All contributions must be accompanied by a remittance report form that includes the name of the Employer, the name, address and phone number of the payor, if different (*e.g.*, payroll company, affiliated entity), as well as all Employee first and last names, addresses, social security numbers, type of engagement(s) (*e.g.*, name of applicable Collective Bargaining Agreement and indication of original use, new use or re-use of recording), description of engagement(s) (*e.g.*, title of show, commercial, jingle or song and location of engagement), all engagement date(s), "scale wage" and contribution amount(s) and such other information as the Board may elect to prescribe in the future. The Employer shall submit to the Fund separate remittance or other reports for each type of engagement.

(b)  If contributions due the Fund are not accompanied by a remittance form containing all of the information set forth in subsection (a) above, the Fund may assess a fee from the Employer in its sole discretion in an amount that the Audit Committee prescribes for each day following the contribution due date for which the remittance report is incomplete or not received by the Fund.

>>> 9.9    **Audits**.

(a) The Board or the Audit Committee (or either of their duly authorized designees) shall be authorized and empowered to initiate on behalf of the Fund whatever action(s) or proceedings(s) it determines to be proper and necessary, in its sole and absolute discretion, for the enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, periodic audits or other forms of examination of an Employer's books and records, enforcement and/or collection proceedings).

(b) The Board or the Audit Committee (or either of their duly authorized designees) shall have the right to designate an accountant, attorney or other

51

representative of the Fund (a "Fund Representative") periodically to examine, copy and audit, the Employer's accounts, books and records at the Employer's place of business (or other mutually agreed upon location) which the Fund Representative determines is necessary to confirm that the Employer has fully satisfied its obligations to contribute to the Fund under the Employer's Collective Bargaining Agreement, this Agreement, the Plan, the rules and policies of the Trustees, or under applicable law.   The Employer must permit such Fund Representative to conduct such periodic examinations and audits.

(c)  The Fund Representative shall have the right to examine all of the Employer's accounts, books and records including, without limitation, all check registers; payroll registers; general, production cost and other ledgers; royalty statements; vouchers; payroll tax deductions; calculations supporting "scale wage" determinations; IRS Forms 1096, 1099, W-2 and W-3; state employment reports; evidence of unemployment insurance contributions; insurance company reports; supporting cancelled checks; disability insurance premiums; certification of workers' compensation coverage; personnel files and/or other documentation supporting employee job classifications; and any other items concerning the Employer's payroll(s) or contributions to the Fund deemed necessary by such Fund Representative to determine the accuracy, completeness, and timeliness of the Employer's contributions and payments to the Fund (all of which are hereinafter collectively referred to as "Records"). The Employer's Records shall be made available at the Employer's place of business at all reasonable times for examination, audit, and copying (at the Employer's expense) by such Fund Representative. In addition, the Records of any affiliate, subsidiary, alter ego, joint venture, successor or related company of the Employer (including, where applicable, payroll companies) shall also be made available at all reasonable times for examination and audit by the Fund's Representative, at the request of said Fund Representative.

(d)  The Employer shall retain, for a minimum period of six (6) years or such longer period as may be required by applicable law (whichever is greater), all Records necessary for the conduct of the examination and audit contemplated in this Article IX.

(e)  An Employer shall be entitled to thirty (30) days' advance written notice of any audit to be conducted under this Article IX. If, however, exigent circumstances exist for conducting the audit on shorter notice, the Fund Representative may do so, provided that it gives the Employer advance written notice of such audit.  Except where the Fund  Representative has determined that exigent circumstances require otherwise, the Employer shall be permitted to adjourn the audit for up to ten (10) business days upon demonstrating to the Fund, no less than ten (10) business days' in advance of the scheduled commencement of the audit, a legitimate business need for such adjournment.

52

(f)  In the event that the Fund Representative has provided proper and timely notice of the audit to the affected Employer in accordance with Section 9.9(e) above, but the Employer nonetheless fails to produce the Records necessary for an audit as set forth in this Article IX, and the Fund brings and prevails in a legal action against said Employer to obtain an audit of said Employer's Records, said Employer shall be obligated to pay the reasonable costs and attorneys' fees incurred in pursuing said action, together with the full cost of such audit (without regard to any of the limitations or other conditions on the amount that can be assessed against such Employer set forth in Section 9.4(e)). In any such action, the affected Employer consents to jurisdiction and venue in the Federal District Court for the Southern District of New York.

(g)  The Employer shall bear all of its own costs of the audit.

# ARTICLE X

## AMENDMENT; TERMINATION; AND
## TRANSFER OF ASSETS

**10.1  Amendment**.  This Agreement and the Plan may be amended, at any time and in any manner, by a vote of the Board (in the manner prescribed in Section 6.4), and the provisions of any such amendment may be made applicable to the Plan or the Trust Fund as constituted at the time of such amendment and to any part of the Trust Fund subsequently acquired, as well as to the Executive Director, all Trustees, all Contributing Employers, any Investment Manager, or Custodian, and all others whosoever; provided that the amendment:

(a)  is consistent with the purposes for which the Fund was established; and

(b)  will not cause the Plan to be disqualified under Section 401(a), or the Trust to lose its tax-exemption under Section 501(a), of the Code.

**10.2  Limitation of Amendments**.  No amendment shall be made to this Trust Agreement or the Plan which shall divert the Fund to any purpose other than that of providing pension or related benefits or result in the return or diversion of any part of the Fund to any of the Contributing Employers except as otherwise permitted by ERISA.

**10.3  Termination**.

(a) This Agreement, and the Trust Fund established hereunder, may be terminated:

(1)  at any time, by a vote of the Board (in the manner prescribed in Section 6.4); or

(2)  by an instrument in writing duly executed by the Union and by Employers which, in the aggregate, were responsible for 50% or more of the contributions paid to the Trust Fund by Employers during the last complete six (6) month period ended June 30 or December 31 immediately preceding the submission of such instrument; or

(3)  automatically, in the event that the obligation of all Employers to make contributions to the Trust Fund shall terminate or there shall be no assets remaining in the Trust Fund.

(4)  In the event of the termination of the Trust, the Board shall apply the assets of the Trust to pay or to provide for the payment of any and all obligations of the Trust and distribute or apply any remaining surplus in a manner consistent,

in their opinion, with this Agreement, the Plan, ERISA, the Code and any other applicable law; provided, however, that no part of the corpus or income of the Trust Fund shall be used for or diverted to purposes other than for the exclusive benefit of the Covered Employees (except as otherwise provided in Section 4.4); the payment of administrative expenses of the Trust Fund, or for other payments in accordance with the provisions of this Trust Agreement. Under no circumstances shall any portion of the corpus or income of the Trust Fund, directly or indirectly, revert or accrue to the benefit of any Employer or the Union except as otherwise permitted by ERISA.

(5)   Upon termination of the Trust, the Board shall forthwith notify all necessary parties, and the Board shall continue to act as Trustees for the purpose of concluding the affairs of the Trust. The Board may take any action with regard to insurance policies or group contracts that may be required by the insurance carrier and which the Trustees, in their discretion, may deem appropriate.

**10.4**   **Transfer of Assets.**

(a)  The Board may issue Instructions from time to time directing that all or a portion of the assets of the Trust Fund shall be transferred to another trust established and maintained for the custody or investment of assets of the Trust Fund.

(b)  Nothing herein contained shall be deemed to prohibit the Board, in its sole and absolute discretion, from transferring any assets of the Fund to another pension fund established or maintained by any Contributing Employer for employees or former employees of the Contributing Employer who were participants in the Plan on such terms and under such conditions as the Board may determine; provided, however, that, in the case of any merger or consolidation with, or transfer of assets and liabilities to, any other pension plan or trust, provisions shall be made so that each Covered Employee affected thereby on the date thereof would (as if the Plan or Trust then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit that he or she would have been entitled to receive immediately prior to the merger, consolidation or transfer (as if the Plan or Trust then terminated).

(c)  To the extent permitted by applicable law, and in accordance with the terms of the Plan and applicable law, the Executive Director shall direct the transfer of assets of the Fund directly to another retirement fund established or maintained by an employer in which an employee or former employee of a Contributing Employer who was a participant in the Plan participates, or to an individual retirement account established or maintained by a former Plan participant (or his

or her spousal beneficiary), pursuant to the written authorization of such participant (or his or her spousal beneficiary).

# ARTICLE XI

## ACCOUNTS OF THE BOARD

**11.1** **Board to Maintain Trust Accounts**.  Unless otherwise delegated to the Executive Director, Custodian, sub-custodian, Fund accountant, or another entity or person, the Board shall:

(a)  Act as a master recordkeeper for the Plan and Trust Fund, and its records shall constitute the official records of the Plan and Trust Fund for all purposes;

(b)  Maintain true, accurate and detailed books of account and records of all their transactions, which shall be open to the inspection of each Trustee, each Employer and the Union at the principal office of the Trust Fund at all reasonable times, and which shall be examined at least annually by a certified public accountant selected by the Board; and

(c)  Maintain such information as will enable the Board to determine the fair market value of each Security, and the aggregate fair market value of all other assets of the Trust.

**11.2** **Valuation**.  For all purposes of this Agreement (including, without limitation, the actuarial valuation of the Plan or an Investment Manager Account, and any accounts as hereinabove provided), all Securities and other property on any business day shall be valued at fair market value, computed in accordance with such commercially acceptable valuation method or methods determined by the Board (or, in the Board's discretion, the Custodian), with prudence and in good faith, to reflect their current fair market value.

# ARTICLE XII

## MISCELLANEOUS

**12.1** **Situs**.  The Board and the Fund shall have and maintain a principal office in the City of New York.

**12.2** **Choice of Law**.  This Agreement and the Trust Fund created hereby shall be construed, regulated, enforced and administered in accordance with the internal laws of the State of New York applicable to contracts made and to be performed within the County and State of New York (without regard to any conflict of laws provisions), to the extent that such laws are not preempted by the provisions of ERISA (or any other applicable laws of the United States).

**12.3** **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall be considered the same instrument. The signature of a party on any counterpart shall be sufficient evidence of his or her execution thereof.

**12.4** **Titles; Plurals; and Gender**.  Titles, headings, and subheadings for sections and paragraphs are inserted for the convenience of reference only, and this Agreement shall not be construed by reference to them. Wherever required by context, the singular of any word used in this Agreement shall include the plural and the plural may be read in the singular. Words used in the masculine shall be read and construed in the feminine where they would so apply.

**12.5** **Service of Process**.  The Trustees are hereby designated as agents for service of legal process on the Trust or the Plan.

**12.6** **Validity of Trustees' Accounts and Instruments**.  No person, partnership, corporation or association dealing with the Board shall be obliged to see to the application of any funds or property of the Trust, to see that the terms of this Agreement and Declaration of Trust have been complied with, or be obliged to inquire into the necessity or expediency of any act of the Board. Every Certificate or other instrument executed by the Co-Chairs shall be conclusive in favor of any person, partnership, corporation or association relying thereon that:

(a)  at the time of the delivery of said instrument the Trust was in full force and effect;

(b)  said instrument was effected in accordance with the terms and conditions of this Agreement; and

(c) the Co-Chairs were duly authorized and empowered to execute such instrument.

**12.7  Definitions**.  All words and phrases defined in the Plan shall have the same meaning in this Agreement, except as otherwise expressly provided herein.

**12.8  Notices**.  Unless otherwise specified herein, all notices, instructions and advice with respect to Securities transactions, or any other matters contemplated by this Agreement, shall be deemed duly given to the Board when deposited in first-class mail, hand delivered, or transmitted by facsimile or electronic mail, addressed as follows:

> Board of Trustees
> American Federation of Musicians
>  and Employers' Pension Fund
> One Penn Plaza, Suite 3115
> New York, New York 10119

or to such other address as the Board shall subsequently designate. Any notice or other communication shall be deemed to have been given to, or received by, the Board as of the date on which it is personally or electronically delivered or, if mailed, on the first (1st) business day after the date of the postmark applied by the United States Postal Service.

**12.9  Severability**.  If any one or more of the covenants, agreements, provisions or terms of this Agreement (or any amendment hereto) shall be held contrary to any provision of law, or shall for any reason whatsoever be held invalid, then such covenants, agreements, provisions or terms (or amendments) shall:

(a)  be enforced only to the extent not contrary to law or invalid;

(b)  be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement; and

(c)  shall in no way affect the validity or enforceability of the other provisions of this Agreement or the rights of the parties hereto.

**12.10  Legal Compliance**.  The Board, Executive Director, each Trustee, each Committee, the Custodian and each Investment Manager shall carry out its respective duties and responsibilities under this Agreement in accordance with, and be limited in the exercise of its rights and obligations by, the provisions of ERISA, the Code and other applicable law.

**12.11  Successor Provisions of Law**.  Any references to a section of ERISA or the Code, or to any regulations or administrative pronouncements thereunder, shall be deemed to include a reference to any successor provision of ERISA or the Code (or of any successor federal law) or to any successor regulations or administrative pronouncements thereunder.

**12.12  Entire Agreement**.  This Agreement sets forth the entire agreement of the parties hereto with respect to the subject matter hereof, is intended to be the complete and exclusive statement of the terms hereof, and may not be modified or amended except pursuant to the procedure set forth in Section 10.1.

**12.13  Construction**.  Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the requirements of ERISA, the Code, or other applicable law.

**12.14  Inurement**.  This Agreement shall inure to the benefit of the Board and its successors and assigns, and the Covered Employees (or their Beneficiaries).

**12.15  Rights In Fund**.  No Employee, or other person, or group of persons, nor any organization (other than the Board), nor any person claiming through them, shall have any right, title or interest in any of the income or property of any character received or held by or for the account of the Fund (by reason of having been named a beneficiary or otherwise), and no person shall have any right to any benefit provided by the Plan, nor shall any person be entitled to any payment or other equity in the assets of the Fund unless and until the Board determines that he or she fulfills all the requirements for a benefit in accordance with the specific provisions of the Plan.

**12.16  Trust Grants No Interest to Employees**.  Neither the creation of this Fund nor anything contained in this Agreement or the Plan shall be construed as giving any Covered Employee entitled to benefits hereunder or under the Plan any right to be continued in the employ of any Contributing Employer or any equity or other interest in the assets of the Fund, except as set forth in the Plan.

**12.17  Duration of Agreement**.  This Agreement shall continue in effect without limit as to time; subject, however, to the provisions of this Agreement relating to amendment, modification and termination thereof set forth in Article X.

**12.18  Interpretation of Agreement**.  Should any provision of this Agreement require interpretation or construction, it is agreed by the parties that

the court, administrative body or other entity interpreting or construing this Agreement shall not apply a presumption that the provisions hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agents prepared the same, it being agreed that all parties, by their respective representatives and agents, have fully participated in the preparation of all provisions of this Agreement.

# ARTICLE XIII

## WITHDRAWAL LIABILITY

**13.1**  **In General**.

Each Employer shall pay to the Fund all amounts due as withdrawal liability resulting from a partial or complete withdrawal from the Fund in accordance with ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980 and as it may be subsequently amended.  The Trustees shall have full authority to adopt rules and regulations governing the determination and payment of withdrawal liability, consistent with the statute and any governmental regulations promulgated under it, and such rules and regulations adopted by the Trustees shall be binding on all Employers.

**IN WITNESS WHEREOF**, the undersigned do hereby cause this instrument to be executed as of the day and year first above written for and on behalf of all Contributing Employers or the Union (as the case may be) and as Trustees of the Fund.

WE HEREBY AGREE to act as Trustees in accordance with the terms and conditions of this Agreement and Declaration of Trust. By our signatures below, we hereby signify and acknowledge that we have read the foregoing instrument, fully understand the contents thereof and agree to comply with all of its terms and provisions.

EMPLOYER TRUSTEES (for and on behalf of all Contributing Employers, and as Employer Trustees of the Fund):

/s/ *Irving Cheskin*
IRVING W. CHESKIN

/s/ *J. Nicholas Counter III*
J. NICHOLAS COUNTER, III

/s/ *Arnie Kaplan*
ARNIE KAPLAN

/s/ *JoAnn Kessler*
JOANN KESSLER

/s/ *Marion Preston*
MARION PRESTON

/s/ *Alan H. Raphael*
ALAN H. RAPHAEL

/s/ *Jeffrey Ruthizer*
JEFFREY RUTHIZER

/s/ *Norman K. Samnick*
NORMAN K. SAMNICK

/s/ *Harriet Slaughter*
HARRIET SLAUGHTER

UNION TRUSTEES (for and on behalf of the Union, and as Union Trustees of the Fund):

/s/ *Harold Bradley*
HAROLD BRADLEY

/s/ *Hal Espinoza*
HAL ESPINOZA

/s/ *William L. Foster*
WILLIAM L. FOSTER

/s/ *Thomas F. Lee*
THOMAS F. LEE

/s/ *David Lennon*
DAVID LENNON

/s/ *William Moriarity*
WILLIAM MORIARITY

/s/ *Melinda Wagner*
MELINDA WAGNER

/s/ *Ed Ward*
ED WARD

/s/ *Phil Yao*
PHIL YAO

63

**AMENDMENT NUMBER ONE TO THE
AGREEMENT AND DECLARATION OF TRUST ESTABLISHING
THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'
PENSION FUND
(As Amended and Restated Effective as of April 1, 2005)**

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of

Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration

of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as

amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board

reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board, at its May 23, 2006 meeting, decided to amend the Trust

Agreement in the manner set forth herein.

**NOW, THEREFORE**, Section 9.4(d)(6) of the Trust Agreement is hereby amended,

effective July 1, 2006, to read as follows:

> interest for every calendar year (or portion thereof) during which the delinquent
> contribution remained unpaid, calculated (and compounded monthly) at the greater of (i)
> the rate of 7.5%, or (ii) the annual prime rate of interest quoted in The Wall Street Journal
> on the first business day of that calendar year plus two percent, or, for interest that
> accrues before July 1, 2006, such prime rate plus five percent; or, if greater, the minimum
> interest charge (if any) established by the Trustees.

**IN WITNESS WHEREOF,** Board has executed this Amendment on this 20th day of September, 2006.

By:  /s/ Norman K. Samnick                    By:  /s/ Thomas F. Lee

By:  /s/ JoAnn Kessler                        By:  /s/ Hal Espinosa

By:  /s/ Jeff Ruthizer                        By:  /s/ Melinda Wagner

By:  /s/ Lovie Smith-Schenk                   By:  /s/ Philip Yao

By:  /s/ Irving W. Cheskin                    By:  /s/ William Foster

By:  /s/ Alan H. Raphael                      By:  /s/ Marion Preston

By:  /s/ Arnie Kaplan                         By:  /s/ Harold Ray Bradley

By:  /s/ Harriet Slaughter                    By:  /s/ David Lennon

By:  /s/ J. Nicholas Counter                  By:  /s/ Gary Matts

## AMENDMENT NUMBER TWO TO THE
## AGREEMENT AND DECLARATION OF TRUST ESTABLISHING
## THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'
## PENSION FUND
## (As Amended and Restated Effective as of April 1, 2005)

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of

Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration

of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as

amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board

reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board desires to amend the Trust Agreement in the manner set forth

herein.

**NOW, THEREFORE**, the Trust Agreement is hereby amended, effective June 1, 2007,

to read as follows:

1.      **Section 6.2 Calling of Meetings**, is amended by deleting the existing text in its entirety

and replacing it with the following:

>       (a)      The Board shall endeavor to meet at least three (3) times per year, and at such
> other times as the Board may reasonably decide.  In addition, (i) either Co-Chair may call
> a special meeting of the Board, at any time, by giving at least five (5) business days
> advance written (including e-mail) notice of the time and place thereof to the other Co-
> Chair and all other Trustees; and (ii) the Co-Chairs may together call a special meeting of
> the Board at any time upon written (including e-mail) notice in the event that they
> determine, in their discretion, that exigent circumstances so require.

>       (b)      Any three (3) Employer Trustees and three (3) Union Trustees may call a meeting
> of the Trustees, at any time, by giving at least ten (10) business days advance written
> (including e-mail) notice of the time and place thereof to the Co-Chairs and to all other
> Trustees.

(c)     Meetings of the Board may be held at any time by telephone conference with proper notice (as prescribed by either paragraph (a) or (b) above).

(d)     Meetings of the Board may also be held at any time, without notice, in person or by telephone conference; provided, however, that a majority of the Employer Trustees and a majority of the Union Trustees consent thereto in writing (including e-mail).

2.     **Section 7.3 Administrative Committee**, is amended by adding the following after the first sentence thereof:

> In addition, a special meeting may be called (i) by either Co-Chair of the Board by giving at least five (5) business days advance written (including email) notice of the time and place thereof to the members of the Administrative Committee or (ii) by both Co-Chairs of the Board upon written (including e-mail) notice in the event that they determine in their discretion that exigent circumstances so require.

3.     **Section 7.4 Investment Committee**, is amended by adding the following after the first sentence thereof:

> In addition, a special meeting may be called (i) by either Co-Chair of the Board by giving at least five (5) business days advance written (including email) notice of the time and place thereof to the members of the Investment Committee or (ii) by both Co-Chairs of the Board upon written (including e-mail) notice in the event that they determine in their discretion that exigent circumstances so require.

4.     **Section 7.5 Audit Committee**, is amended by adding the following after the first sentence thereof:

> In addition, a special meeting may be called (i) by either Co-Chair of the Board by giving at least five (5) business days advance written (including email) notice of the time and place thereof to the members of the Audit Committee or (ii) by both Co-Chairs of the Board upon written (including e-mail) notice in the event that they determine in their discretion that exigent circumstances so require.

3967/11131-001 Current/9539270v2

**IN WITNESS. WHEREOF**, the Board has executed this Amendment on this 3lst day of **May 2007**

*/s/ Norman K. Samnick*
Norman K. Samnick, Co-Chairperson

*/s/ Thomas F. Lee*
Thomas F. Lee, Co-Chairperson

*/s/ Irving W. Cheskin*
Irving Cheskin

*/s/ Harold Ray Bradley*
Harold Bradley

*/s/ J. Nicholas Counter III*
J. Nicholas Counter, III

*/s/ Hal Espinosa*
Hal Espinosa

*/s/ Arnie Kaplan*
Arnie Kaplan

*/s/ William L. Foster*
William L. Foster

*/s/ JoAnn Kessler*
JoAnn Kessler

*/s/ Mary Landolfi*
Mary Landolfi

*/s/ Marion Preston*
Marion Preston

*/s/ Gary Matts*
Gary Matts

*/s/ Jeffrey Ruthizer*
Jeff Ruthizer

*/s/ Lovie Smith-Schenk*
Lovie Smith-Schenk

*/s/ Alan H. Raphael*
Alan H. Raphael

*/s/ Melinda Wagner*
Melinda Wagner

*/s/ Harriet Slaughter*
Harriett Slaughter

*/s/ Philip Yao*
Phil Yao

**AMENDMENT NUMBER THREE TO THE**
**AGREEMENT AND DECLARATION OF TRUST ESTABLISHING**
**THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'**
**PENSION FUND**
**(As Amended and Restated Effective as of April 1, 2005)**

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of

Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration

of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as

amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board

reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board now wishes to amend the Trust Agreement in the manner set

forth herein.

**NOW, THEREFORE**, Section 9.1(c) of the Trust Agreement is hereby amended,

effective as of the amendment and restatement date, to read as follows:

(c) The rate and amount of contribution shall at all times be based solely on, and
no more than, the scale wages (as defined in the Collective Bargaining
Agreement) earned by Covered Employees. The minimum contribution rate shall
be 4% of scale wages and the maximum contribution rate shall be 15% of scale
wages; provided that the Board shall review proposed contribution rates of less
than 4% or greater than 15% and may approve variances in such minimum and
maximum contribution rates, on a case-by-case basis, in its sole and absolute
discretion.

**IN WITNESS WHEREOF,** the Board has executed this Amendment on this 29th day of May, 2008.

By:   */s/ Thomas F. Lee*
       Thomas F. Lee, Co-Chair

By:   */s/ Norman K. Samnick*
       Norman K. Samnick, Co-Chair

2

<u>**A M E N D M E N T   N U M B E R   F O U R   T O   T H E**
**AGREEMENT AND DECLARATION OF TRUST ESTABLISHING**
**THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'**
**PENSION FUND**
**(As Amended and Restated Effective as of April 1, 2005)**</u>

**WHEREAS,** the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS,** pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

**WHEREAS,** on October 14, 2009, the Board adopted a resolution describing changes in a collective bargaining agreement that would result in the collective bargaining agreement and employer being unacceptable to the Board; and

**WHEREAS,** the Board now wishes to amend the Trust Agreement to formally incorporate the terms of the resolution;

**NOW, THEREFORE,** Section 2.4 of the Trust Agreement (Participation by Contributing Employers) is amended to read as follows, effective October 15, 2009:

"(a) Any Employer may participate in the Trust and the Plan by:

(1)     Executing a copy of a Collective Bargaining Agreement, or otherwise establishing a consistent pattern of contributing to the Trust Fund pursuant to a Collective Bargaining Agreement;

(2)     Designating a date on which such participation shall become effective;

(3)     Designating the categories of employment and its Covered Employees for participation in the Plan; and

(4)     Acceptance by the Board of the participation by such Employer in the Plan and Trust.


(b) Except as otherwise provided by the Board, an Employer and a Collective Bargaining Agreement is not acceptable to the Board in the event that: (i) in the case of a Collective Bargaining Agreement the terms of which were in effect (by agreement or operation of law) on October 15, 2009, the effective contribution rate applicable to any period of that Collective Bargaining Agreement is reduced (by agreement or otherwise, on or after October 16, 2009); or (ii) in the case of any future extension of or successor to any Collective Bargaining. Agreement the terms of which were in effect (by agreement or operation of law) on October 15, 2009, the effective contribution rate is reduced to a rate that is lower than the effective contribution rate in effect on the last day of the expiring Collective. Bargaining Agreement (based on the terms of the Collective Bargaining Agreement as they existed on October 15, 2009)."


**IN WITNESS WHEREOF,** the Board has executed this Amendment on this 24th day of February, 2010


By:      */s/ Thomas F. Lee*
         Thomas F. Lee, Co-Chair


By:      */s/ Alan H. Raphael*
         Alan H. Raphael, Co-Chair

**AMENDMENT NUMBER FIVE TO THE**
**AGREEMENT AND DECLARATION OF TRUST ESTABLISHING**
**THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'**
**PENSION FUND**
**(As Amended and Restated Effective as of April 1, 2005)**

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board has agreed to amend the Trust Agreement in the manner set forth herein and has delegated to the undersigned the authority to execute this Amendment.

**NOW, THEREFORE**, the Trust Agreement is hereby amended to read as follows, effective as of the date of adoption:

1.      Section 6.1 (Officers) is amended to read as follows:

"(a)     There shall be two (2) Co-Chairs of the Board, one of whom shall be the duly authorized President of the Union (or designated by the majority vote of those Union Trustees then in office, if the duly authorized President of the Union is not a Trustee), and the other of whom shall be designated by the majority vote of those Employer Trustees then in office.

(b)     The term of such officers shall commence on the date of their election and continue until their successors are elected."

2.      Section 7.3 (Administrative Committee) is amended as follows:

a.      Subsection (a) is amended to read as follows:

"Employer Trustee members of the Administrative Committee shall be appointed by the Employer Co-Chair of the Board, and Union Trustee members of the Administrative Committee shall be appointed

by the Union Co-Chair of the Board. The members of the Administrative Committee shall select a Chairperson from their number."

b. Subsection (f) is amended to read as follows:

"Any member of the Administrative Committee may resign by delivering his or her written resignation to the Board and to the other members of the Administrative Committee, and another Trustee shall be appointed in his or her place in the manner set forth in subsection (a) above; provided, however, that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee (except in situations in which a vacancy is pending and waiting to be filled)."

3. Section 7.4(a) (Investment Committee) is amended as follows:

a. Subsection (a) is amended to read as follows:

"Employer Trustee members of the Investment Committee shall be appointed by the Employer Co-Chair of the Board, and Union Trustee members of the Investment Committee shall be appointed by the Union Co-Chair of the Board. There shall be two (2) Co-Chairs of the Investment Committee, one of whom shall be designated by the majority vote of the Employer Trustee members of the Investment Committee and one of whom shall be appointed by the Union Co-Chair of the Board."

b. Subsection (e) is amended to read as follows:

"Any member of the Investment Committee may resign by delivering his or her written resignation to the Board and to the other members of the Investment Committee, and another Trustee shall be appointed in his or her place in the manner set forth in subsection (a) above; provided, however, that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee (except in situations in which a vacancy is pending and waiting to be filled)."

4. Section 7.5(a) (Audit Committee) is amended as follows:

a. Subsection (a) is amended to read as follows:

"Employer Trustee members of the Audit Committee shall be appointed by the Employer Co-Chair of the Board, and Union Trustee members of the Audit Committee shall be appointed by the Union Co-Chair of the Board. The members of the Audit Committee shall select a Chairperson from their number."

2

    b.     Subsection (f) is amended to read as follows:

> "Any member of the Audit Committee may resign by delivering his or her written resignation to the Board and to the other members of the Audit Committee, and another Trustee shall be appointed in his or her place in the manner set forth in subsection (a) above; provided, however, that there shall always be an equal number of Employer Trustees and Union Trustees appointed to such Committee (except in situations in which a vacancy is pending and waiting to be filled)."

5.    The first two lines of Section 7.4(b) are amended to read as follows:

> "Subject to the actions of the Board and the provisions of the Investment Policy Statement and the Plan, the functions of the Investment Committee shall be to:"

6.    The amendments to Sections 7.3, 7.4 and 7.5 of the Trust Agreement made by Amendment Number 2 to the Trust Agreement shall be moved to immediately after the first sentence of Sections 7.3(c), 7.4(c) and 7.5(c), respectively.

7.    A new Section 9.10 shall be added to read as follows:

### Applicability of Article IX to Statutory Employer Surcharge

> For purposes of Section 9.3, 9.4, 9.5, 9.6, 9.7 and 9.9, the terms "contribution," "contributions", and "Unpaid Contributions" shall include employer surcharges required under Section 432(e)(7) of the Code.

         *         *

**IN WITNESS WHEREOF,** the undersigned have executed this Amendment on this 19th day of May 2010.

By:    _/s/ Thomas F. Lee_
        Thomas F. Lee, Co-Chair

By:    _/s/ Alan H. Raphael_
        Alan H. Raphael, Co-Chair

3

## AMENDMENT NUMBER SIX TO THE
## AGREEMENT AND DECLARATION OF TRUST ESTABLISHING
## THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'
## PENSION FUND
## (As Amended and Restated Effective as of April 1, 2005)

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of

Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and

Declaration of Trust Establishing the American Federation of Musicians and Employers'

Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust

Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board

reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board has agreed to amend the Trust Agreement to clarify the

definition of Employer in Section 1.13 and to conform the provisions of Article VIII with

the Investment Policy Statement adopted by the Board effective May 19, 2010, and has

delegated to the undersigned the authority to execute this Amendment.

**NOW, THEREFORE**, the Trust Agreement is hereby amended to read as follows,

effective as of the date of adoption:

1.      Section 1.13 (Employer) is amended to read as follows, effective as of the April 1,
2005 restatement date:

> **1.13   "Employer", "Employers" or "Contributing Employers"** shall mean
> any employer acceptable to the Board (through Board approval or otherwise in
> accordance with procedures it establishes) that heretofore or hereafter is required
> or otherwise undertakes to contribute to the Plan and/or the Trust Fund on behalf
> of its Covered Employees pursuant to a Collective Bargaining Agreement,
> including (without limitation) an employer that is no longer obligated to
> contribute to the Plan and/or Trust Fund with respect to all periods of time during
> which such employer had such an obligation. The term "Employer", "Employers"
> or "Contributing Employers" shall not include unincorporated self-employed

persons or sole proprietorships with no other employees, or partnerships that have no employees other than partners.

2. Sections 8.1 and 8.2 of Article VIII (INVESTMENT MANAGERS) are amended to read as follows, effective May 19, 2010:

### 8.1  Appointment of Investment Managers.

(a) In its sole and absolute discretion, the Board or the Investment Committee may, from time to time, appoint one or more Investment Managers to manage and invest (including the power to acquire and dispose of) all or a portion of the assets of the Trust Fund. In the event that more than one Investment Manager is appointed, the Board or the Investment Committee shall separately segregate, or request the Custodian or sub-custodian to segregate, each portion of the assets constituting the account to be managed by each respective Investment Manager into a separate Investment Manager Account.

(b) The Board or the Investment Committee may also supervise and direct the investment of any portion of the Trust Fund that is not subject to the management and control of an Investment Manager, by exercising any of the powers set forth in Section 5.5 of this Agreement with respect to the Securities or Real Property or Interests in Real Property of the Trust Fund so invested.

(c) In addition, in its sole and absolute discretion, the Board or the Investment Committee may, from time to time, appoint one or more Investment Managers to serve as a "named fiduciary" (within the meaning of Section 402 of ERISA) for such specific purposes as may be provided by the Board or Investment Committee.

### 8.2  Authorization.

(a) Any appointment of an Investment Manager shall be authorized by the Board or the Investment Committee, and shall become effective as of the date specified by the Board or the Investment Committee. The Investment Manager shall also identify to the Board or the Investment Committee the person or persons authorized to give Instructions or directions to the Board on behalf of the Investment Manager.

(b) The Investment Manager shall have full discretion and authority, to the extent required, permitted or not prohibited by ERISA and other applicable law, to invest and reinvest the portion of Trust Fund assets allocated to it by the Board or the Investment Committee, without further notice, consent or approval of any party, except as expressly provided to the contrary in this Agreement or any agreement between the Board and the Investment Manager, and subject to any directions or guidelines as may be delivered from time to time to the Investment Manager by the Board or the Investment Committee (pursuant to Section 8.7).

(c)  The duties and responsibilities of each Investment Manager shall be expressed in a written agreement to be entered into and executed on behalf of the Board and by such Investment Manager. Each Investment Manager so employed shall be compensated in such manner as shall be mutually agreed upon in such agreement.

(d)  The Board or the Investment Committee shall meet periodically with any Investment Manager appointed hereby for the purpose of reviewing the activities of the Investment Manager, monitoring its investment performance (including the voting of any proxies that the Investment Manager has been delegated the right to vote), and determining if the Investment Manager has complied with any Investment Guidelines that may have been promulgated by the Board or Investment Committee (pursuant to Section 8.7).

**IN WITNESS WHEREOF.** the Board executed this Amendment on this 1st day of

September, 2010.

By:      */s/ Raymond M. Hair, Jr.*
         Raymond Hair, Jr., Co-Chair

By:      */s/ Alan H. Raphael*
         Alan H. Raphael, Co-Chair

<u>AMENDMENT NUMBER SEVEN TO THE</u>
<u>AGREEMENT AND DECLARATION OF TRUST ESTABLISHING</u>
<u>THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'</u>
<u>PENSION FUND</u>
<u>(As **Amended and Restated Effective as of April 1, 2005**)</u>

**WHEREAS,** the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS,** pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

**WHEREAS,** the Board wishes to amend the Trust Agreement in the manner set forth below, and has delegated to the undersigned the authority to execute this Amendment.

**NOW, THEREFORE,** Section 9.1 of the Trust Agreement is hereby amended to add the following new subsection (d), effective January 13, 2012:

Notwithstanding the provisions of Section 9.1(c) above, an Employer may also make contributions to the Trust Fund in accordance with a Collective Bargaining Agreement that provides for contributions to be made on a basis other than scale wages if the Collective Bargaining Agreement provides that any such contributions will not be taken into account in determining any benefit payable under the Plan.

**IN WITNESS WHEREOF,** the Board executed this Amendment on this 16th day of February, 2012.


By:     */s/ Raymond M. Hair, Jr.*
          Raymond M. Hair, Co-Chair


By:     */s/ Alan H. Raphael*
          Alan H. Raphael, Co-Chair

**AMENDMENT NUMBER EIGHT TO THE**
**AGREEMENT AND DECLARATION OF TRUST ESTABLISHING**
**THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'**
**PENSION FUND**
**(As Amended and Restated Effective as of April 1, 2005)**

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board wishes to amend the Trust Agreement in the manner set forth below, and has delegated to the undersigned the authority to execute this Amendment.

**NOW, THEREFORE**, the Trust Agreement is hereby amended as follows:

1.      **Section 9.4 is amended to read as follows:**

**9.4      Default in Payment**.

(a)  Employer contributions to the Trust Fund are due no later than:

(1)  with respect to contributions due under any National Collective Bargaining Agreement, or any other Collective Bargaining Agreement that becomes effective before June 1, 2005:

(a)   the due date for such contributions as set forth in the applicable Collective Bargaining Agreements, but no later than the last day of the month immediately following the calendar quarter in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(b)  if the Collective Bargaining Agreement does not specify a due date for Employer contributions to the Trust Fund, the last day of the month immediately following the month in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(2)  with respect to contributions due under any Collective Bargaining Agreement, other than a National Collective Bargaining Agreement, that becomes effective on or after June 1, 2005 (or that become effective earlier, but are renewed or extended effective

on or after that date), the last day of the calendar month immediately following the calendar month in which the Covered Employee performed the services for which such contributions are due and payable to the Trust Fund; or

(3) notwithstanding anything in Section 9.4(a)(1) or (2) of this Trust Agreement to the contrary, with respect to contributions (i) that are due from an Employer that has an outstanding delinquency to the Fund at the time the contribution obligation arises, and (ii) on which the Board or the Audit Committee (in its sole and absolute discretion) has determined the Employer is at risk of defaulting, any date on or after the due date for the payment of the wages on which the contributions are due, as prescribed by the Board or the Audit Committee , on a case-by-case basis, in its sole and absolute discretion. The Board or the Audit Committee shall notify an Employer as soon as reasonably practicable following the Board's determination that the provisions of this Section 9.4(a)(3) will be invoked and applied to the Employer.

(b) In addition to any other enforcement remedies that may exist under this Agreement or any applicable Collective Bargaining Agreements, the Board or the Audit Committee is authorized and empowered to initiate whatever actions or proceedings may be proper and necessary in their sole and absolute discretion for the enforcement of an Employer's contribution obligations to the Trust (including, but not limited to, proceedings at law or in equity, arbitration, mediation, other dispute resolution mechanisms and any other remedies that generally would be available for the enforcement of said obligation to contribute to the Trust Fund). Venue for such actions or proceedings shall be in New York County, New York or, in the sole discretion of the Board or the Audit Committee, in any other location authorized by law.

(c) In the event that any Employer shall fail to make required Employer contributions to the Trust Fund when due, the Board or the Audit Committee may and is empowered, in its sole and absolute discretion, to terminate, on a prospective basis, the participation of the Employer in the Plan and Trust Fund, and the crediting of future service credit to Employees of such terminated Employer. Nothing in this Section 9.4(c) shall affect or otherwise modify the ability of the Board or the Audit Committee to assert and enforce any and all other rights (as may be set forth in this Agreement, the Plan or any Collective Bargaining Agreement, or as may be provided by applicable law) against such Employer for the collection of any delinquent Employer contributions to the Plan or Trust Fund (including, but not limited to, those rights and actions set forth in this Article).

(d) A delinquent Employer shall be responsible for all late fees (including, without limitation, liquidated damages) set forth in any policy adopted by the Board or the Audit Committee from time to time. In addition, a delinquent Employer shall be liable for all costs and expenses incurred in effectuating its contributions or other payments due to the Trust Fund including but not limited to:

(1) audit costs (as provided in Section 9.9(f) of this Trust Agreement);

(2) arbitration expenses;

(3) attorneys' fees;

(4) court costs;

(5)  other costs and expenses attributable to the collection of such contributions or other payments; and

(6)  interest for every calendar year (or portion thereof) during which the delinquent contribution remained unpaid, calculated at the annual prime rate of interest quoted in The Wall Street Journal on the first business day of that calendar year, plus five percent, compounded monthly.

(e)  All payments received from or on behalf of an Employer will be applied to amounts due in the following order: (i) interest; (ii) liquidated damages; (iii) surcharges under the Pension Protection Act of 2006; (iv) pension contribution obligations; and (v) withdrawal liability payments (including interest thereon).

(f)  In addition to the right to assess an Employer with audit costs provided in Section 9.9(f), the Board or the Audit Committee shall also have the right to assess an Employer with all reasonable costs and expenses (including, without limitation, all audit, accounting, and legal fees) attributable to the audit of the Employer's payroll, wage, and related business records with respect to the contributions which the Employer is obligated to make to the Fund; provided, however, that the Board or the Audit Committee has determined that such Employer has been delinquent in remitting such contributions or payments to the Fund, and the aggregate amount of such delinquency, plus all accrued interest thereon and the cost of the audit, exceeds twenty percent (20%) of the actual audited amount determined by the Fund's auditors to be due the Fund.

2.      **Section 9.8 is amended to read as follows:**

**9.8    Remittance Reports**

(a)      Except as provided in Section 9.8(b), all contributions must be accompanied by a remittance report form that includes the name of the Employer, the name, address and phone number of the payor, if different (e.g., payroll company, affiliated entity), as well as all Employee first and last names, addresses, social security numbers, type of engagement(s) (e.g., name of applicable Collective Bargaining Agreement and indication of original use, new use or re-use of recording), description of engagement(s) (e.g., title of show, jingle or song and location of engagement), all engagement date(s), "scale wage" and contribution amount(s) and such other information as the Board may elect to prescribe in the future. The Employer shall submit to the Fund separate remittance or other reports for each type of engagement.

(b)      Remittance Reports for Contributions Not Based on Scale Wages. In the case of contributions that are required to be made on a basis other than scale wages (as described in Section 9.1(d)), the remittance report form shall include such information as may be required by the Board to verify the accuracy and completeness of such contributions.

(c)      If contributions due the Fund are not accompanied by a remittance form containing all of the information set forth in subsection (a) or (b), as applicable, the Employer may in the sole discretion of the Audit Committee be assessed a fee in an amount as may be prescribed by the Audit Committee for each day following the

contribution due date for which the remittance report is incomplete or not received by the Fund.


**IN WITNESS WHEREOF**, the Board executed this Amendment on this 20th day of May, 2015

By:      _/s/ Christopher J.G. Brockmeyer_____
         Christopher J.G. Brockmeyer, Co-Chair


By:      _/s/ Raymond M. Hair_____
         Raymond M. Hair, Co-Chair

**AMENDMENT NUMBER NINE TO THE
AGREEMENT AND DECLARATION OF TRUST ESTABLISHING
THE AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS'
PENSION FUND
(As Amended and Restated Effective as of April 1, 2005)**

**WHEREAS**, the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

**WHEREAS**, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

**WHEREAS**, the Board wishes to amend Section 9.1(d) of the Trust Agreement in the manner set forth below for clarification, and has delegated to the undersigned the authority to execute this Amendment;

**NOW, THEREFORE**, Section 9.1(d) of the Trust Agreement is hereby amended to read as follows:

Notwithstanding the provisions of Section 9.1(c) above, an Employer may also make contributions to the Trust Fund in accordance with a Collective Bargaining Agreement (or settlement of a claim under a Collective Bargaining Agreement) that provides for contributions to be made on a basis other than scale wages if the Collective Bargaining Agreement (or settlement agreement) provides that any such contributions will not be taken into account in determining any benefit payable under the Plan.

**IN WITNESS WHEREOF**, the Board executed this Amendment on this 5th day of August, 2015.

By:   _/s/ Christopher J.G. Brockmeyer_____
       Christopher J.G. Brockmeyer, Co-Chair

By:   __/s/ Raymond M. Hair_____
       Raymond M. Hair, Co-Chair

**AMENDMENT NUMBER TEN**
**TO THE AGREEMENT AND DECLARATION OF TRUST ESTABLISHING THE**
**AMERICAN FEDERATION OF MUSICIANS AND EMPLOYERS' PENSION FUND**
**(As Amended and Restated Effective as of April 1, 2005)**

WHEREAS, the Board of Trustees (the "Board") of the American Federation of Musicians and Employers' Pension Fund (the "Fund") adopted the Agreement and Declaration of Trust Establishing the American Federation of Musicians and Employers' Pension Fund, as amended and restated effective as of April 1, 2005 (the "Trust Agreement"); and

WHEREAS, pursuant to Article X, Section 10.1 of the Trust Agreement, the Board reserves the right to amend the Trust Agreement at any time; and

WHEREAS, the Board wishes to amend the Trust Agreement in the manner set forth below, and has delegated to the undersigned the authority to execute this Amendment;

NOW, THEREFORE, the Trust Agreement is hereby amended to read as follows:

1.    Section 6.1(c) shall be deleted and replaced with the following:

    (c) The Co-Chairs of the Board shall choose one of themselves to preside over each meeting of the Board.

2.    Section 9.4(a) shall be amended by adding the following paragraphs (4) and (5):

    (4) to the extent contributions are due with respect to all or a portion of an electronic media guarantee ("EMG") under a Collective Bargaining Agreement between the Union and a symphony orchestra under which musicians receive a periodic wage payment that also counts towards wages payable for electronic media work, the due date for contributions due on account of such EMG shall be the due date for such contributions as set forth in the Collective Bargaining Agreement, but no later than the end of the second month following the month in which the symphony's season ends.

    (5) to the extent contributions are due on amounts other than scale wages, paid pursuant to Section 9.1(d) above, the due date for contributions on such amounts shall be the due date in the Collective Bargaining Agreement.

1

IN WITNESS WHEREOF, the Board executed this Amendment on this 16th day

of February 2017.


By:    /s/ Christopher Brockmeyer_____
       Christopher J.G. Brockmeyer


By:    /s/ Raymond M. Hair, Jr._____
       Raymond M. Hair, Co-Chair

# EXHIBIT 5

| **Form 5500** | **Annual Return/Report of Employee Benefit Plan** | OMB Nos. 1210-0110 1210-0089 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6057(b) and 6058(a) of the Internal Revenue Code (the Code). | **2018** |
| Department of Labor Employee Benefits Security Administration | ▶ **Complete all entries in accordance with the instructions to the Form 5500.** | |
| Pension Benefit Guaranty Corporation | | **This Form is Open to Public Inspection** |

## Part I   Annual Report Identification Information

For calendar plan year 2018 or fiscal plan year beginning  04/01/2018  and ending  03/31/2019

**A** This return/report is for:  ☒ a multiemployer plan   ☐ a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions.)

☐ a single-employer plan   ☐ a DFE (specify) ____

**B** This return/report is:  ☐ the first return/report   ☐ the final return/report

☐ an amended return/report   ☐ a short plan year return/report (less than 12 months)

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

**D** Check box if filing under:  ☒ Form 5558   ☐ automatic extension   ☐ the DFVC program

☐ special extension (enter description)

## Part II   Basic Plan Information—enter all requested information

**1a** Name of plan
American Federation of Musicians and Employers'
Pension Fund and Subsidiary

**1b** Three-digit plan number (PN) ▶ | 001

**1c** Effective date of plan
10/02/1959

**2a** Plan sponsor's name (employer, if for a single-employer plan)
Mailing address (include room, apt., suite no. and street, or P.O. Box)
City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)
Board of Trustees of the American
Federation of Musicians and Employe

14 Penn Plaza, 12th Floor
New York                                    NY   10122

**2b** Employer Identification Number (EIN)
51-6120204

**2c** Plan Sponsor's telephone number
(212)284-1242

**2d** Business code (see instructions)
711510

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | | | Raymond M. Hair, Jr. |
|---|---|---|---|
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | Christopher J.G. Brockmeyer |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |
| SIGN HERE | | | |
| | Signature of DFE | Date | Enter name of individual signing as DFE |

For Paperwork Reduction Act Notice, see the Instructions for Form 5500.            Form 5500 (2018)
v. 171027

Form 5500 (2018)                  Page **2**

| | | | |
|---|---|---|---|
| **3a** | Plan administrator's name and address   ☒   Same as Plan Sponsor | **3b** | Administrator's EIN |
| | | **3c** | Administrator's telephone number |

| | | | |
|---|---|---|---|
| **4** | If the name and/or EIN of the plan sponsor or the plan name has changed since the last return/report filed for this plan, enter the plan sponsor's name, EIN, the plan name and the plan number from the last return/report: | **4b** | EIN |
| **a** | Sponsor's name | | |
| **c** | Plan Name | **4d** | PN |

| | | | |
|---|---|---|---:|
| **5** | Total number of participants at the beginning of the plan year | **5** | 49,905 |
| **6** | Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines **6a(1), 6a(2), 6b, 6c,** and **6d**). | | |
| **a(1)** | Total number of active participants at the beginning of the plan year .................... | **6a(1)** | 20,602 |
| **a(2)** | Total number of active participants at the end of the plan year ........................... | **6a(2)** | 20,316 |
| **b** | Retired or separated participants receiving benefits.......................................... | **6b** | 14,071 |
| **c** | Other retired or separated participants entitled to future benefits......................... | **6c** | 13,754 |
| **d** | Subtotal. Add lines **6a(2), 6b,** and **6c**.......................................................... | **6d** | 48,141 |
| **e** | Deceased participants whose beneficiaries are receiving or are entitled to receive benefits. ............. | **6e** | 1,994 |
| **f** | Total. Add lines **6d** and **6e**.................................................................... | **6f** | 50,135 |
| **g** | Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item) | **6g** | |
| **h** | Number of participants who terminated employment during the plan year with accrued benefits that were less than 100% vested | **6h** | |
| **7** | Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item)......... | **7** | 5,464 |

**8a**   If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:

       1A

**b**   If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

| **9a** | Plan funding arrangement (check all that apply) | | **9b** | Plan benefit arrangement (check all that apply) | |
|---|---|---|---|---|---|
| **(1)** | ☐ | Insurance | **(1)** | ☐ | Insurance |
| **(2)** | ☐ | Code section 412(e)(3) insurance contracts | **(2)** | ☐ | Code section 412(e)(3) insurance contracts |
| **(3)** | ☒ | Trust | **(3)** | ☒ | Trust |
| **(4)** | ☐ | General assets of the sponsor | **(4)** | ☐ | General assets of the sponsor |

**10**   Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached. (See instructions)

| **a** | Pension Schedules | | | **b** | General Schedules | | |
|---|---|---|---|---|---|---|---|
| **(1)** | ☒ | **R** (Retirement Plan Information) | | **(1)** | ☒ | **H** (Financial Information) | |
| **(2)** | ☒ | **MB** (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary | | **(2)** | ☐ | **I** (Financial Information – Small Plan) | |
| | | | | **(3)** | ☐ | ____ | **A** (Insurance Information) |
| | | | | **(4)** | ☒ | **C** (Service Provider Information) | |
| **(3)** | ☐ | **SB** (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary | | **(5)** | ☒ | **D** (DFE/Participating Plan Information) | |
| | | | | **(6)** | ☐ | **G** (Financial Transaction Schedules) | |

**American Federation of Musicians and Employers' Pension Fund and Subsidiaries**
**Consolidated Schedules of Administrative Expenses**
**Years Ended March 31, 2019 and 2018**

| | 2019 | 2018 |
|---|---|---|
| Administrative expenses | | |
| Accounting and audit fees | $     225,919 | $     137,258 |
| Actuarial fees | 1,106,209 | 1,375,598 |
| Bank and payroll processing fees | 42,166 | 44,399 |
| Consulting fees | 183,728 | 331,545 |
| Data conversion, document imaging and data cleanup | 183,348 | 135,188 |
| Depreciation and amortization | 188,622 | 248,011 |
| Disaster recovery program | 28,062 | 25,952 |
| Employer compliance audits of contributing employers | 206,551 | 80,987 |
| Employee benefits | 1,634,918 | 1,635,219 |
| Employee recruitment and advertising | 54,861 | 30,400 |
| Equipment repairs and maintenance | 35,605 | 32,768 |
| Insurance | 2,078,699 | 1,971,742 |
| IT maintenance | 296,133 | 287,025 |
| Legal fees | 1,982,194 | 2,032,711 |
| Miscellaneous | 44,544 | 44,028 |
| Office supplies | 55,732 | 53,911 |
| Off site storage | 32,959 | 31,533 |
| Participant communication | 267,466 | 466,689 |
| Payroll taxes | 382,450 | 416,692 |
| Pension check processing fees | 307,324 | 287,186 |
| Postage | 132,121 | 120,060 |
| Printing | 83,036 | 76,498 |
| Rent and other occupancy costs | 1,351,392 | 1,276,268 |
| Salaries | 4,935,603 | 5,001,153 |
| Staff seminars and tuition reimbursements | 49,961 | 22,481 |
| Staff travel | 1,083 | 1,351 |
| Telephone | 15,897 | 16,414 |
| Temporary office help | 10,556 | 4,004 |
| Trustee education | 46,087 | 27,539 |
| Trustee meeting | 130,043 | 130,840 |
| Total administrative expenses | $  16,093,269 | $  16,345,450 |

See Independent Auditor's Report on Other Supplementary Information.

# EXHIBIT 6



American Federation
of Musicians &
Employers' Pension Fund

P.O. Box 2673
New York, NY 10117-0262
(212) 284-1200
Fax (212) 284-1300
www.afm-epf.org

Fund

To:      All Participants and Beneficiaries Receiving Benefits

From:  Board of Trustees of the American Federation of Musicians and Employers' Pension Fund (the "Plan")

Re:      Annual Funding Notice and Notice of Critical Status

Date:    July 25, 2014

Enclosed are the following documents that are required to be provided to you by law:

- **Annual Funding Notice for Plan Year Ending March 31, 2014**: All defined benefit plans (including the Plan) are required to provide this annual notice. Please be aware that parts of this notice reflect the finances of the Plan as of April 1, 2013 rather than March 31, 2014

- Notice of **Critical Status for Plan Year Ending March 31, 2015.**

As you will note from the enclosed **Annual Funding Notice**, the Plan's funded percentage (for Pension Protection Act of 2006 ("PPA") purposes) was 86.9% as of April 1, 2013. You will also see from the enclosed **Notice of Critical Status**, the Plan remains in critical status for the current Plan year (which began April 1, 2014). This is because a plan can be in critical status regardless of how well funded it is if, as is the case here, future contributions are projected to be less than the amount required by law to meet minimum funding requirements. Please keep in mind that all projections are by definition based on a number of assumptions about the future that may or may not be realized. If the Plan were to outperform the assumptions that are being used, it could be in a position to emerge from critical status.

The Plan's funded percentage (for PPA purposes) as of April 1, 2014 will not be known until the actuarial valuation for the most recent plan year, ending March 31, 2014, is complete, but is estimated to be 86.1%. This estimate reflects a slight decrease from the previous year's funded percentage.

As was the case last year, the Plan's actuary projects that if the Plan meets its current assumptions (even if it does not exceed them), the Plan will *not* become insolvent over the longest period for which the actuary has made projections (that is, through 2047). Accordingly, based on those assumptions and projections, the Plan continues to be expected to be able to pay all benefits for the foreseeable future.

As always, the Fund Office is available to answer questions regarding these notices. Questions should be directed to the Fund Office by phone to Customer Service at 1-800-833-8065 (extension 1311), by e-mail through the "Contact Us" link on our web site (www.afm-epf.org) or by mail.



1



American Federation
of Musicians &
Employers' Pension Fund

Fund

P.O. Box 2673
New York, NY 10117-0262
(212) 284-1200
Fax (212) 284-1300
www.afm-epf.org

To:     All Participants and Beneficiaries Receiving Benefits

From:   Board of Trustees of the American Federation of Musicians and Employers' Pension Fund (the "Plan")

Re:     Annual Funding Notice and Notice of Critical Status

Date:   July 29, 2015

Enclosed are (i) the Plan's **Annual Funding Notice for the Plan Year ended March 31, 2015** and (ii) the **Notice of Critical Status for the Plan Year ending March 31, 2016**. These two documents are being provided as required by applicable law. There is no action that you are required to take and there is no change to the Plan's benefits.

The **Annual Funding Notice** is for the Plan Year ended March 31, 2015. You should be aware that parts of this notice reflect the finances of the Plan as of March 31, 2014, rather than March 31, 2015. As you will note from this notice, the Plan's funded percentage (for Pension Protection Act of 2006 ("PPA") purposes) was 85.7% as of April 1, 2014.

You will also see from the enclosed **Notice of Critical Status** that the Plan remains in critical status for the current Plan year (which began April 1, 2015). This is because a plan can be in critical status regardless of how well funded it is if, as is the case here, future contributions are projected to be less than the amount required by law to meet minimum funding requirements.

The Plan's funded percentage (for PPA purposes) as of April 1, 2015 will not be known until the actuarial valuation for the most recent plan year, ending March 31, 2016, is complete, but is estimated to be 82%. This estimate reflects a decrease from the previous year's funded percentage.



As was the case last year, the Plan's actuary projects that if the Plan meets its current assumptions, the Plan will remain solvent over the actuary's 20 year projection period, providing the Plan with time to improve its funded status. Whether the Plan will continue to remain solvent over the long term depends most on its long-term investment performance. It is for this reason that the Board carefully monitors and, where appropriate, adjusts the Plan's asset allocation and investment manager roster, prudently balancing risk and reward.

As always, the Fund Office is available to answer questions regarding these notices. Questions should be directed to the Fund Office by phone to Customer Service at 1-800-833-8065 (extension 1311), by e-mail through the "Contact Us" link on our web site (www.afm-epf.org) or by mail.

July 23, 2020

ATTN: Honorable Valerie E. Caproni, USDJ
UNITED STATES DISTRICT COURT— SDNY
Thurgood Marshall United States Courthouse
40 Foley Square,
New York, NY 10007



*via* FEDEX Overnight and USPS Priority Overnight

*re:*

**Snitzer and Livant *v.* The Board of Trustees of the American Federation of Musicians
and Employers' Pension Fund, *et al.,* No. 1:17-cv-05361-(VEC)**

LETTER STATING OBJECTIONS TO THE
CLASS ACTION SETTLEMENT AGREEMENT

Dear Judge Caproni,

1. I am a vested, retired Musician defined as a Class Member in the Court's Preliminary

   Approval Order (D.I. 163)[1] of the proposed Class Action Settlement:

> "All participants and beneficiaries of the American Federation of Musicians and
> Employers' Pension Plan ["AFM-EPF" "Plan"] during the Class Period, *excluding
> Defendants and their beneficiaries* (the "Settlement Class")." (*emphasis added*)

**A.** *General Objections*

2. I Object that I have not been afforded the opportunity to Opt Out of this Class Action and

   Class Action Settlement, pursuant to procedures set out in Rule 23 that govern Actions filed

   under Fed. R. Civ. P. 23(b)(1). Had I been notified, I would have Opted Out of this Class

---

[1] "Order Granting Preliminary Approval Of Class Action Settlement, Provisionally Certifying "Settlement
Class," Directing Notice To The Settlement Class, And Scheduling Fairness Hearing" (D.I. 163)

2601 Jefferson Circle, Sarasota FL 34239
<annebryantmusic@mac.com>

Action, as I wish to do now, and I would have Opted Out of this proposed Class Action

Settlement, as I wish to do now, for reasons cited below:

3. Whereas,

   a) A failure to Object or to Opt Out will result in a tacit approval of the Class Action

      Settlement by me and the other Class Members, thus binding me and us to its terms;

   b) The Class Action Settlement terms, to which Class Member Musicians such as myself are

      forced to agree, vitiates rights I/we may have to exercise the *Continuing Violations*

      *Doctrine, the Discovery Rule* and the *Injury Rule,* in concert with Claims we have, have

      had, or may have against the Defendants, the Plan and Class Member Representatives;

      and, my/our *14th Amendment Rights;* and, may vitiate the rights provided to Union

      Members under the *Labor Management Reporting and Disclosure Act ("LMRDA") and*

      *(29U.S.C. § 1132)* Labor Laws;

   c) Class members are enjoined, by way of the proposed Class Action Settlement, from

      pursuing any claims we have, have had, or may have;

   d) The Settlement Class *receives no direct benefit* from the Settlement; the *indirect benefit*

      to 100,000+ Class Member Musicians may be only that the proposed 17 million dollar

      payment to the American Federation of Musicians Employers' Pension Fund, ("AFM-

      EPF" or "the Plan") may, for a short while, defray the sky-high administrative expenses

      of the Plan, including extraordinarily high salaries paid to Senior Executives of the

      "Plan;" [2]

---

[2] Pension contributions earned by Class Member Musicians have been used to pay for the Plan's largesse.

2601 Jefferson Circle, Sarasota FL 34239
<annebryantmusic@mac.com>

*e)* It is notable that if the proposed 17 million dollar settlement were to be paid to/divided by the 100,000+ Class Members, in lieu of the proposed settlement payment to the AFM-EPF Plan, it would result in an insubstantial payment of less than $17.00 to each Class Member; and,

Whereas,

*f)* *Rather than any substantial direct benefit,* Class Member Musicians are forced en masse by the Settlement Agreement terms to Waive our rights, *inter alia,* to act in our own behalf, in any appropriate forum, in order to challenge any misfeasance, nonfeasance or malfeasance by "the Plan," and the affiliated AFM Union and AFM Locals nationwide; and, to forfeit all Claims, *inter alia,* in perpetuity against the Released Parties in connection to the Released Claims in the proposed Class Action Settlement Agreement, (D.I. 139-1); and,

*g)* I Object in Particular to certain Key Provisions/Conditions of the proposed Class Action Settlement Agreement cited, *infra,* (¶5, *et seq.*),

Therefore,

*4.* I Oppose the proposed Class Action Settlement Agreement (*Id.*) and; **I respectfully request to be permitted by this Court to Opt-Out of this Class Action Settlement.**

**B.** *Particular Objections* (to RECITALS)

*5.* I Object to the Class Action Settlement, based upon, but not limited to the particular subsections cited, followed by quoted passages and/or my questions, inset, *infra:*

*a)* **Released Parties *D.I. 139-1 at 6,* 2.21,** "each Defendant and the Plan."

*•Why must I release the Plan?*

b) **Released Claims** *Id.* **2.22** enumerated.

*•What are the **actual** Claims in this Action?*

*•Why am I and we forced to release potential Claims…"whether known or unknown, suspected or unsuspected, foreseen or unforeseen" ?* (D.I. 139-1 at 6, 2.22) *Can this demand be legal?*

c) *Id.* **2.22.1,** *re:* Claims asserted in the Complaint (D.I. 1).

*•The Amended Complaint (D.I. 54) completely replaces the Original Complaint (D.I.1); any claims asserted that were not made part of the Amended Complaint should not be considered.* "When an amended complaint has been served, it supersedes the original complaint and becomes the only complaint in the case," *R&G Brenner Income Tax Consultants v. Gilmartin,* November 7, 2018, Second Department, NY Slip Op. 07470.

d) **D.I. 139-1 2.22.1**(i) *re:* "allocated assets;" (iii) "failures to disclose information… funding;"[3] (iv) "any alleged breach of the duty of loyalty, care, prudence, diversification, or any other fiduciary duties or prohibited transactions in connection with (i) through (iii) above. "

*•The list of Claims to be released is over-broad, all encompassing, and in perpetuity—a dis-incentive to improve performance of the Plan's investments. And the Released Claims would remove oversight by the Class Members, who are left with no recourse in any matter involving recurring issues, potential issues and differing issues that may arise in connection to the Plan.*

e) I Object that I cannot find a Notice of Complaint docketed in this Action. No short and plain statement of the Claims being made in the Action, in compliance with Fed.R.Civ.P. 8(a), is docketed for the Original Complaint (D.I. 1) or the un-redacted Amended Complaint (D.I. 54).

*•As the Defendants do not admit to any wrongdoing in the Class Action Settlement Agreement, what exactly are the Claims in this Action upon which this Settlement is based?*

---

[3] Pension benefits paid to Class Member Musicians are also "allocated assets".

> • *Class Member Musicians are expected to Waive Claims,* <u>inter</u>
> <u>alia,</u> *against <u>the Plan</u> [4] in perpetuity.*
> • *The Plan receives 17 Million Dollars; the Class Member*
> *Musicians receive nothing.*
> •*What are the benefits to be provided to the Settlement Class?*
>
> • *It appears that the perdurable releases of the Plan, the OCIO,*
> *and the Trustees and their families,* <u>et</u> <u>al</u>, *that are expected from*
> *the Class Member Musicians, are the main objective of the*
> *Settlement Agreement.*

AND,

> •*Why are Defendants (Trustees) [and their families] excluded from*
> *the Waivers of rights,* <u>inter</u> <u>alia,</u> *demanded from the Class*
> *Members? (See* D.I. 163-Certification of the Settlement Class
> ¶1(C) inset; *and, D.I. 139-1,* Exhibit 4 at 58)).
>
> • *The eight Union Trustees may be participants in the Plan, as they*
> *may have been performing musicians in the past. And, both the*
> *Union Trustees and the Employer Trustees may also be*
> *participants in the Plan—directly or indirectly.*

I lack that information.

f)  re: *MPRA Proceeding, (D.I. 139-1 at 6, un-numbered paragraph following 2.22.3), stating:*

> "Nothing in this Settlement Agreement shall impact or impair any rights that any
> members of the Settlement Class or participants and/or beneficiaries of the Plan
> may have in connection with the pending MPRA Proceeding."

I <u>Object</u> that the breadth of releases of Parties and Claims, particularly, or generally could

well be argued in the future by corporate litigators in order to defeat *any and all* breaches

---

[4] Plaintiffs Snitzer and Livant sued on behalf of the <u>Plan</u>. Why then are Class Member Musicians, [class action Plaintiffs] required to release the Plaintiff-side <u>Plan</u> when the Plan is the major beneficiary in the Class Action Settlement?

alleged by me or other Class Member Musicians against the Plan, (that have been)

expressed by many Plan Participants (*here,* Class Members) in connection with the

pending MPRA Proceeding.

g)  *re:* **13. General Provisions, D.I. 139-1 ¶13-3 at 17 et seq.**  I <u>Object</u> to the statement in the

Class Action Settlement that has been made *for* me and the Settlement Class (Participating

Musicians):

> "Each Settling Party to this Settlement Agreement hereby acknowledges
> that he, she, or it has consulted with and obtained the advice of counsel
> prior to executing this Settlement Agreement and that this Settlement
> Agreement has been explained to that Settling Party by his, her, or its
> counsel."
>
>> • *Many musicians continue to work after retirement. But in
>> the current environment of the Corona Virus Pandemic,
>> Musicians cannot work; singers cannot work; the physical
>> proximity performing artists in ensemble, and forceful
>> expelling of air/breath poses a danger to us and to others.*
>> • *And, Retired Musicians will soon see their Pensions cut
>> substantially by the Plan that has been poorly administered
>> on many levels; as such,*
>> • *Most Musicians can ill afford to pay lawyers to download
>> (pay for), and read through 3,000,000 documents in order
>> to advise us.*

I could not certify this statement made by others for me; and it is my hope that other

Class Member Musicians in the proposed Settlement Agreement will  not be coerced to

certify this statement if not known to be actually true.

**C.** *Procedural Objections* —

6. No short and plain statement of the Claims being made in the Action, in compliance with

<u>Fed.R.Civ.P. 8(a)</u>, is docketed for the Original Complaint (D.I. 1) or the un-redacted

Amended Complaint (D.I. 54). (See also ¶5(e) at 4, *supra)*

7. *re:* Fed. R. Civ. P. 23(c) *(re) Determining by Order Whether to Certify a Class Action; []*
   *Notice and Membership in Class; [] Multiple Classes and Subclasses.*

   Subsections of Rule 23(c) govern actions filed under Fed. R. Civ. P. 23(b)(1):

   > "…The Court must—at an early practicable time— determine by order whether to
   > certify the Action as a class action." Fed. R. Civ. P. 23(c)(1)(A).

   > "For any class certified under Rule 23(b)(3),[5] the Court must direct to class
   > members the best notice practicable under the circumstances, including individual
   > notice to all members who can be identified through reasonable effort. The notice
   > must concisely and clearly state in plain, easily understood language: …that the
   > court will exclude from the class any member who requests exclusion, stating
   > when and how members may elect to be excluded…" Fed. R. Civ. P. 23(c)(2)(A)
   > and (B)

   > • *To my knowledge, this has never been done.*

   I Object that I have not been provided notice of the opportunity to be excluded from this

   Action.

8. I further Object that the choice to be included/excluded in the Class Action is not provided to

   Class Members under Rule 23(c)(4)(B), which states:

   > "a class may be divided into subclasses and each subclass treated as a class, and
   > the provisions of this rule shall then be construed and applied accordingly."

   > *To my knowledge, this has not been done.*

9. *re:* **D.I. 139-1 (at 8) §3.1**, stating: The Preliminary Approval Order to be presented to the

   Court shall, among other things: **3.1***(e)* "Preliminarily enjoin Class Members and the Plan

   from commencing, prosecuting, or pursuing any claim or complaint that arises out of or

   relates in any way to the Released Claims."

---

[5] The Court has Certified the class under Fed. R. Civ. P. 23(b)(1)(A), and 23(b)(1)(B) (which has 3
subsections). (D.I. 163, §1. ¶A. at 3)

> • *Class Members having on-going claims, having rights now to*
> *pursue them, and to acquire documents relevant to those Claims,*
> *should not be enjoined from acting through legal processes by a*
> *(non-final) Preliminary Approval Order. Is this not over-reaching?*

**D.** *Legal Rights Forfeited by Class Members —Labor Laws—*

### *LMRDA Rights* [6]

10. The scope of the rights, *inter alia*, expected to be Waived, *inter alia*, by Class Members such

    as myself, may have the effect of trammeling the "Employee Bill of Rights," provided under

    the Labor Management Reporting and Disclosure Act of 1959 [7] ("LMRDA") 29 U.S.C. §

    411. Specifically, 29 U.S.C. Ch. 11, §§401-531,[8] provides Union Members the Right to sue

    in a district court; Protection of the right to sue; Retention of existing rights; and, the Right to

    copies of Collective Bargaining Agreements, *inter alia*.[9]

### *ERISA Actions*

11. The scope of the rights, demanded in the Settlement Agreement, to be Waived, *inter alia*, by

    Class Members such as myself, may prohibit exercise of my/our rights as Union Members,

    under 29 U.S.C.§ 1132(c)(1).

### *Constitutional Rights*

12. Approval of the Class Action Settlement Agreement currently under consideration by This

    Court (D.I. 139-1, at Exhibit 1), would offend my/our 14th Amendment Rights:

---

[6] The LMRDA is an Act of Congress that protects Union "Employees," from abuses by our Unions (and the affiliated AFM-EPF)

[7] as amended

[8] No S.O.L. is specified by the Act.

[9] Personally, I have sought and will continue to seek copies of my Recording Engagement Agreements, pursuant to the LMRDA and 29 U.S.C.§ 1132

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

## E. *Objections Reserved*

*13.* I Reserve other objections and arguments under Rule 23 that may later be required in

connection with the provisions of Fed. R. Civ. P. 23(d) "Orders and Conduct of Actions;"

Rule 23(e)(1)(A), (e)(3) "Settlement, Voluntary Dismissal, or Compromise;" and Rule 23,

(e)(4(A), stating, "Any class member may object to the proposed settlement, voluntary

dismissal, or compromise that requires court approval under Rule 23(e)(1)A)." Rule 23(e)(3)

may also factor in, only in so far as it provides a new opportunity to request exclusion to

individual class members…"

*14.* And I reserve other objections and arguments that may later be required in connection with

the Class Action Settlement Agreement: *Id. §3.* ¶¶ *3., (c),(g); Id. § 5.* ¶¶*5.1,* ¶¶ *(a),(b),(c),*

*(e),(f),(g); Id. § 7; Id. § 8; Id. § 9; Id. § 10; § 11; Id. §12 (what are the claims in the*

*Action?); Id. § 12,*¶ *13.3,* ¶*13.5.*

### *Fairness*

15. All Objections and arguments stated above—*saepe*; and, Objections and arguments reserved.

### *The Fairness Hearing*

16. As I would like to speak at the Fairness Hearing, but cannot safely travel from Florida (my

home) to New York for the Trial due to COVID-19 restrictions and quarantine requirements,

I respectfully request that my Letter of Objections will be considered at the Fairness Hearing

and will be docketed in this Action.

### *Affirmation*

I, Anne Bryant, Affirm under penalty of perjury that my statements herein are true to my

knowledge, and that procedural Rules and Laws referenced, made by information and belief, are

believed by me to be true and correct.

_____                    (dated)
Anne Bryant (Objector)
2601 Jefferson Circle
Sarasota FL 34239
<annebryantmusic@mac.com>
917.848.5203

### *Certification*

*As instructed by the NOTICE OF PROPOSED CLASS ACTION SETTLEMENT (D.I.139-1, ¶13,
attached as Exhibit 2), this Letter of Objections has been sent to the Court Attn: Judge Caproni
on July 25, 2020 via FEDEX.*

*A courtesy copy has also been sent to Judge Caproni via USPS Overnight Mail on or before July
27, 2020.*

Anne Bryant, *Objector*

2601 Jefferson Circle, Sarasota FL 34239
<annebryantmusic@mac.com>

ANNE BRYANT                                                           10 of 10

I respectfully request that my Letter of Objections will be considered at the Fairness Hearing

and will be docketed in this Action.

### *Affirmation*

I, Anne Bryant, Affirm under penalty of perjury that my statements herein are true to my

knowledge, and that procedural Rules and Laws referenced, made by information and belief, are

believed by me to be true and correct.

Anne Bryant (Objector)                        (dated)

2601 Jefferson Circle

Sarasota FL 34239

<annebryantmusic@mac.com>

917.848.5203

### *Certification*

*As instructed by the NOTICE OF PROPOSED CLASS ACTION SETTLEMENT (D.I.139-1, ¶13,*
*attached as Exhibit 2), this Letter of Objections has been sent to the Court Attn: Judge Caproni*
*on July 25, 2020 via FEDEX.*

*A courtesy copy has also been sent to Judge Caproni via USPS Overnight Mail on or before July*
*27, 2020.*

I CERTIFY that I have not Objected to a Class Action Settlement in the last five years.

Anne Bryant, *Objector*

2601 Jefferson Circle, Sarasota FL 34239
<annebryantmusic@mac.com>

# OBJECTION TO CLASS ACTION SETTLEMENT



ATTN. The Honorable Valerie J. Caproni
United States District Court Judge
United States Courthouse
Southern District of New York
40 Foley Square New York, New York 10007

RE: *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, et al* ., No. 1:17-cv-05361-VEC)

I, the undersigned member of the class do hereby respectfully request that Your Honor reject the settlement in the above-referenced case because it is not "fair, reasonable, and adequate."

I would like to make three specific objections:

1. The settlement is not reasonable as it lacks meaningful restraints on the Plan Trustees and Plan Advisors going forward. The Trustees can still hire the same money managers, and continue to pursue the same "exceedingly risky" investment policies. The Independent Neutral Fiduciary has no formal legal power to force the Trustees to make more prudent and conservative investments, while still remaining diversified.

2. The settlement is not adequate given that the Plan has a long history of mismanagement. If the job of the Independent Neutral Fiduciary is limited to only 4-5 years, it is unrealistic to expect that they can have much of a positive impact. Therefore, a much longer period is needed. Additionally, the monitor must have the mandate to notify the Court of any breach of fiduciary duty by the Trustees and/or their advisors.

3. The settlement is unfair because there need to be restrictions on the Trustees use of Plan Assets (such as email communications) to disparage the Class Members, and Class Representatives, Paul Livant and Andrew Snitzer, and unwarrantedly characterize the settlement as a victory for the trustees, as they have already done. Continued public statements by the participants in this case should be factual and non-disparaging.

1

Sincerely,

Belinda Whitney

20 Treadwell Avenue
New Milford, CT 06776
(917) 991-4054
belindawhitney@msn.com
I have not objected to a class action settlement in the past 5 years.

I do not plan to attend the Fairness Hearing.

# OBJECTION TO CLASS ACTION SETTLEMENT



ATTN. The Honorable Valerie J. Caproni
United States District Court Judge
United States Courthouse
Southern District of New York
40 Foley Square New York, New York 10007

RE: *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, et al .*, No. 1:17-cv-05361-VEC)

I, the undersigned member of the class do hereby respectfully request that Your Honor reject the settlement in the above-referenced case because it is not "fair, reasonable, and adequate."

I would like to make three specific objections:

1. The settlement is not reasonable as it lacks meaningful restraints on the Plan Trustees and Plan Advisors going forward. The Trustees can still hire the same money managers, and continue to pursue the same "exceedingly risky" investment policies. The Independent Neutral Fiduciary has no formal legal power to force the Trustees to make more prudent and conservative investments, while still remaining diversified.

2. The settlement is not adequate given that the Plan has a long history of mismanagement. If the job of the Independent Neutral Fiduciary is limited to only 4-5 years, it is unrealistic to expect that they can have much of a positive impact. Therefore, a much longer period is needed. Additionally, the monitor must have the mandate to notify the Court of any breach of fiduciary duty by the Trustees and/or their advisors.

3. The settlement is unfair because there need to be restrictions on the Trustees use of Plan Assets (such as email communications) to disparage the Class Members, and Class Representatives, Paul Livant and Andrew Snitzer, and unwarrantedly characterize the settlement as a victory for the trustees, as they have already done. Continued public statements by the participants in this case should be factual and non-disparaging.

1

Sincerely,

George P. Flynn

179 Kent Cornwall Road
Kent, CT 06757
(917) 952-6073
gpflynn@yahoo.com

I have not objected to a class action settlement in the past 5 years.

I do not plan to attend the Fairness Hearing.

2

# OBJECTION TO CLASS ACTION SETTLEMENT

ATTN. The Honorable Valerie J. Caproni, U.S.D.C.J. United States District Court For The
   Southern District of New York 40 Foley Square New York, New York 10007

RE: *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians
   and Employers' Pension Fund, et al.*, No. 1:17-cv-05361-VEC)

I am writing as a member/participant of the AMF Pension Fund. I initially wrote several times to
the Treasury Department to respectfully ask them to reject the Fund's application under MPRA
to reduce benefits. Even if (and not sure) it is necessary to keep the Fund afloat, the manner in
which it is proposing to reduce benefits is patently unfair. I believe you are aware of all the
objections that were filed.

This letter is about the settlement, noted above, that was reached in the case against the
Trustees. I am writing as a layperson and don't have documents to submit. But I did read the
depositions that were recently made public and pertain to the case. These documents confirm
my suspicions raised after each meeting with the Trustees. Members were dismayed by the
dismal performance of our Fund compared to other Funds in the music/entertainment industry.
The Trustees were not forthcoming about their record. They were defensive, refused to
entertain suggestions/questions; and most revealing to me, not once did they apologize for
their performance. If it was incompetence, show some remorse. But I always suspected it was
more than that (bad enough) and the depositions by the attorneys for the Fund confirm, to me
anyway, that incompetence is only the tip of the iceberg.

Therefore, I am asking you to reject the settlement. The remuneration to the Fund should be
much larger! And most important - there must be far greater oversight, and an overhaul of the
method of appointing Trustees. The depositions made clear there was a severe lack of
expertise on the part of the Trustees.

In my opinion there could be conflict of interest when you have employer trustees and
employee trustees administering the Fund. Hence all the questions in the depositions about
fiduciary responsibilities. That issue is resolved at the bargaining table. But what happens if it
crosses over and influences the discussions/decisions at The Fund? And those same
discussions are influenced by the lobbying in Congress, which has of late had an anti-pension
fund/defined benefit bias? Any settlement needs to include an objective assessment and long
term oversight by an Independent Neutral Fiduciary.

Sincerely,

*Olivia Koppell*   Your written signature*  Printed name* *Olivia Koppell*
Your address* 1110 Beacon St. # 3B, Brookline, MA 02446
Telephone number* 917-886-4490  Your email* mumsleytumsley@aol.com
*required

☑ I have not objected to a class action settlement in the past 5 years
      Choose one of the following:
☑ I do plan to attend the Fairness Hearing (or/choose one)
☐ I do not Plan to attend the Fairness Hearing

RECEIVED
JUL 30 2020
VALERIE CAPRONI
U.S. DISTRICT JUDGE
S.D.N.Y.



**ROPA** Regional Orchestra Players' Association

A conference of the American Federation of Musicians, AFL-CIO

RECEIVED
JUL 30 2020
VALERIE CAPRONI
U.S. DISTRICT JUDGE
S.D.N.Y.

July 26, 2020
The Honorable Judge Valerie Caproni
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Caproni,

The Executive Board of the Regional Orchestra Players' Association (ROPA), a Player Conference of the American Federation of Musician of the United States and Canada (AFM), stands with our colleagues of the Governing Board of the International Conference of Symphony and Opera Musicians (ICSOM) in their support of the settlement that was reached in the case of *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, et al.*, No. 1:17-cv-05361-VEC.

ROPA represents 91 regional orchestras, opera companies, and ballet companies across the United States, and nearly 6,000 musicians. Many of these organizations contribute to the AFM-EPF. In addition, many of our ROPA orchestra musicians are employed by other employers who contribute to the Plan. With approval of the settlement, we understand that a substantial payment of $17 million will be made to the fund at a time when our organizations and performing venues are suffering under the coronavirus pandemic, and very little in the way of contributions are currently being made.

Thank you for your attention.

With all due respect,

*John Michael Smith*

John Michael Smith, President, ROPA

# OBJECTION TO CLASS ACTION SETTLEMENT

ATTN. The Honorable Valerie J. Caproni, U.S.D.C.J. United States District Court For The
  Southern District of New York 40 Foley Square New York, New York 10007

RE: *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians
  and Employers' Pension Fund, et al.,* No. 1:17-cv-05361-VEC)

We, the undersigned members of the class do hereby respectfully request that Your Honor
  reject the settlement in the above-referenced case because it is not "fair, reasonable,
  and adequate."
We would like to make three specific objections:

1. The settlement is not reasonable as it lacks meaningful restraints on the Plan Trustees
   and Plan Advisors going forward. The Trustees can still hire the same money managers,
   and continue to pursue the same "exceedingly risky" investment policies. The
   Independent Neutral Fiduciary has no formal legal power to force the Trustees to make
   more prudent and conservative investments, while still remaining diversified.

2. The settlement is not adequate given that the Plan has a long history of mismanagement.
   If the job of the Independent Neutral Fiduciary is limited to only 4-5 years, it is unrealistic
   to expect that they can have much of a positive impact. Therefore, a much longer period
   is needed. Additionally, the monitor must have the mandate to notify the Court of any
   breach of fiduciary duty by the Trustees and/or their advisors.

3. The settlement is unfair because there needs to be restrictions on the Trustees' use of
   Plan resources (e.g. email lists and on-line communications, etc.) to disparage the Class
   Members, and Class Representatives, Paul Livant and Andrew Snitzer, and to
   unwarrantedly characterize the settlement as a victory for the trustees, as they have
   already done. Continued public statements should be factual and non-disparaging.

Sincerely,

_____ Your written signature* Printed name*  Robbie Buchanan
Your address*  958 Lisgar Court, North Vancouver, BC, V7K 3E1, Canada
Telephone number* 604-765-9846         Your email*  robbiebuchanan@mac.com
*required

☒ I have not objected to a class action settlement in the past 5 years
   Choose one of the following:
☐ I do plan to attend the Fairness Hearing (or/choose one)
☒ I do not Plan to attend the Fairness Hearing

RECEIVED
JUL 29 2020
VALERIE CAPRONI
U.S. DISTRICT JUDGE
S.D.N.Y.

ATTN. The Honorable Valerie J. Caproni
United States Courthouse,
Southern District of New York
40 Foley Square
New York, New York 10007
**RE: Snitzer and Livant v. The Board of Trustees of the American Federation
of Musicians and Employers' Pension Fund, et al., No. 1:17-cv-05361-VEC)**



### As a member of the class in the above referenced case, I wish to object to the Proposed Class Action Settlement before the Court, and respectfully ask the judge to reject this settlement.

**I make the following objections.**

1. Having read through all the material posted on the Settlement web site, I have concluded that the Defendants did fail to meet their Fiduciary Responsibilities to the Participants. Additionally, the record indicates that the Defendants were deliberately misleading in their communications with the Participants, repeatedly, over a long period of time. This Settlement Agreement does nothing to correct this. Trustees remain free to continue the same risky and imprudent investment strategy and are not restrained from continuing to mislead Participants.

2. The appointment of Andrew Irving to the position of Neutral Independent Fiduciary Trustee, is insufficient, and unacceptably limited in both term and scope. Mr. Irving's role is loosely designated as "4 or 5" years, and he is given no binding oversight authority. His appointment does nothing to repair the structural damage done to our fund by the Defendants, and does nothing to ensure that the next generation of retirees has any reason to believe their future with this fund is secure.

3. This Settlement allows the same Trustees who mismanaged our Fund to remain in place, with no restraints placed on future actions. I believe that at a minimum, Trustees Raymond Hair and Christopher Brockmeyer should be removed from their positions as Co-chairs of this Trustee Board.

4. Although this lawsuit is a Class Action, none of the over 50,000 other class members were reasonably consulted. This Settlement agreement requires that "all Class Members would forever release the Released Claims against the Released Parties". I cannot agree to that for a settlement this lacking in meaningful remedies.

**I certify I have not objected to a class action settlement in the past 5 years**
**I do not Plan to attend the Fairness Hearing**

Signed:

Robert A. Hajacos
109 Cambridge Court
Goodlettsville, TN 37072
615-351-4804
Hajacos@comcast.net

CLASS ACTION OBJECTION
ATTN. The Honorable Valerie J. Caproni
United States Courthouse,
Southern District of New York
40 Foley Square
New York, New York 10007



RE: Snitzer and Livant v. The Board of Trustees of the American Federation
of Musicians and Employers' Pension Fund, et al., No. 1:17-cv-05361-VEC)

    As a member of the class in the above referenced case, I wish to object to the
Proposed Class Action Settlement before the Court, and respectfully ask the judge to reject this
settlement.

Andrew Irving, as Neutral Independent Fiduciary Trustee, will have a temporary appointment with no
real power over decisions of the Board.  We need a permanent position for an independent
professional fiduciary who has binding power over our Board of Trustees since our Trustees have
proven to be incompetent for this task.


I certify I have not objected to a class action settlement in the past 5 years.
I do not Plan to attend the Fairness Hearing.

Sincerely,

Sara Cyrus

Sara Cyrus
10 Clyde Court
Bergenfield, NJ 07621
saramcyrus@gmail.com

LOCAL 802 AFM , 77 AFM, 400 AFM, 369 AFM