**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ANDREW SNITZER and PAUL LIVANT,

              Plaintiffs,

     v.

THE BOARD OF TRUSTEES OF THE AMERICAN
FEDERATION OF MUSICIANS AND
EMPLOYERS' PENSION FUND, ET AL.,

             Defendants.

Case 1:17-cv-05361-VEC

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTIONS**
**FOR FINAL APPROVAL AND ATTORNEYS' FEES**
**AND IN RESPONSE TO OBJECTIONS**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................1

II.   THE COURT SHOULD REJECT ALL OBJECTIONS TO
      THE SETTLEMENT ........................................................................4

      A.    The Objections Regarding the Scope of the
            Release Are Wrong And In Any Event Moot ........................................4

      B.    Applicable Legal Standards Require Approval
            Of The Settlement......................................................................6

      C.    The Objections To The Governance Provisions Are
            Legally Wrong ...........................................................................8

      D.    Defendants Make Unsupported Arguments And
            Distort The Record .....................................................................9

      E.    Objectors Are Wrong; The Governance Provisions
            Provide Excellent Protective Infrastructure And
            Exceed The Requirements Of Rule 23(e) .................................13

            1.    The OCIO Monitor Provisions Protect
                  Against Business As Usual for Asset
                  Allocation And Risk Taking ............................................13

            2.    The Neutral Independent Fiduciary Trustee
                  Andrew Irving Has Robust Authority And
                  Will Provide Robust Protection ...................................14

            3.    The Governance Provisions Here Are Better
                  Than Those In All The Other Recent ERISA
                  Pension Settlements .....................................................20

      F.    The Settlement Requires Important, Meaningful
            Disclosures To Plan Participants And The Trustees............................26

      G.    Objectors' Other Arguments Are Wrong ................................................30

      H.    Martin Stoner's Objections Should Be Rejected.....................................34

i

III.    THE COURT SHOULD REJECT DEFENDANTS'
        FEE-RELATED ARGUMENTS ...............................................................34

        A.    Plaintiffs Skillfully Navigated The Settlement
              Negotiation ...............................................................................35

        B.    Defendants' Merits Arguments Fare No
              Better Here Than They Would Have At Trial.........................37

        C.    Defendants' Fee Arguments Conflict With ERISA
              Fee Jurisprudence......................................................................39

        D.    Class Counsel Properly Documented Their Expenses .........39

IV.     THE COURT SHOULD APPROVE THE SERVICE AWARDS.......................45

V.      THE COURT SHOULD APPROVE THE RELEASE
        IN FAVOR OF THE CLASS REPRESENTATIVES ............................................46

VI.     CONCLUSION.........................................................................................47

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Blankenship v. Boyle*,
    329 F. Supp. 1089 (D.D.C. 1971) ......................................................................25

*Bryant v. Potbelly Sandwich Works*,
    LLC, No. 1:17-cv-07638 (CM) (HBP), 2020 U.S. Dist. LEXIS
    21900 (S.D.N.Y. Feb. 4, 2020) .........................................................................41

*Chao v. Merino*,
    452 F.3d 174 (2d Cir. 2006) ..............................................................................20

*Clark v. Duke Univ.*,
    No. 16-cv-1044 (D.N.C.) ...................................................................................22

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ................................................................................22

*Figs v. Wells Fargo & Co.*,
    No. 08-cv-04546 (D. Minn. 2011), ECF Nos. 264, 265, 295 ...........................40

*In re Healthsouth Corp. ERISA Litig.*,
    No. 03-cv-1700 (N.D. Ala.) ...............................................................................40

*Hugler v. Byrnes*,
    247 F. Supp. 3d 223 (S.D.N.Y. 2017) ...............................................................20

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................2

*Johnson v. Fujitsu Tech. & Business of America, Inc.*,
    2018 WL 2183253 (N.D. Cal. May 11, 2018) ...................................................33

*Karpik v. Huntington BancShares, Inc.*,
    No. 1:17-1153 (S.D. Oh.) ..................................................................................23

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984) ..............................................................................20

*Kornell v. Haverhill Ret. Sys.*,
  790 F. App'x 296 (2d Cir. 2019) ......................................................................41

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
  Civ. A. 07-cv-9329-SHS ...................................................................................5

*In re Lloyd's Am. Trust Fund Litig.*,
  2002 U.S. Dist. LEXIS 22663 ...........................................................................2

*Milliken v. Hospitality Investor's Trust, Inc.*,
  No. 1:18-01757-VEC (S.D.N.Y.), ECF #152 .................................................6, 36

*Moreno v. Deutsche Bank Americas Holding Corp.*,
  No. 15-cv-9936 (LGS) (S.D.N.Y.) ...................................................................21

*In re Nasdaq Market-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................2

*Nichols v. The Trustees of Princeton University*,
  No. 17-3695 (D. N. J.) ......................................................................................23

*Price v. Eaton Vance Corporation et al*,
  Civ. 1:18-cv-102098-WGY (D. Mass.), ECF No. 32 ........................................33

*Rievman v. Burlington N. R.R. Co.*,
  118 F.R.D. 29 (S.D.N.Y. 1987) .........................................................................8

*Selby v. Principal Mut. Life Ins. Co.*,
  2003 U.S. Dist. LEXIS 21138 (S.D.N.Y. Nov. 17, 2003) ..................................8

*TBK Partners, Ltd. V. Western Union Corp.*,
  675 F.2d 456 (2d Cir. 1982) ..............................................................................2

*In re Tremont Sec. Law*,
  2019 U.S. Dist. LEXIS 21910 (S.D.N.Y. Feb. 11, 2019) .................................42

*Trudell v. Hair et al.*,
  No. 2:19-10249 (S.D. Mich.), ECF # 1 ............................................................46

**Statutes**

CAFA .........................................................................................................................2

ERISA ..............................................................................................................*passim*

iv

ERISA §403(b)/401K.................................................................................40

ERISA Section §1021.........................................................................28, 29

**Other Authorities**

Fed. R. Civ. P. 23(e)(2)...........................................................................6

Fed. R. Civ. P. 23 ........................................................................7, 33, 47

Fed. R. Civ. P. 23(a)...............................................................................34

Fed. R. Civ. P. 23(b)(1)..........................................................................34

Fed. R. Civ. P. 23(e)........................................................................7, 13, 23

## I.    INTRODUCTION

The claims asserted in this lawsuit relate to the Trustees' breaches of fiduciary duty from 2010 to the OCIO Date in October 2017 regarding the Trustees' excessively-risky investment decisions and their failure to meaningfully disclose that the primary reason for those risky investment decisions was because coming out of the 2008 recession, the Plan was headed towards insolvency. Class Counsel prosecuted this case almost to the eve of trial, assembled a compelling evidentiary record supporting Plaintiffs' claims, and negotiated an outstanding $26.85 Settlement representing between 65% - 75% of collectable assets available to fund any judgment along with a comprehensive set of Governance Provisions that compare favorably to the injunctive relief obtained in every recent civil ERISA pension case. In short, the Settlement is likely as good as, if not better than, the best result that could have been achieved at a successful trial and sustained on appeal, without the risk and delay of continued litigation.

Plaintiffs and Class Counsel recommend approval of the Settlement. So do Class Counsel's experts. Mediator Robert Meyer of JAMS, who presided over 18 months of negotiations and has intimate knowledge of the claims and defenses, recommended that the Parties accept his "mediator's proposal" to close the remaining gaps for both prongs of the Settlement. The Independent Settlement Evaluation Fiduciary, who owes his duties to the Plan (and not Plaintiffs, Defendants, or any of the lawyers), supports approval, finding that "the amount of the Settlement of $26,850,000 is reasonable, as is the prospective relief." *See* Fiduciary Counselors Report, Schwartz FA Decl. Exhibit 3, at

12. So too do leaders of the International Conference of Symphony and Opera Musicians and the Regional Orchestra Players Association. *See* ECF # 180 at 18; ECF #186 at 237. No AFM Local or organization has filed an objection. Nor has the Musicians for Pension Security organization, which is the largest organization opposing the current Trustees. Nor have any government officials who received CAFA notice.

Unfortunately, a small percentage of class members (less than 0.1%)[1] filed objections to the Settlement based on an incorrect view of the scope of the proposed Release, fundamental misconceptions regarding the scope of the mandate and authority of the proposed Neutral Independent Fiduciary Trustee Andrew Irving, and an unrealistic view of what could be achieved at a successful trial. Plaintiffs and Class Counsel appreciate and sympathize with the angst of these and other class members about the current state of the AFM-EPF Plan, the Trustees' pending MPRA benefit cut application,[2] the evidence regarding beaches of duty, and frustration with the Trustees' insistence they have done nothing wrong. But this lawsuit was not designed to, nor could it, solve every problem with the AFM-EPF. The Settlement largely achieves the goals of the litigation, given the scope of the claims asserted and the limited resources to pay a judgment, and no rational lawyer would recommend risk losing the Settlement

---

[1] This small percentage supports approval of the Settlement. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 485 (S.D.N.Y. 2009); *TBK Partners, Ltd. V. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982); *In re Lloyd's Am. Trust Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, *67-68 (S.D.N.Y. Nov. 26, 2002 (approving settlements despite hundreds of objections including objections representing between 18% - 36% of the class); *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 479 (S.D.N.Y. 1998)(fact that only 10% of the class objected "strongly favors settlement").

[2] Department of Treasury staff will apparently recommend denial of the application.

benefits in favor of going to trial in the hopes of chasing a better result after years of additional litigation. The AFM-EPF desperately needs the $17 million now and also needs the Settlement's Governance Provisions put in place now.

No class member objected to the requested Service Awards for Plaintiffs Snitzer and Livant. The $10,000 requested is less than those approved in most recent ERISA pension cases, and Plaintiffs have committed to donating those awards to organization(s) fighting to protect class members' pension rights. Nor has any class member objected to the proposed release in favor of Plaintiffs. Messrs. Snitzer and Livant admirably did their jobs as Class Representatives and deserve both.

Finally, only one class member, Martin Stoner, objected to the Class Counsel's fee request. The Court should reject that objection along with the hypocritical objection to fees raised by the defendant Trustees, who apparently had no problem with their insurers paying their lawyers about $9 million on a non-contingent basis. Courts have approved a one-third fee request in virtually all recent ERSIA pension class actions. If anything, the unique risks of this case – demonstrated by the inability of many of the objectors here to convince any other lawyers to file this case -  justify a higher fee than the fees awarded in the other recent, more desirable cases. Class Counsel risked about $8 million in attorney time and almost $1 million in expenses, and even if the Court awards the full request fee, will receive almost no multiplier on their time.

II.     **THE COURT SHOULD REJECT ALL
        OBJECTIONS TO THE SETTLEMENT**

Most objectors withdrew their individual objections in favor of the joining the *Ad Hoc* Coalition objection. ECF #186 at 3-220. Martin Stoner filed numerous objections on his own behalf. Other class members filed form objections prepared and solicited by Mr. Stoner. *See* ECF # 169 at 14. Others filed individualized objections. *See, e.g.,* ECF #186 at 221. Most are redundant and we respond to those as a group (with a focus on the Coalition) unless otherwise indicated. Defendants support the Settlement but object to the fee request and disagree with Plaintiffs' (and Objectors') view of the evidentiary support for Plaintiffs' claims. ECF # 184. The Court should reject all objections.

A.     **The Objections Regarding The Scope Of The Release
        Are Wrong And In Any Event Moot**

As stated in our Preliminary Approval Brief at 28, the Settlement has an appropriately-tailored release limited to the claims asserted in the Amended Complaint related to the Trustees' investment decisions from 2010 to the OCIO Date in October 2107. Objectors nonetheless mistakenly believe that the Release would prevent class members from filing their own lawsuit challenging the Trustees' separate  conduct regarding different investment decisions from October 2017 through 2020, even though in our Fee Motion at 34-35, we stated the Release would not release such claims.

For the reasons stated in Defendants' Response to those objections (ECF #189), Objectors misread the Release, and therefore misunderstand the scope of the Release. The Release was subject to hard and careful negotiations regarding its scope and impact

on relevant insurance policies.[3] Objectors mistakenly believe the "including but not limiting to" clause nullifies all the language, including the OCIO date limitation that follows, while ignoring what precedes that clause: limiting the Release to the claims "asserted" in or that relate to the "factual or legal allegations" in the Amended Complaint.[4] The Amended Complaint does not allege claims related to post-OCIO Date conduct. While Defendants initially resisted discovery regarding the Trustees' process regarding choosing an OCIO, after extensive negotiations, the Parties agreed to include that process as part of the discovery process based on Plaintiffs' assertion that facts regarding that process were relevant to the 2010-October 2017 claims asserted in the Amended Complaint while largely excluding discovery regarding the Trustees' decisions after the OCIO Date. Schwartz FA Decl., ¶2.

In any event, since all parties, including Defendants, are on record about the limited scope of release, the objections are moot. These on-the-record statements constitute binding judicial admissions on behalf of not just the Defendants but also the Plan. The Independent Settlements Evaluation Fiduciary concluded that to avoid any ambiguity, the final order entered by the Court should make clear that Release in the Settlement Agreement covers the enumerated types of claims only for the period before the OCIO Management Date. Report at 8. The Parties agree and have included such

---

[3] All Plan participants have an interest in the Plan's insurance policies actually providing coverage, both with respect to this case and any future case that may be filed.
[4] By design, this language differs from broader releases in other ERISA settlements which release claims that "could have been asserted" in the operative complaint. *See, e.g., Leber v. Citigroup 401(k) Plan Inv. Comm.*, Civ. A. 07-cv-9329-SHS, settlement approved at 2019 U.S. Dist. LEXIS 23593, at *5 (S.D.N.Y. Jan. 3, 2019); release set forth at ECF #281-1 at 708.

language in the proposed Final Order submitted with this Motion. Thus, approval of the Settlement will not impair the ability of Plan participants to bring claims, if appropriate, based on decisions made by the Trustees after October 2017 OCIO Date.

###### B.    Applicable Legal Standards Require Approval Of The Settlement

Federal Rule of Civil Procedure 23(e)(2) requires the Court to determine whether this class Settlement is "fair, reasonable and adequate." To assess procedural fairness, courts examine plaintiffs' counsel's experience and ability, whether the settlement resulted from arms-length negotiations, and whether the parties engaged in the necessary discovery to ensure effective representation. *Milliken v. Hospitality Investor's Trust, Inc.*, No. 1:18-01757-VEC (S.D.N.Y.), ECF #152 at 2, citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "A settlement's substantive fairness depends on the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial, the likelihood of success in light of the risks posed by continued litigation, the likely duration and cost of continued litigation, and any [] objections to the settlement." *Id.*, citing *Detroit v. Grinnell*, 495 F.2d 448, 463 (2d Cir. 1974).

*Ad Hoc* Objectors concede that "Class Counsel worked hard on this case and developed a compelling record of years-long incompetence, mismanagement, and dishonesty by the Trustees." Br. at 25. Class Counsel leveraged that record in the extensive negotiations to maximize the Settlement recovery.

We agree with the *Ad Hoc* Objectors that Rule 23(e) requires the Court to "make an intelligent comparison between the amount of the compromise and the probable recovery." Br. at 7. Objectors concede that the $26.85 million recovery represents a near-

maximum recovery of collectible money damages but ask this Court to ignore that cash recovery in its analysis and focus solely on the injunctive relief. No case supports that proposition. The Settlement must be evaluated as a whole. The $26.85 million, in conjunction with the Governance Provisions, constitute an outstanding result that not only far exceeds the Rule 23(e) standards but also approaches the best *collectable* judgment that likely could have been achieved at trial and sustained on appeal.

Objectors' arguments ignore the Rule 23 standards. They believe the Settlement should be rejected simply because it does not strip away all governing authority of the Trustees appointed by the AFM Union President and the Plan Employers and effectively put the AFM-EPF into receivership (as has been done by the government with union plans riddled by corruption). They also believe that even though many of these very same objectors decided against bringing this very lawsuit in 2017, and admitted they could not even find a lawyer willing to take the case due to perceived risks of success, they should be granted the decision-making authority to make the judgment whether to pocket the $26.85 million and Governance Provisions now, or take the case to trial in the hope that the Court would enter a judgment that would be affirmed by the Second Circuit (sometime in the mid-2020s) that awards at least $26.85 million and places the AFM Plan into receivership. Rule 23 lodges that discretion with Class Representatives and Class Counsel, not absent class members. We made that decision based on our best judgment – judgment which has proven more prescient than the judgment of our respected colleagues who represent the top echelon of ERISA

lawyers. Our judgment was informed by our top-shelf experts with intimate familiarity of the facts, and Mediator Robert Meyer of JAMS.

### C.    The Objections To The Governance Provisions Are Legally Wrong

*Ad Hoc* Objectors' reliance on *Selby v. Principal Mut. Life Ins. Co.*, 2003 U.S. Dist. LEXIS 21138, at *9 (S.D.N.Y. Nov. 17, 2003), is misplaced. Unlike here, in *Selby* the maximum damages were $22,000, far less than expected litigation costs, and the settlement provided for no cash, no notice to class members, and agreed fees for class counsel pursuant to a clear sailing agreement. *Id*. at *6-12 & n. 10. The *Selby* settlement only required defendant to "change its computer system" and "supplement and/or amend its manuals and training" procedures. *Id*. at *6-8. The court rejected the argument Objectors make here and approved the settlement "since there are substantial risks and costs involved in continuing this litigation, there is no guarantee such an effort would result in any [better] injunctive relief." *Id*. at *17.[5]

Objectors and Defendants each mischaracterize the Governance Provisions. Contrary to their assertions, the provisions are comprehensive, robust and provide effective limits on the defendant Trustees' ability to breach their duties in the future while simultaneously creating a "litigation trap" that increases the Trustees' exposure should they breach their duties.

---

[5] Objectors inexplicably also cite *Rievman v. Burlington N. R.R. Co.*, 118 F.R.D. 29, 32-35 (S.D.N.Y. 1987). There the court rejected class-member objections and approved an all-cash settlement (even though the complaint only sought injunctive relief) and approved fees representing a 3.26 multiplier pursuant to a clear sailing agreement.

### D.    Defendants Make Unsupported Arguments And Distort The Record

Defendants repeat prior false assertions, without citing any evidence, that the injunctive relief sought in this litigation and the Settlement was "designed to bolster efforts to replace the Union Trustees at the union membership Convention."  Defs.' Obj. at 11. As reflected at pages 14-16 of our Preliminary Approval brief, and the Schwartz FA Declaration at 3, there was no coordination with the political effort (which included many of the Objectors here and organizations like MPS) at the AFM 2019 convention to oust President Hair. Neither Class Counsel nor Plaintiffs Snitzer and Livant play any role with respect to the 2019 Convention. Nor was there coordination at the outset or during the prosecution of this litigation. *Id*.

Defendants are correct that the Settlement did not remove certain Trustees. Nor has any other recent civil ERISA pension case without evidence of self-dealing or corruption. But as previously stated, the total package of Governance Provisions will likely be more effective than replacing one or two Trustees, as all of them supported the imprudent investment allocation decisions and none disclosed to Plan participants that they made those risky investment decisions due to the looming insolvency of the Plan.

Defendants, without evidence other than their say-so, state at page 12 that they "fully expect" that the NIFT Mr. Irving "will validate the prudence of the process that the Trustees have been engaged in all along."[6] Class Counsel and our experts disagree

---

[6] Defendants recently walked back their statement and correctly noted that Mr. Irving's job is not to adjudicate the Trustees' prior conduct but rather to help protect against future breaches and add value to the Trustees' future decision-making process. *See* ECF #189 at 2 n. 2.

and believe Mr. Irving will provide a strong deterrent to future breaches and imprudence. Mr. Irving is intimately familiar with the Trustees' track record. Indeed, at our insistence, he was required to review the parties' expert reports and other case materials. Mr. Irving previously assured the Court that he "can add value to the Plan trustees' investment decision-making and will do so in an unbiased and independent fashion." ECF #192-2, ¶7. If the Trustees' processes were historically prudent, there would be little value to add. Mr. Irving's gravitas and judgment with respect to investing and fiduciary duty stand in stark contrast to the Trustees' documented conduct. Moreover, after reviewing Defendants' statement, Mr. Irving judiciously reiterated that: "I have neither formed nor communicated to anyone any view as to the prudence of the Trustees' current processes, let alone any changes in those processes they may make in the future during and subject to the conditions of my tenure as Neutral IFT." Supplemental Irving Declaration, ¶6. Class Counsel carefully vetted Mr. Irving's track record and are satisfied he will provide the necessary strong, independent and unbiased judgment.

From 2011-2018, Mr. Irving served as Area Senior Vice President and Area Counsel to Gallagher Fiduciary Advisors. That experience, and quality of Gallagher's work, informs Class Counsel's assessment. During that time, Gallagher conducted the OCIO RFP process for the Trustees.[7] Upon reviewing the Trustees' unsound asset allocation, Gallagher, in its final draft report, blistered the Trustees' "15% emerging markets target very aggressive" and every OCIO finalist recommended a decrease in

---

[7] Mr. Irving had no role on Gallagher's work for AFM-EPF.

the EME allocation from 15% to below 5%. SEI criticized the 15% allocation as "too large of an overweight on a risk-adjusted basis" and that "EME at 15% can bring too much volatility" *See* Witz Report at 32-34.

After getting a preview of that final draft, Defendants Brockmeyer and Plan Counsel Rory Albert lobbied Gallagher to remove the specific 15% EME allocation criticism *and never told any of their fellow Trustees of this revision*, thereby adulterating the entire Trustee process regarding one of the most important decisions the Board ever faced. Gallagher's final report provided to Trustees diluted the criticism to: "Have made some aggressive strategic and tactical allocation recommendations." *Id*. The other Trustees, including union President Hair and union OCIO Search Co-Chair Yao, only learned of this revision *from Class Counsel* at their depositions. *Id*.; *see also* Hair Deposition at 136-161.

While Defendants tout their litigation experts, none of them could identify a single other large pension Plan with a similar risky asset allocation. Nor could they identify a real-world *rational* asset allocation that could have been constructed to accomplish the Trustees' outsized 9% target return. *See* Witz Rebuttal Report at 13-14. Ms. Borzi offered no opinions whether the Trustees' decision to increase of the target investment return from 7.5% to 9% was prudent; whether the Trustees' decision to lower the domestic equity allocation far below the norm was prudent; or whether the Trustees' processes that led to the overall asset allocations challenged in this lawsuit were prudent; because, in her words, "that was all I was asked to opine on by counsel. Borzi Deposition at 172 -173; *see generally* pages 168-201.

Moreover, contrary to Defendants' assertions, Meketa did not affirmatively recommend the 11%/15% or 15%/18% EME/PE allocations in 2011 and 2015. *See* Borzi Deposition at 197-198 ("I didn't see anything like that in the record like that.").[8] Meketa refused to recommend or endorse the Trustees' decision to adopt the 15% EME/18% PE allocation other than to say that it was "not a crazy strategy" and that the Trustees had to "decide how much volatility and illiquidity [they] can tolerate." Meketa also described the Trustee's asset allocations as "the most aggressive [asset] allocation" of any Meketa client "with the most downside." Witz Report at 32-34; Borzi Deposition at 197-198. And Meketa ultimately recommended that the Trustees de-risk the portfolio by reducing EMEs by 60% *based on the same risks it had identified since 2010*. Witz Report at 32-34. Contrary to Defendants' bold assertions in their brief, the most Trustee Co-Chair Brockmeyer could say was that Meketa "never objected" and "didn't not recommend [those allocations]." Brockmeyer Deposition (day 2) at 349-350.

To be sure, Mr. Irving's mandate is not to adjudicate the Trustees' conduct from 2010-2017. His mandate is to help the Trustees to make prudent decisions going forward and document his disagreement should they make imprudent decisions. Mr. Irving's familiarity with Defendants' track record will help him carry out that mandate. Class Counsel received uniform views from their experts and other plaintiff lawyers

---

[8] Defendants misleadingly cite to Meketa statements. Br. at 20-21. The Trustees' depositions and emails reflect that the aggressive allocation was "what the Trustees wanted" and "Meketa shouldn't be faulted for going along with the Trustees' wishes" because Meketa was just following the Trustees' "marching orders." Witz Report at page 35 & note 34; pages 48-49 and note 41. Meketa only told the Trustees that if they wanted to take the risk to shoot for outsized returns, the excessive EME and PE allocations were the best way they could figure out how to do that.

personally familiar with Mr. Irving that he would be an excellent, effective and unbiased Neutral Independent Fiduciary. Schwartz PA Decl., ¶ 16. Indeed, no one, even Objectors, has challenged Mr. Irving's gravitas, judgment, qualifications, or track record of independence, much less provided any evidence to support such a challenge.

> **E.   Objectors Are Wrong; The Governance Provisions Provide Excellent Protective Infrastructure And Exceed The Requirements Of Rule 23(e)**
>
>> **1.   The OCIO Monitor Provisions Protect Against Business As Usual For Asset Allocation And Risk Taking**

When the Trustees switched to the OCIO model in late 2017, they retained authority to provide the OCIO with marching orders about the target investment return and asset allocation. Brockmeyer Deposition at 81. Put differently, as with Meketa from 2010-2017, the Trustees had control over the level of aggressiveness of risk taking. OCIO Cambridge's role was to make discretionary and strategic decisions subject to those marching orders. Moreover, despite Gallagher's criticisms of the Trustees' outsized 15% EME allocation, the Trustees hired Meketa as OCIO Monitor, instead of hiring Gallagher, as was initially planned.  That made no sense given the Trustees' knowledge and failure to do anything about Meketa's bad judgment, disastrous track record, and failure to effectively rein in the Trustees from 2010-2017.

The Settlement ousts Meketa in favor of a new OCIO Monitor to be picked from a list approved by Class Counsel and their experts. The new OCIO Monitor will be educated by Mr. Irving about the Trustees' s track record. Settlement § 1.1.3. Critically, the new OCIO Monitor will have a far greater role than Meketa had in that position, including the mandatory requirement and authority to: analyze and make written

recommendations with respect to the proposed asset allocation targets to be provided to the OCIO; make an alternate proposal should the Trustees veto those recommendations; and document, review, and approve the description of the entire process in the Board Minutes. *See* Settlement § 1.1.4. Mr. Irving, in his role as a *de facto* third Co-Chair of the Investment Committee, will have intimate involvement in the entire process, to provide an effective team to deter outsized risk taking. These OCIO Monitor provisions represent a material additive improvement, and do not represent anything close to "business as usual" as *Ad Hoc* Objectors claim.

### 2. The Neutral Independent Fiduciary Trustee Andrew Irving Has Robust Authority And Will Provide Robust Protection

Objectors' argument that the NIFT provisions are "toothless" misconstrues the authority granted to Mr. Irving and reflects a lack of understanding of ERISA pension plan fiduciary processes. To be sure, the NIFT provision does not effectively place the Plan into receivership and strip the Trustees of all of their decision-making authority. It does materially alter the Trustees' decision-making process and provide a strong deterrent to making future imprudent investment decisions.

Other than voting, Mr. Irving will "function in all respects" as a Co-Chair of the Investment Committee with "complete access to relevant information." § 8.1.5.1(b). Along with the Trustee Co-Chairs, he will create the agenda, lead the Investment Committee meetings, and participate in any full Board meetings, deliberations and decisions related to Plan investments. § 8.1.5.1(b), (c) & (d). Mr. Irving aptly describes his role as follows: "I may not, and will not, stand by silently or idly in the event I

14

observe acts or omissions that, in my reasoned view, amount to breaches by other fiduciaries, including (but not limited to) the voting Trustees, of their fiduciary responsibilities as they relate to investment matters." Irving Supp. Decl., ¶3.

If he disagrees with *any* decision or *any* matter under deliberation by the Investment Committee, he must "state his assessment, including his reasoning…" § 8.1.5.1(e) (cleaned up). He must also make recommendations, at least annually, about improving the Investment Committee processes. § 8.1.5.1(f). Objectors mistakenly contend that there is no requirement for Mr. Irving to create a written record of disagreements. In fact, Mr. Irving's views, including disagreements, will be reflected in the final Investment Committee and full Board Minutes. As the functional equivalent of an Investment Committee Co-Chair, Mr. Irving must participate in the drafting of those minutes and must approve those Minutes just like the other Co-Chairs. Mr. Irving confirmed:

> I will take care that the minutes of each meeting at which I make such an assessment reflect that assessment and the underlying reasoning accurately. And more generally, if I decide I need to state to the other Trustees, the OCIO or the OCIO monitor my views on an investment matter in writing, nothing in the Settlement precludes me from doing so.

Irving Supp. Decl.,¶5.[9]  Mr. Irving's participation and sign-off of the Minutes will not only provide the written record Objectors seek, but also deter the Trustees from

---

[9] Objectors fail to recognize that the reason why the Settlement has an express written report requirement for the OCIO  Monitor but not the NIFT is because the Monitor does not have sign-off authority over Minutes as a functional Co-Chair of the Investment Committee. The same is true of written reports required in other pension fund settlements where the agreed-upon fiduciary has limited powers.

sanitizing Board minutes as reflected in the evidence assembled by Class Counsel. *See Ah Hoc* Objectors Brief at footnote 29, citing depositions.

Moreover, Mr. Irving must also, in coordination with the Trustees and OCIO, prepare a written report about possible changes to the Plan's Investment Policy Statement. § 8.1.5.1(g). Contrary to *Ad Hoc* Objectors' misconception (page 10) that such a report "is not prepared independently," Mr. Irving has confirmed the "coordination" only means he "may consult with the OCIO and the Trustees" but "the report will be mine." Irving Supp. Decl.,¶4. Critically, as part of his duties, Mr. Irving will undoubtedly insist that the Trustees actually follow the Investment Policy Statement.

The Investment Policy Statement is a vital governance document. Indeed, former Plan counsel Rory Albert testified (page 48) that the IPS is one of only four documents he keeps handy for ready reference. As reflected at paragraphs 15-19 of her Report, Dr. Mangiero explained how the Trustees could not have engaged in their wild and crazy investment bets had they followed the directives in the Plan's existing Investment Policy Statement to protect "Fund Assets from undue volatility or avoidable risk of loss" by requiring the Trustees to limit the "level of investment market risk, consistent with moderate interim volatility; Allocate Fund Assets among asset classes that, during most periods of time, are not expected to correlate with one another; [and] … Avoid extreme levels of volatility."

Incredibly, at her deposition at pages 130-145, Defendants' expert Borzi conceded that, despite her grand pronouncement that the Trustees' processes were the best she had ever seen, she was not familiar with the Plan's Investment Policy Statement (page

130);  that the Trustees failed to  comply with the key provisions of the Investment Policy Statement such as comparing, gross and net of fees, the performance of actively managed investment to index funds (pages 135-137); that she saw no evidence that the Trustees "were trying to comply" with the IPS (145-146); and that while she identified these issues in preparing her expert report, she had no explanation why she decided against discussing them in her report other than her belief that "there's no significance, really." (pages 138, 142). These examples are symptomatic of Ms. Borzi's entire report and testimony. She makes grand pronouncements without making any meaningful analysis that addresses, much less weighs and evaluates, the key evidence of imprudence. Indeed, her testimony revealed a shocking unfamiliarly with basic facts relevant to her opinions.[10]   And she simply ignored evidence contrary to her opinions. Borzi Report at 9-10 ("I have not afforded great weight to [the Trustees' damning] emails").

---

[10] Other examples include her assertion that: Meketa's unseemly pitch while serving as independent investment consultant to assume the lucrative role as AFM's discretionary private equity manager was "common" and "did not …create a conflict of interest that would warrant scrutiny; and that Meketa's  involvement in the *Perez* case brought by the DOL was "minimal" and irrelevant to her analysis and that Meketa made full disclosure to the AFM Trustees.  Borzi report at 17 & n. 8. Despite claiming she was "thoroughly  briefed" by her DOL subordinates on the *Perez* case, Ms. Borzi made her opinions despite having "no idea" that Meketa's pitch was exactly the central allegation of *Perez*. She also did not know that Proskauer's Robert Projansky said that Meketa "show[ed] "bad judgment" when "it made a similar proposal" to the AFM Trustees and that Meketa stonewalled the Trustees by refusing to give them "any solid information" and providing  "contradictory" information that was "carefully worded and misleading." *See* Witz Report at 485- & note 42; Borzi Deposition at  244, 253, 267, and generally at 239-82, which reflects Ms. Borzi's lack of familiarity of the record.

Mr. Irving's role with respect to the content of and compliance with the Plan's Investment Policy Statement directly addresses the breaches asserted in the Complaint. What's more, the catch-all provision at § 8.1.5.1(h) provides Mr. Irving with the ability to seek additional authority as he deems appropriate. And he has total discretion to "determine" whether to continue as the NIFT for a fifth year. § 8.1.5.2.

Contrary to the objections, Mr. Irving will have comprehensive authority to effectively protect the Plan, and to leverage that authority in coordination with the new OCIO Monitor, to deter the Trustees from committing similar future breaches. And should the Trustees commit such breaches, particularly if they do so over the objections of the NIFT and OCIO Monitor, their written statements and testimony will provide Plan participants with strong ammunition to prosecute fiduciary breach claims.[11]

The *Ad Hoc* Coalition mis-cites Dr. Mangiero's February 2020 "Ghostbusters" article purportedly to demonstrate Andy Irving must have complete control over all Plan investment Management to provide robust oversight and benefit participants. Br. at 2 n.2 & Ex. 2. To the contrary, the "Ghostbusters" article only notes "the movement by the plaintiff's bar to set in place operational changes with respect to plan

---

[11] Various objectors illogically complain that the Governance Provisions, which are not yet in place, did not prevent the Trustees from making outsized investment risks from the October 2017 OCIO date through 2020. They also belittle the deterrent effect of potential future litigation. ERISA, including its fee shift provisions, and DOL policy, each recognize that deterrent effect as part of the overall enforcement scheme. While we appreciate that Objectors failed in their attempt in 2017 to find willing counsel for this case, Class Counsel here have provided a roadmap for how to frame such claims for breaches from 2017-2020 and created a record that can be effectively used by skillful counsel to efficiently frame and prosecute such claims if warranted.

management . . . in addition to any pre-trial or intra-trial financial settlement or, when a court opines against defendants, economic damages." *Id*. at 1. The article notes that the particular NIF terms to address claims in litigation can vary widely in mandates and directives. *Id*. at 2 ("Mandates range from simple to complex"; Not all directives are universally agreed upon as the singular way to add value for participants"; Contract terms will vary by situation"; What should not vary is protection allowing the independent fiduciary to rigorously watch over the actions of in-house ERISA investment committee members and outside vendors with impunity.  No one is well-served if a supposedly objective third party rubber stamps decisions or has limited clout to prevent undue risk-taking by others."). Mr. Irving's mandate provides for just such rigorous oversight within the Plan's governance structure and Taft-Hartley.

### 3. The Governance Provisions here are Better than those in All Other Recent ERISA Pension Settlements

As reflected in our Fee Brief at 7-9, many of the recent ERISA pension settlements provide no governance relief.  Moreover, the Governance Provisions here compare favorably to those that do.  Objectors fail to dispute our analyses of any of the cases we cited.  Nor do they cite any civil ERISA pension settlements or judgments removing trustees in the absence of self-dealing or corruption.[12]  Nor do they cite any case where

---

[12] *Ad Hoc* Objectors cite several inapposite cases brought by the DOL. In *Chao v. Merino*, 452 F.3d 174, 177, 185-186 (2d Cir. 2006), the court removed a fiduciary who knowingly hired a felon convicted for embezzling funds from three other employee benefit plans who proceeded, not surprisingly, to steal plan funds. In *Hugler v. Byrnes*, 247 F. Supp. 3d 223, 230, 236-37, (S.D.N.Y. 2017), the court found it "uniquely appropriate" to remove a fiduciary who invested 95% of plan assets in a single penny stock in order to further his own financial interest in that penny stock without any investigation beyond

the duly-elected union president was removed from serving as a trustee in a Taft-Hartley plan.[13] The assertion by *Ad Hoc* Objectors' counsel that a trial would inevitably or even likely have resulted in effectively placing the Plan into receivership is unfounded. Moreover, since Objectors believe that the Trustees have engaged in new breaches of their fiduciary duties since the OCIO date in 2017, to the extent *Ad Hoc* Objectors' counsel Mr. Walfish or any other lawyer concludes such conduct would support removal, nothing prevents such lawyers from filing a lawsuit to seek the removal of the Trustees and/or to seek damages for breaches after the OCIO date.

The *Ad Hoc* Objectors' citation (page 14) to *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-cv-9936 (LGS) (S.D.N.Y.) (settlement agreement at ECF 322-1), is

---

relying on oral representations. In *Katsaros v. Cody*, 744 F.2d 270, 281-282 (2d Cir. 1984), the court replaced trustees who made a series of loans, without any professional assistance or meaningful evaluation, representing over 60% of plan assets, to Hyman Green for construction of Nevada casinos, with an interim asset manager who had a maximum   term of the earlier of 15 months or "as soon as successor trustees are appointed by the union and employer association who meet with the court's approval." (quoting  legislative history).

[13] Adam Krauthammer, with the support of many of the Objectors here, secured an amazing and well-deserved victory in the long march towards bringing accountability to the AFM-EPF Plan by defeating and replacing Tino Gagliardi as president of AFM Local 802. But during the pendency of this litigation, despite the opposition of many of the Objectors, defendant Hair won reelection as AFM union president, and accordingly, under Taft-Hartley and the governing documents for the Plan, the notion that Class Counsel had the leverage in settlement negotiations to effect removal of Hair is not realistic. Objectors' disappointment that the litigation did not achieve what some of them failed to achieve in connection with the union president election, while understandable, is not a basis for rejecting the Settlement. The evidence developed by Class Counsel here, and, at Class Counsel's insistence made publicly available the settlement website, provides Objectors and all other Plan participants (and the Trustees and their supporters) with the ability to make an informed decision and engage in an informed, well-armed campaign for the next AFM union presidential election in 2022.

misplaced. Our settlement is better all around. Our $26.85 million recovery is over 20% more than the $21.9 million cash recovery in *Moreno*. The injunctive relief in Article 7 of the *Moreno* settlement was also far less comprehensive or impactful than here. The settlement there did not prohibit Deutsche from continuing to keep Deutsche investment funds in its employees' 401K plan, which was the primary focus of the complaint; it simply called for Deutsche to hire an independent fiduciary to provide an opinion whether those funds should be replaced. Critically, it allowed defendant Deutsche to pick the new (unknown) independent fiduciary without any input from class counsel and or any agreed-upon procedures. Here, the NIF Mr. Irving has been vetted and approved by Class Counsel and their experts, and the new OCIO monitor will be chosen via an RFP process from a list of candidates also approved by Class Counsel and their experts. Moreover, unlike the AFM Settlement, the *Deutsche* settlement does not provide for any additional disclosures; any guaranteed minimum term for the independent fiduciary's tenure; and at section 2.35 provides Deutsche with unfettered discretion to choose the independent settlement fiduciary to evaluate the overall settlement (here the parties jointly agreed upon the retention of Steven Caflisch of Fiduciary Counselors, Inc. to provide the independent settlement evaluation of the entire settlement as required by DOL regulations). Schwartz FA Decl., ¶4. The Deutsche settlement at section 2.45 also has a far broader release than the one Objectors challenge here. And Deutsche settlement does not require removal of any trustees.

*Ad Hoc* Objectors' citation to *Clark v. Duke Univ.*, No. 16-cv-1044 (D.N.C.) (settlement agreement at ECF # 149-2), is similarly misplaced. The cash settlement there

was only $10.65 million, less than 40% of the cash recovery here. *See* §§5.4, 5.5. The injunctive relief at section 10.4 permits Duke, after waiting until 2 years after the settlement effective date, unfettered discretion to hire a consultant to "provide a recommendation" whether the trustees should do an RFP to hire another consultant of the trustees' choosing to make recommendations about recordkeeping and administrative services. The trustees then have discretion to wait until four years after the settlement approval date to decide whether to follow and implement the recommendations of the second consultant, or alternatively, to decide against following those recommendations by simply providing class counsel with a written explanation of the trustees' "basis for" that decision. Moreover, the release at 2.36 of the Duke settlement agreement is also broader than the release negotiated here.

The most recent ERISA pension settlement is *Karpik v. Huntington BancShares, Inc.*, No. 1:17-1153 (S.D. Oh.). The proposed settlement there is only $10.5 million with no injunctive relief. *See* ECF # 67-1 at 3-4. The next most recent settlement is *Nichols v. The Trustees of Princeton University*, No. 17-3695 (D. N. J.). The proposed settlement is there is only $5.8. million. The injunctive relief does not remove any trustees or their advisors. Nor does it provide for an independent fiduciary trustee. Rather, the defendant trustees only agreed they would not raise record-keeping fees for three years; would revise their procedures to adopt "best practices" per recommendations from their current investment consultant; meet with their consultant four times per year and "review and consider" making changes to the investment line-up; and conduct an RFP (without defined procedures or candidates) for new advisors without any prohibition of

retaining their current advisers). ECF 58-5 at ¶34. The settlement also has a release broader than the one here. *Id*. at ¶¶7-8. And defendants gave class counsel a clear sailing agreement for a 33% fee request. *Id*. at ¶ 22.

*Ad Hoc* Objector's claim that 5 years is "too short" for the NIFT has no purchase under Rule 23(e) and they cite no civil settlements with a longer term. The term limit was among the most hotly-negotiated terms and Class Counsel were pleased with the outcome and the Mediator Meyer's 4/5 year proposal. Martin Stoner asserts that the 4-5 year term is too short based on an "expert analysis" he allegedly received based on the fact that the monitors for the Central States Pension Fund and UMW plan "served for decades." ECF 180 at 17-19.[14] The US DOL secured a consent decree stripping the CSPF trustees of their power because the trustees engaged in rampant corruption including

---

[14] The only attribution Mr. Stoner provides for his so-called expert analysis is his selective quote from a communication not in the record purportedly written by a former PBGC attorney. That so-called analysis is unauthenticated, inadmissible hearsay, contrary to *Daubert* standards, and lacking in any evidentiary value, and should be stricken. Indeed, it appears the expert only read a single, unidentified "letter" without reading the Settlement Agreement or Preliminary Approval papers or case materials on the Settlement Website. As a result, he mistakenly thought AFM Plan "actuary [Milliman] has a long history of doing the trustees' bidding and skewing his assumptions to keep required contributions low – too low for safety…" In fact, Milliman refused to increase its assumed rate of return above 7.5% despite the defendant Trustees' lobbying Milliman to increase it based on the trustees' outsized 9% Target Investment Return. Witz Report at 10. Moreover, while the so-called expert correctly stated that Class Counsel "has great expertise in investment related fiduciary breach," he ignorantly stated "they are not known for setting up post judgment watchdog functions." That is not true, and anyone who bothered to look would have known it was not true. Schwartz FA Declaration, ¶ 13. He also apparently did not know of (or ignored) the advice from Class Counsel's experts that the Governance Provisions provide an "excellent protection infrastructure."

making risky loans for casino development to organized crime mobsters.[15] And the decades-long monitors who replaced the trustees performed as bad, if not worse, than those trustees, running the plan into the ground.[16] The neutral trustee Mr. Stoner cites for the UMW plan (Dean Paul Dean) was not appointed pursuant to civil litigation brought by plan participants. Rather, that neutral trustee was appointed at the joint request of the employer and union trustees to replace a prior neutral trustee, also appointed by the union/employer trustees, who had engaged in self-dealing.[17]

Consistent with his conflation of civil and criminal litigation, in his July 22, 2020 objection (ECF 183 at 11), Stoner makes the outrageous, baseless charge that Class Counsel failed to follow non-existent instructions from Plaintiffs Snitzer and Livant and "only agreed" to bring this case as a "civil matter" and "refused to represent class members on their allegations that the trustees… engaged in additional criminal conduct…" Schwartz FA Declaration, ¶ 5. Class Counsel are private, civil lawyers; we do not represent the government, nor do we have authority to bring "criminal" charges against trustees. The appropriate governmental body to bring such charges and to seek sanction or removal of ERISA pension plan trustees is the Department of Labor. Class Counsel developed a comprehensive record cataloging the breaches of duty committed

---

[15]    https://www.forbes.com/sites/ebauer/2018/12/03/understanding-the-central-states-pension-plans-tale-of-woe/#715d83656c10.

[16]    https://www.marketwatch.com/story/how-the-teamsters-pension-disappeared-more-quickly-under-wall-street-than-the-mob-2016-04-04.

[17] *Blankenship v. Boyle*, 329 F. Supp. 1089, 1106, 1110, 1113 (D.D.C. 1971); https://www.nytimes.com/1971/07/22/archives/umw-trustee-named.html.

by the defendant Trustees, including their false and misleading statements to Plan participants from 2010 – 2017. To the extent there is any basis for the DOL to seek sanctions or removal of the Trustees, Class Counsel has created a record and roadmap for the DOL. At the instruction of Class Representatives Snitzer and Livant, to the extent that the DOL requests any cooperation from Class Counsel, we have committed to provide such cooperation at no charge. Schwartz FA Declaration ¶ 6.

### F. The Settlement Requires Important, Meaningful Disclosures To Plan Participants And The Trustees

The Trustees knew beginning in December 2011 that the Plan was unlikely to emerge from critical status. But the Trustees hid the ball and waited until late 2016 before giving Plan participants meaningful disclosure of the Plan's looming insolvency. *See* Schwartz FA Decl., Exhibit 2. The Trustees also failed to tell participants that they adopted a highly-aggressive, unprecedented asset allocation strategy solely based on their recognition of the looming insolvency crisis. Indeed, the Trustees' disclosures deliberately hid the massive EME and private equity allocations and the fact that their asset allocation was unlike any other Taft-Hartley pension plan.[18] Even the in their shocking December 2016 letter to participants, the Trustees misled participants in a deliberate effort to avoid disclosing the Trustees' outrageous 15% allocation to EMEs

---

[18] The Plan's annual funding notices disclosed general asset categories by percentage of the total, and the disclosed general categories did not show the Plan's outsized percentages of high-risk assets. *See e.g.*, ECF # 185-15 at 6-7; ECF #185-16 at 5-6; ECF #185-17 at 5-6.

and 18% allocation to private equity.[19] Thus, as reflected in the Objections, participants

were blindsided, and appropriately outraged, when the Trustees disclosed, without any

explanation, that the Plan went from projected solvency to projected insolvency despite

a raging domestic bull run.

Defendants disagree with Plaintiffs and Objectors and assert that they prudently

kept Plan participants informed about the Plan's funded status. They support that

argument with a misleading spin on the chronology of their disclosures.  Defs.' Br. at

26-29. In fact, Class Counsel's deposition of union Trustee Moriarity tells a compelling

story about the inadequacy of the Trustees' disclosures.  Schwartz FA Decl., Ex. 1. The

April 2010 Rehabilitation Plan stated the Plan was expected to emerge from critical

status no later than March 31, 2047. *Id*. at 34-35. Mr. Moriarity testified that during the

period after the Rehabilitation Plan, up until the summer of 2016, it was reasonable for

Plan participants to assume that the Plan was still projected to emerge from the red

zone. *Id*. at 58. But the Trustees knew by early 2012 that Milliman's projections showed

the Plan would never emerge from the red zone under Milliman's 7.5% investment

return assumption.  *Id*. at 39-53. The Trustees failed to disclose that key fact until 2016.[20]

---

[19] *See* Schwartz FA Decl., Exhibit 2, at 3: "Our current asset allocation includes the following: equities (domestic, international developed, emerging markets, private equity); bonds (investment grade, high yield and emerging market debt); treasury inflation-protected securities (TIPS); real estate, natural resources and infrastructure. Our domestic equities include core, value and growth and large-cap, mid-cap, small-cap, and micro-cap classes. Trustees, as plan fiduciaries, are required to prudently invest assets."

[20] An internal Milliman document that Milliman designated "attorneys' eyes only" under the Protective Order entered by the Court provides relevant information regarding the adequacy of Defendants' disclosures. Plaintiffs will request that the Court

The Settlement at § 8.1.2 and Exhibit 5 requires the Trustees to make new, meaningful disclosures that address to issues identified in discovery. The new Cambridge reports posted on the Plan Website will provide a meaningful breakdown that shows the Plan's allocations to EMEs and private equity along with a comparison of those allocations to peer Taft-Hartley plans, and performance, net of fees, of the plan's actively-managed funds to comparable index funds. This provides better information than even the Trustees had/knew when making their disastrous investment decisions from 2010-2017. *See* Hair Deposition at 132 (Trustees didn't know if Meketa reports show performance gross or net of fees): Witz Report at 62-64 & note 49 (same plus reflecting Trustee Rood in 2017 first realized he had "missed concerns [about] Meketa's reporting of asset classes" because he did not realize Meketa's "asset class numbers are not net of fees" and concluding that "chasing return through active management has not beaten the index for 3, 5 and 10 years" and therefore the Plan "has seriously underperformed during each time period."); Brockmeyer Deposition at 82 (reflecting ignorance of then-current EMEM allocation because the Cambridge reports "don't distinguish *per se* between emerging market, developed equity or domestic"). These disclosures will not only inform participants, but also improve the Trustees' decision-making process.

The Trustees also actively undermined participants' ability to get information required by Section 1021 of ERISA. In response to Plaintiff Snitzer's pre-suit request,

---

permit Class Counsel to publicly file that document so Class Members and the Court can evaluate the Parties' respective disclosure arguments based on a balanced record.

even though the Plan office had PDFs of the requested documents, Defendants slow-rolled production by making hard-paper copies, costing Snitzer $2,500 and the insolvent Plan over $3,600 in labor costs. Brockmeyer Deposition (second day) at 473, 485. They also flat-out lied in response to Snitzer's request for the names of Trustees on the Plan's Board committees, telling him: "The Trustees' practice is not to release this information" even though Executive Director Kilkelly had contemporaneously sent an internal email stating: "We have previously provided names of Inv. Com. members in response to an inquiry." Schwartz FA Decl., ¶8. At her deposition, Kilkelly could not provide *any* explanation as to how her email on behalf of the Trustees to Snitzer was truthful.[21] Nor could any Trustee. Due to pressure from this litigation, the Plan now provides PDF versions in response to § 1021 ERISA requests.

*Ad Hoc* Objectors quibble about the level of granular information required by the Settlement. Br. at 17-19 (complaining about the number of peer comparisons, the exact underlying composition of the excessive hedge fund allocation, details of the global equity holdings, etc.). But unlike the Trustees' prior disclosures, the new information in the required report discloses the allocation to EMEs (as distinct from international *developed* equities such as investments in Western European markets) and other high-risk categories like hedge funds, natural resources, real estate, etc. The comparison to

---

[21] Defendants take a potshot at Plaintiff Snitzer for not reading the Plan notices between 2010-2016. Br. at 26. They omit disclosing his reason. He got fed up and assumed the Trustees would only lie to him, since in response his asking at a Local 802 meeting in 2010/2011 for an explanation how the Plan lost $800 million in the 2008 recession, the Plan Executive Director Kilkelly responded: "I don't have to tell you, so I'm not going to." Schwartz FA Decl. ¶14. Given Mr. Snitzer's interaction with Ms. Kilkelly in 2017, Mr. Snitzer's instinct's proved prescient.

peer funds shows just how far out-of-the-box the Trustees pushed the risk envelope. *See* Witz Rebuttal Report at 4-5; Mangiero Report at 22, 52-54. The required disclosures, in conjunction with the information generated by the litigation and posted on the Settlement Website, provide participants with more than sufficient information to identify red flags. To the extent any participant wants more granular information, they can get Cambridge's (and Milliman's) full reports, now free of charge, via an ERISA §1021 request. Objectors' complaint that the return information on Settlement Exhibit 5 only begins in 2017 misses the point that the Cambridge report only provides historical return information during Cambridge's tenure since Cambridge replaced most of the prior active fund investments. The expert reports on the Settlement Website provide that information including illustrative charts from 2010-2017. *See* Witz Report at 52-71.

*Ad Hoc* Objectors also complain about the requirement in § 8.1.6 that the Trustees must provide Plan Participants with at least four weeks' notice of the identity and qualifications before the "effective date of any new Trustees' appointment." Br. at 2-3, 17. That complaint is surprising, since many of the same objectors unsuccessfully sought the same relief at the AFM 2019 convention. Schwartz PA Decl., ¶20. This provision achieves their stated goal and provides Plan participants with the opportunity to evaluate and raise any objections to prospective new Trustees before their appointments become effective. To the extent their complaint is that they want to have a new trustee not picked by Defendants (something objectors also unsuccessfully sought), the appointment of Mr. Irving achieves that goal as well.

### G.    Objectors' Other Arguments Are Wrong

Objectors argue that Plan Counsel have a disqualifying conflict because they also served as defense counsel. We will leave it to Plan Counsel to defend their actions. Regardless of whether a conflict exists, it does nothing to undermine the adequacy of the Settlement. Class Counsel, not defense counsel, represented and protected the interests of the Plan participants in the litigation and settlement negotiations. The negotiations were conducted under the auspices of a leading mediator. And the Independent Settlement Evaluation Fiduciary reviewed the Settlement to ensure it was prudent for the Plan to approve it.

Class Counsel did not miss the conflict issue. We advised the Court about of our concern that Defendants might seek to delay trial based on a belated discovery of a conflict of Proskauer's Mr. Rumeld serving as lead defense trial counsel while his partner Rory Albert was a key witness whose testimony and documents Class Counsel believed would prove damaging to the defense at trial. ECF #107 at 3. Mr. Rumeld assured the Court that Proskauer "investigated" the issue and had "no expectation" that Mr. Albert would provide testimony "adverse" to their clients." March 1, 2019 Hearing Tr, at 10-11. While we question that conclusion,[22] we protected class members' interests, protected the trial date, and leveraged the trial date in negotiations.

_____

[22] Mr. Albert's damaging documents and testimony would have included his accurate observations that: "Of the dozen or so active managers retained by the Fund, 10 have provided lackluster -- or worse than lackluster -- returns over more lengthy periods of time and the 'average' 5- and 10- (and in some cases even 3-) year portrayals look worse, at least to my eye, than the single year returns…"; that in 2016, Meketa recommended that the Trusts reduce the EME exposure by 40% based on the same risks

Objectors' augments regarding damages are wrong. Class counsel recovered about 65% of the current remaining insurance proceeds and 75% of the proceeds that would have been available to pay any judgment sustained on appeal. *Ad Hoc* Objectors' argument at footnote 39 that the insurance money "comes from the *class members*" ignores basic concepts of insurance and sunk costs. Regarding the amount of damages, Class Counsel and their damages expert David Witz were fully aware of the interplay between the July 2011 statute of limitations cutoff and potential liability for the failure to correct the imprudent 2010 allocation per the Supreme Court's *Tibble* decision. Mr. Witz was plaintiffs' expert in *Tibble*. The trigger date for duty-to-correct the 2010 allocation was no earlier than the first board meeting after July 2011, which was in August 2011. The damages from the 2010 6% EME allocation had largely accrued by then, and there was only a small window for additional damages flowing from the 2010 allocation since the Trustees adopted a new allocation in November 2011. Nor did we ignore our projected active manager damages (some of which were duplicative of asset allocation damages). While Class Counsel believe we had the better of the battle of the damages experts, our best judgment, and that of our damages expert, was that a successful liability verdict would result in a damages award in the low to mid tens of millions of dollars. Those projected damages were sufficiently above the available insurance policy limits to provide maximum negotiating leverage (*i.e.*, to threaten the

---

Meketa had identified since 2010 (Albert Deposition at 368-374); and his role in how he and Brockmeyer failed to inform OCIO Search Co-Chair Yao or other Trustees about Gallagher's original criticism of the 15% EME allocation and how Yao's conduct during the process was "perplexing and surprising." *Id*. at 338-364; quote at 363.

Trustees that we would seek to bankrupt them if they refused to demand their insurers tender their limits, and to set up the insurers for bad faith claims if they refused a request to tender).

Objectors' various litigation-risk arguments are odd given their inability to find counsel in 2017 or their current counsel's apparent risk aversion to filing the 2017-2020 claim he mistakenly believed was released and that his clients want to pursue. Rule 23 does not require class counsel to eschew making a reasoned, objective evaluation of risk in settlement negotiations. Our damages theory was sound and rooted in ERISA jurisprudence, but the "curb appeal" of damages based on absolute losses is different from damages based missing out on additional gains, particularly when, given the nature of the various calculations and debate of the parties' experts, the Court would have wide discretion in calculating damages.

The notion that Class Counsel overstated the "cautionary tales" from defense trial court judgments in *Sacerdotal v. NYU* and *Brotherton v. Putnam,* is wrong. Despite finding no damages causation, in *NYU* Judge Forrest condemned most trustees' conduct as "shocking" and as if "they had no idea" of basic facts. https://www.law360.com/articles/1044492?scroll=1. Those criticisms were hardly "quibbles." *Ad Hoc* Obj. at 25. Nonetheless, both Judge Forrest and subsequently Judge Torres declined to remove or sanction any trustee. While the plaintiffs ultimately secured a partial reversal in *Brotherston*, the case only settled for 28% of damages and injunctive relief less invasive than the Governance Provisions here. 1:15-13825 (D.

Mass.), ECF # 22 at 5.[23]. Martin Stoner's various unsupported pronouncements that the Court would place the AFM-EPF into receivership or that trial victory was certain reflects his lack of knowledge or judgment about the judicial process.[24]

The form objections to a non-opt out class are without merit. *See. e.g.*, ECF # 180 at 11. Courts in this Circuit consistently certify non-opt out classes under Rule 23(b)(1) in ERISA lawsuits raising fiduciary breaches stemming from plan-wide investment decisions because the requirements of Rule 23(a) and 23(b)(1) easily met. *See* ECF 130.

### H.    Martin Stoner's Objections Should Be Rejected

Most of Mr. Stoners' objections and inflammatory, baseless statements have been covered above, in prior filings (*see, e.g.*, ECF #167 at 20-26; ECF # 174 at 7-9) or are facially without merit. With respect to Mr. Stoner's misunderstanding of the class action fee process, the Independent Settlement Evaluation Fiduciary correctly noted (pages 8-9) that there is nothing wrong with Class Counsel's 33% request and further noted, as we have, that unlike many other ERISA settlements, there is no clear sailing agreement, Defendants are opposing the fee request, and the Court will be able to make a judicious decision based on an adversarial record.

---

[23] Our recovery of damages, collectable or otherwise, is far greater than *Brotherston* or other recent ERISA pension cases. *See Price v. Eaton Vance Corporation et al,* Civ. 1:18-cv-12098-WGY (D. Mass.), ECF No. 32 at 12 (23%); *Johnson v. Fujitsu Tech. & Business of America, Inc.*, 2018 WL 2183253, at *6-7 (N.D. Cal. May 11, 2018) (less than 10%).

[24] *See* https://www.nydailynews.com/new-york/musician-suing-age-bias-complained-elderly-judge-reassigned-88-year-old-judge-article-1.967958.

### III.    THE COURT SHOULD REJECT
### DEFENDANTS' FEE-RELATED ARGUMENTS

Defendants make baseless factual and legal arguments regarding the 33% fee request. They contend that the claims asserted were a "mere charade" due to Plaintiffs' "inability to prove their case;" and that the "monetary recovery can be viewed as a 'success' only if success is measured against the precarious claim for monetary relief they were left with as the case approached trial." Defendants incongruently argue that Class Counsel should receive a smaller fee because they rejected early, lowball settlement offers. Br. at 1-2, 4, 9-10. They outrageously claim Class Counsel "needlessly extended this lawsuit for years." *Id*. at 4, 9-10. In fact, Class Counsel assembled a compelling evidentiary record and were well-prepared to proceed to trial; and it was Defendants and their insurers, not Class Counsel, who misjudged the case settlement value only to ultimately move towards Plaintiffs' number to avoid trial.

### A.    Plaintiffs Skillfully Navigated The Settlement Negotiation

The $26.85 million recovery represents about 65% of the current balance of Defendants' insurance policies and about 75% of what would have been left to collect on a final judgment given the "burn rate" of defense counsel's bills. Defendants' argument that Class Counsel failed to recover uncollectable damages, or damages for claims outside the statute of limitations, are nonsensical.

Defendants argue that "most substantial waste of time is attributable to Plaintiffs' professed strategy of turning down earlier settlement offers that did not exhaust the lion's share of the available insurance proceeds….this strategy served merely to divert to defense costs insurance proceeds that could have funded an earlier,

34

reasonable settlement." Br. at 31. They doubled down on that argument at ECF # 193, stating: "Plaintiffs pursued certain litigation strategies that were expensive … Plaintiffs should have opted to settle earlier in the proceedings, before costly fact discovery commenced." Nonsense. The notion that Class Counsel should get a *small*er percentage fee because they successfully held out for *more money* for the class is absurd. The notion Class Counsel should have, as Defendants suggest, agreed to an early, cheap settlement based on a weaker hand without performing "document review and depositions," is not only absurd, but conflicts with standards for settlement approval enunciated by this Court and the Second Circuit. *See Milliken, supra.,* ECF #152 at 2, citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). ("whether the parties engaged in the necessary discovery to ensure effective representation.").

Even worse, the factual predicate for Defendants' argument is flat-out false. Defendants made no "earlier settlement offers." Defendants put zero dollars on the table at the 2018 mediation. First excess carrier Hartford canceled the next scheduled mediation in February 2019 on less than one-days' notice. Only after the Court rejected Defendants' request for permission to file a summary judgment motion at the March 1, 2019 status conference did Defendants agree to resume mediation on April 30, 2109. If Defendants want to proceed with  this argument at the Final Approval Hearing, Plaintiffs would be pleased to disclose the amount of the first and last offer Defendants put on the table at the April 30, 2109 mediation (Defendants have refused our request to make this disclosure). What we can say is neither was "early" nor "reasonable," and the substantial incremental gains from the additional six months of continued prosecution

by Class Counsel and shuttle diplomacy by the Mediator to get the case settled at $26.85

million, for practical purposes, will pay virtually the entire requested fee. Schwartz FA

Decl., ¶9. If Defendants and their insurers truly believed that Plaintiffs could not prove

their case, they would have proceeded to trial and only paid a few million in additional

defense counsel's fees. Plaintiffs had confidence in their trial prospects, and therefore

held out until they got their number. And if Defendants wanted an early settlement,

they should have put at least a $26.85 million offer on the table before burning $9

million in defense costs. They did not. Not even close.

Similarly, while Plaintiffs did not win removal of any Trustees as alleged in the

complaint, they patiently and zealously negotiated the Governance Provisions, which

Class Counsel and their experts believe are more valuable than removing one or two

Trustees, despite the risk that presented to the cash portion of the Settlement.

### B.    Defendants' Merits Arguments Fare No Better Here Than They Would Have At Trial

Defendants cherry-pick snippets from their expert reports to argue that their

decisions to push the risk envelope to chase unprecedented rates of return and invest an

unprecedented percentage of assets to EMEs and private equity were prudent. In

defending their actions, they distort the advice provided by Meketa and the OCIO

candidates. *See* Defs.' Obj. at 13-24. Defendants make these arguments under the guise

of objecting to Class Counsel's fee request.[25] In fact, the true purpose is to wage a PR campaign with Plan participants to support the political interests of the Trustees.

The simple answer to Defendants' arguments is transparency – something that Plaintiffs, Class Counsel and Plan participants have advocated for, and Defendants have opposed, throughout this process. The expert materials and depositions posted on the Settlement Website provide compelling evidence debunking Defendants' merits-based arguments. The discussions above address defense experts Borzi and Carron.

Defendants also tout the *investment* and *fiduciary process* opinion by their *actuarial* expert Franklin, even though, as an actuary he has no expertise to make such opinions. *See* Pitts Report at ¶15. Franklin made the absurd opinion that given the Plan's looming insolvency, it was better for the Trustees to chase losses like drunken gamblers, because it was better to try (and fail) to "win ugly" than "lose elegantly." Franklin report at 19-20. Class Counsel debunked that theory at the July 12, 2019 Court conference (ECF 122 at 27-31) as did Plaintiffs' actuarial expert Mr. Pitts at 18-19 of his report and the *Ad Hoc* Objectors at 4-5 & n. 5. Franklin also goes far beyond his area of expertise in opining: "Based on my review of the relevant documents and meeting minutes indicates that the AFM-EPF's Board of Trustees' process was second to none." Report at 27. That Defendants had to have their actuarial expert stretch to say things like that highlights the weakness of their defense and the inability of their experts to identify a single other pension plan with a risk profile or asset allocation anything like the one adopted by the

---

[25] Not only are these merits arguments largely irrelevant regarding fees, if they were true, and Plaintiffs had no case, then these arguments would support a higher fee for negotiating such a favorable settlement from a weak hand.

Trustees. Indeed, Defendants did not have any *investments* expert, presumably because they couldn't find one willing to endorse their irrational asset allocations.

In any event, perhaps the leading actuary, Mercer, told the Trustees in 2010 that trying to solve the Plan's solvency shortfall by taking a "more aggressive investment approach" was a "highly risky roll of the dice." Despite that warning, Defendants rolled the dice in 2010 and lost, doubled down and rolled the dice and lost again in 2011, and tripled down and lost again in 2015. Defendants have the same answer to Mercer's prescient advice as with all the other devastating documents uncovered by Class Counsel. They claim they don't mean what they say. Defs. Obj. at 17-18. Defendants similarly criticized Class Counsel for making what they believe was an "outlandish" statement in their complaint that the Trustees "doubled down" like acted like "drunken sailors" in making a continuing series of excessively-risky investment bets. *Id*. at 1. Class Counsel had not seen the Mercer warning when they filed the complaint, but Class Counsel's gambling analogy and Mercer's gambling analogy each hit the mark.

### C.    Defendants' Fee Arguments Conflict With ERISA Fee Jurisprudence

Other than Martin Stoner, no class member filed an objection to Class Counsel's fee request.[26] Nonetheless, Defendants  challenge the requested fees.

Defendants accuse Class Counsel of paying "lip service" to the *Goldberger* standard. Br. at 6. But Defendants ignore the very standard they cite. Virtually all of the recent ERISA pension plan cases award 33% of the recovery for counsel fees. Fee Brief at

---

[26] Class member Chris Deschene initially challenged the fee request (ECF #180 at 4) but withdrew it as part of the *Ad Hoc* Coalition Objection. ECF #186  at 1 n. 1.

6-7. Citing those cases is not "cherry picking;" it is considering similar cases of similar complexity and risk.[27] Class Counsel here faced more risk because, unlike most of the ERISA 403(b)/401K fee cases, where members of the class action bar have competed to lead those cases since they have a proven track record of success, none of the other leading class action firms decided to take this case despite being solicited by Plaintiffs and many of the objecting class members. That legal market evidence underscores the risk faced by Class Counsel here.

Defendants' argument that Class Counsel here should get a lower percentage because they got a higher monetary settlement than in other ERISA cases supports a higher, not lower, percentage fee. Critically, Class Counsel obtained a higher percentage of collectible damages here than in the other ERISA pension cases awarding a 33% fee.

Moreover, the lodestar crosscheck supports the one-third fee. There will be virtually no multiplier here, and at the end of the day there may be a negative multiplier. Moreover, Class Counsel here had a tight, 5-person team accounting for 95% of their lodestar. The teams in many of the other cases we more diffuse, with larger teams and more firms serving as co-leads. If anything, our lodestar represents a more

---

[27] Defendants cannot find recent relevant cases so they cite old, irrelevant cases. They cite *Figs v. Wells Fargo & Co.*, No. 08-cv-04546 (D. Minn. 2011), ECF Nos. 264, 265, 295 (awarding fee of 25% from a $17.5 million settlement fund). Without providing reasoning it is 2-page order, the court in *Figs* awarded a 25% fee, which represented a 1.3 multiplier, more than the requested multiplier here. Plaintiffs recovered less than 20% of damages there and only took 14 depositions, each less than here. In *In re Healthsouth Corp. ERISA Litig.*, No. 03-cv-1700 (N.D. Ala.), the court awarded the full requested 25% fee, which represented a 2.15 multiplier for a lightly-litigated case with no depositions. Their citation to the Fitzpatrick survey is irrelevant because it only lists the average percentage award based on the dollar recovery without any other context including complexity, percentage recovery of damages,  or lodestar multiplier.

efficient lodestar. Finally, defense counsel billed a higher lodestar than Class Counsel even though we had to piece together the claims and the documents from scratch and took virtually all of the depositions. Defense counsel had the head start of decades-long experience as Plan counsel and the benefit of Defendants explaining their documents. Unless defense counsel believe they were inefficient or inflated their bills, their lodestar arguments are the proverbial pot calling the kettle black.

Since Class Counsel litigated this case almost to the eve of trial, the summary lodestar chart filed with our Fee Motion (ECF #168-1) in conjunction with the additional information provided about the work we performed (ECF #168, ¶¶5-7 and ECF #139, ¶¶ 34-4244-50) met the standards for crosscheck purposes. *See Kornell v. Haverhill Ret. Sys.*, 790 F. App'x 296, 298-99 (2d Cir. 2019)(rejecting defendant's argument that court erred by relying on total hours instead of a breakdown of hours by time and task, and holding that where the lodestar acts as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized); *Bryant v. Potbelly Sandwich Works*, LLC, No. 1:17-cv-07638 (CM) (HBP), 2020 U.S. Dist. LEXIS 21900, at *19 (S.D.N.Y. Feb. 4, 2020)(where lodestar acts as a cross-check, it need not be exhaustively scrutinized, and courts in the Second Circuit regularly award lodestar multipliers from two to eight times lodestar and in some cases even higher); *In re Tremont Sec. Law*, 2019 U.S. Dist. LEXIS 21910, at *40 (S.D.N.Y. Feb. 11, 2019)(same).

Nonetheless, per the Court's instructions, we filed additional information breaking down the time spent by 14 separate categories. ECF #190. That information confirms that even if the Court awards the requested one-third fee, there  will be little if

any multiplier. In their most recent submission (ECF # 193) Defendants state they do not contest the amount of time spent on the various tasks but reiterate their objections raised at ECF #190.

Defendants' arguments about two alleged examples of "excessive hours spent on fruitless activities" which they falsely claim, without evidence, was part of a "politically motivated [] witch hunt," are wrong. Br. at 30-31 (discovery regarding spoliation and inappropriate romantic relationships). In every class case, we take discovery regarding document preservation and potential spoliation, as part of our basic fiduciary duty of vigorous representation. Schwartz FA Decl., ¶10. In this case, during the course of our investigation, we received specific information alleging that defendant Gagliardi destroyed emails. *Id.*, ¶11. So we took a short deposition of an IT designee of Local 802 discovery on that issue, plus the issue of Proskauer's procedures for document preservation and collection. The time spent was immaterial, and included no extra travel, as it was the day after the Brockmeyer and Gagliardi depositions. *Id.* While that spoliation due diligence did not produce admissible evidence regarding spoliation, it did lead to information that answered our questions about another allegation of Trustee misconduct.

Objector Martin Stoner argues that Class Counsel should have spent more time and money, including hiring private investigators, on the issue. ECF # 183 at 9-10. Defendants argue we spent too much time on the issue. Br. at 31. Neither are right.

In every breach of fiduciary duty case, we take discovery regarding potential conflicts between fiduciaries and their advisors. Schwartz FA Decl., ¶10. During our

investigation, we learned of allegations (that had been widely circulated amongst various Plan participants) that Trustee Hair was having a romantic relationship with an unidentified lawyer at former AFM Pension Plan counsel Bredhoff & Kaiser. *Id.*, ¶11. That was a serious charge because, if true, it would undermine the Trustees' reasonable reliance on their advisors. The relevance was amplified because Hair abruptly fired the Bredhoff firm under suspicious circumstances, in clear violation of the Plan's governing terms and over the intense opposition of several other union Trustees. *See* Hair Deposition at 111-114; 118-129; 217-222; 248-255; 321-323; 328. Accordingly, we properly asked a few questions, which took an immaterial amount of time, at depositions regarding potential conflicts. That questioning revealed that Hair fired Bredhoff because he thought the union Trustees need a stronger counterweight to Proskauer and concerns about Rory Albert (*e.g.*, "…I thought that Rory ought to just shut up."). Hair Deposition at 116-117. It also revealed pre-existing attorney-client relationships between Proskauer and some Plan advisors including Meketa.

While it turns out that Class Counsel did not uncover evidence backing up the rumors of a romantic relationship between Hair and *Pension Plan* counsel, our investigation of the spoliation issue led us to a well-placed source who told us that Trustee Hair and Gagliardi were having romantic relationships with lawyers representing the AFM union (one outside counsel; one in-house) who allegedly were hired and/or promoted to positions and/or given salaries inconsistent with their qualifications and experience. Schwartz FA Decl., ¶11. While those allegations, if true, would not have been as directly relevant in evaluating Hair and Gagliardi's fiduciary

42

duties owed to pension Plan participants and their reliance on Plan advisors defense, they may have been relevant at trial with respect to evaluating how they treat their fiduciary duties generally. *Id*.

Regardless, taking discovery on the issue was consistent with our duty of zealous advocacy and the time we spent on this issue was immaterial.

### D.    Class Counsel Properly Documented Their Expenses

No class member challenges Class Counsel's request for reimbursement of expenses. Per the Court's request, Class Counsel recently provided additional information about the cost for each trip, amounts paid to each expert, and copying costs. ECF # 190. After reviewing that information, Defendants withdrew their prior objection regarding expenses. *See* ECF # 193.

## IV.    THE COURT SHOULD APPROVE THE SERVICE AWARDS

No class member objected to the proposed service awards for Plaintiffs Snitzer and Livant. Courts make such awards, usually much higher than $10,000, in most ERISA settlements, and Defendants fail to cite a single case refusing to make such an award. Any award approved by the Court will not cost the Plan a single penny; rather, it will reduce the amount of attorneys' fees otherwise awarded by a corresponding amount. Defendants nonetheless vindictively oppose the service awards solely because Snitzer and Livant have committed to donating those awards to an organization or organizations fighting to protect AFM Plan participants' pension rights. Defendants bizarrely characterize that selfless act as an improper "collateral objective" inconsistent with the purposes of service awards. But a service award is designed to provide

43

compensation for a class representative's "service" to the class. If anything, that Messrs. Snitzer and Livant want to continue providing a service to the class, instead of simply spending any service award on personal consumption, supports approving the requested award. To our knowledge, no court has ever told a class representative how to spend their service award, and no reason exists for this Court should to become the first.[28]

Moreover, Messrs. Snitzer and Livant have spent more hours on this case (including sophisticated pre-suit damages analyses) than almost any other class representative (except institutional investor plaintiffs) in any of the cases prosecuted by undersigned counsel, who collectively have more than 60 years of class experience, and many multiples more than the time spent by the plaintiffs in *Melito v. Am. Eagle Outfitters*. ECF 167 at 28-29; Schwartz FA Decl., ¶ 12.

## V.   THE COURT SHOULD APPROVE THE RELEASE IN FAVOR OF THE CLASS REPRESENTATIVES

No class member raised any objection about the proposed narrow release of claims class members might have against Messrs. Snitzer and Livant for their role in the

---

[28] Defendants label the notion that Messrs. Snitzer and Livant risked retaliation for bringing this lawsuit as "offensive" and "unsubstantiated." Br. at 32 n. 18.  In fact, no responsible plaintiff lawyer would ever fail to advise a prospective class plaintiff of such a risk where the defendants have any power over the plaintiff's employment prospects.  Schwartz FA Decl., ¶ 15. Mr. Livant plays guitar for Broadway shows; Mr. Brockmeyer is the Broadway League's full-time trustee employee. Mr. Snitzer largely depends on others to hire him to play saxophone gigs. Union President Hair has deep tentacles in the union music world and has been accused of sharp tactics. *See, e.g., Trudell v. Hair et al.*, No. 2:19-10249 (S.D. Mich. ), ECF # 1 at ¶44 (accusing Hair of "extortion, coercion, bullying, intimidation and threats"). The heated emotions of this case are apparent to all. The risk to Snitzer and Livant, whether materialized or not, was real and a proper consideration under governing law.

initiation, prosecution and settlement of this action. Nor do Defendants object. The absence of class member objections is particularly significant, not just because they are the ones providing the release, but also since they have apparently given great thought and not hesitated to advise the Court who they might sue in the future. Given the circumstances, including the blunderbuss of baseless charges of criminal and ethical violations that have thrown about in connection with the settlement approval process, providing the requested release is more appropriate than those approved in more routine ERISA settlements.[29]

## VI.    CONCLUSION

This settlement approval process has engendered a multi-dimensional wide-ranging discussion regarding a troubled pension Plan and musicians genuinely concerned about their pensions. But the undisputed facts and governing standards under Rule 23 dictate approval. This was a risky, highly-contested case, litigated by skilled lawyers on both sides, that was settled via hard negotiations before an experienced mediator, resulting in a Settlement that provides substantial cash relief plus a comprehensive set of injunctive relief that compares favorably to injunctive relief in other recent ERISA pension class settlements. The one-third fee request is the same as approved in most of the recent ERISA settlements and will result in a minuscule, if any, multiplier. The Court should approve the Settlement, fees, Service Awards, and releases to the Class Representatives.

---

[29]  In response to the Court's concerns, the parties have removed the release in favor of Class Counsel in the proposed Final Approval Order filed concurrently herewith.

Dated:  August 12, 2020

Respectfully submitted,

By:  _/s/ Steven A. Schwartz_
CHIMICLES SCHWARTZ KRINER
 & DONALDSON-SMITH LLP
Steven A. Schwartz
Mark B. DeSanto
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

By: _/s/Robert J. Kriner, Jr._
CHIMICLES SCHWARTZ KRINER
 & DONALDSON-SMITH LLP
2711 Centerville Road, Suite 201
Wilmington, DE 19808

*Counsel for Plaintiffs Andy Snitzer*
*and Paul Livant and the Class*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 12, 2020, a true and correct copy of Plaintiffs'
Memorandum of Law in Support of Plaintiffs' Motion for Final Approval and in
Response to Objections was served by CM/ECF to the parties registered to the Court's
CM/ECF system and will be posted on the Settlement Website.


Dated: August 12, 2020                                  */s/ Steven A. Schwartz*
                                                         Steven A. Schwartz

1