UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED:__08/24/2020__            │
└─────────────────────────────────────┘
```

ANDREW SNITZER and PAUL LIVANT, individually
and as representatives of a class of similarly situated
persons, on behalf of the American Federation of
Musicians and Employers' Pension Plan,

Plaintiffs,

v.

THE BOARD OF TRUSTEES OF THE AMERICAN
FEDERATION OF MUSICIANS AND EMPLOYERS'
PENSION FUND, THE INVESTMENT COMMITTEE
OF THE BOARD OF TRUSTEES OF THE
AMERICAN FEDERATION OF MUSICIANS AND
EMPLOYERS' PENSION FUND, RAYMOND M.
HAIR, JR., AUGUSTINO GAGLIARDI, GARY
MATTS, WILLIAM MORIARITY, BRIAN F. ROOD,
LAURA ROSS, VINCE TROMBETTA, PHILLIP E.
YAO, CHRISTOPHER J.G. BROCKMEYER,
MICHAEL DEMARTINI, ELLIOT H. GREENE,
ROBERT W. JOHNSON, ALAN H. RAPHAEL,
JEFFREY RUTHIZER, BILL THOMAS, JOANN
KESSLER, MARION PRESTON,

Defendants.

No. 1:17-cv-5361 (VEC)

**ORDER**

VALERIE CAPRONI, United States District Judge:

WHEREAS a fairness hearing via Skype and teleconference is currently scheduled for

August 26, 2020, at 10:00 A.M.;

WHEREAS the Court gave individual objectors who previously expressed an interest in

attending the fairness hearing an opportunity to request to be heard via video;

WHEREAS the only objectors who have requested to be heard in response to the Court's

inquiry are Anne Bryant, Frank Hosticka, and Martin Stoner;

WHEREAS Daniel Walfish, counsel for a group of objectors, will also be heard via

video; and

WHEREAS Mr. Walfish and Mr. Stoner have each submitted additional objection papers after the objection deadline;

IT IS HEREBY ORDERED that the *pro se* objectors—Ms. Bryant, Mr. Hosticka, and Mr. Stoner—shall each have **five minutes** to address the Court.  The Court notes for the record that chambers has emailed instructions for appearing via video to Ms. Bryant, Mr. Hosticka, Mr. Stoner, and all counsel.

IT IS FURTHER ORDERED that Mr. Walfish's and Mr. Stoner's additional submissions (attached) are filed on ECF for purposes of maintaining an accurate record.  Because they were submitted beyond the objection deadline, Class Counsel need not respond in writing.  Because Mr. Walfish and Mr. Stoner are each appearing at the hearing, they may raise any relevant issues they wish orally, and Class Counsel should be prepared to address them.

IT IS FURTHER ORDERED that Class Counsel make this Order available on the settlement website no later than the close of business today, **August 24, 2020**.


**SO ORDERED.**

Date:  **August 24, 2020**                                    **VALERIE CAPRONI**
          **New York, New York**                          **United States District Judge**

MARTIN STONER
900 West End Avenue
New York, New York 10025
(212) 866-5447

August 17, 2020

The Honorable Valerie E. Caproni, U.S. D. C. J.
Southern District of New York
40 Foley Square
New York, New York 10007
Email: CaproniNYSDChambers@nysd.uscourts.gov

Re: *Snitzer and Livant v. The Board of Trustees of the American Federation of Musicians and Employers' Pension Fund, et al.,* 17-cv-5361 (VEC)

Dear Judge Caproni:

Please accept this supplemental submission in response to recent disclosures of 42 (forty-two) pages of the deposition of Trustee William Moriarity, the disclosures in Class Counsel's Declaration dated August 12, 2020 including claims by Mr. Schwartz about "potential spoliation of electronic documents by Mr. Gagliardi", and Class Counsel's separate disclosure of Milliman documents and deposition testimony also on August 12, 2020 in Dkt. # 199.

As previously requested in my objections, I respectfully request that this letter be added as a supplement to my prior objections due to the fact that these disclosures occurred after the end of the objection period and to which I was not given a chance to respond.

In Steven Schwartz' letter to the Court dated August 12, 2020, Paragraph 1, Mr. Schwartz reveals for the first time, that

Hon. Valerie Caproni
Page 2
August 17, 2020

"Milliman served as the AFM-EPF Plan actuary and is getting a
release as part of the proposed class settlement." I argue that the
fact that this release was not revealed in either the settlement
notice or the settlement itself makes the settlement notice
inadequate and brings up the question of what other releases and
side agreements have also not been disclosed by the parties?
This Court should order the parties to disclose all releases and
other private "arrangements" made by the parties that are not
disclosed in the settlement notice or settlement agreement itself.

The Schwartz disclosures also clearly demonstrate that Milliman
participated in the Trustees' documented breaches of fiduciary
duty, in violation of ERISA. Deposition of Mr. Behar pg. 148,
"Honest sounds like we have been hiding the ball, which we have,
but we don't need to point that out." The proposed settlement
therefore lacks any redress or remedy for Milliman's imprudent
conduct such as the equitable remedies available under EREISA.
*See*, i.e., *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). *See also*
*Frommert v. Corkright*, 17-cv-114 (2d Cir. 2019).

In any event, the proposed settlement is not adequate because it
does not address class concerns that Milliman is a bad actor here,
and the proposed settlement leaves Milliman in place as Plan
Actuary instead of removing Milliman completely from
employment by the Plan. Milliman's recent contributions to the
Plan's MPRA application to Treasury were cited as the reason for
the rejection of the Plan's application. Another Milliman error!

Hon. Valerie Caproni
Page 3
August 17, 2020

Why is it in the best interests of the class that some individuals closely tied to the Trustees are being given a free pass in this settlement so that they have no liability and assume no consequences for their conduct? Why should the class give up the right to further restitution from other Defendants and leave them in place as a reward? That is not in the best interests of the class which make the proposed settlement unfair, unreasonable, and in adequate.

The new evidence also provided recently by Mr. Schwartz included the revelations that Trustee Tino Gagliardi allegedly destroyed his emails in an effort to avoid producing them in this litigation, and that Trustee William Moriarity additionally misrepresented the Plan's financial condition to Plan Participants. These disclosures make it mandatory that the settlement must not only include the removal of Trustees Raymond Hair and Christopher Brockmeyer, but also William Moriarity, and Tino Gagliardi, All of them must be removed from serving as a Trustee or in any fiduciary capacity in the future.

ERISA specifically prescribes the removal of Trustees as a remedy for fiduciary violations of ERISA and yet this is the one remedy that the proposed settlement completely omits. This is what ERISA says:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to

Hon. Valerie Caproni
Page 4
August 17, 2020

> restore to such plan any profits of such fiduciary which have
> been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief
> as the court may deem appropriate, including removal of
> such fiduciary.

The Second Circuit has held repeatedly that:

> "removal of pension fund trustees and the appointment of a
> person to serve in their stead is appropriate under the statute
> when they have engaged in `repeated or substantial
> violation[s] of [ their] responsibilities.'" *Katsaros,* 744 F.2d at
> 281 (quoting *Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir.
> 1978)).

Finally, injunctive relief is appropriate where the trustees' conduct
has violated the prudence standards of Section 404, even if no
losses have been established.

> In determining the appropriate injunctive relief, it is
> irrelevant that the honest but imprudent actions of the trustees
> resulted in no loss to the fund. Honest but imprudent trustees
> can dissipate the assets of a fund with speed comparable to
> dishonest trustees. In either case, imprudent trustees
> undermine the purpose of ERISA which is to insure that the
> assets of a fund will be there when the beneficiaries need
> them. *Brock v. Robbins,* 830 F.2d 640, 647 (7th Cir.1987).
> As cited in *Liss v. Smith*, 95-cv- 1256 (S.D. N.Y. 1995).

Hon. Valerie Caproni
Page 5
August 17, 2020

Additionally, the Supreme Court in *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) has specifically held that equitable claims against non-fiduciaries *may* be available. "Professional service providers such as [attorneys] . . . (*assuming nonfiduciaries can be sued under § 502(a)(3)*) may be enjoined from participating in a fiduciary's breaches, compelled to make restitution, and subjected to other equitable decrees." *Id*. at 262 (emphasis added).

The proposed releases therefore are overly broad as they would limit the class' ability to file a claim against non-fiduciaries including possibly Defendant's attorneys, Milliman, and Meketa, due to their participation in the Trustees' breach of fiduciary duty as alleged in the amended complaint. Since the releases are overly broad and no Trustees are going to be removed as required under ERISA, the proposed settlement must be rejected as unfair and inadequate.

Contrary to the argument of the Defendant, the imprudent conduct of the Trustees has not stopped with the appointment of a new OCIO, i.e., Cambridge Associates. The allocation of plan assets according to the 2018 IRS Form 5500 clearly shows the Fund is still currently 80% invested in extremely risky and illiquid investments. Thus the Trustees' investment policy has not changed since Cambridge has come onboard, so that the pre-2017 conduct and the post-2017 conduct are the same, contrary to Mr. Rumeld's argument.

Moreover, Cambridge Associates, like Meketa, and other service providers of the Plan is itself conflicted. According to Chris Brockmeyer in his deposition at pages 368-360:

Hon. Valerie Caproni
Page 6
August 17, 2020

> Q. Is Meketa a client of the Proskauer firm?
> A. CHRISTOPHER BROCKMEYER: I believe they have
> done work for the Proskauer firm.

So first we have the former OCIO Monitor Meketa that had a
conflict of interest due to its association with Proskauer. Now we
have in the Rory Albert deposition on page 358-359:

> Rory Albert: I understand Cambridge to
> be a client of the firm [Proskauer].

So now we have the current OCIO Cambridge also with a conflict
of interest as well. Then, Gallagher, the firm chosen by the
Trustees to help evaluate and select the new OCIO is also
conflicted due to its business ties to Proskauer.

At page 369:
> Q. Is Gallagher a client of Proskauer?
> A. CHRIS BROCKMEYER: I believe the answer is yes.

Thus, this settlement must be rejected because all the parties
associated with the American Federation of Musicians and
Employers Pension Plan are conflicted!

Finally, the imprudent conduct of the Trustees, their agents and
assigns, has been going on for too long (please see Exhibit 1, an
unanswered letter from July 2010 to the Plan Trustees from
putative class member, Bruce Babcock, detailing improper conduct
dating back to 2008). The parties are wrong that Andrew Irving
can correct all these longstanding problems in the space of only 4-
5 years, especially since he lacks any voting authority (please see

Hon. Valerie Caproni
Page 7
August 17, 2020

Exhibit 2, an email from my expert, Terence Deneen, which
refutes the parties' claim that the Governance provisions are
adequate).

No, the Plan needs a fresh start. The two retiring Trustees should
be replaced with financially knowledgeable and competent
Trustees. The Plan itself should be reformed ("Plan Reformation"
as per *Amara*) to increase oversight and limit the potential for
imprudent conduct in the future.  And all of Defendant's attorneys,
plus Milliman, Meketa, and Cambridge should be removed as Plan
providers.

> Attorneys may be viewed as exercising discretionary
> authority or control within the meaning of Section 3(14) of
> ERISA even when acting in an advisory capacity. According
> to the legislative history of the statute:

> While the ordinary functions of consultants and advisers to
> employee  benefit plans ... may not be considered as
> fiduciary functions, it must  be recognized that there will be
> situations where such consultants and advisers may because
> of their special expertise, in effect, be exercising
> discretionary authority or control with respect to the
> management or administration of such plan or some authority
> or control regarding its assets. In such cases, they are to be
> regarded as having assumed fiduciary obligations within the
> meaning of the applicable definition. *Mason Tenders Dist.*
> *Council Pension Fund v. Messera,* F. Supp. 869 , 881-82
> (S.D.N.Y. 1997) (*Messera*) (attorney "involved in most or all
> aspects of the decision-making process" may be fiduciary);

Hon. Valerie Caproni
Page 8
August 17, 2020

For all the reasons above, the proposed settlement must be rejected. It would be an abuse of discretion and arbitrary and capricious if the Court approved the proposed settlement.

Thank you very much, Your Honor, for your consideration.

Sincerely,

Martin Stoner

Martin Stoner

Copies to attorneys
Enclosures

EXHIBIT I

July 19, 2010

Maureen Kilkelly
AFM-EPF

Dear Ms. Kilkelly;

I am a member of Professional Musicians Local 47 and attended the meeting held there May 25, 2010 to hear a report from Fund representatives about the current status of our pension, or, in other words, our financial future.

We were given lots of information about our endangered status and our "Rehabilitation Plan" but very little information or explanation as to exactly which actions taken by the Fund contributed to our current "red zone" status. It was disappointing to see that only one Fund trustee, Phil Yao, who lives in Los Angeles, bothered to attend.

In particular, where was AFM President and EPF Trustee Tom Lee? We have already seen our pension multiplier reduced twice in the past few years while Mr. Lee increased the number of Fund trustees. Isn't a "red zone" alert enough of a reason to address the members of the AFM's largest local, and biggest contributor?

That night I asked a lot of questions which went unanswered. I was told that I "can always write to the Fund with any questions." So I am.

Yes, there was a "market downturn" and a "financial crisis," and yes, these things happen. But the implication at the meeting was that the actions of the Trustees and the Fund had nothing to do with contributing to the losses suffered. It was a bit like listening to representatives from BP - something bad happened but none of it was our fault. Every one of us who attended, and in fact everyone who is not yet receiving their pension, has taken a long-term financial hit. Has anyone at the Fund been held accountable in any way? Has anyone at the Fund taken a pay cut? Have the trustees held anyone accountable in any way?

How about the eighteen entities listed as "investment manager" in the 2008 Annual Report, to whom we paid millions of dollars in fees? Our corporate stock assets went down from $847,792,208 to $488,964,605, more than 42%. A casual glance at the report shows that 28 of these stocks declined more than 50%, with some approaching 70%. Thirteen different bonds or securities declined in value by similar amounts. That's more than a "downturn." Those are bad choices. Were any of these "managers" terminated? If not, why not? Did any receive bonuses? What percentage of Fund assets was invested in derivatives? What percentage of the Fund's losses were due to derivatives?

A portfolio of three to five Vanguard mutual funs would have fared far better  than the Fund did during the same period. If the Fund owns any mutual funds at all, it wasn't immediately apparent to me from the report.

Typically, investors receive a quarterly report showing how their fund did in comparison to well-known indices in its category. We would have liked to know how our Fund stacks up against the SAG, AFTRA, DGA, IATSE and WGA funds, to various corporate plans (Ford, GM) and state employee pension funds. How many other entertainment union pension funds are in "red zone" status? How many of them are paying the huge amount of rent that our Fund pays in New York City?

We would also like to know what the expense ratio of the fund is. With eighteen entities listed as "investment managers" one can only conclude that the ratio is high. The large number of individual stocks also points to a high expense ratio. Can the annual expense ratio of the Fund be determined? If so, what were the ratios for 2006, 2007, and 2008? I am not a CPA so if this information is in the reports, please forgive my ignorance.

As an individual, I would never employ the strategies or invest in the choices apparently made by the Fund. One would think that the Fund, responsible for the retirement income of thousands of individuals, would be more prudent and risk-adverse than I am. I'm 59, with 32 years in the business. I have six years to wait, and hope that things at the Fund turn around. We have all worked too hard for too long to see our retirement income put at risk. It doesn't seem like too much to ask to know what the eighteen different "investment managers" plan to do differently from here on out.

Sincerely,


Bruce Babcock

EXHIBIT II

Re: Questions re: AFM Pension

From: Terrence Deneen (terrydeneen@icloud.com)

To: jilmar_10025@yahoo.com

Cc: trance1147@aol.com; dennis@dennisdreith.com; jasonarosen@gmail.com; chcertan@yahoo.com; johnjmoses@aol.com; belindawhitney@msn.com; paykincello@gmail.com; gpflynn@yahoo.com; adam.krauthamer@gmail.com; cenovia4@gmail.com; KFerguson@pensionrights.org; KFriedman@pensionrights.org; nps32@drexel.edu; ronwass@me.com; trivmyliz@gmail.com; steve@stevenathanmusic.com

Date: Wednesday, July 8, 2020, 2:08 PM EDT

Dear Martin: I have read the letter from Class Counsel, and I have some firm suggestions about your response. Your goal must be the appointment of an effective third party monitor who will prevent the meatheads from causing more damage. The monitor set up in the settlement is inadequate for several reasons:
1. The 4-5 year period is too short; the Plan will take decades to recover, if at all, from the combination of factors that destroyed the Plans viability. In other cases the CSPF, monitors have served for decades, as did the neutral trustee of the UMW Plans, Dean Paul Dean of GeorgetownLaw, who was appointed by Judge Gerhard Gesellschaft.
2. The monitor's mission statement is FAR too narrow. He is only involved in matters dealing with investments. The guy they nominated is good on investment procedures but cruddy investments are only part of the problem. Your monitor needs authority over all functions: you want your guy to be at every meeting and seeing every piece of paper. 2. The monitor needs expert assistance on actuarial issues. To do that he needs to control money to consult a third party actuary. Suggest that some of the $27M recovery be reserved to pay for this. This is essential b/c (1) your actuary has a long history of doing the trustees bidding and skewing his assumptions to keep required contributions s low—too low for safety and (2)your Plan, like many others, has a problematic accrual structure that needs to be revisited.

I recommend that you start your response on an irenical note. Say upfront that the lawyers have written several pages to defend themselves against criticism that you are not making. You agree that this was a hard case, you agree that they did a good job, and they invested millions of dollars in the case. You are not attacking their professionalism. But, while their firm has great expertise in investment related fiduciary breach, they aren't known for setting up post judgement watchdog functions—few private sector firms do. This Plan has unusual problems that require a tailor made oversight function.

Addimenta: monitor should file quarterly reports with court and post them on Plan website.

Expedited financial disclosure: no later than 45 days after close of fiscal year the Plan shall post;

Contributions made to plan;
Benefit payments made out of plan;
Administration expenses;
Investment income
Asset levels at beginning of year and year end.

Please forgive the curt tone: I am in the hospital emergency room with lots of needles stuck in me and typing is difficult. My very best wishes. Terry

Sent from my iPhone

On Jul 7, 2020, at 9:00 PM, martin stoner <jilmar_10025@yahoo.com> wrote:

Dear Mr. Deneen,

Once again we are all very grateful to you for your time spent helping us develope a concise and reasonable objection to the AFM Pension settlement. I now wanted to ask if you would be so kind as to give us some additional suggestions/points for additional objections to refute comments made by Class Counsel in a letter today to the Court on a totally different subject re: about the inadvertent release of confidential information by Class Counsel to Martin Stoner.

As part of our representation of the Class, we also continue to work hard not only to make sure that the Court has the    necessary information to evaluate the Settlement, which we and our experts believe is in the best interests of all Plan    participants, but also to make sure we have as complete an understanding as possible regarding the concerns raised by the    few number of objectors regarding the effectiveness of the proposed Governance Provisions so we can best address those    concerns in our response to those objections.

To the contrary, despite all of the concerns raised by class members in 2017 about the Trustees' breaches, and despite all the    distinguished ERISA lawyers with whom many of them consulted, my firm was the only one that stepped up and agreed to    prosecute litigation against the Trustees, and as a result of our diligent efforts, produced a settlement that represents the best    monetary recovery that was achievable and collectible and, in addition, provides Governance Provisions that, as reflected at    pages 2-7 of our Preliminary Approval Brief and pages 8-9, 23, 25-26 of our Fee Motion Brief (ECF #167), that we and our    experts believe are better and will be much more effective than the best injunctive relief the Court would have awarded, if    any, at trial and more stringent than governance provisions negotiated by other distinguished counsel in other ERISA    pension plan class settlements.

It is clear from these comments that Class Counsel intends to argue 1) that only a few objections were received (over 40 according to the docket sheet today), and 2. that the Governance provisions are adequate. We can address the criticism of too few objections by getting more. But can you help us to pinpoint the weaknesses in the Governance Provisions aside from the fact that the Trustees e3mail to AFM Participants dated March 30, 2020 stated that despite the settlement the trustees would continue to pursue the same investment policies as before and that they were "confident" that the Neutral Fiduciary would agree with and support their investment policy.
Also, who pays the Neutral Fiduciary. If it is the Trustees or the Plan that are paying then how can his evaluation of the settlement be truly independent and neutral?

Thanks so much for your time and your consideration.



DANIEL R. WALFISH   dwalfish@walfishfissell.com   +1.212.672.0521
405 Lexington Avenue, 8th Floor   New York, NY 10174   www.walfishfissell.com

August 19, 2020

**<u>Via email to Chambers</u>**

Hon. Valerie E. Caproni
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re: <u>Snitzer et al. v. Board of Trustees of AFM-EPF, et al.</u>, No. 17 Civ. 5361 (VEC)

Dear Judge Caproni:

We represent the Ad Hoc Coalition ("<u>Coalition</u>") of 68 class members opposed to the set-tlement in the above-referenced matter. We respectfully submit this letter principally to explain that the Parties' submissions in response to our Objection, including the revised Release,[1] did not go far enough, and that the latest revelations only underscore the inadequacy of the proposed set-tlement.[2] Objectors – all musicians (or their beneficiaries) who have been directly and materially harmed by the Trustee's deceptive and imprudent behavior[3] – firmly believe that this is a case in which the settlement is unfair, inadequate, and unreasonable. We urge the Court to reject it.

**<u>The Release Is Still Too Broad</u>**

The parties have responded to the Objection's argument that the release language was far broader than Class Counsel had stated to the Court (Objection 21-22) with a proposed final order modifying the Release. DE 197-3 at 10-11; DE 195-1 ¶ 13; DE 196 at 10-12. The proposal is still insufficient. Under the parties' suggestion, there would appear to be two types of claims covered by the Release: those in certain enumerated subject-matter categories labeled (i) through (iv), for which the Release is date-limited at September 30, 2017 (we call these the "bucket A" claims); and all other claims, which have no express date limitation and thus are arguably barred for all time, regardless of when they arise ("bucket B").[4] DE 195-1 ¶ 13.

---

[1] Undefined capitalized terms have the meanings assigned in the Objection of Ad Hoc Coalition Opposed to the Class Action Settlement [DE 186 at 3-220] ("<u>Objection</u>"), which we cite using its internal page numbers, as opposed to the ECF headers, which we use for all other filings, unless otherwise indicated.

[2] We do not here revisit every issue raised in our Objection, many of which Class Counsel ignored or caricatured, and instead respectfully refer the Court to the Objection for a more comprehensive accounting of the settlement's failings.

[3] Class Counsel claims that "many of these very same objectors decided against bringing this very lawsuit in 2017." DE 196 at 13. This is not true. Of 68 Coalition members, we are aware of exactly one who considered becoming a named plaintiff but decided that his/her personal circumstances were such that he/she could not afford the associated career risks. We are aware of zero Objectors who disagreed with the decision to file this suit.

[4] As our Objection explained (at 22), the Release in a future case likely would be read to bar *at least some claims* arising after September 30, 2017 and on into the future – or else Agreement § 9.3 would make no sense (because it

Hon. Valerie E. Caproni
August 19, 2020
Page 2

Right now bucket A is still too narrow. The overriding theory of imprudence in this case was that the Trustees, separate and apart from any *specific asset allocation*, adopted unduly aggressive *investment return targets* (which in turn drove the selection of asset allocations). *E.g.*, Prelim. Approval Mot. [DE 138] 16; Witz Report ¶ 57. Unbelievably, the enumerated categories in bucket A *appear not to capture this aspect of the case*, raising a very serious risk that a claim that (for example) the Trustees continued to swing for the fences in 2018 or 2020 or 2022, just as was alleged in the Amended Complaint for prior years, is forever extinguished, on pain of contempt.[5] Instead the Court should insist on a *global* date-limitation for the Release of September 30, 2017. (There could be narrow exceptions, for example for the Settlement Fiduciary's role here.[6]) Failing that, the Court should ensure that bucket A is sufficiently broad (and bucket B sufficiently narrow) that class members have recourse to hold the Trustees to account to the extent that the reckless behavior challenged in this case has continued or recurs after September 30, 2017.

## The NIF Needs To Be Given Genuine Authority and a Role in Participant Communications

Last week's submissions, including the new revelations of Trustee mendacity, make it clearer than ever before that the proposed relief is inadequate.

**Class Counsel is wrong that this settlement is superior to recent settlements in other cases.** (DE 196 at 25). The cases that Class Counsel has cited challenge conduct less consequential (mostly 401(k) recordkeeping expenses and investment-menu selection) than running a defined benefit plan into the ground and then lying about it, and anyway a number of the other settlements do have more impactful relief.[7] In addition, Class Counsel incorrectly states that "the most recent

---

[5] imposes a date cut-off at the Settlement Effective Date, which would be unnecessary if the Release was globally limited to pre-October 1, 2017 claims. Both sides and the Settlement Fiduciary (itself a beneficiary of the Agreement's releases, *see* §§ 2.21, 2.22.2) have failed to respond to this point.

[5] The defense has proffered an interpretation of the *original* release language that boils down to the idea that one could never craft an investment-related claim that arises post September 30, 2017 but that relates to the allegations in the Amended Complaint. DE 189 at 3 ("whatever claims were made in the Complaint relating to Trustee investment decisions . . . ended as a result of the [October 1, 2017] retention of the OCIO"). We refer to this as the "DE 189 theory." First, we dispute the premise of the DE 189 theory, as does Class Counsel (*see* DE 196 at 19). But if the DE 189 theory is valid, no one should have any problem with a release that clearly states, as the revised release does not, that *any and all decisions relating to investments* (including the setting of investment-related *objectives*) are fair game if they arise after September 30, 2017. Indeed, the Court should rebuff the parties' suggestion (DE 195-1 ¶ 13) to incorporate the DE 189 theory into the final judgment. The DE 189 theory rests on self-serving, one-sided, untested, and contested assertions about the degree to which the Trustees washed their hands of responsibility when they hired an OCIO. The release language needs to stand on its own, without resort to a defense brief.

[6] It is especially important, given defense counsel's inability to justify their conflicts of interest (*see* footnote 10 below), that the Release not bar claims based on the Trustees' decision from 2017 onward to commit millions of dollars of class members' retirement money (*see* Objection Ex. 5) to pay fees to irredeemably conflicted outside plan counsel who in substance were actually the Trustees' individual attorneys. The Fund and its beneficiaries were entitled to receive *unconflicted legal advice* on such matters as communications concerning the condition of the Fund and the possibility of benefit cuts. The Court should clarify that this type of claim is *not* covered by the Release.

[7] An example is the *Kruger* settlement cited by Class Counsel, which included measures designed to ensure "accurate participant communications" (DE 167 at 17-18; *see also* No. 14-cv-208 (M.D.N.C.), Dkt. 44-1 § 10.11) – as is badly needed here.

Hon. Valerie E. Caproni
August 19, 2020
Page 3

ERISA pension settlement" was *Karpik*, an Ohio case in which the proposed resolution lacks in-junctive relief. DE 196 at 28. In fact, after *Karpik* and before Class Counsel's filing last week, an ERISA pension settlement was submitted in *this* Court, and, even though it involved allegations less serious than those here, the proposed relief includes *an independent fiduciary with decision-making power and an independent consultant with approval rights over plan communications. See Bhatia v. McKinsey & Co.*, No. 19-cv-1466 (GHW) (S.D.N.Y. Aug. 10, 2020) (DE 75-1 at 34).[8] That type of relief is exactly what is needed here.

**The NIF must be a given a vote, or at the very least a meaningful ability to exercise ERISA's watchdog powers.** It remains wholly unexplained *why the NIF is not being given a vote. See* Objection 13. Taft-Hartley, far from foreclosing such relief, expressly contemplates neutral board members with decision-making power.[9] Class Counsel and Mr. Irving instead take comfort in the co-fiduciary liability provisions of ERISA § 405, with Mr. Irving stating that he "will not stand by silently or idly in the event I observe acts or omissions that . . . amount to breaches by other fiduciaries . . . of their fiduciary responsibilities as they relate to investment matters." DE 198 at 2; DE 196 at 20-21. To the extent that the theory here is that Mr. Irving will be a watchdog, ERISA's primary mechanism for fiduciaries to police one another is not ERISA § 405. (Class Counsel abandoned their own § 405 claims in this very case. *See* DE 90 at 43; Am. Compl. ¶¶ 182-89.) It is rather 29 U.S.C. § 1132(a)(2) & (a)(3), which authorize any fiduciary to initiate suit against any other fiduciary to remedy any breach or violation. The NIF here is theoretically au-thorized to bring such a lawsuit in an appropriate circumstance, but has been given no budget or authority to hire counsel for such a suit. (Nor would it necessarily be easy to find a lawyer to take his case on contingency, if Class Counsel's origin story about its own involvement in this case is to be believed.) By contrast, the *regular* Trustees, collectively exercising voting power, have the ability, using Fund assets, to pay for such a suit against any of the Fund's fiduciaries (theoretically even including the NIF if relations became sour enough).

While we do not question Mr. Irving's qualifications or good intentions, the NIF *role* as created here is impotent and falls short of what has been done in other cases involving *less* serious allegations. Our Objection, contra Class Counsel's mischaracterizations (DE 196 at 13, 20), never asked for the Fund to be put into receivership or anything close, just that the NIF have decision-making power like Congress contemplated (and that the Chair roles be re-assigned). At a bare minimum, the settlement should include a discretionary reserve budget for the NIF to vindicate his 29 U.S.C. § 1132(a) rights, since Class Counsel and Mr. Irving state that the NIF will act as a watchdog over the other fiduciaries.

**The NIF also needs to be given express approval rights for minutes**. The assurances from Class Counsel (DE 196 at 21) and even Mr. Irving himself (DE 198 ¶ 5) appear to overlook how the minutes work for this Fund. Minutes of past meetings are approved at subsequent meetings

---

[8] Class Counsel (DE 196 at 27) also flatly misstates key aspects of the settlement terms in *Moreno*. We respectfully refer the Court to our Objection (at 18) or to the *Moreno* settlement itself for its terms.

[9] 29 U.S.C. § 186(c)(5) ("employees and employers [must be] equally represented in the administration of [a Taft-Hartley trust fund], *together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon.*").

Hon. Valerie E. Caproni
August 19, 2020
Page 4

as official board action (*see, e.g.*, Brockmeyer Dep. 146:15-147:5), in other words *by vote of the Trustees*. But the NIF does not have a vote. That is why the Agreement goes out of its way to provide *that the minutes have to include the NIF's potential dissenting views on selection of OCIO monitor and that the NIF has the right to review and comment on those minutes*. DE 139-1 at 85. The fact that these rights had to be uniquely spelled out for *one specific subject* suggests that the NIF does *not* have approval rights regarding board minutes on any other subject. And the reality, as Class Counsel acknowledges (DE 196 at 21-22), is that these Trustees have long "sanitize[ed]," if not outright gamed, their (lawyer-drafted) minutes (*see* Objection 15 n.29). It is not so difficult to imagine the incumbent Trustees using their voting power and the Fund's (conflicted[10]) counsel to prevent official minutes from recording inconvenient views expressed by the NIF. And while Mr. Irving *of course* can express his views to other parties "in writing" *outside* the minutes (DE 198 at 2), such an informal "off-line" communication would be far less accessible to concerned participants seeking plan records than formal minutes would be. Such a communication, in other words, would *not* be a meaningful, as Class Counsel terms it, "litigation trap" (DE 196 at 14).

**It is absolutely essential that the NIF be given a role in participant communications**. Counts I and II of the Amended Complaint, which the Court sustained in full (DE 90 at 43, DE 89), asserted claims based not just on investment-related decisions, but also on *deceptive communications to plan participants about the condition of the Fund*, alleged to breach the duty of *loyalty*. Am. Compl. ¶¶ 143-48, 154, 165(a), 168, 177, 180(a); *see also Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) ("'lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA.'"). As if to reinforce our Objection,[11] last week Class Counsel released additional evidence that the Trustees and their advisors knowingly made misrepresentations to plan members about actuarial projections. In late 2016 – when it was no longer possible for the Trustees to hide the deterioration of the Fund – the Fund's lead actuary repeatedly commented on a draft communications plan proposing "open, honest communications" as follows: "Can we say straightforward or direct? *Honest sounds like we have been hiding the ball, which we have but we don't need to point that out.*" DE 200 at 4, 5. Class Counsel also released testimony of a Trustee who admitted that plan participants were kept in the dark because the Trustees did not

---

[10] Defense counsel's cursory defense (DE 189 at 2 n.1) to their conflict of interest (Objection 16-17) is meritless. In brief, the particular New York ethics rule and commentary referred to by counsel are far from an unconditional green light to simultaneously represent *both* an organization and its fiduciaries accused of breaching their duties to the organization, especially when, as here, there are allegations (credible enough to survive a motion to dismiss) of breaches of the duty of *loyalty* – and the organization counsel's own advice is in issue. While the defense counsel cite *no case* approving their dual roles here, there is a wealth of authority for the disqualification of counsel with comparable (or lesser) conflicts. *See, e.g.*, *McGinn v. DeSoto, Inc.*, 1990 WL 251753, at *4 (N.D. Ill. Dec. 21, 1990) (disqualifying same counsel from representing both pension fund and its fiduciaries accused of breach); *Frank v. Ducy*, 1986 WL 1964, at *1 (N.D. Ill. 1986) (same); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1317 (3d Cir. 1993) (in derivative litigation, "except in patently frivolous cases," allegations of breach of the duty of loyalty "require separate counsel") *Yablonski v. United Mine Workers*, 448 F.2d 1175, 1177, 1181-82 (D.C. Cir. 1971); *Lewis v. Shaffer Stores Co.*, 218 F. Supp. 238, 239 (S.D.N.Y. 1963); *see also* Restatement of the Law Governing Lawyers § 131 cmt. g ("In a derivative action, if the advice of the lawyer acting for the organization was an important factor in the action of the officers and directors that gave rise to the suit" – as was true here – "it is appropriate for the lawyer to represent, if anyone, the officers and directors and for the organization to obtain new counsel.").

[11] Objection 12-13 & n.23; *id.* Ex. 6 (explaining that the Trustees' annual "plain English" cover letters contained bald misrepresentations about the Fund's projected solvency that were belied by the defense's own expert reports).

Hon. Valerie E. Caproni
August 19, 2020
Page 5

want the union membership "running towards the exits."[12] The Trustees, of course, were required to place the participants' interests ahead of the union's interest.[13]

Last week's disclosures, in other words, make it even more obvious that serious breaches of the duty of loyalty occurred. And yet substantially the same Trustees are in place, with substantially the same leadership structure, advised by the same conflicted counsel. For the settlement to be fair and adequate, it needs to contain *some kind of measure* to prevent future deception about the condition of the Fund (as opposed to simply requiring additional disclosures regarding investment performance, which is a distinct subject). Objection 12. This settlement troublingly provides *nothing* in that regard. Giving the NIF a say in plan communications would solve this problem.

## Conclusion

For all the reasons set forth in the Coalition Objection and in this letter, the Court should decline to approve the Proposed Settlement.

## Fee Request

Undersigned counsel respectfully requests an award of reasonable attorneys' fees. The undersigned and his partner, Rachel Fissell, have thus far spent (including an estimate of future time to prepare for and attend the upcoming hearing) 197 hours on this matter. Our partners' regular hourly rate is $675. Under a hybrid capped/contingent arrangement, one Objector (who then sought donations from many others to defray the expense) has already paid us a $15,000 retainer for the first 30 hours of work at the significantly discounted rate of $500/hour. A Miami federal court recently approved $500 as a *discounted* rate for our two partners, who are 16 and 15 years out of law school and handle sophisticated commercial litigation. *Metal Group USA LLC v. Seapack, Inc.*, 2019 WL 5291183, at *5-*6 (S.D. Fla. Sept. 8, 2019). Given the circumstances, while reserving the right to make a different request if there are additional developments in this matter, we request to be paid from the fees awarded to Class Counsel $132,975 (equal to $675 x 197 hours), and, assuming the Court approves an award at this level such that counsel will be reasonably compensated, we request permission to return the $15,000 retainer amount back to the individuals who donated it.

Respectfully submitted,

Daniel Walfish

cc (via email): Counsel of record

---

[12] DE 197-1, transcript pages 28, 30-32, 37, 42-43, 31-32, 45-46, 50-51, 58, 60-66, 68.

[13] *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329-31, 334 (1981) (Taft-Hartley plan trustee's "duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him").