```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ANDREW SNITZER, et al.,

 4               Plaintiffs,

 5          v.                         17-cv-05361 (VEC)

 6   THE BOARD OF TRUSTEES OF THE
     AMERICAN FEDERATION OF
 7   MUSICIANS AND EMPLOYERS'
     PENSION FUND, et al,
 8
                 Defendants.
 9
     ------------------------------x
10                                    New York, N.Y.
                                      August 26, 2020
11                                    10:00 a.m.

12   Before:

13                    HON. VALERIE E. CAPRONI,

14                                      District Judge

15                         APPEARANCES

16   CHIMICLES & TIKELLIS LLP (DE)
          Attorneys for Plaintiffs
17   BY:  STEVEN A. SCHWARTZ
          ROBERT J. KRINER, JR.
18
     PROSKAUER ROSE LLP
19        Attorneys for Defendants
     BY:  MYRON D. RUMELD
20        JANI RACHELSON
          DEIDRE GROSSMAN
21
     DANIEL WALFISH
22        Attorney for Ad Hoc Coalition Objectors

23

24

25
```

1          (Case called)

2          THE COURT:  Okay.  Good morning, everybody.  Welcome

3    to my dark courtroom.  Here is what I'm going to do.

4          For the plaintiff, what lawyer is talking for the

5    plaintiff?

6          MR. SCHWARTZ:  Good morning, your Honor.  It's Steve

7    Schwartz.  I'm here with my partner, Bob Kriner, but I will be

8    presenting for plaintiff.

9          THE COURT:  Who is going to be speaking for defendant?

10         MR. RUMELD:  Good morning, your Honor.  This is Myron

11   Rumeld.  I do have Jani Rachelson and Deidre Grossman if there

12   are questions appropriate for them to answer.

13         THE COURT:  Are you having any difficulty hearing me?

14         MR. RUMELD:  We can hear you, your Honor.

15         THE COURT:  And for -- somebody does not have their

16   phone muted, and that means I am getting feedback.  Please mute

17   your phone.

18         For the ad hoc coalition of objectors, do I have

19   Mr. Walfish?

20         MR. WALFISH:  Good morning, your Honor.  This is

21   Daniel Walfish.

22         Is the Court able to hear me?

23         THE COURT:  I am.  Good morning.

24         MR. WALFISH:  Good morning.

25         THE COURT:  I'm just trying to get people penned on to

1    the screen that I know are going to be speaking.

2         Okay.  We've already talked about the fact that you

3    need to keep your phone muted when you're not speaking.  I will

4    try to call on people so that we have a rational transcript of

5    what's going on.

6         I know someone is not muted because I just heard you

7    talking to someone.  This is a warning to everyone who is a

8    guest on this phone.  If you do not mute your phone, I'm going

9    to knock you off the call.  So please mute your phones.  Thank

10   you.

11        Here is going to be the order of today's argument.

12   We're going to start with plaintiffs' counsel, which will be

13   Mr. Schwartz.  Then I'll hear anything that defense counsel

14   wants to say.  I'll then hear from Mr. Walfish on behalf of the

15   objectors.

16        I then have three pro se objectors who want to be

17   heard.  I will hear from them in the following order:  First,

18   Ms. Bryant, then Mr. Stoner, and then is it Hosticka?

19        MR. HOSTICKA:  Your Honor, it's Hosticka.  Thank you.

20        THE COURT:  If I mispronounce it when it comes back

21   around, I apologize.

22        MR. HOSTICKA:  No problem.

23        THE COURT:  And then we'll come back to Mr. Schwartz

24   to respond to anything he wants to respond to.  So that's the

25   order of today's proceeding.

1          So with that, Mr. Schwartz, I'm going to turn the

2     floor over to you.

3          MR. SCHWARTZ:  Thank you, your Honor.  I appreciate

4     that we put a lot of paper in front of your Honor.  So we

5     didn't want to be repetitive.

6          THE COURT:  Hold on just a second.

7          This is my final warning on muting phones.  Mute your

8     phone if you are not speaking.  Only Mr. Schwartz's phone right

9     now should not be muted.

10          All right.  Go ahead, Mr. Schwartz.

11          MR. SCHWARTZ:  Thank you.

12          As I was saying, I'm happy to just answer questions

13     because I don't want to repeat what's in the papers.  I know we

14     put a lot of paper in front of you.  So if that's the way you

15     want to proceed, I'm happy to do it that way.

16          I'm prepared to just have on overall overview of why I

17     believe the settlement should be approved.  And I'll start with

18     that, unless your Honor wishes to proceed in a different

19     manner.

20          THE COURT:  Go ahead.

21          MR. SCHWARTZ:  Thank you.

22          So with respect to objections, there are,

23     percentage-wise, a very small number of objections, less than

24     .1 percent.  All of the organizations or locals that have

25     spoken up have supported the settlement.

1        Other organizations like the Musicians for Pension

2    Security -- they have not objected.  While my clients,

3    Mr. Snitzer and Mr. Livant, appreciate and understand the

4    objectors' legitimate concerns and general concerns about the

5    Benefit cuts that could potentially reduce their pension, about

6    their concerns about the trustees' disclosures on fiduciary

7    breaches.  We appreciate that.

8        But at the end of the day, it was Mr. Snitzer and

9    Mr. Livant who decided to step up and become class

10   representatives, and it was my firm that became the

11   court-appointed interim class counsel and then the class

12   counsel.

13       We maximized recovery in this case.  We litigated as

14   hard as it could be litigated, negotiated as hard as it could

15   be negotiated.  It is class representatives and class counsel

16   who get to make the initial judgment call whether we should

17   pocket the best possible settlement we're able to negotiate or

18   just simply go to trial and hope years down the road we can

19   maybe get more.

20       Our judgment call was that the plan needs the $17

21   million now and it needs the governance provisions now, not

22   years from now.  Under Rule 23(e), courts just generally don't

23   reject a settlement simply because a small minority of class

24   members want a slightly better or different settlement or think

25   they can better evaluate the risk and reward of proceeding to

1   trial or even if they just prefer to go to trial regardless of

2   any settlement.

3           At the end of the day, I think Mr. Walfish stated it

4   nicely in his brief that the standard is that the Court should

5   make an intelligent comparison between the settlement recovery

6   and the probable recovery at trial.

7           The objections really don't stick to that standard

8   because it appears to me that the objectors are just going to

9   be dissatisfied with any settlement short of placing the plan

10  in receivership.  We don't think that maximalist position is

11  rooted in reality and did not warrant going to trial to try to

12  achieve that.

13          While the standard for approval is that the settlement

14  has to be fair, reasonable, and adequate -- and we think we

15  meet that minimum standard hands down -- this settlement was

16  much better than that.

17          It was our assessment and our expert's assessment that

18  this was the best that could be done, given the fact that we

19  have the leverage that we gained with the effective litigation

20  that we did which that created the leverage that we did.

21  Therefore, we think the settlement should be approved under the

22  Rule 23 standard and even if there was a tougher standard.

23          With regard to the arguments regarding the standard

24  for a release of claims for a case that someone said they want

25  to bring for the period of October 2017 through the present,

1    we've been through this in our papers.

2         The release that we drafted and submitted for

3    preliminary approval of the settlement agreement does not

4    release those claims.  It was very clear.  To the extent there

5    was any lack of clarity on that -- we don't think there was --

6    the defendants at ECF 189 made crystal clear in filing the

7    judicial admission.  That's exactly what it means.  These

8    people can file the 2017 to 2021 case if they want to.  Let me

9    make very clear that release of those claims --

10         THE COURT:  Mr. Schwartz, let me interrupt you for a

11   second.  On the issue of release, the way you have drafted

12   this -- this is in the proposed final judgment.  The release

13   appears on page 9 of that.

14         I don't like the way you drafted it.  And I think,

15   based on the parties' submissions, I understand what the

16   parties have said.  I think I understand it.  I am proposing

17   that the final order be amended as follows.  So if you could

18   all get it in front of you so you can follow me.  This is page

19   9 of the proposed order.  It's ECF document 195-1, page 9.

20         Mr. Schwartz, do you have it?

21         MR. SCHWARTZ:  Yes, I do.

22         THE COURT:  Mr. Rumeld, do you have it?

23         MR. RUMELD:  I do.  Sorry.  I was on mute.  Thank you.

24         THE COURT:  That's okay.

25         Mr. Walfish, do you have it?  You can just nod

1    vigorously.  Okay.  Everybody's got it in front of you.

2         Here is the proposed change.  I don't like referencing

3    another document, document number ECF 189, in my order.  So I'm

4    proposing the following, which, again, I believe is consistent

5    with the parties' intent.

6         On the third line, delete that phrase that begins

7    "consistent with" down through "release."  So we will delete

8    "consistent with the condition imposed by the independent

9    settlement evaluation fiduciary regarding the scope of the

10   release --"

11        Someone does not have their phone muted because I am

12   hearing a side conversation.

13        The following phrase is deleted:  "Consistent with the

14   condition imposed by the independent settlement evaluation

15   fiduciary regarding the scope of the release."  Begin the

16   sentence as follows:"  For the avoidance of doubt about the

17   scope of the release, the Court finds" then delete "hereby

18   incorporate the explanation of the release offered by

19   defendants in ECF number 189 and agrees that."  I didn't use

20   the word "find."

21        So "The Court finds that the release is limited to the

22   period before the OCIO management date with respect to

23   decisions regarding, one, the plan's asset allocation,

24   investment return targets."  And then the balance of your

25   language remains.

1          So let me read that to you one more time.  The order

2     would provide as follows.  Starting after the word "settlement

3     agreement" on the third line:  "For the avoidance of doubt

4     about the scope of release, the Court finds that the release is

5     limited to the period before the OCIO management date with

6     respect to decisions regarding, one, the plan's asset

7     allocation, investment return targets, and the selection

8     (including the plan's OCIO), retention, monitoring," etc.  So

9     that is my proposal.

10          Mr. Schwartz, is that consistent with the parties'

11     agreement regarding the scope of the release?

12          MR. SCHWARTZ:  Yes, your Honor.  I believe it's

13     100 percent consistent --

14          THE COURT:  Hang on.

15          Mr. Schwartz, I can't hear you at all because someone

16     else is talking.  That means a phone is not muted.

17          Hang on just a second.

18          (Pause)

19          THE COURT:  Mr. Schwartz, is that consistent with your

20     understanding of the release?

21          MR. SCHWARTZ:  Yes.  I believe it's 100 percent

22     consistent with the release in the settlement agreement and

23     what we've tried to do in our proposed final order.  I think

24     you may have done it better, but that's 100 percent consistent.

25          THE COURT:  Mr. Rumeld, is that also your

1    understanding of the scope of the release?

2         MR. RUMELD:  It is consistent with the scope of the

3    release.  I am a little concerned, your Honor, that the

4    explanation we wrote in the brief as to why it's consistent

5    with the scope of the release is important for us for the

6    reasons that we said in the brief.

7         I do think it's important for the purposes of an

8    eventual claim, based on what we're hearing, that it be

9    understood, at least on the record, that the reason those items

10   are carved out is because they would be considered new claims.

11        THE COURT:  I'm sorry.  Say that again.

12        MR. RUMELD:  I think it's important that it be clear

13   that the reason these items are carved out is because they

14   would probably be considered new claims and that's why they're

15   not released.

16        We made that point in our brief.  I understand

17   your Honor's reluctance to incorporate that document.  But if,

18   regrettably, there is a new case, it would be important that

19   that be the understanding.

20        THE COURT:  So the order cross-references to the

21   release, and the order is discussing what is and is not in the

22   release.

23        So it all goes back to the release.  Right?

24        MR. RUMELD:  That's true.  But we have accusations

25   that the claims postdating 2017 are a continuation of the

1    claims predating 2017.  We've explained why we view any claims

2    postdating 2017 to be new claims, and that's why we believe

3    it's appropriate to carve them out.

4            THE COURT:  They're not carved out.  They're just not

5    released.  That's my problem.  The problem with the language

6    that you guys are using is it's confusing.  There is a release.

7    If the claim was released, it was released.  If it's not within

8    the release, it wasn't released, period.

9            I think you're making this more complicated than it is

10   because of arguments that were raised that, frankly, I didn't

11   buy.  But I understand that they have concerns.

12           So the order makes it absolutely clear where the line

13   is drawn for purposes of the release.  If it's not released,

14   whether you call it a new claim or anything else, it doesn't

15   matter.  It wasn't released.  Right?

16           MR. RUMELD:  There needs to be insurance coverage for

17   a new claim.

18           THE COURT:  I understand that.

19           MR. RUMELD:  So our intention is not to release new

20   claims.

21           THE COURT:  Meaning claims --

22           MR. RUMELD:  Our intention is to release old claims.

23           THE COURT:  That is very clear on the record of what

24   the intent of the release is.

25           MR. RUMELD:  All right.  Thank you.  I appreciate your

 1   making that statement, your Honor.

 2          THE COURT:  Understood.

 3          Mr. Walfish, does that resolve your problem with the

 4   scope of the release?

 5          MR. WALFISH:  Initially, yes, your Honor.  And I

 6   appreciate the Court's edits because they are precisely what I

 7   would have suggested with one slight tweak.  The settlement

 8   agreement in 8.1.4 expressly retains as the trustee's

 9   responsibility investment returns and risk objectives.  So in

10   an ideal world --

11          THE COURT:  Hold on one second.

12          Mr. Rumeld and Mr. Schwartz, please mute your phones.

13          MR. SCHWARTZ:  Apologies.

14          THE COURT:  Go ahead, Mr. Walfish.

15          MR. WALFISH:  Your Honor, I was saying that the

16   settlement agreement makes very clear that going forward, the

17   setting of both investment return and risk objectives are the

18   trustee's responsibility.

19          So I would say that the Court's language goes almost

20   all of the way towards addressing the issue we raised.  But the

21   language that the Court inserted after (i), the plan asset

22   allocation, should say "investment return and risk targets" or

23   "investment return and risk objectives."

24          THE COURT:  Doesn't investment return targets

25   encompass within it risk?

1           MR. WALFISH:  Yes, your Honor.  It does.  But the

2    settlement agreement, I presume, is worded the way it is

3    because the parties viewed those things as somehow different or

4    distinguishable.  In fact, there was a dispute on the merits in

5    this case about exactly that.

6           So I am mostly quite comfortable with the Court's

7    edits but would say that if the goal is really to avoid any

8    ambiguity here, a reference to risk should be added to a

9    reference to return.

10          THE COURT:  So what were you proposing?  Investment

11   return and risk targets?

12          MR. WALFISH:  I would say "objectives" because that's

13   the language in the settlement agreement as to what is the

14   trustee's ongoing responsibility.

15          THE COURT:  Say that again.

16          MR. WALFISH:  Your Honor, "investment return and risk

17   objective."

18          THE COURT:  All right.  Is there any objection to that

19   edit, Mr. Schwartz?

20          MR. RUMELD:  No, your Honor.

21          THE COURT:  Mr. Schwartz?

22          MR. SCHWARTZ:  I don't have any objection to it.  I

23   think it's duplicative, but I don't have any objection to it

24   because it's the same thing.

25          THE COURT:  That's fine.  Done.

1          Mr. Schwartz, I interrupted you because we were on the

2     release.  So go ahead with your prepared remarks.

3          MR. SCHWARTZ:  Thank you, your Honor.

4          With regard to the substance of the settlement, I

5     don't think anyone has objected to the amount of money that we

6     got from the trustees.  I can say that we left nothing on the

7     table.  I do believe Mr. Stoner has raised an objection that we

8     should have tried to get more money by suing other people like

9     Meketa and maybe other people.

10          We briefed that.  Our view of the case is that the

11     focus should be on the trustees, which I also believe is the

12     focus of all of the objectors.  And it was our assessment, not

13     just when we first started the case but throughout when

14     Mr. Kriner and I repeatedly's evaluated and re-evaluated this

15     issue that suing Meketa would have been counterproductive and

16     would have undermined the claims against the trustees and would

17     have undermined the ability to get and max out as much as we

18     could from the insurance providers for the trustees to pony up

19     as much as we got because it was the trustees' defense, oh,

20     let's blame Meketa.  We relied on Meketa.

21          As we've said in our papers and as we've said in

22     evidence the reality is for the 2011 and 2015 asset

23     allocations, Meketa didn't say, rah, rah.  We think you should

24     do this.  We think you should take this much risk.

25          What Meketa said was if you want to have a target

1    investment return of 8 percent or 9 percent, which is really

2    high, this is the best way we can think of how you could do

3    that.  But you, trustees, have to decide how much risk you

4    take.

5             So everything we would have done if we brought suit

6    against Meketa to prove that claim would have undermined the

7    claim against the trustees.  And we thought that the claim

8    against the trustees was the primary one.

9             So that's why we did that, and we don't think that the

10   settlement should be disapproved simply because a single

11   objector thinks we should have sued someone else as part of the

12   mix, whoever that may be, whether it was Meketa or someone

13   else.

14            With respect to the governance provisions, which

15   appears to be the primary substantive objection, our view is we

16   got everything we could.  It was a separate negotiation after

17   the money.

18            We literally risked the money portion of the

19   settlement by negotiating hard for several months on the

20   governance provisions.  And the provisions that we got compare

21   favorably to all the other recent ERISA cases.  We think that

22   Mr. Irving has very substantial and effective provisions and

23   powers to help prevent the trustees from misstepping again.

24            Again, under Rule 23, since we had provisions that are

25   more stringent, more comprehensive, more tailored to the

1    specific facts of the case, compared to all the other ERISA

2    settlements that have been approved in recent pension cases,

3    the easy answer is that easily satisfies the fair, reasonable,

4    and adequate standard under Rule 23.  And we of course think it

5    goes much, much further above that.

6            Just a couple points.  Mr. Walfish and the ad hoc

7    objectors' brief makes the point that if you don't have voting

8    power, you don't have any power.  But the settlement says that

9    Mr. Irving must state his opinion on any matter on which

10    there's either a deliberation or a vote of the investment

11    committee.  So he is actually going to be weighing in on every

12    single issue that will come before the investment committee for

13    deliberation or for a vote.

14            And he's made very clear in his supplemental

15    declaration that he is not going to sit like a wallflower in

16    the back and stay mute if he sees something that he doesn't

17    like.

18            He will speak up, and he will document.  And he said

19    he will play it right down the middle.  He's not going to favor

20    us; he's not going to favor defendants.  He's just going to

21    call it as he sees it.

22            Second, on the issue of whether Mr. Irving or someone

23    else should have been a communications fiduciary, our view is

24    that it is class representative and class counsel who actually

25    litigate this case and actually know this case, it is our job

```
 1   to prioritize settlement demands and asks.

 2           THE COURT:  Hang on.  You sort of clicked out.

 3           It's your job to prioritize settlement demands and

 4   what?

 5           MR. SCHWARTZ:  And asks.

 6           THE COURT:  And asks.  Okay.

 7           MR. SCHWARTZ:  Yes.  Because many portions of

 8   settlements like this end up in a zero-sum game where if you're

 9   going to get something on this side, you're going to have to

10   give up something on the other side.

11           On the communications end, we first prioritized

12   disclosure regarding asset allocation and a comparison of the

13   results of actively managed funds to passively managed funds

14   because that was a goal not just in disclosures to class

15   members, the plan participants, but also, in our view, as a

16   goal for what the trustees had in front of them and understood

17   during board meetings.  We wanted those two things to be

18   crystal clear.

19           If it had been disclosed from 2010 through 2016 that

20   the plan had the allocations, the emerging markets equities and

21   private equities that it did, it would have been very easy to

22   figure out, uh-oh, this is aggressive, way over the top.

23   Something must be wrong.

24           So first of all, we think that those disclosures on

25   those investment allocations and investment performance are
```

1    very important.  And we got that.  The objections about well,

2    what about having some fiduciary deal with disclosures about

3    the plan's funded status, I kind of feel like it's kind of like

4    the meme when I was a kid of after World War II, the proverbial

5    Japanese sailor who was on an island cut off from

6    communications and was fighting the war decades after it was

7    over, we have resolved the complaint about the disclosures

8    about the funded status from 2010 through 2017.

9        We have laid out what we believe the trustees did

10    wrong in the goriest detail, and there is no doubt about that.

11    And everyone knows now what they disclosed versus what the

12    reality was.

13        The MPRA ongoing process necessarily discloses the

14    funded status issues.  Right now I understand that the MPRA

15    application has been at least provisionally denied.  I won't

16    get into that.

17        But the ongoing MPRA application discloses the funded

18    status.  We think that the deterrent effect of calling out

19    Milliman the way we did with the recent hide-the-ball documents

20    is a deterrent effect.  The Moriarity deposition that my

21    partner, Mr. Kriner, took where we just went and, with the

22    skillful precision, laid out, this is what you disclosed.  This

23    is what you knew.  Why wasn't it there.

24        We think, plan counsel -- we think that the actuaries,

25    we think that the trustees, having gone through this process,

1    will be very hesitant to make the kinds of disclosures that

2    they did before.

3           And to the extent that there are class members who

4    still want more disclosure about the funded status, all they

5    have to do is send a Section 1021 ERISA request asking for the

6    quarterly report of the actuaries which you can get going back

7    years and obviously get going forward.  And that will provide

8    the underlying details on that.

9           So if anyone thinks they don't have enough disclosure

10   on that, they have a handy tool under ERISA.  They get it for

11   virtually free.  And it made no sense for us to expend our

12   negotiating capital to have another layer of another

13   independent fiduciary on disclosure when we already got the

14   most important part of the disclosure and everything else we

15   that could get we could just get by sending a letter.  So that

16   is our response to that objection.

17           THE COURT:  Okay.  Anything further?

18           MR. SCHWARTZ:  I can respond to the other details of

19   objections after I hear what the objectors say.  I won't repeat

20   what I said in my brief.  Just briefly, service awards and the

21   relief for my clients, I'm happy to address that now or wait,

22   depending on your preference.

23           THE COURT:  You can wait.

24           MR. SCHWARTZ:  Okay.  That's all I have for now, and I

25   appreciate your Honor giving me the time.

```
 1            THE COURT:  Okay.  Thank you.  Please mute your phone.
 2            Mr. Rumfeld.
 3            MR. RUMELD:  Thank you, your Honor.  Also, it's Rumeld
 4       by the way.
 5            THE COURT:  I'm sorry.  I'm totally sorry.
 6            MR. RUMELD:  This is my last chance to try and get it
 7       right for you.
 8            THE COURT:  Have I consistently mispronounced it over
 9       the entire case?
10            MR. RUMELD:  No.  It happens often.
11            THE COURT:  I'm sorry.
12            MR. RUMELD:  Thank you for giving me the opportunity
13       to speak.
14            I would like to comment on plaintiff's attorney fee
15       application and also just add a couple of thoughts about the
16       settlement itself.  Plaintiffs have requested fees equal to
17       33 percent of the settlement pot, and that would be in addition
18       to the costs that they are seeking to recoup.
19            In response, among other things, we cited to some
20       surveys that have guided numerous courts, including this Court,
21       in determining the appropriate fee award.  Those surveys, as we
22       explain, point towards an award of approximately 25 percent
23       rather than 33 percent.  And I don't think we read any response
24       to why those surveys shouldn't be considered and followed here.
25            The adjustment to 25 percent would be rather
```

1   significant as it would leave this fund with another $2 million

2   or so in net recovery.  So we just wanted to reiterate that

3   point.

4           We also argued that any upward adjustment to the

5   25 percent on account of the success that plaintiffs claim to

6   have achieved was something that we disagreed with strongly.

7   Toward that end, we highlighted some of what we considered to

8   be the principal reasons plaintiff did not really present a

9   very strong case.

10          I don't intend to rehash all of these arguments right

11  now, but I would like to just identify a few key points that we

12  made that we don't feel plaintiffs were able or are able to

13  refute.

14          First of all, although the trustees are accused of

15  taking on too much investment risk following the financial

16  crisis, plaintiffs cannot identify any alternative strategy

17  that would have been calculated at the time to fare better than

18  the one that the trustees chose.  We know this because

19  plaintiffs' own experts have admitted that they were not

20  prepared to do that.

21          Secondly, plaintiffs are unable to identify any

22  investment-related advice that was rendered by the plan

23  professionals and that the trustees ignored to the detriment of

24  the plan.

25          Plaintiffs cited to evidence of statements made by

1    other professionals, Mercer or the firms who applied for the

2    OCIO position.  None of these firms were retained to provide

3    advice to the trustees, and none of them possessed the

4    requisite information to provide such advice, something that

5    plaintiffs' own experts eventually acknowledged.

6          Although plaintiffs' experts at one point accused the

7    trustees of acting contrary to the advice of the plan's

8    professionals, they eventually walked back those statements

9    when we confronted them with the record evidence at their

10   depositions as we showed in our papers.

11         Third point, in contending that the trustees hid the

12   ball on the plan's financial conditions, plaintiffs repeatedly

13   make the obvious error that helps to illustrate why their

14   communication claims, which really weren't freestanding claims

15   to begin with -- why these communication claims are much more

16   complex than they would have the Court believe.

17         On page 25 of their most recently filed brief, just by

18   way of example, they equate the trustees' awareness of the plan

19   being in critical status with an awareness of a looming

20   insolvency that they say we should have been disclosing years

21   before 2016 when we sent that letter.

22         The same accusation appears in their first brief, and

23   the same accusation also appears in the report of their expert,

24   Mr. Witz.  In his supplemental report in response to Mr. Witz's

25   report, our expert, Cary Franklin, took Mr. Witz to task on

1     this issue.

2             He explained while critical status is a serious

3     condition that requires, among other things, that the plan

4     develop this rehabilitation plan, it does not signify an

5     impending or looming insolvency.  In fact, the plan can be in

6     critical status indefinitely without ever heading to

7     insolvency.

8             The fact that our plan was entrenched in critical

9     status for several years beginning in 2011 and was not expected

10    to emerge unless it outperformed its assumptions did not mean

11    that the plan was on the brink of insolvency.  And in fact, it

12    wasn't at that time, as Mr. Franklin explained in his report.

13            By equating critical status with impending insolvency,

14    plaintiffs are apparently conflating the concepts of critical

15    status with another status known as critical and declining

16    status.  Critical and declining status means that the plan is

17    projected to be insolvent in 20 years, something we might all

18    consider to be a looming insolvency.

19            It is a term that first came into existence when MPRA

20    was passed in December of 2014.  And in 2016 when the plan

21    suffered some poor investment returns, as did the rest of the

22    market that year, the plan nearly went into critical and

23    declining status for the first time.

24            That led to the disclosures, first in the summer in

25    the annual statement, and then in the September letter that

1    insolvency was something that could happen and that the plan

2    could enter into critical and declining status as early as the

3    following year.

4         As it turned out, the plan did not enter into critical

5    and declining status the following year and didn't until 2019,

6    which is just an indication as to how movable these parts

7    really are.

8         Now, look.  I don't mean to suggest that the plan's

9    financial condition was not of great concern well before 2016.

10   since the time of the financial crisis and the plan's entry

11   into critical status, there were ongoing discussions over the

12   fact that the funded status of this plan was declining and what

13   this could mean in the longterm for the plan.

14        As Mr. Franklin observed, there was no risk at that

15   time of an imminent insolvency, and it would have been

16   inaccurate to communicate that the plan was at risk of an

17   imminent insolvency.

18        Nevertheless, the trustees wrestled with the relative

19   merits of sticking to the facts on the ground and reporting

20   what the actual projections that ERISA required were as opposed

21   to volunteering more far-reaching statements about what might

22   happen in the future.

23        They were being told by their actuaries that long-term

24   projections past 20 years are not particularly reliable and the

25   situation could change materially in the interim even from year

1    to year.

2            And since the trustees' responsibility is to protect

3    the fund, some of them questioned the merits of unduly

4    frightening participants to the point of causing them to exit

5    the fund and thereby changing this risk of insolvency from a

6    mere possibility to a mere certainty because if everybody

7    leaves and no contributions come in, that's a problem too.

8            Now, in making this point, I'm not looking to generate

9    any conclusions from this Court.  We are hopefully settling

10   today.  I'm simply trying to point out that the communication

11   issues that plaintiffs have cited were much more nuanced than

12   plaintiffs would have the Court and the plan participants

13   believe.

14           If this case were tried, your Honor would have the

15   opportunity to review a voluminous record of back-and-forth

16   discussions among the trustees and their professionals over

17   these very issues.

18           Like these trustees, your Honor would be confronted

19   with the dilemma that there is no existing legal framework to

20   guide the decisions as to what disclosures, if any, should be

21   required in these circumstances beyond those that are

22   statutorily mandated and that the trustees made.

23           Final point.  No matter how the Court evaluates these

24   decisions or the various other decisions that were challenged

25   in this case, there will be no disputing that they were all the

1    product of extensive deliberations, that they were engaged in

2    in good faith.

3         Second-guessing decisions is one thing.  Finding that

4    the trustees breached their fiduciary duties is something very

5    different.  This leads to one final point, which relates to

6    what has been accomplished by these protracted proceedings and

7    what will be accomplished if the Court approves the settlement.

8         We agreed to settle this case because we thought it

9    would be best for all concerned to put this litigation behind

10   us and shift everyone's focus back to the very difficult issues

11   at hand.

12        Unfortunately, that objective has been threatened by

13   events that have transpired since we first agreed to the

14   settlement.  As Your Honor knows, a number of the objectors are

15   poised now to commence a new lawsuit immediately after this one

16   resolved.

17        even if they don't carry out that threat, the

18   trustees' ability to do their job effectively has already been

19   substantially hampered by the reputational mudslinging while

20   this case is being litigated and that has continued right

21   through the settlement process.

22        It has even extended to innocent third parties like

23   union attorneys who have nothing to do with the plan or this

24   lawsuit but who at the 11th hour are being accused of holding

25   positions or receiving compensation that they don't deserve.

1          This reputational damage that has occurred is the

2     product of litigation tactics that we submit were not necessary

3     to advance this case and that certainly have not been helpful

4     in advancing the resolution.

5          There are now, frankly, many among my clients who,

6     having seen what transpired since the settlement was first

7     agreed to, who now question the wisdom of the decision to

8     accept this settlement, which we advised them to do.

9          But a deal is a deal.  And I think when all is said

10    and done, this Court has been left with persuasive arguments

11    for approving this deal.  If the Court agrees, the only thing

12    that remains is how the Court describes its reasons for

13    approving the settlement.

14         We ask that in doing so, the Court try to find a way

15    to assure these doubting participants that notwithstanding the

16    unfounded allegations made in this lawsuit, the fund is in

17    capable hands.  Thank you, your Honor.

18         THE COURT:  I'm sorry.  The fund is what?

19         MR. RUMELD:  In capable hands.  Thank you.

20         THE COURT:  Mr. Rumeld, let me ask you one question.

21    One of the themes in the defendants' brief in opposition to the

22    attorney's fees -- let me say the plaintiffs' lawyer gets some

23    credit for not insisting on a clear-sailing agreement.

24         I appreciate hearing from the defendants regarding

25    attorney's fees because it's one of the things that's very

1  difficult as the neutral watching the litigation to really get

2  a feel for, although in this case I had a pretty good sense as

3  to what was going on.

4         One of the defendants' objections was the argument

5  that the plaintiff should have settled this case far earlier

6  and that a lot of money was wasted in pursuing discovery that

7  was unnecessary.

8         What do I have in the record to look at that would say

9  to me that in fact the plaintiffs could have gotten net of fees

10 a better deal had they settled earlier?

11        MR. RUMELD:  Let me say three things on that:  First,

12 I think that's a really good question.  Secondly, as you can

13 see from both sides' responses, it is difficult to provide

14 information that doesn't compromise issues of confidentiality.

15        And I have to say that I'm a little bit constrained

16 because, as your Honor can appreciate, throughout these

17 settlement discussions, I was offering up other peoples' money.

18 It wasn't us.  It was the insurance carriers, and I'm not sure

19 it's appropriate to go into the back-and-forth of offers and

20 rejections.

21        I will also say I think there are a couple of truths

22 that can be said.  We know that the first layer of coverage was

23 $25 million.

24        We understand the difficulty associated with getting

25 into a second or third layer of coverage until the first layer

 1    of coverage is exhausted.  It's pretty clear from plaintiffs'

 2    papers that from the start, they wanted to get into those

 3    additional layers of coverage as a condition of settlement.

 4            Where we ended up -- plaintiffs, by the way, made a

 5    point about what offers they received and didn't receive.  I

 6    will just say that anybody who is in this business knows that

 7    if the carriers aren't hearing anything from the plaintiff that

 8    suggests they're in the neighborhood they're going to settle

 9    at, they never really get to hear what the carrier's number is,

10    which was definitely a problem since the beginning of this

11    case.

12            What we can see if we look at the math is there is $25

13    million in the first layer.  We've spent about $9 million out

14    of defense costs out of that layer.  Plaintiffs are seeking

15    approximately $10 million.

16            And if you sort of reverse engineer the math, you can

17    appreciate how we might have been able to settle within the

18    first layer and generated a net recovery that isn't much

19    different than the net recovery we're seeking right now.

20            Admittedly, this is not specific enough for your Honor

21    to really trade on.  And admittedly, with confidentiality

22    constraints, it makes it very difficult.  But I also would

23    say -- this is why I made the point about what we view to be

24    the collateral damage that's been done here.

25            From our standpoint, if this case settled for a net of

1    $1 million or $2 million, more or less, earlier than later,  we

2    could have avoided a lot of the collateral damage that we think

3    is material to the current operation of the plan.

4         And the fact that lots of ideas have been put in the

5    heads of participants so much to the point that they're ready

6    to file a lawsuit all over again, which we think would be

7    completely meritless, if it is in the OCIO period, is an

8    indication of issues that we think are relevant to that

9    discussion.

10         THE COURT:  Understood.  Thank you.

11         I think I said I was going to next call on

12    Mr. Walfish.

13         Mr. Rumeld, let me remind you to mute your phone,

14    please.

15         Mr. Walfish.

16         MR. WALFISH:  Thank you, your Honor.

17         With the Court's leave, I'd like to start by reading

18    from a letter submitted by Objector Steven Nathan to the

19    Treasury Department earlier this year in connection with the

20    defendant trustees' request for permission to cut vested

21    benefits.

22         THE COURT:  For permission to cut?

23         MR. WALFISH:  Vested benefits.

24         "I'll be 69 in a couple months, and I'm one of the

25    less than 200 victims of a 40 percent cut to the primary

1    component of my life's savings.  There are no new jobs for

2    musicians my age.  I can't just double up on a Roth IRA or buy

3    some T-bills.  It's too late now.

4         "My union promised me that if I let them defer a small

5    percentage of my wages to this fund, they would grow them for

6    me.  And they guaranteed that when I got too old to work, I

7    would be able to draw a defined benefit in order to pay bills,

8    keep food on the table, cover medical expenses, and stay in my

9    home.  I planned for my retirement based on that guarantee."

10        The letter goes on:  "It might be different if the

11   AFMEPF had fallen into the same factors that hurt many other

12   troubled funds, but they did not.  Our fund's demographics are

13   actually better than most.  Our ratio of actives to retirees is

14   in fact closer to typical green zone funds than to critical and

15   declining.  Our fund does not suffer the orphaned employer

16   problem so many legitimately troubled funds do.  Our trustees

17   just failed miserably at stewardship of this fund."

18        Now, Mr. Nathan is not alone in his situation.  And

19   much of what he says about the mismanagement of the plan, when

20   all is said and done, is not seriously disputed or disputable.

21   No one has been able to point to another Taft-Hartley plan

22   whose investments looked anything the way this one's did.

23        On top of that, the deception regarding fund condition

24   is irrefutable as the trustees reassured the participants year

25   in/year out that the actuaries are not projecting insolvency

 1   under current assumptions.

 2        Even as the core defense on the merits here was that

 3   the trustees were seeing projected insolvency under current

 4   assumptions supposedly making it justified to swing for the

 5   fences and try to get higher returns than that.

 6        As another commenter to Treasury, Ken Gibas (phonetic)

 7   from Eastchester New York put it, referring to these annual

 8   assurances:  "It is very hard to plan for a retirement with

 9   advice like that which turns out to be completely wrong.

10        THE COURT:  Mr. Walfish, let me interrupt you for a

11   second because I'm not sure exactly where you're going with

12   this.  The issue is whether I should approve the settlement or

13   not.

14        MR. WALFISH:  Sure.  Your Honor, Mr. Rumeld says that

15   these issues of communications are complicated.  It's not

16   complicated.  It is impossible to read the trustees'

17   communications in plain English to their membership and not

18   conclude that they contained serious misrepresentations.

19        Or as the lead actuary for the fund put it in evidence

20   just two weeks ago:  "We have been hiding the ball, but we

21   don't need to put that out.  In other words, on top of

22   catastrophic mismanagement, a serious fraud, which is a breach

23   of the duty of loyalty, occurred here.  and even though the

24   same people are still in charge of the fund with the same

25   leadership structure devised by the same conflicted counsel,

1    this settlement contains not a single measure designed to

2    prevent future deception about the condition of the fund," as

3    opposed to simply requiring additional disclosures on

4    investment performance, which is separate.

5         Now class counsel says their settlement compares

6    favorably to other ERISA pension settlements.  Basically every

7    one of their cited cases was a lawyer-driven challenge for

8    record-keeping expenses and menu selection in the 401-k and the

9    403(b) defined contribution context.

10        Those things are a very far cry from fiduciary's

11   destruction of a defined benefit pension plan, coupled with the

12   coverup of that destruction.  So those other settlements that

13   counsel was talking about are not necessarily relevant to the

14   comparison, but let's talk about them anyway.

15        Class counsel asserted in his August 12 approval

16   papers that the most recent 401-k settlement was *Karpik* out of

17   Ohio with no injunctive relief.  And we explained in our letter

18   last week that two days before class counsel made that

19   representation, there was a more recent settlement submitted in

20   this court, Judge Gregory Woods, *Bhatia v. McKinsey*,

21   19 cv 1466.

22        And the settlement there, sure enough, involved the

23   appointment of independent neutrals with decision-making power

24   and a role in participant communications, the two things must

25   sorely missing from the relief here.

1          And *Bhatia* is not an outlier.  Plenty of other settled

2     cases have culminated in, A, the appointment of an independent

3     with decision-making power and/or, B, the adoption of other

4     measures designed to ensure truthful communications.

5          And in fact, those things are the norm when, as here,

6     there is a credible showing of deception or other breaches of

7     the duty of loyalty and no assurance against a recurrence.

8          Now, Mr. Schwartz says that I'm fighting the last war.

9     But I'm not fighting the last war because the same people are

10    in place with the same conflicted counsel, and there is nothing

11    preventing them from continuing to make, as they've done right

12    up until the present moment -- I'm not sure the Court wants me

13    to get into details, although I could -- nothing preventing

14    them from continuing to make what are clearly

15    misrepresentations to their financially unsophisticated

16    membership.

17         Now, unless the Court has additional questions about

18    that, I'd like to go into a little bit more detail about some

19    of the problems with the specific governance provisions.

20         THE COURT:  I have a question.  You are an objector.

21         MR. WALFISH:  Yes.

22         THE COURT:  Do you think I should decline to approve

23    the settlement?  That is, that it's in the best interest of the

24    beneficiaries to litigate this case.

25         MR. WALFISH:  Your Honor, I think that it is in the

1    best interests of the beneficiaries that there be a better

2    settlement or, failing that, that this case be litigated.  Yes,

3    because what's been agreed on here is just not all that

4    meaningful.

5           And one can see that in the defense papers talking

6    about how the governance provisions are not only weak but

7    literally they have no monetary value and are, in the literal

8    sense, worthless.

9           I don't think that this settlement is fair and not

10   adequate relative to the underlying facts as were shown in this

11   case.  Mr. Schwartz said that only .1 percent --

12          THE COURT:  I'm sorry.  Mr. Walfish, let me just

13   correct something.  I'm doing this for the benefit of the

14   beneficiaries who are on the phone.

15          When you say what has been shown, understand this case

16   has not been litigated.  Nothing has been shown.  What you had

17   is raw discovery.  That may or may not have persuaded a trier

18   of fact, which is me.

19          So you can say that there's evidence, and there is.

20   But as is typically the case in cases like this, parties have a

21   tendency to cherrypick information that may or may not have

22   valid rebuttal from the other side.  So just to be clear,

23   nothing has been proven in this case.

24          Go ahead.

25          MR. WALFISH:  Thank you, your Honor.  I understand

1    that was for the benefit of the listeners.

2          THE COURT:  Well, it's for your benefit too.  I don't

3    want you making arguments that you as an attorney know are not

4    supported by where we are in this case.

5          MR. WALFISH:  Right.  Your Honor, I appreciate the

6    Court's point.  I would not do that.  The legal standards

7    require that the Court make a comparison between what could or

8    would have been awarded after trial and what's actually being

9    proposed here in light of, to some extent, the evidence.

10         Of course the Court is not required to conduct a full

11   trial on the merits.  That would obviously defeat the purpose

12   of this type of procedure.  But I believe that the precedents

13   do call upon the Court of course to familiarize itself, as the

14   Court has done, with the issues in the case.

15         And I don't think that one can look at these

16   disclosures that have been released recently, as well as some

17   other things.  I don't think that one can look at these

18   communications that were made to plan participants submitted by

19   both sides in the case and not conclude anything other than

20   they contained a very serious misrepresentation.  I am not

21   asking the Court to make that finding.  I apologize if anything

22   I said suggested otherwise.

23         I want to say something on Mr. Schwartz's point that

24   mathematically if you add up the approximately 100 individuals

25   who have objected here -- and that includes the 68 that I

1    represent and another approximately 28 -- mathematically,

2    that's still a tiny percentage of the class members.

3           By the way, let me just say that class counsel claims

4    ad nauseam in their final approval papers that many of these

5    same objectors couldn't find a lawyer for this case or decided

6    not to bring it.  That's just not at all true, and we tried to

7    address that in our letter last week.

8           I think the Court appreciates that having almost 100

9    individual objectors is an extraordinarily large number for

10   almost any genre of class action settlement.  And this actually

11   represents a huge percentage of the people disproportionately

12   impacted by the defendants' misconduct.

13          In this union, you're accrued pension benefits for a

14   function of how active or successful a musician you were in

15   your working years.  Those benefits are based on contributions,

16   and the contributions, in turn, are based on the amount of work

17   actually performed, live performances, recording sessions, etc.

18          Now, having presumptively ruined this fund, the

19   trustees now are looking to cut benefits under the MPRA

20   legislation.  And there are only a few hundred families, only a

21   few families, out of the 51,000 participants in this fund who

22   would bear the overwhelming brunt of the cuts the trustees are

23   proposing and may again propose.

24          So actually a sizable, a very plurality of the

25   families who are most at risk are objectors here.  I know that

1   the Court -- these are, generally, by the way, musicians who

2   both are, one, in or approaching retirement age; and two, were

3   full-time, successful musicians in their working years as

4   opposed to part-timers, etc. who are generally not at much risk

5   here and also have other employment and other sources of

6   retirement income.

7         The Court of course certified this for settlement

8   purposes as a mandatory class action.  But all class members

9   are absolutely not similarly situated in the usual sense.

10        So the legal precedents that talk about low

11  percentages and Mr. Schwartz using the 0.1 percent number --

12  those precedents don't apply here, and that percentage is

13  illusory.  If anything, I think the large number is what should

14  give the Court pause.  Hopefully I haven't belabored that point

15  too much.

16        If it's okay with the Court, I do want to say some

17  things about the neutral that's being proposed here.  I've

18  tried to explain why I think it's a fatal defect that the

19  neutral has no role in participant communication.

20        THE COURT:  Has no role in participant communication.

21  I'm sorry.  Please don't let your voice trail off.

22        Go ahead.

23        MR. WALFISH:  Class counsel has represented along the

24  way that the fund has somehow turned over a new leaf because

25  there's been some kind of changing of the guard in terms of who

1    is serving as regular outside counsel to the fund.

2           That doesn't work.  The law firms that serve as

3    regular outside counsel to this plan are conflicted because

4    they also represent the trustees in this breach of fiduciary

5    duty lawsuit.  We tried to explain in our objection and in last

6    week's letter why the conflicts are so problematic and there is

7    no authority for them.

8           But the point is that there is no one, other than sort

9    of these incumbents and their conflicted counsel and the

10   actuaries of hide-the-ball notoriety, who is going to have any

11   role going forward and no role now in participant

12   communications.

13          And that's fundamentally unfair and inadequate, given

14   both the allegations and what I would contend as the strength

15   of the evidence here.  I won't use the word "shown."

16          More generally, it's unclear what the whole point of

17   install this figure, the NIF, the neutral independent

18   fiduciary, what the whole point of installing this figure is if

19   he can't vote.  With this fund, all decisions are made by vote

20   and only be vote of the trustees.

21          so this NIF is akin to a U.S. representative from the

22   District of Columbia.  He can offer his 2 cents, but that's

23   about the extent of his power.  No one has explained why the

24   NIF has not been given a vote.

25          The Taft-Hartley legislation expressly contemplates

1    neutrals with voting power.  class counsel's expert has written

2    that a NIF needs to be empowered with genuine authority and

3    should be given a role in participant communications.  Other

4    settlements have this.  The defense, meanwhile, has made

5    various statements to the effect that all the governance relief

6    here is window dressing.

7         We have zero reservations about Andrew Irving's

8    qualifications, capabilities, or good intentions and no reason

9    to question his integrity.  But his role is constituted in such

10   a way that he has no actual power.

11        Contrary to class counsel's characterization, we never

12   asked for receivership or anything close.  We just asked that

13   the NIF have the decision-making power that Congress

14   contemplated and that share roles could be assigned.

15        Class counsel argues well, that the NIF will still be

16   a watchdog.  That doesn't withstand scrutiny either.  The true

17   mechanism for ERISA fiduciaries to police one another is not,

18   as they say in their papers, ERISA Section 405.  It's 29 U.S.

19   Code, Section 1132(a) it's which gives any ERISA fiduciary duty

20   the ability to go into court and bring an action against other

21   breaching fiduciaries.

22        Here, the neutral, the NIF, has no budget and no

23   ability to do that, unlike the other trustees who of course

24   control the purse.  Ridiculous as this may sound, it would be

25   much easier for him to sue them than the other way around.  So

1    the idea that he would be a watchdog doesn't hold water.

2         THE COURT:  Counsel, why isn't the value of the

3    independent fiduciary someone who, as the discussions were

4    going along and this board was going down a route of, in his

5    view, putting the fund in investments that pose undue risk,

6    that his role is to say, guys, that's way too risky for a

7    Taft-Hartley plan.

8         That is, you're not dealing here or I have seen not a

9    shred of evidence that these trustees were not endeavoring to

10   operate in the best interests of the beneficiaries.  There is

11   no evidence of self-dealing, none.

12        MR. WALFISH:  Deception towards that end but no

13   self-dealing.  I agree with your Honor.  Yes.

14        THE COURT:  That being the case, if there is no

15   self-dealing, someone who says, guys, you're like a toad in

16   water when it's slowly getting hotter and you're not jumping

17   out.  It's time to jump out.  This level of risk for a

18   Taft-Hartley plan makes no sense.

19        Why do you view that as worthless, again, given a

20   board that there is not a shred of evidence was not trying to

21   do the right thing for its beneficiaries.

22        MR. WALFISH:  Yes, your Honor.  Just to be clear, I

23   don't see that as worthless, but it's certainly not enough.  In

24   the toad in hot water situation, the other trustees could

25   simply ignore him.

```
 1              THE COURT:  Of course.  That's always a possibility.
 2     It's also a possibility that he would be outvoted if he had a
 3     vote.  The question is, given the record in this case, which,
 4     again, is not a board that's engaged in self-dealing -- it's a
 5     board that's engaged in trying to do the right thing for its
 6     beneficiaries, that is, that throwing a flag -- in my
 7     experience, that's exactly what will sort of stop people who
 8     have gotten sort of caught up in irrational exuberance is
 9     someone throwing cold water into the pot and saying, guys,
10     let's be real here.  And that's Mr. Irving's role.
11              MR. WALFISH:  Yes, your Honor, but with no ability to
12     ensure that his views are documented, a topic I'll get to in a
13     second.  That may be his role, but that's insufficient because
14     it could just be the tree that fell in the forest and no one
15     knew that he gave that advice.
16              Class counsel's point here is that the existence of
17     the NIF is quote a "litigation trap" that creates a documentary
18     record that will either deter the trustees from breaching
19     conduct or subject them to liability.  That doesn't work
20     because of the board minutes issue that we identified in our
21     letter last week.  That I can get into.
22              THE COURT:  I understand your point on that.  I'm
23     going to give you about five more minutes.
24              MR. WALFISH:  Okay.  Again, your Honor, I just have
25     already said this.  But the participant communications -- this
```

 1   NIF was excluded from those discussions.  He's not in the room

 2   when they decide how to communicate with their membership.

 3          I think I have two more points, your Honor.  And I

 4   really appreciate the Court's patience.

 5          THE COURT:  Okay.

 6          MR. WALFISH:  First, the class should not have to pay

 7   for the NIF.  In other cases that we know of where a NIF was to

 8   be installed, it was the plan's lawyers, the employers, that

 9   paid for the NIF, not the class members' retirement money.

10          I can tell you, having looked at the transcript of the

11   conference that Judge Gregory Woods held to consider

12   preliminary approval in the *Bhatia v. McKinsey* case,

13   Judge Woods was extremely focused on ensuring that the money

14   that McKinsey was paying for the NIF here was separate and

15   apart from the cash settlement payment that McKinsey was making

16   into the plan.

17          The judge clearly did not want that money raided or

18   eroded to pay for the NIF, and the same is true here.  The more

19   money the plan spends on the NIF, the less goes out to class

20   members.  Admittedly, it's a drop in the overall bucket, but

21   it's just an issue of fairness.

22          By the way, there's an irony here for whatever it's

23   worth because the defense said in opposing the fee request for

24   Mr. Schwartz that the NIF provisions have zero monetary value

25   for the class.  If that's the case, why are they submitting

1    plan assets to pay for it.

2         THE COURT:  I'm sorry, Mr. Walfish.  Your last point

3    is entirely inconsistent with your entire argument.  So you

4    view the governance procedures as having value.  The fact that

5    there is not a dollars-and-cents value that can be attributed

6    to them doesn't mean that they don't have value.  And if they

7    have value, that's the reason why the plan pays for them.

8         MR. WALFISH:  Yes, your Honor.  But he's being

9    installed because of concerns surrounding the events at issue

10   in this case.  So it really should be, in fairness, the insurer

11   of the fiduciaries that pays for this, particularly in

12   circumstances where we're not remotely close to the policy

13   limits.

14        I understand the point that the Court is making.  I

15   just think that to parallel this with other case that's have

16   involved NIFs, the money really shouldn't be coming from the

17   class members' retirement money.

18        The Court has been exceptionally patient with me.  I

19   really appreciate this attention to this matter.  The only

20   other thing I'd like to do, to the extent necessary as a

21   formality, is to renew or reiterate our request for fees for

22   objectors' counsel as set forth in our letter last week.  I

23   don't know if the Court needs --

24        THE COURT:  Yes.  That letter was thin, in fact,

25   probably non-existent, on authority.  And it was not an

1    adequate fee request.  I have absolutely no backup for what

2    your fees are, nor any explanation of why funds should be used

3    to pay your fee.

4         MR. WALFISH:  Yes, your Honor.  There is a lot of

5    authority in this circuit, starting with *White v. Auerbach*, 500

6    F.2d 822 (2d Cir. 1974).  Another case is *Park v. Thomson*

7    *Corp.*, 633 F. Supp. 2d 8 (S.D.N.Y. 2009).  That one collects

8    authorities.

9         There is a lot of authority for awarding fees to

10   counsel for objectors because of the role, the important role,

11   that objectors place in policing settlements that have been

12   hashed out between class counsel and defense counsel.

13        In fact, in this particular case, I think our efforts

14   have already borne fruit in the form of a release that cannot

15   be -- was not subject to sort of dispute and litigation the way

16   the parties had originally proposed.  So I think we've already

17   added value.

18        If the Court requires backup in the form of time spent

19   on tasks and things of that nature, we'd be pleased to provide

20   it.  But there is a lot of support for awarding these to

21   objectors' counsel when they bring about improvements to the

22   settlement.

23        THE COURT:  Okay, Mr. Walfish.  I would suggest in the

24   future, if there is a lot of authority for your position, maybe

25   one or two cases should be cited in your submission.

```
 1              MR. WALFISH:  Understood, your Honor.

 2              THE COURT:  Anything further?

 3              MR. WALFISH:  No, your Honor.  Thank you.

 4              THE COURT:  Thank you.  Please mute your phone again.

 5         All right.  Ms. Bryant, I have unmuted you.

 6              MS. BRYANT:  Thank you.  And thank you for the

 7    opportunity to speak here today, which was impossible for me

 8    because I'm in Florida.  So thank you for this.

 9         I want to introduce myself a little bit, if it please

10    the Court, to tell you that I've had several music businesses.

11    I'm an arranger, orchestrator, conductor.  I've had a very busy

12    career since the early '70s.

13         As a signatory producer, I really understand how the

14    contracts work, the practices, how we work with contributions

15    to the pension plan.  To say that I hired the very most

16    wonderful and greatest musicians in the world -- they're

17    New York musicians and other musicians around the country when

18    I worked with them.

19         We all worked like crazy.  I'll just call us the

20    baby-boomer musicians because we're a real working crowd and

21    earn high pensions which are, of course, threatened right now.

22              THE COURT:  So what kind of music did you make?

23              MS. BRYANT:  As an arranger, I wrote in every style.

24    For the first 20 years of my career, I was an orchestral

25    arranger, and then electronics started to come in.  But they
```

1   were very primitive.  So we started to work them into the

2   sessions to the point where it was all electronic most of the

3   time.

4            THE COURT:  Okay.

5            MS. BRYANT:  I wrote music for television shows,

6   advertising, film, scoring -- all kinds of music.

7            THE COURT:  Okay.

8            MS. BRYANT:  I worked with all of these wonderful

9   musicians, and I know how responsibilities changed for master

10   recordings works.  No one has really brought this up I don't

11   think.  So I feel pretty good.  I thought everybody was going

12   to bring up my points and I wouldn't have anything to say.

13            THE COURT:  When that happens with lawyers, they just

14   say them anyway.

15            MS. BRYANT:  Okay.  If the lawyers can do it, then

16   maybe I can too.

17            When I first read this case and heard about it, I

18   certainly felt Mr. Snitzer and Mr. Livant had good intentions

19   and did everything on good faith.  And I thought they had a

20   point there that I agreed with but felt would be a heavy lift

21   to bring to a close in a good way.

22            Now when I look at what's been brought here is a

23   settlement in which it's being settled on the back of

24   musicians.  We are corralled into a class action without an

25   opportunity to opt out -- and I want to discuss that

1    separately -- and made to give up every right and every

2    fraction of every right that we would have, including future

3    governance over these improvements that are said to be made in

4    this financial situation.

5         And I want to go to the wording as drafted in released

6    parties and released claims.  I found it in DI 139-1, page 67.

7    They're overbroad, and they're all encompassing.

8         I think, as written, released parties and released

9    claims -- that's Section 2.21 and 2.22 of the settlement

10   agreement -- I think that they are disrespectful, cruel,

11   cynical, and without appreciation for the fact that our work

12   built the plan by and large.

13        There was maybe a generation before us, and we boomers

14   who worked so hard built this plan.  The managers didn't build

15   this plan.  Our contributions from our work built the wealth of

16   this plan.

17        As such, I'm looking at the released parties first.

18   It means, A, each defendant and the plan.  No one has explained

19   to me yet why I'm releasing the plan.  I'm expecting to release

20   the plan when the plan is the major beneficiary and I thought

21   was on the plaintiffs' side.

22        B, it goes on with a very long list, a wish list -- I

23   won't say it all -- each defendant's predecessors, successors,

24   assigned, past and present and future employers.

25        Now let me go to assigned.  When a master recording is

 1   assigned to a new entity, for example -- I don't like the word

 2   "assigned" -- that person, that company has distribution

 3   agreements to sign that benefit musicians and benefit our

 4   pensions.  Why am I releasing them.

 5          Future employers.  Employers are distributors and, in

 6   some situations, producers and clients who have a liability

 7   which is to make contributions.  They have an obligation to

 8   make contributions to our pension plan which is, you know,

 9   failing.

10          Affiliates.  That would mean the unions and the locals

11   around the country would be released as the released parties.

12   My feeling is it's really upsetting.  They also say -- one more

13   thing I want to say.

14          The defendants' spouses, dependents, beneficiaries,

15   and marital community, heirs -- there is an unsavory practice

16   in the industry among some producers and their clients of

17   adding themselves to music contracts so that they get salary

18   and they get eventually contributions to their pensions.  This

19   is wrong.

20          THE COURT:  Whoever is telling your honey that you're

21   on a conference call, you need to mute your phone.

22          MS. BRYANT:  So this has happened many times, and it

23   happened to me.  And it's one of the reasons I don't want to

24   give up and excuse everybody for everything they've ever done

25   and give a clean slate to misdeeds in the past, the present,

1   and for the future and give up any governance over these

2   improvements.  Are they really going to work for us.  We're

3   giving up everything here.

4           If you would remove the musicians, the class members,

5   from this or in large portion, there would be no settlement,

6   because the way this is drafted, would release parties and

7   release claims, is so damaging to musicians.

8           It means we don't even know what the actual and

9   potential claims are in released claims.  It has us giving up

10  statutory rights and contract rights in equity.  So we're

11  giving up so much for the drafting of this.  My feeling is

12  released parties should mean each defendant, and I don't know

13  why everybody else.  Why are spouses in there.

14          It's releasing claims for obligations.  I'm looking at

15  this and saying, okay.  We're really supposed to be talking

16  about this financial problem and the investment and the issues

17  surrounding it, but these words are so dangerous.

18          I've worked with lawyers, and I've been pro se myself.

19  I know that an experienced litigator can, you know, that kind

20  of linguistic prosody-- take any one of these words and say,

21  you gave up all of your rights.

22          I don't know why this is not seen as we're giving up

23  all of our rights.  we're also giving up statutory rights.

24  There's the LMRDA, the Labor Management Reporting and

25  Disclosure Act of 1959, 29 U.S. Code, Section 411 --

1          THE COURT:  Hang on a second.

2          Whoever has got the walkie-talkie, shut it off.  Thank

3    you.

4          Go ahead.

5          MS. BRYANT:  The LMRDA it's called gives union members

6    the right to sue in the district court; protection of the right

7    to sue; retention of existing rights; and the right to copies

8    of collective bargaining agreements, which includes recording

9    agreements which are merged with the collective bargaining

10   agreements.

11         How is this compatible with the language in released

12   claims.  Yes.  Giving up statutory rights.

13         THE COURT:  I'm sorry, Ms. Bryant.  Let me just

14   interrupt you for a second.

15         Released claims deal with claims that are asserted in

16   the complaint.  So the only thing that's encompassed within

17   released claims are these fiduciary claims under ERISA that

18   were raised against the trustees.  Your recording contract --

19   none of that's part of this case.

20         MS. BRYANT:  The LMRDA rights are preserved?  Do I

21   have a right to go into the district court and sue the plan?

22   Do I have a right to do that?

23         THE COURT:  Based on what?

24         MS. BRYANT:  I'll give you my own story.  My

25   hundred-thousand-dollar-plus pension is $17,000 having to do

 1   with people replacing me on my contracts.  That's a serious

 2   matter that I have.

 3           Instead of more than a six-figure pension, my pension

 4   has been raided.  I have every right to go in and sue these

 5   people and get these contracts and go right to the people who

 6   have done that to me.  And it may have happened to other

 7   people.  I hope not.

 8           THE COURT:  Okay.

 9           MS. BRYANT:  That's why these LMRDA rights need to be

10   preserved, your Honor.

11           THE COURT:  I'm going to ask you to wrap up in the

12   next couple of minutes.

13           MS. BRYANT:  They need to be preserved.  That's my

14   main thing.  I don't know why we should release everybody.  It

15   seems like a wish list that makes a clean slate for everyone

16   else, including the unions, who say that they've lost all my

17   contracts.

18           THE COURT:  Okay.

19           MS. BRYANT:  Now, we have constitutional rights, and

20   we have also rights under ERISA, 502.83.  I want to opt out.

21   The notice that they've told us, the notice to the members of

22   the proposed settlement, says at paragraph 14 that we have no

23   right to opt-out because you certified that this is a class

24   action under 23(b)(1).  But in 23(c), we do have rights that

25   deal with 23(b)(1) actions:  "The Court will exclude from the

1    class any member who requests exclusion."

2                THE COURT:  This is not an opt-out class.

3                MS. BRYANT:  Does 23(c) not govern?

4                THE COURT:  No.

5                MS. BRYANT:  You're a judge.  So I'll just appeal.

6                THE COURT:  Okay.  I'll give you one more minute,

7    Ms. Bryant.

8                MS. BRYANT:  Okay.  My last minute is I'd like to be

9    excluded from this class action. I was not told I was going to

10   be a part of it as drafted.  I oppose the writing and the

11   drafting of the release claims and the released parties.

12               THE COURT:  Thank you very much.

13               MS. BRYANT:  And I intend to go forward with my own

14   issues and be able to do that.  Thank you.

15               THE COURT:  You'll be able to do that if the claims

16   are not released under the release that's been provided and

17   that's available to you.  I'm not ruling on that right now.

18   The only thing I'm ruling on is whether I'm going to approve

19   the settlement.  So thank you for your time.  I'm going to mute

20   you as well.

21               Mr. Stoner, you are next.  Let me unmute you.

22               Mr. Stoner, again, you've got five minutes.

23   Mr. Stoner, my constant letter writer, you're not here?

24   Mr. Stoner?

25               MR. STONER:  I'm here.

1          THE COURT:  You're here.  Okay.  All right.

2     Mr. Stoner, you've got the floor.

3          MR. STONER:  May it please the Court.  Defendant

4     trustees have violated ERISA by issuing materially false and

5     misleading statements in their communications with plan

6     participants.

7          Yet the proposed settlement fails to contain adequate

8     measures to prevent future deception and dishonesty.  Thus, the

9     settlement is unfair, unreasonable, and inadequate.

10         I note that Mr. Rumeld agrees with me on the need for

11    truthful plan communications.  In his online article in the

12    first quarter ERISA newsletter dated April 23, 2020, he writes:

13    "Plan fiduciaries should pay particular attention to developing

14    a clear record of the rationale for maintaining these

15    investments and that this rationale is clearly reflected in

16    participant communications.

17         "Plan participant communications also should be

18    reviewed to make certain that they fully inform participants of

19    the rewards and risks presented by their investment options in

20    a volitive market."

21         Mr. Rumeld, why don't you share that article with the

22    trustees?  Because it may be news to them.  In fact, according

23    to the November 2018 deposition of trustees's co-chair Raymond

24    Hair at page 44 when asked the question:  Do you believe you

25    have a fiduciary duty to speak truthfully to plan participants,

1  he answered, I don't know whether that's a fiduciary duty or

2  not.  I don't know.

3          So Mr. Hair didn't know that he had a fiduciary duty

4  to speak truthfully in November 2018, one year after the new

5  OCIO was brought in.  And clearly the ongoing practice of the

6  trustees failing to communicate honestly and openly with plan

7  participants has continued beyond 2017.

8          Thus, there must be no release for any continuing

9  claim relating to plan communications from 2010 to the present.

10  Clearly, class counsel has failed to hold the trustees

11  accountable by employing the one recourse clearly stated in

12  ERISA, the removal of plan trustees.

13          Mr. Rumeld argues that Mr. Hair cannot be removed

14  because the plan requires that the AFM president must be the

15  union side co-chair.  That is false because the plan must

16  conform to ERISA requirements first as a matter of law.  And

17  therefore, the plan must be modified through plan reformation

18  as I've previously stated.

19          Class counsel also likes to say that his firm was the

20  only one willing to take this case because there were so many

21  risks involved.  However, according to *Goldberger v. Integrated*

22  *Resources*, a landmark 1991 Second Circuit case, the principal

23  analytical flaw in counsel's argument lies in the assumption

24  that there is a substantial contingency risk in every common

25  fund case.

1          At least one empirical study has concluded that there

2    appears to be no appreciable risk of non-recovering securities

3    class actions because virtually all cases are settled.  Even

4    when there is some contingency risk, recovery remains virtually

5    certain.  Thus, Mr. Schwartz's fees are too high for what he

6    accomplished.

7          The Supreme Court in *Harris Trust & Savings Bank v.*

8    *Salomon Smith Barney* has held that ERISA allows claims against

9    non-fiduciaries who knowingly participate in prohibited

10   transactions.

11         The proposed settlement therefor lacks any equitable

12   redress for any non-fiduciaries in prudent contact and leaves

13   all the current service providers in place.  Thus the proposed

14   settlement is unfair, inadequate, and unreasonable.

15         The problem here is that class counsel has put his

16   self-interests above the interests of his client, the class

17   members.  Similarly, defendants' attorneys have also put their

18   self-interest above their fiduciary duty as plan counsel.  As

19   such, they are hopelessly conflicted and should be removed from

20   this case.

21         I hereby ask the Court to hold a separate hearing on

22   the issue of conflicts to determine if plan counsel and any

23   service providers are required to be replaced.

24         Of course the Court itself has a self-interest in this

25   case.  According to the article Reviving Judicial Gatekeeping

1   of Aggregation in the George Washington Law Review,

2   February 2011, no matter how virtuous the judge, the fact

3   remains that courts are overworked, they have limited access to

4   quality information, and they have an overwhelming incentive to

5   clear their docket.

6        Thus, the Court also has a choice between its own

7   self-interest and its fiduciary duties to class members.  Will

8   the Court reject a settlement that's unfair, inadequate, and

9   unreasonable as required under ERISA?  Or will the Court choose

10  its own self-interest, like the other lawyers here, and issue a

11  pro forma approval.

12       The failure of this Court to reject the settlement

13  will be an abuse of discretion, as well as an arbitrary and

14  capricious decision.  Please reject this settlement, your

15  Honor.  Thank you.

16       THE COURT:  Thank you, Mr. Stoner.

17       Mr. Hosticka.

18       MR. HOSTICKA:  Thank you.  Thank you.  Can you hear

19  me, your Honor?

20       THE COURT:  I can.

21       MR. HOSTICKA:  Okay.  Great.  I thank you for this

22  opportunity very much.  Besides the free press being able to

23  participate in this judicial process, it is amazing to me.  I'm

24  grateful to you.

25       THE COURT:  Come to court any time after COVID.  Our

         1    courthouses are always open.  We love to have people come.  I

         2    hope when you get your jury summons that you will respond and

         3    not try to get off of jury service.

         4         MR. HOSTICKA:  I have many times.  It's been my duty

         5    and privilege too.  I appreciate your comments.  So I've

         6    learned a lot in this hour and a half already.  So thank you

         7    very much, your Honor.

         8         THE COURT:  You're welcome.

         9         MR. HOSTICKA:  Quite quickly, my biography is that I'm

        10    71 years old.  I've been a performing professional trumpet

        11    player since the age of 18.  I've supported myself and a family

        12    in that manner.  I've had a lot of various, various places I've

        13    performed.  Living in New York City, I'm available to a lot of

        14    different venues, let's put it that way, mostly in the

        15    classical field.

        16         I have more than a passing interest in my pension.

        17    I've been very fortunate at this age as a boomer has been

        18    mentioned.  I have the three-legged stool.  I'm not here

        19    objecting on my own behalf.  I am here concerned about my

        20    colleagues, my union, my pension fund, their pensions, and the

        21    governance of that.

        22         My request that you consider my objection is based

        23    simply on the fact that the same people who have run us into

        24    this position remain.  I understand the governance has been

        25    addressed.  I understand there's a financial settlement which

1    to me seems negligible, if not insignificant, to the losses.

2    And I would like to support that view with just three quick

3    points, if I may.

4         First of all, the remedy that I'm seeking is we have

5    competent and educated people who have a lot more ability to

6    assess their roles.  These guys just don't seem to have figured

7    this out.

8         Let's start with all these illiquid assets that they

9    pushed into, for want of their own thinking, whenever that was

10   they decided to go that route.  these are the worst investments

11   for a person like myself.

12        These are investments clearly -- I know this from past

13   experience -- for wealthy people, billionaires, hedge fund

14   guys, millionaires.  And even though these trustees might think

15   that they're billionaires because they're in charge of a

16   $2 billion fund, that's my money.  That's not theirs to risk.

17        That really -- I'll tell you this also as a fact I

18   believe -- please correct me if I'm incorrect -- that the sale

19   of these -- what are they called? Products -- is very

20   profitable to the people selling them.  That's for sure.

21   That's known.  You ask any financial advisor.  They love to

22   sell this stuff because they make a lot of money up front.

23   That's a governance.

24        Did they know what they were doing?  I have to assume

25   they were.  I'm not going to even begin to say I know anything

1   about criminality or anything.  I'm just talking about general

2   competence.  These individuals remain.

3          In the midst of this recovery since 2008, there was an

4   unprecedented bull market.  Now, I know I'm speaking like I

5   know what I'm talking about, but I'm not a lawyer.  I'm not an

6   investor.  It was a bull market for ten years.  It's still

7   going actually in spite of everything.  It's quite remarkable

8   actually.  I'm fortunate to witness it with some of my savings.

9          In the midst of this, if you look at the actuarial

10  reports, in '15 and '16 they lost money.  They lost money.  The

11  value of the fund went down.  Yes.  I could have gone to

12  Charles Schwab ten years ago and started like ten years ago and

13  made money all throughout this.

14         And these guys -- forgive me.  I'm sorry.  These

15  trustees -- they lost money for us.  They were motivated to

16  recover.  There were all kinds of justifications.  I'm sure

17  their intentions were this and that, but this is what actually

18  happened.  And they're still there.

19         They're now presenting clients to everybody to fix

20  this and go forward.  In 20 or 30 years, it's all going to work

21  out.  The fund will be fixed.  These are the folks that are now

22  going to present to us how to fix it.  I'm very, very

23  suspicious of that.

24         Now, I'm sorry to say that I agree with other people

25  that -- I have colleagues in other forms of our business, not

1    musicians.  They're in multi-employer pension plans.  None of

2    them are like this plan in this strait.  We've all been hit.

3         There are a lot of reasons for investing and not

4    investing and losing and gaining.  But I have no faith in their

5    judgments.  Forget about the governance and they have advisers

6    and this and that.  Their governance has been appalling.

7         I have no way to accuse them of criminal behavior.  I

8    have no way to do that.  I also have no illusion that I'm going

9    to turn this ocean liner around, your Honor.

10         I'm in favor of settlements.  I've been involved with

11    my union as a rank and file and trustee of my Local 802.  I

12    understand the need for settlement.  I understand the value of

13    that.

14         But I'm looking for a remedy for my fund, for my

15    future, for my colleagues.  Myself, I will survive.  I was

16    expecting a haircut.  I'm looking at more like an amputation.

17    That's my own expression.

18         I don't think anything that's going on in this case is

19    going to change any of that I don't believe.  But the

20    settlement bothers me in that the same people that have created

21    the situation are still there.

22         THE COURT:  Understood.

23         MR. HOSTICKA:  There does not seem to be a great

24    addressing of that, and this may not be the forum to do that.

25    But I do value the opportunity to speak to them through their

1    counsel and to use your court for that purpose.  For that, I

2    thank you very much.

3            THE COURT:  Thank you, Mr. Hosticka.

4            We're going to take a five-minute break.  I'm going to

5    leave the Skype link open so you can stay on.  And then I'm

6    going to come back to Mr. Schwartz to give.

7            In addition to giving you an opportunity to respond if

8    you want to, and Mr. Rumeld as well, I have specific questions

9    about some specific issues.  Five minutes.  So I'm going to

10   bring you back at 11:46.

11           (Recess)

12           THE COURT:  Okay.  Mr. Schwartz.

13           MR. SCHWARTZ:  Obviously, your Honor, there's a lot

14   that I could respond to.  But I'm perfectly happy, if

15   your Honor wants to -- you mentioned you have some questions.

16   Maybe it makes sense to address your questions first.

17           THE COURT:  Fair enough.  So one of the questions that

18   I don't think Mr. Walfish really harped on today but I noted it

19   in his papers is that the way that the settlement is set up,

20   the union trustees -- their credentials are going to be

21   disclosed four weeks before the effective date of the

22   appointment, which makes it sound like it's after the person

23   has been selected but before they actually take office.

24           Why is that the case?  Why can't the union disclose

25   the proposed trustee's credentials before they're actually

1    appointed?

2         MR. SCHWARTZ:  So that provision I will, frankly, say

3    is not the most important portion of the governance provisions.

4    That was at the end of the negotiation.  What we got on that

5    issue is what various people, including some of the objectors,

6    had asked for during I believe it was the 2019 convention.  We

7    put that into my declaration on preliminary approval.

8         What it does is to the extent that someone picks

9    someone who is just outrageously defective as a trustee,

10   interested people can raise their objections and do what I'll

11   call a PR campaign to see whether it could change the trustees'

12   view as to whether they should be appointed or not.

13        As I said before, we prioritized what our asks were

14   for the negotiation, the governance provision.  And we also

15   didn't get everything we asked for when we started, which is

16   obvious.

17        What we were not candidly going to be able to get in

18   this negotiation was, for example, us as class counsel to have

19   the ability to say, we're going to appoint this person or that

20   person.

21        THE COURT:  I realize that that question was really

22   better directed to Mr. Rumeld, and I'll come to him in a

23   second.

24        For you, I'm not going to go through chapter and verse

25   of your fee application.

1          Isn't your office in Haverford, Pennsylvania?

2          MR. SCHWARTZ:  Yes.  We have a Haverford,

3   Pennsylvania, office and a Wilmington, Delaware, office.

4          THE COURT:  Both of them are a train ride to New York.

5   I don't understand.  Like for every court appearance you've got

6   massive expenses.  It's a train ride.

7          MR. SCHWARTZ:  Right.  Your Honor, first of all, in

8   order to avoid situations which have happened in the past for

9   court appearances, we have to stay the night before.

10          I understand that Amtrak seems like it should be solid

11   enough so you can just hop on a train and get there, but that's

12   not always been true in my general experience.

13          The one deposition when I tried to do it, I got there

14   15 minutes late.  Even there I probably should have gotten

15   there 45 minutes or an hour early.  It's just not reliable

16   enough for us not to stay over.

17          The costs of the Amtrak, while I did take -- I can

18   tell you I took Keystone trains and Northeast Regional trains

19   when I could.  So I tried to avoid the Acela expresses, which

20   are much more expensive, every single time we could.

21          But there are some times, in order to get there at the

22   right time to get out of the city, you have to take the Acela.

23   Most of the trips I know for sure were not Acelas because I

24   know what I did.

25          THE COURT:  Also in your hours, you have two

1    categories that sort of caught my attention.  One was court

2    hearings and conferences which weighed in at a whopping 244

3    hours, and I am confident I have not seen you for anywhere

4    close to 244 hours.

5          And lastly was your fact analysis, which in that

6    category does not include depositions, discovery requests, or

7    experts, was close to 5,000 hours.

8          Do you want to address either of those?

9          MR. SCHWARTZ:  Yes.  With respect to our category

10   number 2 for court appearances, that also includes all of the

11   pretrial stipulations.

12         So we're talking about confidentiality, ESI.  We're

13   talking about the reports, preparation for the meetings.  We're

14   talking about the bimonthly discovery report that we had for

15   your Honor.

16         So it is not just like the time in court or the travel

17   time to get to court.  It encompasses a bunch of other things,

18   and those things just take time.

19         THE COURT:  Mr. Rumeld, I'm going to address my other

20   two questions then to you because I realize that's really what

21   could be negotiated with you.

22         So the same question that I asked Mr. Schwartz.  Why

23   not disclose the credentials of the people that the union is

24   considering naming to the board before they're actually

25   appointed as opposed to after they're appointed but before they

1    take office?

2         Second, if you can help me understand what is the

3    thought process behind having an independent fiduciary trustee

4    but not giving them a vote.

5         MR. RUMELD:  Well, I'm going to try and respond while

6    also recognizing that I'm a little constrained in trying to

7    unpeel/unpack what the reasons were, particularly since they

8    are really the product of a lot of internal attorney-client

9    privileged discussions with my trustees about what they would

10   be prepared to agree to or not.  But I think there are certain

11   objective statements that can be made here.

12        One is, consistent with really the practice of all

13   Taft-Hartley funds that I think I'm familiar with, it is

14   normally the prerogative of the union leadership to designate

15   their trustees.

16        If we tried this case and we had a bad day, your Honor

17   would make whatever rulings your Honor made.  But in the form

18   of a settlement, I think it's fair to say that the union

19   leadership's prerogative was really an issue for us.

20        I will also point out, because I think it's

21   relevant -- and we made some points about this in our papers,

22   and so did Mr. Schwartz -- that this is a little bit of an

23   unusual class action in the sense that this is not a class of

24   random people.

25        This is a class of union members who have their own

1    democratic process, pursuant to which, if they want changes to

2    be made in the union leadership or the union leadership's role

3    in this fund, they have an opportunity to do so pursuant to

4    that process.

5         THE COURT:  I understand that.  That point I fully

6    understand.

7         MR. RUMELD:  And it's also worth noting that while

8    there are many of us on our side of the ledger who think it was

9    very unfair, pursuant to that process, one of the union

10   trustees ceased to be the leader of Local 802, and that was a

11   significant event for them.

12        I'm sorry.  What was the second question again?  I

13   lost my train of thought.

14        THE COURT:  Giving the independent fiduciary a vote.

15        MR. RUMELD:  So there too, it's a little hard to sort

16   of explain why something didn't happen.  I can tell you our

17   firm represents many Taft-Hartley funds.  There's unit voting

18   on a fund like this.

19        THE COURT:  I'm sorry.  There is what on a fund like

20   this?

21        MR. RUMELD:  Unit voting, which means all the employee

22   trustees are one vote.  All the union trustees are one vote.

23   They caucus separately when there are issues that require that.

24        If we made Mr. Irving a union-designated trustee or an

25   employer-designated trustee, as a practical matter, his vote

1    would have no more consequence than his gravitas has as an

2    independent fiduciary.

3            THE COURT:  But his vote would give him a unit.

4            MR. RUMELD:  Right.  I can't tell you that that's a

5    terrible result.  It's not the result we negotiated for.  It's

6    not the result that our clients have agreed to.  But I will

7    tell you -- and this is really responsive to I think a lot of

8    the points that Mr. Walfish was trying to make.

9            On the one hand, everybody is communicating confidence

10   in Mr. Irving's background and ability and his sincerity and

11   his desire to do the right thing.  On the other hand, none of

12   the objectors seem to be giving Mr. Irving credit for having

13   been around the block for many years with Taft-Hartley funds

14   and knowing how to get things done.

15           On this fund and on most of our funds, if there was an

16   immediate third vote to break the tie, it would actually

17   interfere with the type of deliberative process that has served

18   very well.

19           This fund almost never goes to deadlock arbitration

20   because somehow, notwithstanding the different agendas of the

21   union trustees or the employer trustees, they hash it out and

22   they come to a solution.  Sometimes sooner; sometimes later.

23   If you suddenly have the equivalent of an immediate neutral

24   arbitrator, it actually could be disserving to that process.

25           THE COURT:  Fair enough.

1      MR. RUMELD:  So while it is true that my people would

2  not have agreed to it, I actually really do feel that it would

3  have been a negative event.  We need to trust Mr. Irving to use

4  his experience, to use his good interactions with trustees that

5  he has spent many years honing to get to the result that

6  everybody will want so there won't be any deadlocks here.

7  That's the way it gets done, your Honor.

8      THE COURT:  Okay.  Understood.

9      Mr. Schwartz, I'm going to give you the last word but

10  not for very long.

11      Anything further you want to say?

12      MR. SCHWARTZ:  Sure.  I do want to echo what

13  Mr. Rumeld just said, that the idea of giving Mr. Irving what

14  I'll call the rubber vote, Taft-Hartley plans are designed

15  equal number, equal votes of employer and union side trustees.

16      I think people should be careful what they wish for.

17  That could really, in some dangerous ways, change the dynamic.

18  That is something that I don't have an answer for, whether it

19  would be good or bad.  I know enough to know that it could be

20  dangerous.  That was a consideration that we took into account

21  for this issue of giving him a third vote.

22      One problem is that once he casts one vote, say,

23  for example, for the union side, he's going to lose his

24  credibility with the other side.  And it's going to mess up

25  what I'll call the duration of what he's there to do, which is

 1    to help guide these trustees to do better.

 2           A couple of other points.  I think there is a little

 3    bit of a lack of appreciation that coming out of the 2008

 4    recession that the plan got clobbered.  It lost hundreds of

 5    millions of dollars.

 6           All the objectors agree with us that the plan-funded

 7    status and expected future solvency was in deep trouble in

 8    those early years.  And yet they're equating that with the

 9    actual money damages that were lost within the statute of

10    limitations for the case that we brought.

11           One of the points we tried to make in our papers is

12    that given the limits of insurance policy and even given the

13    limits of actual damages that our experts would testify to

14    within the statute of limitations, that was not going to change

15    the fundamental funded status problem of this plan, given where

16    it was, given where the music industry was.

17           I think Ms. Bryant said quite eloquently, because my

18    client, Mr. Snitzer, was involved with this, when he graduated

19    NYU Business School with his MBA, he was making a lot of his

20    money.  And he went to the music instead of the MBA stuff.

21           A lot of his money was being made doing the studio

22    gigs.  And now some computer geek does it and takes the jobs of

23    many, many musicians like my client, Mr. Snitzer, for example,

24    my client, Mr. Livant, and obviously a lot of the people who

25    are on the line today.

1          And those jobs disappeared in favor of maybe one or

2     two computer geeks which is great for them.  My daughter is

3     doing that right now, but it caused some fundamental problems

4     with the music industry for jobs.

5          So there is a disconnect between what the objectors

6     believe, that the plan was really looming and insolvent in

7     those very early years, then their complaint that we haven't

8     solved that problem in this lawsuit is just looking at the

9     wrong thing because that's not what our case was, and we carved

10    out any claims regarding the MPRA process.

11         But we just did not have the power, and it just wasn't

12    our case.  Maybe someone needed to bring a case back in 2010,

13    but that was not done for a variety of reasons, again,

14    including -- and I can say this because I know this --

15    including lawyers who didn't think that there was a case to be

16    brought.

17         On that point, I said it in my declaration, and I'll

18    say it again.  Lawyers, good lawyers, really good ERISA

19    lawyers, passed on this case.  When I hear people on this

20    phonecall saying there was no risk to this case, I know

21    your Honor knows better about that.  It's just not true.

22         There was a lot of risk.  We have very competent,

23    skilled counsel on the other side.  They know how to do their

24    job very well.  The *NYU* case is a perfect example where you had

25    a really good plaintiffs' firm.  They did a trial.  They had

1    some really good evidence.  They didn't like the result that

2    came out.

3          There are reasons for that.  We protected against

4    those reasons, particularly by making sure that we went all the

5    way with our experts because the experts didn't really carry

6    the water they did in the *NYU* case, and we were very cognizant

7    of that.

8          On the issue that your Honor raised about the fact

9    category over time, it was very difficult for our team, and we

10   had a five-person team that accounts for 95 percent of our

11   hours.

12         To put something in what I'll call fact category

13   versus the deposition category versus the trial category versus

14   the settlement category, we created what I'll call the

15   mediation statements which are really summary judgment

16   statements in a trial outline.

17         They all kind of blend together.  I think the simple

18   answer is that we were very efficient because it was not a case

19   where we had two, three, four class action firms where everyone

20   wants to get their hands in the til.  And I think our Lodestar

21   is actually lower than the Lodestar of defense counsel, even

22   though we were the ones doing what I'll call the original work.

23         No matter what your Honor -- if your Honor thinks that

24   the Lodestar is too high, no matter how you slice it and dice

25   it, it's still going to be a very small multiplier if you grant

1     the fee award that was requested.

2            With respect to the fees, the *Goldberger* case, all the

3     cases don't say that you get some average of every single class

4     action, even the ones that get 2 cents on the dollar, ones that

5     are weak cases, ones that weren't litigated, ones where there

6     is a 5 multiplier.

7            You look at cases that are relevant and comparable.

8     So when you look at those cases, every single recent ERISA

9     pension case -- all of those are -- I don't want to call them

10    cookie-cutter cases, but lawyers do compete for those cases.

11           I know my firm has some, and usually you can't get one

12    of those cases by yourself because lots of people want to join

13    in.  Our case had a lot more risk.  And in all of those cases,

14    the courts have approved 33 percent.

15           Sometimes lawyers get 5 for the multipliers.

16    Sometimes they get negative multipliers, but that 33 percent

17    does appear to be the market rate for ERISA cases.  And we

18    think that we did a great job, not just on the money end but

19    also on the governance end.

20           The issue that was raised -- I know Mr. Walfish raised

21    what I'll call new evidence that I don't think we've ever heard

22    before.  I'm not sure that's proper procedurally, but I'm not

23    sure any of that changes anything.

24           Again, we have sympathy for Mr. Nathan and every other

25    musician who is negatively impacted by the potential of the

1  benefit cuts but just not our case, and the money that we're

2  bringing into the plan is still a positive for that.

3        I think your Honor's reference to Mr. Irving can throw

4  a flag properly understands the dynamic of how Mr. Irving does

5  have a lot of power, despite not having what we call a vote.

6        And it puts the trustees in a very difficult position

7  if they decide to go on a course of conduct where Mr. Irving

8  has said, guys, and gals, that's way too risky.  Don't do that.

9        That creates a very, very difficult dynamic for the

10 trustee to go forward that way.  And as someone who litigates

11 these cases, that would be what I'll call litigator's gold.

12       And the ability of the litigator to use that, if

13 that's the case, would be really, really -- create a lot of

14 leverage and grease a lot of wheels in the settlement.

15       The idea that Mr. Irving needs some kind of litigation

16 slush fund -- I think that misunderstands the concept here.

17 And if Mr. Irving is on record --

18       THE COURT:  Somebody has gotten their phone unmuted.

19       Go ahead, Mr. Schwartz.

20       MR. SCHWARTZ:  The idea that Mr. Irving needs a slush

21 fund, if Mr. Irving came to me and said, the trustees are doing

22 something crazy, Steve.  I think we should bring a lawsuit,

23 that's a lot less risky than the lawsuit we just brought.

24 Mr. Irving has lots and lots of power.

25       Regarding Mr. Walfish's request --

 1          THE COURT:  Mr. Schwartz, I'm sorry to interrupt.  I'm

 2    going to give you two more minutes.  You really do not have to

 3    go through chapter and verse all of Mr. Walfish's argument.

 4          MR. SCHWARTZ:  Then with respect to Mr. Rumeld's

 5    comments, we did address the Fitzpatrick study.  But I think

 6    I've addressed that.  We can debate all the merits of the case.

 7    The reality is that we did a good job building our factual

 8    record.  Were used that as leverage.

 9          As far as the early settlement offer issue, you asked

10    the question well, what's the evidence in the record.  I put in

11    my declaration.  I really went as far as I possibly could, made

12    the offer to open up the window of transparency if you want to

13    talk about what the real offers, the bids and asks, were.

14          The reality is that this case could not have been

15    settled earlier and gotten the plan the same amount of money

16    because, for whatever reason, the insurers were not putting

17    enough money on the table for that.

18          If you need more transparency for that, I don't have

19    an objection to that.  This was the same typical negotiation

20    that you get.  I think that our JAMS mediator, Bob Meyer -- he

21    went above and beyond in this case.

22          And it wasn't due to a failure of diplomacy because

23    there's a settlement to be had, and people just didn't

24    understand it.  We had a big gap, and he had to work and work

25    and work until we got the number to where it was.  For that

1    reason, that argument we disagree with.

2          With regard to the other objections, and particularly

3    Ms. Bryant was concerned about her individual claims.  I think

4    your Honor covered that nicely.  We're not releasing individual

5    contract claims that might be the release of fiduciary duties

6    that relate to this plan.

7          For this kind of breach of fiduciary duty case where

8    it's a defined benefit plan -- it's not a defined contribution

9    plan -- the only way to do it is on a non opt-out class.  You

10   can't have different people suing over the same claims.

11         With respect to the issue of the released parties, in

12   order to get peace so that an insurer doesn't pay to settle one

13   claim and then you get a cross-claim, there needs to be peace

14   for what I'll call the related parties, the defendants who

15   settled the case.  That happens in every case, and I went

16   through the reasons why we did not sue those other people, and

17   we delineated them appropriately.

18         Those are my comments.  I'm certainly happy to answer

19   any other questions that may be out there.  The bottom line for

20   us is that having been through this rodeo many times and having

21   defended judgments on appeal that I've had and basically taking

22   settlement positions, I'm not giving a single dollar away

23   because I was able to evaluate the risk, and I've been

24   successful in that.

25         Our best judgment and our expert's best judgment is we

 1    got everything there was to be had here.  It's a really good

 2    settlement.  I think that there's a little blind spot with some

 3    of the objectors that just because they think the trustees

 4    aren't doing a good job, say from 2017 to 2020, our governance

 5    provisions have not yet taken effect.

 6          I kind of feel like they're denigrating the governance

 7    provisions because even though they haven't taken effect, they

 8    didn't do something during the 2017 through 2020 period.

 9          And that obviously is something that Mr. Irving and

10    the new OCIO monitor has not had a chance yet to do.  So we

11    feel very good that these governance provisions will provide a

12    big impact and, along with the money, create a settlement that

13    is in the best interests of plan participants.

14          As I said before, this plan really needs the

15    governance and needs the money now.  It is not in a position to

16    wait the many years it will take if we went through trial and

17    appeal.

18          THE COURT:  Thank you, Mr. Schwartz.

19          One other question for Mr. Rumeld.

20          To the extent you can tell me, what was the thought in

21    terms of the term that Mr. Irving is severing?  The four or

22    five years.

23          MR. RUMELD:  Well, it was the product of extensive

24    negotiation.  On Mr. Schwartz's behalf, I think I would say

25    that we really proposed a much shorter duration and a much

1    narrower scope of work, and Mr. Schwartz very aggressively

2    bargained from that position.

3             So I don't know that there's a particular magic to the

4    period of time.  But I would say that when you think of sort of

5    the frequency with which the fund meets, the initial period of

6    time it will take until Mr. Irving is completely up to speed

7    and understands what's going on, our feeling is the four-year

8    period is plenty enough for him to assess what's going on,

9    steer the fund, if it needs any steering independent of the

10   path that it's already on; and have us sailing going forward.

11            Anything beyond that would seem more like the type of

12   situation we have with say the Teamsters or some situation

13   where trustees are accused of doing some real wrongdoing, and

14   nobody on my side would have appreciated those types of

15   implications.

16            THE COURT:  Okay.  Thank you.

17            Thank you to everybody.

18            MR. WALFISH:  Your Honor, I'm sorry.  May I be heard

19   just on a point that Mr. Rumeld made with respect to his answer

20   to your questions regarding the NIF and the voting?

21            THE COURT:  You have one minute.

22            MR. WALFISH:  Mr. Rumeld's point was that to give the

23   NIF a vote would upset this tried and true dynamic where union

24   and employers are equally represented.  As the Court knows, the

25   statute expressly contemplates voting neutrals.

1          All I would say is that the result, the result of the

2     traditional dynamic, is not great.  This fund is undeniably

3     very, very troubled and has been so for some time.  And it's in

4     a very small minority of peer funds that are in this kind of

5     trouble.  So it's not as if the system that they've been using

6     has worked so well.

7          On the be-careful-what-you-wish-for, the NIF's term is

8     time limited.  So if the NIF were given a vote and if that

9     didn't work out to everyone's satisfaction, fairly soon people

10    could revisit whether they want to preserve the NIF.  That's

11    pretty much all I wanted to say.  Thank you, your Honor.

12          THE COURT:  Thank you, Mr. Walfish.

13          I want to remind everybody to mute your phone.

14          The Court is going to approve the settlement, and I'm

15    overruling all objections.  I am sympathetic to the plan

16    beneficiaries and to the frustrations and the concerns of the

17    objectors.

18          Their defined benefit plan, which many counted on for

19    a comfortable retirement, is in trouble.  And it is likely to

20    be in a lot more trouble today than it was a year ago, not

21    because of any decisions made by the trustees, but because of

22    the devastation to the economy caused by COVID.

23          I also understand that there are members of the union

24    and plan beneficiaries who are unhappy with current leadership

25    at the union.  I also understand that those people are in the

minority.  I know they are in the minority, because if they
were in the majority, they would have voted the perceived
rascal out by now.

As everyone understands, this is a settlement.  That
means two things:  First, no one will get everything that they
want; and second, the perfect should not be the enemy of the
good.

Pursuant to Rule 23(e)(2) of the Federal Rules of
Civil Procedure, the court may approve a class action
settlement that is binding on class members after conducting a
hearing and finding that the settlement is "fair, reasonable,
and adequate."

In making that determination, the Court must consider
whether the class representatives and class counsel have
adequately represented the class and whether the settlement was
negotiated at arm's length.  That's what's known as procedural
reasonableness.

The Court must also consider the adequacy of the
relief, taking into account "the costs, risks, and delay of
trial and appeal" and the amount of attorney's fees.  That's
called substantive reasonableness.

Before turning to the adequacy of the settlement,
which is the most important factor, I'll say a quick word about
procedural fairness.  Having presided over this action since it
was first filed in 2017, which included a motion to dismiss and

1    numerous conferences, including several that took place while

2    the settlement talks were ongoing, I have no doubt that the

3    settlement agreement was reached after an arm's-length

4    negotiation.

5        Class counsel is experienced and has been competent

6    and thorough, both when litigating the motion to dismiss and

7    when conducting extensive fact and expert discovery.

8        When a settlement is the product of an arm's-length

9    negotiation between competent attorneys after meaningful

10   discovery, there is a presumption that the outcome is fair,

11   adequate and reasonable.  See Wal-Mart Stores, Inc. v. Visa.

12   U.S.A,, Inc., 396 F.3d 96 --

13       Let me remind everybody to mute your phone.

14       -- 396 F.3d 96 at page 116 (2d Cir. 2005).  There is

15   also a "strong judicial policy in favor of settlements,

16   particularly in the class action context," in part, because

17   prolonged litigation both delays and reduces the resources

18   available to redress the harms suffered by the class, same

19   case.

20       Now, turning to the adequacy of the relief, I have

21   considered all of the submissions from class members.  By my

22   count, there were about 100 individuals who objected to the

23   settlement out of a class of approximately 115,000.  That's at

24   docket 194-3.

25       Approximately half of the objections were formulaic

1   objections.  Overall, the submissions expressed three primary

2   concerns:  First, that there are inadequate restraints on the

3   trustees to prevent them from pursuing high-risk investment

4   strategies in the future; two, that the neutral independent

5   fiduciary trustee lacks sufficient influence and permanence;

6   and three, that the trustees who mismanaged the fund are

7   allowed to remain in place.  There are also some concerns about

8   the scope of the release provisions, but those were resolved

9   today in the oral argument.

10          The Court has also received letters of support which

11  were not solicited in the class notice from two individuals and

12  one entity who support approval of the settlement.  The entity

13  was the International Conference of Symphony and Opera

14  Musicians, which represents 52 orchestras, 41 of which rely on

15  the fund for their musicians' retirement benefits.

16          Those expressing support say that the trustees are not

17  responsible for the fund's problems and that the trustees

18  should be allowed to devote their full attention to solving the

19  very real challenges facing the plan.

20          The measure of a fair settlement is not only whether

21  other remedies are possible or could have been obtained if

22  plaintiffs were successful at trial.  The Court must consider

23  the strength of the plaintiffs' case and the likelihood of

24  success, taking into account the complexity, expense, and

25  likely duration of litigation, as well as the overall reaction

from the class and the ability of the defendants to withstand a

larger judgment.  See *Joel A. v. Giuliani*, 218 F.3d 132 at 138

(2d Cir. 2000).

In terms of likelihood of success for the plaintiffs

at trial, this is a risky case.  When I denied defendants'

motion to dismiss, I explained that although plaintiffs managed

largely to succeed in getting past the motion to dismiss, this

was going to be a hard road to hoe on the merits.

The reason it is a hard case to make is that this is

not a board of trustees that did nothing or that engaged in

self-dealing.  The board asked questions.  They participated.

They listened to their consultants who are not fly-by-night

operators.

They have a reasonable defense, both in terms of the

allocations decisions they made and in terms of the active

versus passive management.  Moreover, even if plaintiffs had

prevailed on showing that there was a breach of fiduciary duty,

which is by no means clear, it would have been a substantial

battle of the experts over whether and to what extent the fund

was harmed and significant uncertainty as to what type of

equitable relief would be appropriate, if any.

In short, this is a case where both parties had

litigation risk.  That fact renders many of the objectors'

objections unfounded.  The settlement reflects a reasonable

compromise, both from a money perspective a governance

1    perspective.

2          Class counsel negotiated a gross settlement amount of

3    $26,850,000. While that does not entirely cap out the

4    insurance proceeds, it is a reasonable financial settlement

5    given, as noted, the significant litigation risks associated

6    with the case.

7          Further litigation to trial and a potential appeal

8    would have been much more expensive, could have delayed the

9    fund getting any relief for years, which would have caused it

10   to lose the compounding effect of getting new dollars into the

11   fund sooner rather than later and likely would have further

12   depleted insurance proceeds available to pay any judgment. The

13   trial alone was expected to take a full month, which would have

14   generated millions more in fees and costs.

15         In terms of the amended governance procedures, the

16   addition of an independent fiduciary is meaningful, even if it

17   is not the home run that plaintiffs' counsel represents it to

18   be.

19         The ad hoc committee of objectors want to make it

20   sound as though it is totally useless because the independent

21   fiduciary does not have a vote. the Court disagrees.

22         Having a neutral, well-informed party at the table who

23   can raise alarms if he thinks the trustees are being

24   insufficiently skeptical of the fund's experts or are making

25   decisions that are unduly risky or, particularly now, unduly

1  cautious is a meaningful addition to the governance of the

2  fund.

3         This is particularly so when there is no evidence of

4  self-dealing by the board.  At best, the plaintiffs' case shows

5  a board that was leaning too far forward chasing returns in the

6  hope that they could dig the fund out of the hole that was

7  caused primarily by the 2008 recession.

8         The independent fiduciary has the ability, if

9  necessary, to splash cold water in everybody's face if he sees

10 that happening again, assuming, without deciding, that is what

11 happened during the class period.

12        Assuming, as I do, because there is no evidence that

13 this is not true, that all of the trustees had the best

14 interests of the fund at heart, having a third party present to

15 provide a reality check from time to time is a useful thing.

16        That said, while I will not impose it as a condition

17 of approving the settlement, I urge the board of trustees to

18 consider making two changes.  At a time when the plan is in

19 deep trouble, clear, trusted communications with the

20 beneficiaries of the plan is critical.

21        Whether it should have happened or not, the disclosure

22 of internal communications by the inside players has fomented

23 distrust which is not good for anyone.  Giving the independent

24 fiduciary a vote over approval of the minutes might help

25 restore trust without upsetting in any meaningful way the

1   balance between labor and management that is struck in the

2   normal governance of a Taft-Hartley benefit plan.

3          Similarly, I would urge the board to consider whether

4   an extension of the independent fiduciary's term longer than

5   the four or five years agreed to, depending on the state of the

6   plan at that time, is appropriate.

7          I would also urge the union to consider one change in

8   its obligations.  As the settlement is written, the union is

9   obligated to give notice of the identity and qualifications of

10  its newly appointed representatives to the board four weeks

11  before their appointment is effective.

12         I encourage the union to consider providing notice of

13  who it intends to appoint and their qualifications several

14  weeks before the person is actually appointed to encourage

15  members to weigh in if they believe an intended appointee is

16  insufficiently qualified to serve.

17         At the end of the day, it doesn't impinge on the

18  president's prerogative or his obligation to appoint someone

19  who is qualified.  But hearing from members might be valuable

20  from their perspective, and it may be valuable from his

21  perspective.  He may hear something that he hadn't considered.

22         In terms of the overall response from the class, the

23  100 objections represent less than .10 of 1 percent of the

24  class.  The Court of Appeals has found that a similar response

25  rate weighs in favor of approval.  See *D'Amato v. Deutsche*

1    *Bank*, 236 F.3d 78 at 86 to 87 (2d Cir. 2001) (affirming that 72

2    opt-outs and 18 written objections supported approval of

3    settlement affecting approximately 28,000 class members).

4              Taking all of the relevant factors into account, the

5    Court finds that the relief afforded to the class is within the

6    range of reasonable outcomes in this litigation.

7              Finally, we get to plaintiffs' attorney's fees.  They

8    are seeking $8.95 million in fees and $863,811.37 in costs.

9    This represents a 33 percent fee for a firm that represents the

10   class on a contingency fee basis.

11             For any class member on the phone who isn't an

12   attorney, that means that plaintiffs' counsel has worked on

13   this case devoting thousands of hours and substantial

14   out-of-pocket expenses with no payment and no guarantee of

15   payment.

16             Defendants argue that for a settlement of this size, a

17   25 percent fee is more common, particularly in ERISA cases.

18   Plaintiffs argue that their requested fee is approximately what

19   their Lodestar is.

20             And in any event, defendants do not seriously contest

21   the hours spent.  Instead, defendants argue that the hours were

22   needlessly spent pursing fruitless and unnecessary strategies.

23             They make the argument that the case could have

24   settled earlier, but I have no evidence that that was possible

25   or that it would have yielded a more favorable outcome for the

1  class.

2      As an overarching premise, counsels' fee request must

3  be reasonable.  To ensure that, the Court must first determine

4  a reasonable baseline fee using similar cases of comparable

5  complexity.

6      In very large settlement funds, a smaller percentage

7  recovery may be appropriate.  Second, adjustments can go up or

8  down based on:  "One, the time and labor expended by counsel;

9  two, the magnitude and complexities of the litigation; three,

10 the risk of the litigation; four, the quality of

11 representation; five, the requested fee in relation to the

12 settlement; and six, public policy considerations.  That's

13 *Goldberg v. Integrated Resources, Inc.*, 209 F.3d 43 at page 50

14 (2d Cir. 2000).

15     Finally, the Court performs a Lodestar crosscheck.  As

16 a starting point, an empirical study has found that in ERISA

17 cases, the average monetary recovery was $25.75 million, just

18 south of the $26.85 million recovery in this case.

19     The median and average fee award in that sample of

20 ERISA cases was 26 percent of the recovery.  That's from

21 *Theodore Eisenberg et al., Attorneys Fees in Class Actions*:

22 2009–2013, 92 N.Y.U. L. Rev. 937, 952 (2017).  That study found

23 a slight variation in fees based on the riskiness of the case.

24 High-risk cases garnered a fee award equal to 29.2 percent of

25 the recovery, while low-risk cases earned 24.5 percent.  That's

1    at page 959.

2            Defendants are correct that cases awarding a fee of

3    33 percent frequently involve a smaller settlement amount and

4    reflect above-average recoveries.  I would note that the data

5    and the study I cited was gathered about a decade ago.  The

6    average recovery has likely gone up a little since then just

7    based on inflation.

8            In terms of adjustment but using the Goldberg factors,

9    plaintiffs' counsel is entitled to a slight upward adjustment

10   for taking on a case that was quite risky and that involved a

11   very substantial commitment of time and money with no guarantee

12   of recovery.

13           The quality of representation was good, but it was in

14   line with what would to be expected in a case of this sort.

15   Thus, quality is neutral in terms of the appropriate amount of

16   attorneys' fees.

17           Discovery was voluminous involving at least half a

18   million documents, nearly 30 depositions, and six experts.

19   That can be found at docket 139, paragraphs 39 and 40.

20           While the complexity of the case warrants some upward

21   adjustment, counsel does not warrant the upward adjustment

22   requested because the nonmonetary relief in this case, while

23   valuable, was not exceptional.

24           In terms of the Lodestar crosscheck, my assessment is

25   that there were a lot of hours spent on this litigation, and

1    many were spent by partners that have high billing rates, and

2    many were unnecessary.

3        For example, the Court agrees with the defendants that

4    requests for emails that included the word "delete" was silly

5    and needlessly increased costs and fees to both sides.

6        Moreover, much of the work that seems to have been

7    done by partners, including 643 hours of document review,

8    could have easily been done by associates at a substantially

9    lower hourly rate.

10       Combining all of that, I find plaintiffs' requested

11   fee of 33 percent is excessive.  And I will reduce it to

12   29 percent or $7,786,500 which is a little above average for

13   ERISA claims and for common fund claims of this size but is

14   warranted for the reasons noted.

15       Plaintiffs' expenses are bloated.  Copy costs were

16   billed at 50 cents a page for color papers and 25 cents a page

17   for black-and-white copies and scanning.  Plaintiffs argue that

18   I should take into account that much of the copying in this

19   case involved odd-sized documents and involved making copies

20   for depositions on "quick turnaround."

21       I am confident that while some of the copying and

22   scanning involved odd-sized documents that involved more labor

23   than normal copying, I am also confident that in a case of this

24   sort, a substantial amount of the copying was routine,

25   8 1/2-by-11 copies, for which 25 or 50 cents per page is

1    nothing short of highway robbery.

2          To the extent copying was done on a "quick turnaround

3    basis," shame on counsel.  You knew when the depositions were,

4    and you knew what your hot documents were.  Being required to

5    make substantial numbers of copies for depositions on a quick

6    turnaround basis simply reflects poor planning.

7          In short, copy costs will be reduced by 40 percent

8    which brings the per-page cost to 15 cents per page for

9    black-and-white and scanning or 30 cents a page for color,

10   which is still quite generous given that normal, routine,

11   black-and-white copying should not exceed 5 cents a page.

12         Travel expenses are inflated.  Looking only at the

13   expenses associated with the court appearances, it's apparent,

14   as counsel acknowledged, that counsel came to New York the

15   night before an appearance or stayed over an extra night.

16         Counsel is free to do so.  And let me say that

17   New York certainly appreciates your taking advantage of our

18   restaurants and hotels.  But that was not necessary, and the

19   associated costs should not be borne by the class.

20         Because travel expenses associated with court

21   appearances are inflated, the Court finds it reasonable to

22   conclude the expenses associated with depositions are similarly

23   excessive.

24         In sum, without going line by line through expenses,

25   the Court is going to impose a 40 percent reduction on copy

1    costs and a 50 percent reduction of all expenses, other than

2    expert fees.

3          After all adjustments, plaintiffs' counsel shall

4    receive the following in expenses:  $652,856.38 in expert fees,

5    $31,603.80 in copying and scanning costs, and $28,744.27 in

6    travel expenses for a total of $713,204.45.

7          Finally, plaintiffs are seeking $10,000 service awards

8    for the named plaintiffs to be paid from plaintiffs' attorney's

9    fees.  There has been no objection from the class.  Therefore,

10   those awards are granted.

11         Because there has been no objection to the release of

12   the class representatives, I will also grant the request that

13   they be provided a release, although I am still at a loss to

14   know what lawsuit could be brought against them.

15         Counsel for the ad hoc committee requests $132,975 in

16   fees from class counsels' award.  That request represents 197

17   hours at $675 an hour.  Other than clarifying the language of

18   the release, counsel provided no meaningful relief for the

19   class.

20         Even if he had, he's provided no support for his

21   requested fee.  His request is wildly out of proportion to the

22   limited benefits of the clarification of the intent of the

23   parties.  Accordingly, that request is denied.

24         Any request or objections that I have not expressly

25   discussed during the course of this opinion are denied.

1          Mr. Schwartz, anything further?

2          MR. SCHWARTZ:  No, your Honor.

3          THE COURT:  Mr. Rumeld?

4          MR. RUMELD:  No, your Honor.  Thank you.

5          THE COURT:  Everybody, thank you very much.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25